**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| W. MATHIS,<br>  101 41st Street, N.E.<br>  Washington, D.C. 20019<br><br>K. DAVIS,<br>  FCI Loretto<br>  772 Saint Joseph St.<br>  Loretto, PA 15940<br><br>        Plaintiffs,<br>        *Individually and on behalf of*<br>        *all others similarly situated,*<br><br>   v.<br><br>UNITED STATES PAROLE COMMISSION,<br>  90 K Street NE, 3rd Floor<br>  Washington, DC 20530<br><br>PATRICIA K. CUSHWA, *in her official*<br>*capacity as Acting Chairman of the United*<br>*States Parole Commission*<br>  90 K Street NE, 3rd Floor<br>  Washington, DC 20530<br><br>COURT SERVICES AND OFFENDER<br>SUPERVISION AGENCY, and<br>  633 Indiana Avenue, NW<br>  Washington, DC 20004<br><br>RICHARD S. TISCHNER*, in his official*<br>*capacity as Director of the Court Services and*<br>*Offender Supervision Agency*<br>  633 Indiana Avenue, NW<br>  Washington, DC 20004<br><br>        Defendants. | Case No. 1:24-cv-01312 |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Violation of the Rehabilitation Act—Failure to Accommodate Supervisees' Disabilities)

## PRELIMINARY STATEMENT

This case, brought by a class of people who are or will be on parole or supervised release in Washington, D.C., challenges the failure of the federal government's post-conviction supervision system to accommodate individuals with disabilities as required by federal law.

For many, a criminal sentence does not end after leaving custody. Instead, it extends for years—and sometimes a lifetime—in the form of either "parole" or "supervised release." People subject to these forms of supervision are required to comply with myriad and onerous conditions even after they have returned to their communities. In D.C., failing to follow the most technical conditions can easily land one back in jail or prison—even if no new criminal conduct is alleged. In 2021 and 2022, at least 10% of all alleged supervision violation reports in D.C. were based *solely* on technical violations of release conditions, meaning non-criminal conduct like missing appointments with supervision officers.[1]

People with disabilities, who are over-represented among the supervision population, are set up to fail in the federal government's supervision system for residents of the District. To meaningfully participate in their supervision, many people with disabilities require reasonable accommodations. For instance, people with disabilities may be unable to fully comprehend the dozens of complex requirements of supervision or to physically move throughout the city to attend the numerous appointments, meetings, and programs that supervision requires. Absent reasonable accommodations, it is exceedingly difficult for many people with disabilities to comply with their supervision requirements. People with disabilities thus face a heightened risk of sanctions—

---

[1] CSOSA Congressional Budget Justification Fiscal Year 2024 (Mar. 9, 2023)) ("CSOSA Budget Justification") at 31, https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2023/03/CSP-FY2024-Congressional-Budget-Justification-03092023.pdf.

including the imposition of additional and more onerous conditions, the extension of their term of supervision, and even incarceration. Among all individuals on supervision in D.C., 10% faced violation proceedings for exclusively technical violations in 2021 or 2022; among individuals whom the supervision agency classified as having a mental disability, the proportion was almost twice as high (18%).[2] Those with disabilities are thus denied the same opportunity as others to meet their supervision conditions, and thereby successfully complete supervision. The inability to meaningfully access their supervision, combined with the ever-looming threat of arrest, sanctions, and further imprisonment, leads to severe stress and needless incarceration.

Because of its systematic failure to accommodate individuals with disabilities, the government's supervision system in D.C. violates Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"). The Rehabilitation Act requires the government to affirmatively provide reasonable accommodations to ensure that people with disabilities have meaningful access to the benefits of the supervision system—foremost among them, the opportunity to be released from supervision upon successfully completing the supervision term. The Rehabilitation Act prohibits the government from administering supervision in a manner that has the effect of discriminating on the basis of disability, or of substantially impairing the purpose of supervision: helping people reintegrate into their communities. The United States Parole Commission ("Commission") and the Court Services and Offender Supervision Agency ("CSOSA")—the two federal agencies that dictate the conditions of supervision and the consequences of non-compliance for D.C. residents— flout this mandate because they systematically fail to assess people's accommodation needs and to provide reasonable accommodations. The result is discrimination on the basis of disability at

---

[2] CSOSA response to Freedom of Information Act request (June 23, 2023) ("CSOSA 6/23/23 FOIA Response") at 6.

each stage of supervision: when setting conditions of supervision, when enforcing the conditions of supervision, when re-incarcerating people for failing to comply with these conditions, and again when releasing people to the very same conditions that, absent accommodation for their disability, they could not follow to begin with. The problem is not that supervision conditions are imposed at all, but that Defendants are imposing conditions on people with disabilities without a system for reasonable accommodations, depriving them of an equal opportunity to succeed on supervision. This violates federal law.

Plaintiffs' experiences on supervision illustrate these systematic violations. Plaintiff W. Mathis is a 70-year-old Black military veteran with congestive heart failure who has been on parole for 18 years. His heart condition makes it difficult for him to travel throughout the city to his multiple supervision appointments each week. His heart condition has also led to numerous hospitalizations and medical appointments at the Veterans Affairs ("VA") hospital, and Mr. Mathis has been punished—and even incarcerated—for missing supervision appointments on dates when he received medical treatment at the hospital. Despite maintaining consistent contact with his Community Supervision Officer ("CSO"), Mr. Mathis was recently incarcerated for nine days for technical violations of his supervision. During his incarceration, he missed a medical procedure to treat his congestive heart failure, even though Defendants were aware of the appointment.

Plaintiff K. Davis is a middle-aged Black man who lives with chronic pain and mobility limitations stemming from third-degree burns, as well as anxiety, depression, and posttraumatic stress disorder ("PTSD"). His disabilities make it difficult for him to get to required meetings and otherwise navigate his onerous parole requirements, which include multiple weekly appointments and drug tests. Defendants are aware of Mr. Davis's disabilities, but nonetheless submitted an Alleged Violation Report ("AVR") for his arrest after he did not contact his CSO for a period of

less than two weeks, despite the fact that he made it to every single drug testing appointment and tested negative every time. Then, despite knowing about Mr. Davis's disabilities and his concerted efforts to comply with supervision, the Commission imposed a 12-month prison sentence. During his incarceration at a Bureau of Prisons facility in Pennsylvania for these technical parole violations, Mr. Davis missed a crucial surgery for his burns that had been scheduled with his doctor at Washington Hospital Center in D.C.

To comply with federal law, Defendants—the Commission, CSOSA, and the heads of these agencies—must implement a system to affirmatively assess people's accommodation needs and provide the reasonable accommodations Plaintiffs and the proposed class need to have an equal opportunity to succeed on supervision.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, because it presents a federal question under the Rehabilitation Act of 1973, 29 U.S.C. § 794.

2.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because the Commission, CSOSA, and the heads of these agencies are located in this judicial district and Plaintiffs' claims for relief arose in this district.

## PARTIES

3.      Plaintiff W. Mathis is a 70-year-old Black military veteran with congestive heart failure who has been on parole in Washington, D.C. for 18 years.

4.      Plaintiff K. Davis is a middle-aged Black man on lifetime parole in Washington, D.C., who lives with chronic pain and mobility limitations stemming from third-degree burns, as well as anxiety, depression, and PTSD. He is currently serving a 12-month sentence for technical violations of parole related to his disability. Upon release, he will return to parole supervision.

5.     Defendant United States Parole Commission is the federal agency responsible for the administration of parole and supervised release in Washington, D.C., including setting the general supervision conditions, as well as decisions regarding the continuation, revocation, or termination of parole and supervised release.

6.     Defendant Patricia K. Cushwa is sued in her official capacity as Acting Chairman of the United States Parole Commission. In this capacity, Defendant Cushwa oversees the operations of the Commission.

7.     Defendant Court Services and Offender Supervision Agency for the District of Columbia is a federal executive agency that, among other responsibilities, oversees the implementation of conditions of release that are imposed by the Commission for those on parole and supervised release in Washington, D.C. This oversight function includes adding specificity to the Commission's set conditions, such as setting the location and frequency of appointments. CSOs, who work for CSOSA, conduct the day-to-day supervision of people on parole or supervised release.

8.     Defendant Richard S. Tischner is sued in his official capacity as the Director of the Court Services and Offender Supervision Agency. In this capacity, Defendant Tischner oversees the operations of CSOSA.

## BACKGROUND

### Supervision in the District of Columbia

9.     This case concerns people with disabilities who are on parole or supervised release in Washington, D.C., all of whom are supervised by two federal, not local, agencies: the Commission and CSOSA.

10.    Which of these two forms of supervision—parole or supervised release—applies depends on when the person on supervision was originally convicted.

11.     Specifically, people convicted of D.C. Code felony offenses before August 5, 2000, are eligible to seek release into the community under parole supervision upon completion of the period of imprisonment set by their sentence. Whether an individual is released to parole is a discretionary decision made by the Commission.

12.     Parole was abolished in D.C. for sentences imposed on or after August 5, 2000, and was replaced by a different system of community supervision: supervised release. People convicted of felony offenses on or after August 5, 2000, are eligible for supervised release.

13.     As to both groups of people (herein referred to collectively as "people on supervision"), the two agencies—the Commission and CSOSA—work in tandem to set conditions of supervision and re-incarcerate those whom they deem to be in non-compliance.

14.     The Commission is responsible for the administration of parole and supervised release in D.C. The Commission decides, for example, which general and special conditions of supervision are imposed on each individual released on parole or supervised release. The Commission issues arrest warrants when it determines that an individual has violated their conditions of release. The Commission holds hearings at the D.C. Jail in which it decides whether to revoke an individual's parole or supervised release and impose a term of incarceration, and if so, whether to impose additional supervision upon release. *See* 28 C.F.R. §§ 2.103, 2.216.

15.     CSOSA, on the other hand, handles day-to-day supervision, under terms set by the Commission. CSOSA has broad authority to determine and oversee the details of supervision conditions set by the Commission in each case, including, for example, the frequency with which a person must meet with their supervision officer, whether and how often they must submit to drug testing, and whether they are required to complete treatment or other programs. CSOSA's CSOs also make the initial determination of whether an individual has violated their conditions of release.

CSOs respond to someone's non-compliance by applying "graduated sanctions"—increasing the number and frequency of supervision requirements—or by requesting, in the form of an AVR, that the Commission issue an arrest warrant and begin the process of revoking the individual's supervision.[3]

16.     This means that, where a CSO and a Commission examiner determine that an individual has not complied with the conditions of supervision, the two agencies work together to revoke the individual's supervision and re-incarcerate them.

17.     Unlike typical criminal proceedings, these prison terms are not always the result of criminal conduct. Instead, they are frequently the result of administrative violations of conditions of release—known as "technical violations."[4]

18.     Technical violations occur where someone fails to comply with a condition of supervision, such as missing an appointment with a supervision officer, being unable to get a job, missing a drug test, associating with someone with a felony conviction, or failing to attend a required program. They are considered "technical" because they are not violations of criminal law, but rather of the administrative terms of supervision.

19.     When someone's supervision is revoked, even as a result of technical violations, lengthy periods of incarceration can ensue. For example, Mr. Davis was sentenced to 12 months of incarceration for technical violations.

---

[3] *E.g.*, CSOSA Operations Manual (2018), ch. VII, pp. 15-19.
[4] CSOSA Budget Justification at 35, *supra* n.1 (non-compliance with conditions of release "can lead to loss of liberty, or revocation, for 'technical' violations").

**Defendants Set People with Disabilities Up To Fail Through Their Pattern and Practice of Not Providing Reasonable Accommodations for Supervisees' Disabilities**

20.     People with disabilities are overrepresented at all points in the criminal legal system, including in supervised release and parole.[5]

21.     By one measure, 23% of people on supervision nationally have a disability.[6]

22.     Defendants are aware that high numbers of people under their supervision have disabilities. According to CSOSA's own calculation, of nearly 3,000 people in D.C. on active parole or supervised release between June 1, 2022, and May 31, 2023, 484—or over 17%—had a mental disability.[7] In 2022, of the 4,000 people who were released to any form of supervision in D.C. (including probation, parole, and supervised release), nearly 25% "reported mental health issues at intake."[8]

23.     Further, CSOSA has reported that physical health conditions are "common" among the supervised population.[9]

24.     Additionally, people on lengthy terms of supervision are likely to experience increased physical disabilities as they age[10]—a process that medical practitioners agree is

---

[5] *See generally* Becky Crowe & Christine Drew, *Orange is the new asylum: incarceration of individuals with disabilities*, 14 BEHAV. ANAL. PRACT. 387 (2021).

[6] Emily Widra & Alexi Jones, *Mortality, health and poverty: the unmet needs of people on probation and parole*, Prison Policy Initiative (Apr. 3, 2023)), https://www.prisonpolicy.org/blog/2023/04/03/nsduh_probation_parole/ (citing National Survey on Drug Use and Health, 2019).

[7] CSOSA 6/23/23 FOIA Response at 6.

[8] CSOSA 2024 Budget Request Summary (Mar. 9, 2023) at 18, https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2023/03/CSOSA-FY2024-CBJ-Summary-Statement-FAQs-03092023.pdf.

[9] CSOSA, Strategic Plan FY2022-2026 at 14, https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2022/05/CSOSA-Strategic-Plan-FY2022-2026.pdf ("CSOSA 2022-2026 Strategic Plan").

[10] Todd Manini, *Development of physical disability in older adults*, 4 CURR. AGING SCI. 184 (Dec. 2011).

accelerated for those, like Plaintiffs, who have been incarcerated.[11] This is particularly concerning for those on parole, as many are on lifetime supervision and CSOSA estimates that the average person on parole is "expected to remain under supervision" for up to twenty-two years.[12]

25.    People with disabilities face heightened barriers to succeeding on supervision than their counterparts without disabilities.

26.    For example, people with physical disabilities face barriers to physically accessing locations to which they are required to report as a condition of supervision. For people with disabilities that make walking difficult or impossible, navigating public transportation to get to regular mandated in-person appointments can pose extreme hardship.[13] Further, people with chronic health conditions face barriers to attending mandated supervision appointments while experiencing serious health issues, which may result in competing medical appointments or hospitalization.

27.    Unaccommodated mental, intellectual, and developmental disabilities also pose enormous obstacles to a person's ability to succeed on supervision. For someone with disabilities that hinder their cognitive functioning, understanding what supervision requires can be difficult, or even impossible, without accommodations from their supervision officer. Certain required programs can also involve content that is inaccessible to many with mental, intellectual, and

---

[11] Osborne Association, *The High Costs of Low Risk: The Crisis of America's Aging Prison Population* (May 2018) at 9 ("people who have been incarcerated very often have the physiological attributes of much older people.").

[12] CSOSA Congressional Budget Justification at 4, *supra* n.1.

[13] *See generally* Matt Alderton, *Nearly 30 years after the ADA, the nation's transit agencies report successes and shortfalls*, THE WASHINGTON POST (June 26, 2020); Ethan Stark-Miller, *Underground and Underserved: To be Blind or Deaf on the NYC Subway* (Jan. 8, 2020), https://citylimits.org/2020/01/08/underground-and-underserved-to-be-blind-or-deaf-and-ride-the-nyc-subway/; Justin M. Owens, et al., Center for Advanced Transportation Mobility, *Analysis of the Non-Driving Mobility Needs of People with Disabilities* (2020), https://ncat.edu/cobe/transportation-institute/catm/catm-finalreport_disabilitysurvey_final-1.pdf.

developmental disabilities. In addition, traveling throughout the city and keeping track of ever-shifting appointments is exceedingly difficult for these individuals. Indeed, people with mental health symptoms such as paranoia and depression can have trouble leaving their home to attend required appointments.

28.     In light of these barriers to compliance with supervision requirements, people with disabilities are more likely to be found in violation of terms of supervision.[14]

29.     Such individuals therefore regularly need accommodations to their supervision rules to afford them an equal opportunity to adhere to their requirements. Such accommodations may include moving meetings to accessible locations; ensuring treatment programs are trauma-informed and accessible to people's cognitive functioning abilities; and providing appointment reminders for people with limited time-management capacities.

30.     Federal law prohibits Defendants from discriminating against people on supervision on the basis of disability. 29 U.S.C. § 794.

31.     Defendants must make "reasonable accommodations" that would "assure meaningful access" to their programs and services. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). To guarantee meaningful access, the Rehabilitation Act's implementing regulations prohibit defendants from "[a]fford[ing] a qualified handicapped individual an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 39.130(b)(1)(ii).

32.     The D.C. Circuit provides the following explanation for how to apply the meaningful access standard: "Where the plaintiffs identify an obstacle that impedes their access to

---

[14] Jennifer L. Skeem & Jennifer Eno Louden, *Toward Evidence-Based Practice for Probationers and Parolees Mandated to Mental Health Treatment*, 57 PSYCHIATRIC SERVICES 333 (2006).

a government program or benefit, they likely have established that they lack meaningful access to the program or benefit." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).

33.     The Rehabilitation Act's implementing regulations further prohibit Defendants from using "criteria or methods of administration the purpose or effect of which would": (i) subject qualified individuals with a disability to discrimination on the basis of a disability; or (ii) defeat or substantially impair accomplishment of the objectives of a program or activity with respect to qualified individuals. 28 C.F.R. § 39.130(b)(3).

34.     Additionally, Defendants must "take appropriate steps to ensure effective communication" with people, 28 C.F.R. § 39.160(a), including through "furnish[ing] appropriate auxiliary aids where necessary to afford … an equal opportunity to participate in, and enjoy the benefits of, a program or activity." *Id.* § 39.160(a)(1).

35.     Defendants must also "make available" to program participants information regarding the Rehabilitation Act's "protections against discrimination[.]" *Id.* § 39.111.

36.     Despite these obligations, Defendants maintain a system of supervision that continually fails to assess people's disabilities when setting their terms of supervision. Specifically, despite the importance of an individual's disabilities to the appropriateness of supervision conditions, the Commission and CSOSA employ the same set of automated tools to set each person's conditions of supervision.

37.     For example, the Commission imposes the same baseline "general" conditions of supervision on everyone, with some people receiving more onerous, "special" conditions. 28 C.F.R. § 2.85(a)-(b); 2.204(a)-(b).

38.     CSOSA then assesses each person's risk and supervision level using automatic tools called the "Triage Screener" and the "Dynamic Risk Assessment for Offender Reentry."[15]

39.     Following these automated assessments, CSOSA's case management system automatically generates a prescriptive supervision plan for each individual, which operates as the default, more particularized supervision requirements for that individual.[16]

40.     None of the automatic tools employed by Defendants consider what, if any, reasonable accommodations individuals with disabilities may need to have an equal opportunity to succeed on supervision.

41.     Although CSOSA collects information on how many people have mental health disabilities, *see infra* ¶ 55, Defendants do not even track intellectual, developmental, or physical disabilities, let alone accommodate them. CSOSA indicated that it "lack[s] records" relating to the number of people it supervises with such disabilities.[17]

42.     In fact, the Commission has no policy whatsoever requiring the consideration of disabilities when supervision requirements are first imposed.[18]

43.     Nor is there a policy requiring CSOSA to consider disabilities when setting the details of supervision requirements, such as the frequency of appointments, or when enforcing the conditions of supervision. CSOSA itself has indicated that an "exhaustive search" of its policies dating back nine years "yielded no guidance/instruction/etc." regarding evaluating whether people

---

[15] CSOSA Budget Justification at 7, 52, *supra* n.1.

[16] CSOSA Operations Manual (2018), Chapter V, p. 9.

[17] CSOSA 6/23/23 FOIA Response at 7; *see also* USPC response to FOIA request (June 20, 2023) at 1-2 ("USPC 6/20/23 FOIA Response") ("[n]o responsive records" to FOIA request for documentation on the "number of people with disabilities supervised by the agency");

[18] USPC 6/20/23 FOIA Response at 1-2; Email from Commission to A. Verriest (Aug. 18, 2023).

on supervision need reasonable accommodations, providing any such reasonable accommodations, or any procedures by which individuals on supervision can request accommodations.[19]

44.     Further, Defendants have no "guidance/instruction/etc. regarding the provision of notice to supervisees" of their rights under Section 504, including their rights to reasonable modifications that would ensure meaningful access to supervision.[20]

45.     Rather, Defendants' process for setting conditions of supervision uses mechanical risk-assessment tools to apply blanket supervision rules devoid of any individualized assessments of people's disability-related needs. Neither individuals on supervision nor their attorneys are able to participate in this process. They are not even present when supervision conditions are imposed. Nor is there a system or process by which Defendants adjust conditions of supervision after learning that an individual they supervise has a disability that affects their ability to comply with their conditions.

46.     To the extent Defendants ever utilize knowledge of an individual's disability, it is not to provide accommodations, but rather to increase the number and scope of supervision requirements. Defendants have a special category called "mental health supervision" under which certain people on supervision with mental health disabilities are required to meet more onerous supervision conditions that might include, for instance, increased drug testing, additional programming, and more frequent meetings with the supervision officer. Despite these heightened requirements, Defendants have no policy or practice of providing reasonable accommodations for individuals on mental health supervision.

47.     For people like Plaintiffs who have disabilities, this process sets them up for failure.

---

[19] CSOSA 6/23/23 FOIA Response at 2–3.
[20] *Id.*; *see also* USPC 6/20/23 FOIA Response at 1–2; Email from Commission to A. Verriest (Aug. 18, 2023).

48.     Defendants repeat their failure to accommodate disabilities throughout the supervision process. For example, despite CSOSA's awareness that persons under their supervision have disabilities and therefore face barriers to complying with their supervision conditions, CSOSA does not amend the conditions of supervision or otherwise accommodate their disability.

49.     Instead, once an individual has missed meetings or otherwise failed to comply with supervision conditions, CSOs regularly request that the individual be arrested and submit an AVR to the Commission requesting that it initiate revocation proceedings.

50.     The Commission then either initiates revocation proceedings or decides to continue supervision without a reasonable accommodation.

51.     Further, the Commission systematically fails to accommodate disabilities during the revocation process. Where disabled individuals on supervision are arrested and face revocation proceedings, they and their attorneys often raise the individual's disabilities and explain the manner in which these disabilities have impeded compliance with supervision. Yet, despite being presented with the harms caused by conditions imposed without reasonable accommodations, the Commission regularly revokes people's supervision and incarcerates them for the violations that stemmed from a disability-related limitation.

52.     Moreover, even where the Commission decides to reinstate an individual to supervision without any additional term of incarceration, it does not adapt the person's supervision conditions to their disability-related needs. Instead, the individual on supervision is expected to follow the unmodified conditions, even when their known disability demonstrably precludes them from doing so.

53.     In fact, the Commission has released people to supervision following revocation proceedings without any accommodation even after explicitly acknowledging that the individual's disabilities would make compliance difficult or even impossible.

54.     Defendants' systematic failure to provide reasonable accommodations persists despite their awareness that high numbers of people under their supervision have disabilities.[21]

55.     CSOSA documents mental health disabilities through their case management system, the Supervision and Management Automated Record Tracking system ("SMART"), which "contains a 'Mental State and Condition' section that staff use to document the supervisee's past and present mental health conditions."[22] Using this information, CSOSA has identified 17% of the individuals it supervises as meeting the agency's definition—which relies on self-reporting and is thus likely underinclusive—as having a "mental disability."[23]

56.     While Defendants do not systematically track other types of disabilities, CSOSA has reported that physical health conditions are "common" among the supervised population.[24]

57.     Despite their awareness that many supervisees have disabilities, Defendants have no system to assess whether these disabilities, if left unaccommodated, would impede compliance with supervision, or to provide needed accommodations.

58.     Named Plaintiffs' experiences illustrate how Defendants do not accommodate disabilities that they are aware of. Indeed, both Mr. Davis and Mr. Mathis notified Defendants of

---

[21] *See* CSOSA, "CSOSA By The Numbers: Fiscal Year 2021", https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2022/04/about-csosa-fy2021r.pdf (stating that "[a]bout 27% of those entering supervision in FY2021 were identified as having mental health needs); CSOSA 2024 Budget Request Summary (Mar. 9, 2023) at 18 (discussing people with "reported mental health issues at intake").
[22] CSOSA 6/23/23 FOIA Response at 2.
[23] *Id.* at 6.
[24] CSOSA 2022-2026 Strategic Plan at 14, (reporting "prominent" number of people with physical health conditions).

their disability-related limitations and told Defendants they needed help to meet their supervision requirements. Nevertheless, Defendants did not provide reasonable accommodations to either Plaintiff. *See infra* ¶¶ 78, 83-84, 91-94, 104-105, 116.

59.     In sum, as a matter of policy and practice, and despite an awareness of people's disability-related limitations, Defendants maintain a supervision system that does not assess what reasonable accommodations an individual on supervision requires in order to have a meaningful opportunity to succeed on supervision, nor do Defendants provide such accommodations at any stage of the supervision process. The result is a system that violates federal law and sets Plaintiffs up for failure.

**Defendants' Systematic Failures To Provide Legally-Mandated Accommodations Cause Individuals with Disabilities Ongoing Harm**

60.     As a consequence of their failures to accommodate people's disabilities, Defendants deny Plaintiffs an equal opportunity to succeed on supervision afforded to others—which harms Plaintiffs.

61.     Success on supervision comes with numerous benefits, the most significant being termination of supervision. Those whom Defendants deem to have complied with their supervision and who avoid revocation for a period of years may have their supervision terminated early. *See* 28 C.F.R. §§ 2.95, 2.208.

62.     By contrast, individuals who are unsuccessful on supervision could have their supervision extended for years, or decades, into the future. Where people are not able to maintain contact with their supervision officer, for example, Defendants can consider them to have "abscond[ed]" from supervision—a determination that will stop the running of the clock on their term of supervision and prevent its expiration. *Id.* §§ 2.85(d) (parole), 2.204(e) (supervised release). With respect to supervised release, if the Commission is dissatisfied with an individual's

compliance "[a]t any time during service of a term of supervised release," it can "submit to the Superior Court a motion to extend the term of supervised release to the maximum term authorized by law, if less than the maximum authorized term was originally imposed." *Id.* § 2.210(a). Relatedly, people who have been on parole for five years are entitled to a hearing at which their parole must be terminated, absent a finding that they are likely to violate a criminal law. *Id.* § 2.95(c). However, revocations restart the clock, extending the time before the person is entitled to such a mandatory termination hearing. *Id.* § 2.95(d).

63.    People who are successful on supervision also avoid the imposition of additional supervision conditions, which are regularly imposed on those who are unsuccessful on supervision.

64.    Additionally, people who are successful on supervision avoid being reincarcerated for failure to comply with their conditions.

65.    Each year, CSOs seek the arrest of hundreds of D.C. residents for solely "technical" violations of their conditions of supervision.[25] People with disabilities are overrepresented in this group. Data provided by CSOSA indicates that while around 17% of people on supervision between June 1, 2022 and May 31, 2023, had a "mental disability" in CSOSA's estimation, 30% of people who had an AVR submitted for solely technical violations had mental disabilities.[26] Similarly, while 10% of all individuals on supervision had an AVR submitted against them for exclusively technical violations, this number rose to 18% for individuals whom the supervision agency classified as having a mental disability.[27]

---

[25] CSOSA Budget Justification at 31, *supra* n.1. This includes people on supervised release, parole, and probation.
[26] CSOSA 6/23/23 FOIA Response at 6–7.
[27] *Id.*

66.     For many arrested for technical violations of supervision conditions, the result of such proceedings is revocation of supervision and a new term of incarceration. For a few, the Commission chooses not to revoke their supervision, but instead reinstates them to the same problematic supervision conditions that did not accommodate their disability-related needs. *See supra* ¶¶ 52-53.

67.     Even where the Commission ultimately decides not to revoke an individual's supervision and impose incarceration as a penalty, the individual must still spend time locked up at the D.C. Jail while awaiting their revocation hearings. Indeed, every person who is awaiting a revocation hearing is incarcerated at the D.C. Jail because the Commission lacks a process for releasing individuals pending a revocation hearing.

68.     This period of pre-hearing incarceration can be devastating. For people in the D.C. Jail whose most serious alleged offense is a parole violation, the average length of incarceration is about four months[28]—more than enough time to lose a job, stable housing, or health care, and risk aggravating an underlying medical condition.

69.     Further, the fear of an arrest and a new term of incarceration is omnipresent for individuals with disabilities who, as a result of their disability, face heightened barriers to complying with their supervision conditions.

70.     Such fears, along with the knowledge that they cannot meaningfully access their supervision, create or exacerbate such individuals' anxiety and emotional distress.

---

[28] Andrea Fenster, Technical difficulties: D.C. data shows how minor supervision violations contribute to excessive jailing, Prison Policy Initiative (Oct. 28, 2020), https://www.prisonpolicy.org/blog/2020/10/28/dc_technical_violations.

**The Experiences of Named Plaintiffs and Members of the Proposed Class Illustrate Defendants' Unlawful Conduct and Its Harms**

*W. Mathis*

71.    W. Mathis is a 70-year-old Black military veteran who has been on lifetime parole supervision since 2006 for an offense from 1984.

72.    Mr. Mathis has congestive heart failure. He has been hospitalized on four occasions since October of 2023 because of his heart failure.

73.    This condition makes it difficult for him to walk. Mr. Mathis experiences dizziness and shortness of breath often, and he uses a walker when he leaves the house.

74.    Mr. Mathis's supervision requires him to go to drug testing once per week and in-person appointments with his CSO twice per week.

75.    Mr. Mathis's disabilities make it difficult for him to travel to these multiple weekly appointments.

76.    The schedule of Mr. Mathis's supervision appointments also does not account for his medical appointments at the VA hospital.

77.    On several occasions, he has had medical appointments scheduled on the same day as his supervision appointments. Mr. Mathis is thus forced to choose between getting treatment for his congestive heart failure and complying with the terms of his supervision.

78.    Mr. Mathis has informed his CSO about his disability numerous times, and has given her a list of his medical appointments. His CSO did not offer to change his supervision appointment dates or to meet him at his home rather than require him to go into her office.

79.    Despite being hospitalized on several occasions in late 2023, Mr. Mathis managed to attend the majority of his supervision appointments during that time. Nonetheless, Defendants

increased his supervision requirements in December of 2023 by requiring him to wear a GPS monitor.

80.     According to Mr. Mathis's doctor at the VA hospital, wearing a GPS monitor—a large device fastened to one's ankle—is dangerous in light of his heart failure as it restricts the blood flow in his leg and causes swelling.

81.     Mr. Mathis explained these health risks to his CSO. His CSO nonetheless imposed the GPS monitoring requirement. As soon as the GPS monitor was placed on Mr. Mathis's leg, his ankle began swelling up.

82.     The GPS monitor made it difficult for Mr. Mathis to walk, caused him pain and discomfort, and made his ankle continuously swollen.

83.     Despite being aware of the health risks posed by a GPS monitor, Defendants required Mr. Mathis to wear the monitor for a month, until he was arrested by the Parole Commission for a technical parole violation in January 2024.

84.     Neither Defendant has ever asked Mr. Mathis if his disabilities make it harder to follow his supervision rules or if he needs reasonable accommodations. Neither entity even advised him of his right to reasonable accommodations.

85.     Despite Mr. Mathis's health issues and onerous supervision requirements, he has worked hard to comply with those conditions.

86.     On December 18, 2023, for example, he was taken to the VA hospital after he passed out due to his disability. He called his CSO from the hospital that same day to let her know where he was.

87.     Mr. Mathis was also in the VA hospital from January 15, 2024, through January 19, 2024, but reported to his supervision officer in-person on January 20, 2024.

88.     Mr. Mathis reported again in-person on January 22, 2024. That day, when he arrived at his CSO's office, he was arrested for technical violations of parole conditions, including missing drug testing appointments and appointments with his CSO in December of 2023, and testing positive for marijuana.

89.     On three of the four days he was accused of missing appointments, he was at the VA hospital receiving treatment for heart failure.

90.     Mr. Mathis had an appointment to have a defibrillator placed on January 26, 2024, at the VA hospital.

91.     Mr. Mathis's attorney informed the Commission's hearing examiner of this appointment at his probable cause hearing on January 23, 2024 in the D.C. Jail. The examiner agreed that he had an important medical procedure and recommended that he be released.

92.     The Commission rejected this recommendation and ordered him to remain in the D.C. Jail. A few days later, on January 30, 2024, the Commission released him and reinstated him to supervision.

93.     Mr. Mathis missed his scheduled medical procedure.

94.     The Commission released Mr. Mathis to parole supervision without any reasonable accommodations—which is his status today.

*K. Davis*

95.     Plaintiff K. Davis is a 48-year-old Black man who is currently serving a 12-month prison sentence for a technical parole violation.

96.     He has served nearly 13 years of a lifetime parole term. He will return to parole upon his release from prison.

97.     Mr. Davis lives with chronic pain stemming from third-degree burns on his bones and ribs, for which he has required multiple surgeries.

98.     In addition, he has mental health conditions including depression, anxiety, and PTSD, for which he has received mental health treatment.

99.     When Mr. Davis was released to parole in 2011, his CSO gave him a piece of paper with his parole conditions, which nobody ever explained to him. The rules include reporting to his supervision officer as required, getting drug tested in-person twice a week, and reporting every address change.

100.    Neither Mr. Davis nor his attorney was present when the rules were imposed.

101.    Mr. Davis's disabilities make completing these requirements difficult. His burns limit his mobility, making it hard to get to in-person appointments. At various points following surgery for his burns, he used a wheelchair, crutches, and a walker—all of which made getting from the doctor's office to his supervision appointments take even longer.

102.    His medical appointments and surgeries also sometimes conflict with his supervision obligations. When he was initially hospitalized for his burns, Mr. Davis left against his doctor's orders so that he could check in with his CSO, fearing that otherwise he risked being charged with a supervision violation.

103.    Additionally, his mental health conditions make it harder to follow all of his requirements. For example, his PTSD and anxiety make trusting new people, and navigating ever-shifting CSO assignments, difficult. These conditions make it hard for him to problem-solve, and to reach out for help, when he encounters barriers to following his supervision rules. He has also had to take medications for his mental health that make him feel tired and nauseous and cause slurred speech and headaches, making it hard to keep appointments.

104.    The Commission and CSOSA are aware of Mr. Davis's disability-related limitations. Mr. Davis told his CSO that he was working with mental health providers. He also informed Defendants about his physical disabilities resulting from his burns. In February and March of 2023, he informed his CSO that he had a scheduled surgery, and in March of 2023 his CSO confirmed that he was in the emergency room at Washington Hospital Center.

105.    Nevertheless, neither entity has ever asked him if his disabilities make it harder to follow his supervision rules or if he needs reasonable accommodations. Neither entity even advised him of his right to reasonable accommodations.

106.    On July 10, 2023, Mr. Davis was released from jail after an earlier revocation proceeding and was homeless.

107.    His burns made getting around the city to his various appointments difficult.

108.    Mr. Davis tried to follow all of his parole rules. He made it to each of his twice-weekly drug testing appointments and tested negative for illegal substances every time.

109.    However, because he did not have a phone, he could not call his CSO as his parole rules required. Mr. Davis became increasingly anxious. He repeatedly contacted University Legal Services ("ULS")—a community-based organization that assists people with disabilities and with which Mr. Davis had been working—for assistance.

110.    Due to his anxiety and PTSD, he experienced "tunnel vision." He continuously and frantically contacted ULS—the people he trusts—and was unable to pivot to consider an alternative solution for contacting his CSO.

111.    Eleven days after his release from jail, Mr. Davis's CSO submitted an AVR seeking his arrest for failing to contact his CSO via phone. His CSO pursued revocation for this reporting

violation even though Mr. Davis was reporting for drug testing on all required occasions, and tested negative each time.

112.    Mr. Davis was arrested on August 3, 2023, and spent two months in jail before his revocation hearing.

113.    The jail did not provide the medical treatment needed for his burns. He had to miss a third surgery for his burns, scheduled for August 8, 2023, due to his incarceration. Being in jail also exacerbated his depression and anxiety.

114.    During his revocation hearing on October 4, 2023, a ULS advocate testified about Mr. Davis's efforts to follow his supervision rules. The Hearing Examiner for the Commission recommended that his parole be revoked and that he serve a 5-month sentence, which was in the middle of his guidelines range of 0-8 months of incarceration. The Parole Commission overrode the recommendation and imposed a 12-month sentence. Mr. Davis is currently serving this sentence.

115.    Since his imprisonment, Mr. Davis's health has suffered. In prison, he cannot obtain adequate treatment for his burns, and still cannot get his needed third surgery with his doctor. He has also become increasingly anxious and discouraged.

116.    Upon his release, Mr. Davis will again be on parole and will be subject to the same conditions. After being released on parole after prior terms of imprisonment, he had been reinstated to the same parole conditions that his disabilities made it difficult to follow. Based on Defendants' past failures to accommodate Mr. Davis and their systematic failure to accommodate people with disabilities generally, it is practically certain that Defendants will not provide any reasonable accommodations when Mr. Davis is back on parole.

*Additional Instances of Defendants' Violations*

117.     Attorneys for the Public Defender Service ("PDS") regularly represent individuals on supervised release or parole who have disabilities that Defendants fail to accommodate.

118.     For example, in one case, attorneys from PDS explained to the Commission that their client's paralysis left him in a wheelchair with limited mobility. Defendants incarcerated him on two occasions for failing to comply with the terms of his supervision, which had included getting to locations that were not wheelchair accessible.

119.     Upon his first such arrest, a hearing examiner from the Commission acknowledged his disabilities, including paralysis, trouble speaking, and memory issues, and explicitly noted that he was medically unable to comply with supervision. Nonetheless, the Commission detained him at the D.C. Jail for several weeks pending further revocation proceedings.

120.     Eventually, the Commission reinstated him to the same terms of supervision it already found him unable to comply with due to his disability.

121.     After his subsequent arrest for again failing to comply with the terms of his supervision, the Commission held him in the D.C. Jail for over a month.

122.     The Commission's failure to accommodate this individual's disabilities caused him harm. He was forced to endure these two periods of custody even though the Commission ultimately reinstated him to supervision without even holding a revocation hearing. Not only were these periods of incarceration physically harmful—notably, the D.C. Jail is particularly dangerous for people with medical needs[29]—it also put him at risk of losing his wheelchair-accessible housing.

---

[29] A federal class action lawsuit was recently filed against D.C. for failing to provide constitutionally adequate medical care to people in the D.C. Jail. *See* Complaint, ECF Dkt. 1, *V.C. et al., v. District of Columbia*, No. 23-cv-01139 (D.D.C. Apr. 24, 2023).

123.    In another example, an individual who has been on parole for about two decades has schizophrenia that makes him afraid to leave his house and travel around the city. According to his PDS attorney, he feels paranoid when he is around people and as a result spends most of his time in his house. In fact, he sometimes spends a week or more without leaving his house. His disability also makes it difficult for him to plan and complete tasks. Even though he has made his CSOs aware of his disability and the difficulties it poses for compliance with supervision, Defendants have never offered to change his conditions because of his disability.

124.    In yet another example, Defendants have failed to accommodate an individual on parole with extreme nerve pain in his back. This nerve pain leaves his legs numb for long periods of time, which makes it difficult for him to walk. This individual has been forced to attend multiple monthly supervision appointments far from his home despite telling his CSO about his difficulty walking.

125.    This individual also had back surgery in November of 2023 to place screws in his spine and address a bulging disc. His back pain persisted after the surgery, and he continues to experience leg numbness after walking long periods.

126.    Despite this mobility disability, CSOSA and the Commission have failed to provide reasonable accommodations.

127.    In November of 2023, after his surgery, the Commission had this individual arrested for alleged technical violations of his parole. Although the Commission did not revoke his parole, it held him at the D.C. Jail for nearly three months, and he was released to continued supervision without any accommodations.

128.    Rather than accommodating his disabilities, Defendants have increased the number and frequency of his supervision conditions even though his parole has not been revoked for over five years.

## CLASS ALLEGATIONS

129.    Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiffs seek to represent a class of all people with a disability who are, or will be, on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need accommodations in order to have an equal opportunity to succeed on parole or supervised release.

130.    Plaintiffs reserve the right to amend or modify the class definition or to establish sub-classes as appropriate if discovery or further investigation reveals that the class should be expanded or otherwise modified.

131.    The class meets the prerequisites of Federal Rule of Civil Procedure 23(a).

132.    Numerosity (Rule 23(a)(1)): The class is so numerous that joinder is impracticable. While the precise size of the class is unknown, upon information and belief, hundreds of people with disabilities are on parole or supervised release in D.C. According to CSOSA's own calculations, 484 individuals of 2,816 individuals who were on active supervision between June 1, 2022 and May 31, 2023 had a mental disability.[30] And these numbers include only those with mental disabilities; neither the Commission nor CSOSA tracks individuals with intellectual, developmental, or physical disabilities.[31]

---

[30] *See* CSOSA 6/23/23 FOIA Response at 6.
[31] CSOSA 6/23/23 FOIA Response at 7; USPC 6/20/23 FOIA Response at 1-2; *see* Email from Commission to A. Verriest (Aug. 18, 2023).

133.    Joinder is inherently impracticable because the number of class members is well above the 40-person threshold that courts traditionally rely on, and will continue to rise as more people with disabilities are placed on parole and supervised release.

134.    Joinder is also impracticable also because proposed class members are highly unlikely to file individual suits on their own behalf given the practical barriers, including their own indigency, and disability-related barriers that prevent their ability to file suit.

135.    Commonality (Rule 23(a)(2)): The claims of the class share common issues of fact and law, including but not limited to whether Defendants have a process for assessing whether individuals with disabilities need accommodations in order to have an equal opportunity to satisfy their supervision requirements, and for providing those accommodations; whether Defendants' process for establishing initial supervision conditions provides individuals with disabilities an opportunity to receive the reasonable accommodations necessary to have an equal opportunity to satisfy their supervision requirements; whether Defendants' process for modifying supervision plans after the initial intake assessment enables individuals with disabilities to receive the reasonable accommodations necessary to have an equal opportunity to satisfy their supervision requirements; and whether Defendants' policy of imposing supervision conditions without any system to assess people's disability-related needs violates Section 504 of the Rehabilitation Act by failing to provide individuals with disabilities the reasonable accommodations necessary to have an equal opportunity to satisfy their supervision requirements.

136.    Typicality (Rule 23(a)(3)): The claims of named Plaintiffs are typical to the class: they have disabilities which Defendants have failed to accommodate and which impede their ability to succeed on supervision.

137.    Adequacy (Rule 23(a)(4)): Plaintiffs are adequate class representatives who meet all of the requirements of Rule 23(a)(4). They have no conflict of interest with other class members, will fairly and adequately protect the interests of the class, and understand their responsibilities as class representatives. Counsel for Plaintiffs have experience litigating class actions and cases involving disability rights, civil rights generally, and the rights of people serving criminal sentences.

138.    Defendants have acted, and will act, on grounds generally applicable to the class, thereby making final injunctive or declaratory relief appropriate as to the class as a whole. The class may therefore properly be certified under Fed. R. Civ. P. 23(b)(2).

## CLAIM FOR RELIEF

**Violation of the Rehabilitation Act, 29 U.S.C. § 794**
*By All Plaintiffs, On Behalf of Themselves and All Others Similarly Situated, Against All Defendants*

139.    Section 504 of the Rehabilitation Act states:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a).

140.    Both agencies are executive agencies and fall within the definition of a covered agency. *Id.*

141.    Plaintiffs are qualified "individual[s] with a disability" within the meaning of the Rehabilitation Act. *Id.*

142.    The Rehabilitation Act requires covered agencies to systematically, and affirmatively, make "reasonable accommodations" that would "assure meaningful access" to their programs and services. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

143.   To assure meaningful access, the Rehabilitation Act and its implementing regulations prohibit Defendants from "[a]fford[ing] a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 39.130(b)(1)(ii).

144.   Defendants are also prohibited from "[d]eny[ing] a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service." *Id.* § 39.130(b)(1)(i).

145.   Defendants are further prohibited from using "criteria or methods of administration the purpose or effect of which would": (i) "[s]ubject qualified handicapped persons to discrimination on the basis of handicap"; or (ii) "[d]efeat or substantially impair accomplishment of the objectives of a program or activity with respect to handicapped persons." *Id.* § 39.130(b)(3).

146.   Defendants' systematic failure to assess whether and what types of accommodations Plaintiffs require, and to provide such accommodations, deprives Plaintiffs of an equal opportunity to succeed on supervision. As a result, Plaintiffs lack meaningful access to the benefits of supervision in violation of the Rehabilitation Act.

147.   Additionally, Defendants' systematic failure to assess whether and what types of accommodations Plaintiffs require, and to provide such accommodations, has the effect of subjecting Plaintiffs to discrimination on the basis of disability and of "[d]efeat[ing] or substantially impair[ing]" supervision's purpose of facilitating reintegration into the community. *Id.* This practice also violates the Rehabilitation Act.

148.   Defendants are aware that high numbers of people on parole or supervised release have disabilities and thus may need reasonable accommodations to have an equal opportunity to succeed on supervision. Moreover, they are aware that each named Plaintiff has disabilities and requires reasonable accommodations to have an equal opportunity to succeed on supervision.

149.    Defendants lack any system to assess whether and what types of accommodations people on supervision require, and they lack any formal process for people to seek such legally-mandated accommodations.

150.    Moreover, Defendants have failed to put in place any guidance, instructions, or policies requiring assessing people's disability-related accommodation needs when initially setting supervision requirements, requiring provision of reasonable accommodations for people's disabilities as they become known, or providing a means by which people with disabilities can request reasonable accommodations.

151.    Defendants' systematic failure to accommodate people with disabilities sets Plaintiffs up for failure, by requiring them to navigate a maze of supervision conditions that, due to their disabilities, they lack an equal opportunity to fulfill.

152.    At the time Defendants created and imposed Plaintiffs' conditions of supervision, Defendants did not assess whether Plaintiffs had disability-related limitations; did not assess whether Plaintiffs might need reasonable accommodations to have an equal opportunity to succeed on supervision; did not assess what individualized accommodations, if any, they required; and did not provide such legally-mandated accommodations. Nor did Defendants assess Plaintiffs' disabilities or make any reasonable accommodations at any point during the course of their supervision.

153.    As a result of Defendants' failure to assess people's accommodation needs or to provide reasonable accommodations, Plaintiffs and the proposed class are deprived of meaningful access to the benefits of supervision due to their disabilities.

154.   Defendants' failures both discriminate against Plaintiffs and the proposed class on the basis of their disabilities and substantially impair the underlying purpose of supervision: helping people reintegrate into their communities.

155.   Plaintiffs and the proposed class have been, are being, and will continue to be harmed by Defendants' ongoing failure to accommodate their disabilities.

## RELIEF REQUESTED

Wherefore, Plaintiffs and proposed class members respectfully request that the Court:

A.  Certify the proposed class under Rule 23(b)(2), and appoint the named Plaintiffs as class representatives and the undersigned counsel as class counsel;

B.  Enjoin Defendants from engaging in the unlawful disability discrimination complained of herein;

C.  Declare that Defendants' disability discrimination described herein violates the Rehabilitation Act;

D.  Enter injunctive relief in Plaintiffs' favor mandating that Defendants:

i.  Implement a system to determine, at the time an individual with a disability is placed on supervision and at regular intervals thereafter, what, if any, reasonable accommodations they require as a result of their disabilities in order to have an equal opportunity to succeed on supervision, and provide such reasonable accommodations;

ii.  Provide reasonable accommodations to people on supervision known to Defendants to have a disability to ensure such individuals have an equal opportunity to succeed on supervision;

33

    iii.  Implement a mechanism whereby individuals with disabilities who are on supervision can request reasonable accommodations for their disabilities, and provide such accommodations as are requested and determined to be reasonable;

    iv.  Individually assess the supervision conditions of all individuals currently on supervision in the community and determine which individuals require reasonable accommodations due to their disabilities and provide such reasonable accommodations; and

    v.  Assess what reasonable accommodations named Plaintiffs W. Mathis and K. Davis require to have an equal opportunity to succeed on supervision based on their individual needs, and provide any and all such required accommodations.

E.  Grant Plaintiffs costs and reasonable attorneys' fees pursuant to 29 U.S.C. § 794a, and any other applicable source of law, except as to the Public Defender Service;

F.  Award such further relief as the Court deems appropriate.


Dated: May 6, 2024

Respectfully Submitted,

*/s/ Hanna M. Perry*

ALLISON FRANKEL
(*Pro Hac Vice* Motion Forthcoming)
afrankel@aclu.org
ASHIKA VERRIEST (D.C. Bar No. 90001468)
averriest@aclu.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, NY 10004
Tel.: (617) 650-7741

HANNA M. PERRY (D.C. Bar No. 90003756)
hperry@pdsdc.org
PUBLIC DEFENDER SERVICE FOR THE
    DISTRICT OF COLUMBIA
633 3rd Street NW
Washington, D.C. 20004
Tel.: (202) 579-0633

SAMIR DEGER-SEN (D.C. Bar No. 1510881)
samir.deger-sen@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas

SCOTT MICHELMAN (D.C. Bar No. 1006945)
smichelman@acludc.org
MICHAEL PERLOFF (D.C. Bar No. 1601047)
mperloff@acludc.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF THE DISTRICT OF
    COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel.: (202) 457-0800

New York, NY 10020
Tel.: (212) 906-1200
Fax: (212) 751-4864

PETER E. DAVIS (D.C. Bar No. 1686093)
peter.davis@lw.com
CHRISTINE C. SMITH (D.C. Bar No. 1658087)
christine.smith@lw.com
JORDAN L. HUGHES (D.C. Bar No. 90004355)
jordan.hughes@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Plaintiffs and the Proposed Class*[*]

---

[*] Counsel wish to acknowledge the assistance of paralegal Clio Gates in the investigation of the facts and the preparation of this complaint.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Complaint will be served once summons issue by hand delivery to:

- U.S. Attorney for the District of Columbia
  Civil Process Clerk
  United States Attorney's Office for the District of Columbia
  555 4th Street, N.W.
  Washington, D.C. 20530

In addition, the foregoing Complaint will be served once summons issue by mail to:

- U.S. Attorney for the District of Columbia
  Civil Process Clerk
  United States Attorney's Office for the District of Columbia
  555 4th Street, N.W.
  Washington, D.C. 20530

- Attorney General of the United States
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  Washington, D.C. 20530

- United States Parole Commission
  90 K Street, NW, 3rd Floor
  Washington, DC 20530

- Patricia K. Cushwa, Acting Chairman
  United States Parole Commission
  90 K Street, NW, 3rd Floor
  Washington, DC 20530

- Court Services and Offender Supervision Agency
  633 Indiana Avenue, NW
  Washington, DC 20004

- Richard S. Tischner, Director
  Court Services and Offender Supervision Agency
  633 Indiana Avenue, NW
  Washington, DC 20004

/s/ *Hanna M. Perry*
Hanna M. Perry