## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

W. MATHIS and K. DAVIS, *individually and on behalf of all others similarly situated*

        Plaintiffs,

v.

UNITED STATES PAROLE COMMISSION, *et al.*

        Defendants.

Case No. 1:24-cv-01312

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................................................1

II.    STATEMENT OF FACTS .......................................................................................4

      A.     Defendants Are Aware That People with Disabilities Regularly Need
           Accommodations to Adhere to Supervision Rules. ................................................4

      B.     Defendants Have No System to Assess People's Accommodation Needs
           or to Provide Legally Required Reasonable Accommodations. ............................5

      C.     Defendants' Systematic Failures to Provide Reasonable Accommodations
           Cause Individuals With Disabilities Ongoing Harm. ..............................................9

      D.     Named Plaintiffs' Experiences Are Emblematic of Defendants' Systematic
           Violations. ............................................................................................................10

III.   LEGAL ARGUMENT............................................................................................13

      A.     Plaintiffs Are Likely To Succeed on the Merits of Their Claim That
           Defendants Are Discriminating on the Basis of Disability....................................14

      B.     Defendants' Failure To Provide Reasonable Accommodations Is Causing
           Plaintiffs Irreparable Harm. .................................................................................23

      C.     The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs'
           Favor. ...................................................................................................................26

IV.    CONCLUSION.......................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alexander v. Choate*,
   469 U.S. 287 (1985)........................................................................................15, 16, 17

\**Am. Council of the Blind v. Paulson*,
   525 F.3d 1256 (D.C. Cir. 2008).......................................................................14, 15, 20, 21

\**Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001), *abrogated on other grounds by Johnson v.*
   *California*, 543 U.S. 499 (2005).........................................................................16, 21

*Bonnette v. D.C. Court of Appeals*,
   796 F. Supp. 2d 164 (D.D.C. 2011)....................................................................23

*Callicotte v. Carlucci*,
   698 F. Supp. 944 (D.D.C. 1988).........................................................................26

*Doe v. Judicial Nominating Com'n*,
   906 F. Supp. 1534 (S.D. Fla. 1995).....................................................................23

*Dunn v. Dunn*,
   318 F.R.D. 652 (M.D. Ala. 2016).......................................................................16, 21

*Enyart v. Nat'l Conf. of Bar Examiners*,
   630 F.3d 1153 (9th Cir. 2011).............................................................................26

*Franco-Gonzalez v. Holder*,
   No. 10-cv-2211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013)............................23

*Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016)............................................................................26

*Gresham v. Windrush Partners, Ltd.*,
   730 F.2d 1417 (11th Cir. 1984)..........................................................................23

*Harrison v. Rubin*,
   174 F.3d 249 (D.C. Cir. 1999)............................................................................14

\**Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003)...............................................................................20

*Honig v. Doe*,
   484 U.S. 305 (1988)...........................................................................................25

*Johnson v. United States*,
    529 U.S. 694 (2000)........................................................................................17

*L.H. v. Schwarzenegger*,
    No. 6-cv-2042 (E.D. Cal. Oct. 7, 2008)......................................................21

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)........................................................................27

*Lewis v. Cain*,
    No. 15-cv-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021).....................21

*Luke v. Texas*,
    46 F. 4th 301 (5th Cir. 2022)................................................................22, 23

*Montgomery v. District of Columbia*,
    No. 18-cv-1928, 2022 WL 1618741 (D.D.C. May 23, 2022).......................22

*Morrissey v. Brewer*,
    408 U.S. 471 (1972)....................................................................................17

*Ne. Fla. Ch. of Assoc. General Contractors v. City of Jacksonville*,
    508 U.S. 656 (1993)....................................................................................23

*Paulone v. City of Frederick*,
    787 F. Supp. 2d 360 (D. Md. 2011)...........................................................22

*\*Pierce v. District of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) ..............................................16, 20, 21, 22

*Robertson v. Las Animas Cnty Sheriff's Dept*,
    500 F.3d 1185 (10th Cir. 2007) ..................................................................22

*Sacchetti v. Gallaudet Univ.*,
    344 F. Supp. 3d 233 (D.D.C. 2018).............................................................20

*Segal v. Metro. Council*,
    29 F.4th 399 (8th Cir. 2022) ......................................................................15

*Seretse-Khama v. Ashcroft*,
    215 F. Supp. 2d 37 (D.D.C. 2002)...............................................................24

*Shirley v. Devine*,
    670 F.2d 1188 (D.C. Cir. 1982)..................................................................26

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022).......................................................................13

*Tellis v. LeBlanc*,
  No. 18-541, 2022 WL67572 (W.D. La. Jan. 6, 2022) ...........................................21

*Tenn. v. Lane*,
  541 U.S. 509 (2004).............................................................................................22

*Turner v. Safley*,
  482 US. 78 (1987).................................................................................................16

*Updike v. Multnomah Cnty.*,
  870 F.3d 939 (9th Cir. 2017) ...............................................................................20

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008)..................................................................................................13

## STATUTES

29 U.S.C. § 705(20)(B) ...............................................................................................14

*29 U.S.C. § 794(a) ..............................................................................................14, 15

42 U.S.C. § 12101(a)(8)...............................................................................................26

42 U.S.C. § 12102(1)(A)..............................................................................................14

## REGULATIONS

28 C.F.R.
  § 2.85(a) ..................................................................................................................6
  §§ 2.85(b) ................................................................................................................6
  § 2.85(d) ..................................................................................................................9
  §§ 2.85(d) ..............................................................................................................25
  § 2.95.....................................................................................................................10
  §§ 2.95...................................................................................................................25
  §§ 2.204(b)...............................................................................................................6
  § 2.204(e)...........................................................................................................9, 25
  § 2.208............................................................................................................10, 25
  § 2.210.....................................................................................................................9
  § 2.210(a)...............................................................................................................25
  § 35.108(c)(1) ........................................................................................................15
  § 39.103.................................................................................................................15
  § 39.130(b)(1)(ii).............................................................................................15, 17
  § 39.130(b)(3) ........................................................................................................16
  § 39.130(b)(3)(i).....................................................................................................17

## I.      INTRODUCTION

This case is about how the federal government's post-conviction supervision system in Washington, D.C. ignores the needs of people with disabilities, sets them up for failure on supervision, and puts them at constant risk of sanctions including incarceration. Defendants' violations of law are so clear, and the harm to Named Plaintiffs and members of the proposed class (collectively, "Plaintiffs") so severe, that Plaintiffs are entitled to preliminary injunctive relief.

People subject to parole and supervised release (collectively, "supervision") in Washington, D.C. must follow numerous complex conditions, under threat of incarceration for any slip-up. People with disabilities face heightened barriers to meeting these onerous requirements. This includes difficulties physically moving throughout the city to attend required meetings; understanding supervision conditions; keeping track of shifting requirements; and attending mandated appointments while experiencing serious health issues. Accordingly, it is often exceedingly difficult for people with disabilities to meet supervision requirements without reasonable accommodations. Such accommodations would be straightforward: for example, plain-language explanations of their requirements, appointment reminders, transportation assistance, and flexible meeting scheduling. Absent such reasonable accommodations, many people with disabilities do not have an equal opportunity to succeed on supervision.

Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") requires government entities to systematically, and affirmatively, assess accommodation needs of people with disabilities and provide reasonable accommodations that allow them meaningful access to the supervision program. In order to have meaningful access to the supervision program, people with disabilities must have an equal opportunity to benefit from, or succeed on, that program. The Rehabilitation Act's implementing regulations further prohibit government entities from administering supervision in a manner that has the effect of subjecting people to discrimination on

the basis of disability, or of substantially impairing the purpose of supervision: helping people reintegrate into their communities.

Yet the United States Parole Commission ("the Commission") and its Chairman, as well as the Court Services & Offender Supervision Agency ("CSOSA") and its Director (collectively, "Defendants")—the two federal agencies that administer supervision in Washington, D.C.—have (a) no system to assess what, if any, reasonable accommodations people on supervision require in order to meaningfully access the supervision program and its benefits, and (b) no system to provide such legally required accommodations. The result is predictable: Defendants routinely fail to provide necessary accommodations. This sets people with disabilities up for failure by requiring them to navigate a maze of supervision conditions that, due to their disabilities, they lack an equal opportunity to meet.

Named Plaintiffs' experiences on supervision demonstrate this systematic problem. Plaintiff W. Mathis is a 70-year-old Black military veteran with congestive heart failure who has been on parole for 18 years. His heart condition requires him to use a walker and makes it difficult for him to travel throughout the city for his multiple supervision appointments each week. This condition has also led to numerous hospitalizations and medical appointments at the Veterans Affairs ("VA") hospital. Mr. Mathis has been punished, including with incarceration, for missing supervision appointments on dates when he was receiving medical care at the VA hospital. In January 2024, Defendants incarcerated Mr. Mathis for technical supervision violations related to his disability, causing him to miss a previously scheduled medical procedure for his congestive heart failure. Despite their awareness of Mr. Mathis's disability-related limitations, Defendants then released him on the same supervision conditions that he previously struggled to meet due to his disability, without providing any reasonable accommodations.

Plaintiff K. Davis is a middle-aged Black man on lifetime parole who lives with chronic pain and mobility limitations stemming from third-degree burns, as well as anxiety, depression, and posttraumatic stress disorder ("PTSD"). Mr. Davis's disabilities make it hard for him to get to required meetings and otherwise navigate his onerous parole requirements, which include multiple weekly appointments and twice-weekly drug tests, on top of his frequent medical appointments and mental health treatment. His mental health conditions further make it difficult for him to problem-solve, trust new people, and reach out for help when he encounters a barrier to following a supervision rule. Mr. Davis is currently serving a 12-month prison term for a technical violation related to his disability. Because of this incarceration, Mr. Davis missed a critical surgery for his burns. Defendants are aware of Mr. Davis's disabilities. Nevertheless, Defendants have repeatedly released Mr. Davis without making any adjustments or modifications to the conditions that his disabilities make it exceedingly difficult to meet, and it is practically certain that they will do so again when his current period of incarceration is complete.

The harms that flow from Defendants' unlawful failure to provide reasonable accommodations are ongoing and irreparable. Specifically, Plaintiffs are suffering or will suffer a denial of meaningful access to supervision; a heightened risk of punishment, including incarceration, for technical violations of conditions that they do not have an equal opportunity to meet; and unequal access to the benefits, such as shortened supervision terms, of succeeding on supervision.

Accordingly, Plaintiffs request that this Court issue an order restraining Defendants from violating the Rehabilitation Act and directing Defendants to (A) assess what reasonable accommodations named Plaintiffs Mathis and Davis require to have an equal opportunity to succeed on supervision, and to provide such accommodations based on their individual needs; and

(B) implement a system to affirmatively assess what, if any, reasonable accommodations all class members require and to provide such accommodations.

## II.    STATEMENT OF FACTS

### A.    Defendants Are Aware That People with Disabilities Regularly Need Accommodations to Adhere to Supervision Rules.

Defendants are aware that high numbers of people under their supervision have disabilities. According to CSOSA's own calculation, of nearly 3,000 people on active parole or supervised release in D.C. between June 2022 and May 2023, 484—or 17%—had a mental disability. Declaration of Ashika Verriest ("Verriest Decl.") Ex. A (CSOSA response to Freedom of Information Act request (June 23, 2023) ("CSOSA 6/23 FOIA Response"). CSOSA does not systematically track the numbers of people under supervision with intellectual, developmental, or physical disabilities. *See id.* at 7. However, CSOSA has reported that physical health conditions are "common" among the supervised population. Verriest Decl. Ex. B (CSOSA, Strategic Plan FY2022-2016)      at      14,      https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2022/05/CSOSA-Strategic-Plan-FY2022-2026.pdf ); *see also* Declaration of Rashida Edmondson ("Edmondson Decl.") ¶ 5.

People with disabilities regularly face higher barriers to succeeding on supervision than their counterparts without disabilities. This includes difficulties physically accessing required meeting locations; understanding their supervision conditions; keeping track of shifting appointments; meaningfully engaging with their supervision officers; and navigating conflicts between their supervision obligations and critical health care needs. *See* Edmondson Decl. ¶¶ 6-7, 34-36. Indeed, Defendants have expressly acknowledged that success on standard supervision conditions is impossible for some people with disabilities. *Id.* ¶ 37.

As a result, people with disabilities regularly need accommodations to their supervision rules to afford them an equal opportunity to adhere to their requirements and complete supervision. *Id.* ¶ 7. Reasonable accommodations are often simple and impose little or no cost, such as explaining supervision conditions in plain language; providing appointment reminders and transportation assistance; and flexibly scheduling meeting times, locations, and frequencies based on people's needs and abilities. *Id.*

### B. Defendants Have No System to Assess People's Accommodation Needs or to Provide Legally Required Reasonable Accommodations.

Despite their knowledge that substantial numbers of people under supervision have disabilities, the Commission and CSOSA systematically fail to assess whether, and what types of, reasonable accommodations such individuals need to meaningfully access their supervision. This failure persists at all stages of the supervision process: when the agencies impose supervision conditions, enforce those conditions, revoke supervision for technical violations of those conditions, and release people to the very same conditions that, absent reasonable accommodations for their disabilities, they could not follow to begin with.

Defendants have no policies regarding the provision of reasonable accommodations to people with disabilities on supervision. The Commission admitted, in response to a FOIA request, that it could not identify a single "document[] containing policies, procedures, guidelines or any other rules or instructions" regarding (1) "[e]valuating whether people on parole or supervised release have disabilities"; (2) "[e]valuating whether people on parole or supervised release need reasonable accommodations"; or (3) "[p]roviding people on parole or supervised release reasonable accommodations." Verriest Decl. Ex. C (Commission response to Freedom of Information Act request (June 20, 2023) ("Commission 6/20 FOIA Response") at 1-2; *see* Ex. D (Email from Commission to A. Verriest (Aug. 18, 2023)) ("confirming that the Commission does

not have any responsive records" for these requests). Instead, the Commission directed Plaintiffs'
counsel to contact CSOSA. *See* Verriest Decl. Ex. C (Commission 6/20 FOIA Response) at 1-2.
But CSOSA likewise stated that "[a]n exhaustive search of all guidance, dating back to 2015,
yielded no guidance/instruction/etc." regarding evaluating or accommodating disabilities. Verriest
Decl. Ex. A (CSOSA 6/23 FOIA Response) at 1-2; Ex. E (CSOSA response to Freedom of
Information Act request (Sept. 5, 2023)) at 2 ("CSOSA 9/5 FOIA Response").

Defendants also lack any procedures by which individuals on supervision can request
accommodations. Verriest Decl. Ex. A (CSOSA 6/23 FOIA Response) at 2–3; Ex. C (Commission
6/20 FOIA Response) at 2; *see also* Edmondson Decl. ¶ 13. Further, Defendants do not have
"guidance/instruction/etc. regarding the provision of notice to supervisees" of their rights under
the Rehabilitation Act, including their rights to reasonable accommodations. Verriest Decl. Ex. A
(CSOSA 6/23 FOIA Response) at 2; Ex. C (Commission 6/20 FOIA Response) at 1; *see also*
Edmondson Decl. ¶ 9; Declaration of W. Mathis ("Mathis Decl.") ¶ 22; Declaration of K. Davis
("Davis Decl.") ¶ 16.

Instead, Defendants impose blanket supervision rules without assessing whether people
need accommodations to follow them. The Commission imposes the same "general conditions of
release" on everyone. 28 C.F.R. § 2.85(a) (parole); *id.* § 2.204(a) (supervised release). These
conditions include reporting to a supervision officer as required, submitting to drug or alcohol
tests, making a good-faith effort to maintain employment, remaining within the District of
Columbia absent permission to leave, and avoiding any persons with a criminal record without
permission. *Id.* The Commission may also impose heightened "special conditions," such as
requiring participation in a drug or alcohol treatment program or home confinement. 28 C.F.R. §§
2.85(b), 2.204(b). At no point does the Commission request information from people on

supervision regarding their disabilities or assess whether such individuals need reasonable accommodations to have an equal opportunity to succeed on supervision. *See* Verriest Decl. Ex. C (Commission 6/20 FOIA Response) at 1-2; Ex. D (Email from Commission to A. Verriest (Aug. 18, 2023)) at 1; Edmondson Decl. ¶¶ 8-9, 12; K. Davis Decl. ¶ 14-15; W. Mathis Decl. ¶ 19-21. Indeed, neither individuals on supervision nor their attorneys are present when the Commission imposes conditions, and they are not otherwise able to seek accommodations or participate in the condition-setting process. *See* Edmondson Decl. ¶¶ 11, 13; Davis Decl. ¶ 13.

CSOSA then imposes more particularized conditions through automated risk assessment tools, none of which are designed to provide reasonable accommodations to people with disabilities. *See* Verriest Decl. Ex. F (CSOSA Congressional Budget Justification Fiscal Year 2024 (Mar. 9, 2023)) at 7, 52, https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2023/03/CSP-FY2024-Congressional-Budget-Justification-03092023.pdf). At no point does CSOSA ask supervisees if they have disabilities that would make it harder to navigate supervision rules, or if they need reasonable accommodations to their supervision obligations. Edmondson Decl. ¶ 17; Mathis Decl. ¶¶ 20-21; Davis Decl. ¶¶ 14-15. Further, there is no formal process for individuals on supervision or their attorneys to provide information about disability-related reasonable accommodation needs. Edmondson Decl. ¶ 9.

To the extent Defendants utilize knowledge of an individual's disability, it is to *increase* the number and scope of supervision requirements for people with certain mental health conditions. Defendants put such individuals on "mental health" supervision, which entails added requirements such as increased drug testing, extra programming, and more frequent meetings— with no provision for reasonable accommodations. *See* Edmonson Decl. ¶¶ 19-20; Verriest Decl.

Ex. A (CSOSA 6/23 FOIA Response) at 1-2 (admitting CSOSA has no "policies, procedures, guidelines, or any other rules or instructions" on "[p]roviding … reasonable accommodations").

CSOSA and the Commission then enforce supervision rules without assessing people's needs for accommodations or providing needed accommodations. *See* Edmondson Decl. ¶¶ 21-22. Unsurprisingly, many people with disabilities are accused of violating supervision rules— exposing them to sanctions including added supervision conditions; extensions of their supervision terms; or revocation and incarceration. *See id.* ¶ 23.

Further, the Commission systematically fails to accommodate disabilities throughout the revocation process. During revocation proceedings, individuals and their attorneys often raise the individual's disabilities and explain the manner in which those disabilities have impeded technical compliance with supervision. *Id.* ¶ 31. Even when the Commission knows about someone's disability—and has acknowledged that their disability makes following their supervision rules difficult or even impossible—it regularly revokes supervision and orders incarceration. *Id.* ¶ 33. When the Commission reinstates individuals with disabilities to supervision (i.e., decides not to impose a new term of incarceration for their violation), it nonetheless reimposes the very same conditions that the individuals' known disabilities preclude them from following, without making any reasonable accommodations—thus setting them up to fail all over again. *Id.*

And whether or not the Commission ultimately revokes supervision, people accused of violations are incarcerated in the D.C. Jail while awaiting their revocation hearings—for an average of about four months. Verriest Decl. Ex. G (Andrea Fenster, Prison Policy Initiative, *Technical difficulties: D.C. data shows how minor supervision violations contribute to excessive jailing* (Oct. 28, 2020), https://www.prisonpolicy.org/blog/2020/10/28/dc_technical_violations/); *see also* Edmondson Decl. ¶ 37. Such terms of incarceration are more than enough time to lose a

job, stable housing, or health care, and risk aggravating an underlying medical condition. *See* Edmondson Decl. ¶¶ 28-30; Davis Decl. ¶¶ 40-41; Mathis Decl. ¶¶ 32-35.

In sum, as a matter of policy and practice, and despite an awareness of people's disability-related limitations, Defendants do not have a system to assess what reasonable accommodations individuals on supervision require in order to have an equal opportunity to succeed on supervision, or provide such accommodations, at any stage of the supervision process. The result is a system that violates federal law and sets Plaintiffs up for failure.

### C.    Defendants' Systematic Failures to Provide Reasonable Accommodations Cause Individuals With Disabilities Ongoing Harm.

Defendants' failures to afford Plaintiffs an equal opportunity to succeed on supervision is causing immediate and ongoing harm. Plaintiffs' inability to meaningfully access their supervision is inherently harmful, as the denial of equal treatment always causes harm—regardless of whether any additional consequences follow.

Plaintiffs also face significant harms above and beyond the fact that Defendants are discriminating against them, including being subjected to heightened supervision conditions, *see* Verriest Decl. Ex. H (CSOSA Operations Manual), ch. VII, p. 22; extension of their supervision sentences, *see* 28 C.F.R. § 2.85(d) (supervision clock stopped based on non-adherence to reporting requirements for parole); 28 C.F.R. § 2.204(e) (same for supervised release); 28 C.F.R. § 2.210 (Commission may seek extension of the supervised release term "[a]t any time" "if less than the maximum authorized term was originally imposed"); and revocation of their supervision term and incarceration, *see* Edmondson Decl. ¶ 26.

Indeed, Defendants regularly revoke supervision and incarcerate people for violations that they know stemmed from a disability-related limitation. Edmondson Decl. ¶ 33. CSOSA admits that people with mental disabilities are almost twice as likely to be charged with technical

supervision violations than the general supervision population. Verriest Decl. Ex. A (CSOSA 6/23 FOIA Response) at 6–7. Meanwhile, Plaintiffs cannot meaningfully access the benefits of success on supervision, such as the possibility of early termination of their supervision. *See* 28 C.F.R. § 2.95 (parole); 28 C.F.R. § 2.208 (supervised release); Verriest Decl. Ex. H (CSOSA Operations Manual), ch. VIII, pp. 17-18; Edmondson Decl. ¶ 25. Further, Plaintiffs' knowledge that they cannot meaningfully access their supervision—and that they could be incarcerated at any moment for violating rules that are exceedingly difficult to follow absent accommodations—creates or exacerbates anxiety and stress. *See* Edmondson Decl. ¶ 30; *see also* Davis Decl. ¶¶ 22, 26*; Mathis Decl. ¶¶ 37-38.

### D.   Named Plaintiffs' Experiences Are Emblematic of Defendants' Systematic Violations.

Named Plaintiffs' experiences on supervision are emblematic of this systematic problem. Plaintiff W. Mathis—a 70-year-old military veteran—has congestive heart failure, which leaves him dizzy and short of breath, and requires him to use a walker whenever he leaves the house. Mathis Decl. ¶¶ 4, 6. As a result, it is hard for Mr. Mathis to walk around the city to get to his myriad supervision appointments each week. *Id.* ¶ 8. Those supervision obligations also regularly conflict with necessary medical appointments and hospitalizations for his health condition. *Id.* ¶¶ 9-11. Although Mr. Mathis provided his CSO with a list of his VA hospital appointments and asked that his meetings be scheduled around them, his CSO "never offered to change [his] appointment dates," or make any other accommodation like meeting at Mr. Mathis's home or allowing him to check in by phone. *Id.* ¶ 12; *see also id.* ¶¶ 19-21. Mr. Mathis is thus forced to choose between getting treatment for his congestive heart failure and complying with the terms of his supervision. *See id.* ¶¶ 9-12.

Rather than accommodating his disability-related needs, in December 2023, CSOSA added a GPS monitoring condition to Mr. Mathis's parole. *Id.* ¶ 13. Mr. Mathis informed his CSO that the GPS monitor was "dangerous for [his] health" because it made his ankle swell, further limiting his mobility. *Id.* ¶¶ 15-17. Mr. Mathis's doctor advised him not to wear the GPS monitor, but having received no accommodation, Mr. Mathis chose to suffer the health consequences rather than risk violating his parole by removing it. *Id.* ¶¶ 17-18.

In January 2024, Defendants incarcerated Mr. Mathis for technical parole violations, including for failing to report to his CSO. *Id.* ¶ 26. However, on three of the four days he was accused of missing appointments, Mr. Mathis was at the VA hospital being treated for heart failure. *Id.* ¶ 27. He stayed in regular contact with his CSO throughout this period—reporting to supervision on five other occasions and wearing his GPS monitor as required. *Id.* ¶¶ 28-29. Nevertheless, when Mr. Mathis reported to his CSO's office on January 22, 2024, he was arrested for technical parole violations. *Id.* ¶ 30. As a result, he was forced to miss a previously scheduled medical appointment—which Defendants knew about—to get a defibrillator that would have treated his congestive heart failure. *Id.* ¶¶ 33-35. A few days later, Defendants released Mr. Mathis on substantially the same conditions that his known disability makes it hard to follow in the first place, without any reasonable accommodations. *Id.* ¶ 37.

Plaintiff K. Davis lives with chronic pain stemming from third-degree burns, which make it hard for him to physically get to supervision appointments and to navigate conflicts between those obligations and necessary medical appointments, including multiple surgeries for his burns. Davis Decl. ¶¶ 18-20. His CSO made him report to the supervision office even after undergoing surgery for his burns, while he was experiencing severe pain and still groggy from prescribed medication. *Id.* ¶ 20. Following surgery, Mr. Davis had to use a wheelchair, crutches, and then a

walker to move around—which made it harder, and more time-intensive, to get to his supervision appointments. *Id.* ¶ 21. Nevertheless, his CSO did not change his supervision conditions in response to his mobility needs. *Id.* ¶ 26

Further, Mr. Davis's anxiety, depression, and PTSD make it overwhelming to track and attend all of his supervision appointments, which include drug testing twice a week and regular reporting to his CSO via phone and in person—on top of frequent medical appointments for his burns and mental health treatment appointments. *Id.* ¶ 12. In addition, Mr. Davis has had to take medications for his mental health that make him feel tired and nauseous and cause slurred speech and headaches, making it hard to keep appointments. *Id.* ¶ 23. His mental health conditions further make it difficult for him to problem-solve, and to reach out for help, when he encounters barriers to meeting his conditions. *Id.* ¶¶ 22-26; Declaration of Tamara Seltzer ("Seltzer Decl.") ¶¶ 14-15. Moreover, Mr. Davis has had five to seven different CSOs in his thirteen years on parole. Davis Decl. ¶ 26. Mr. Davis's mental health conditions make it difficult for him to trust new people, and frequently changing CSOs increases his anxiety. Davis Decl. ¶ 26; *see also* Seltzer Decl. ¶¶ 10, 14. Mr. Davis needs Defendants to make reasonable accommodations that would allow him to succeed on supervision. *See id.* ¶ 51; Seltzer Decl. ¶ 20. Despite their awareness of his disability-related barriers, Defendants have not assessed Mr. Davis's accommodation needs or provided reasonable accommodations. Davis Decl. ¶¶ 14-15, 21, 45.

In August 2023, Defendants arrested Mr. Davis for failing to contact his CSO via phone for a period of less than two weeks, even though he made it to every single one of his drug testing appointments—and tested negative—during that period. *Id.* ¶¶ 29-38. Mr. Davis was required to report to his CSO by phone, but he did not have a working phone. *Id.* ¶¶ 33-34. Mr. Davis was "very anxious and scared" about the fact that he could not meet this requirement. *Id.* ¶ 35. His

anxiety and PTSD gave him "tunnel vision," meaning he focused exclusively on one solution—contacting his mental health advocate at University Legal Services ("ULS") for help—and, when that did not work, he was not able to consider or find alternative options. *Id.* ¶ 35; Seltzer Decl. ¶ 15. Compounding his limited ability to problem-solve, Mr. Davis's mental health conditions make it difficult for him to trust new people, which meant he did not feel capable of asking anyone besides ULS—such as his CSO—for help with this problem. Davis Decl. ¶ 36; Seltzer Decl. ¶¶ 10, 14.

Even though Defendants knew that Mr. Davis was getting help for his mental health conditions and was making efforts to follow his supervision rules despite his disability-related barriers, the Commission revoked Mr. Davis's supervision and sentenced him to 12 months in prison. Davis Decl. ¶¶ 44-45. While incarcerated, Mr. Davis missed a necessary scheduled third surgery for his burns. *Id.* ¶ 40. He is not receiving adequate treatment for his burns in prison and still has not received this surgery. *Id.* At ¶¶ 40, 48. Given Defendants' past practices and lack of a system to provide accommodations, it is a practical certainty that absent preliminary relief, upon release, Mr. Davis will be subject to the same parole conditions that his disabilities make it almost impossible to follow.

## III.   LEGAL ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish that they are (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). Plaintiffs have satisfied all four factors.

A.    **Plaintiffs Are Likely To Succeed on the Merits of Their Claim That Defendants Are Discriminating on the Basis of Disability.**

To state a claim under the Rehabilitation Act, Plaintiffs "must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity" by reason of their disability, "and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008); 29 U.S.C. § 794(a). Courts interpret Section 504 Rehabilitation Act claims "interchangeabl[y]" with claims under Title II of the Americans with Disabilities Act ("ADA"). *Am. Council of the Blind*, 525 F.3d at 1260 n.2; *accord Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) (claims "under the two statutes are virtually identical").

i.    Plaintiffs are "Otherwise Qualified" Individuals with Disabilities and Defendants are Covered Agencies Under the Rehabilitation Act.

Elements (1), (2), and (4) of the Rehabilitation Act are easily met here. Plaintiffs satisfy the first element because they are disabled within the meaning of Section 504 of the Rehabilitation Act. Section 504 adopts the definition of disability used in the ADA, 29 U.S.C. § 794(a); *see* 29 U.S.C. § 705(20)(B), which covers individuals who have "a physical or mental impairment which substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). Congress has made clear that the term "disability" "shall be construed in favor of broad coverage." *Id.* § 12102(4)(A).

Both named Plaintiffs have such substantial limitations. Mr. Mathis has congestive heart failure, which substantially limits his ability to walk. Mathis Decl. ¶¶ 4, 6. Mr. Davis experienced third-degree burns that also substantially limit his ability to walk, Davis Decl. ¶¶ 5-6, and has mental health conditions including anxiety, depression, and PTSD that substantially limit his

ability to think, concentrate, and interact with others, *id.* ¶ 7. Walking, thinking, concentrating, and interacting with others are major life activities. 28 C.F.R. § 35.108(c)(1).

Plaintiffs likewise satisfy the second element because they are "otherwise qualified" for supervision. *Am. Council of the Blind*, 525 F.3d at 1266. An individual with a disability is "qualified" for a program if they meet "the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity." 28 C.F.R. § 39.103. Here, Plaintiffs have been placed on supervision and are subject to its terms, and therefore meet the essential eligibility requirements established by Defendants to participate in supervision.

The fourth element is also straightforward: parole and supervised release are programs or activities carried out by the Commission and CSOSA, federal executive agencies covered under the Rehabilitation Act. 29 U.S.C. § 794(a); *see Am. Council of the Blind*, 525 F.3d at 1266 n.13 (noting with approval that "the federal agencies interpreting section 504 . . . have concluded that 'a federally conducted program or activity is, in simple terms, anything a Federal agency does'") (internal citation omitted).

   ii. <u>Defendants are Discriminating against Plaintiffs on the Basis of Disability.</u>

With respect to Element (3), Defendants are discriminating against Plaintiffs on the basis of their disabilities. The Rehabilitation Act requires regulated entities, such as Defendants, to make "reasonable accommodations" to their programs, services, and activities to guarantee that people with disabilities have "meaningful access" to them. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Meaningful access, in turn, requires ensuring that people with disabilities have an "equal opportunity to . . . gain the same benefit" from the program, activity, or service as people without disabilities. *Segal v. Metro. Council*, 29 F.4th 399, 404 (8th Cir. 2022) (quoting *Choate*, 469 U.S. at 305); *see also* 28 C.F.R. § 39.130(b)(1)(ii). The D.C. Circuit has explained the "general pattern"

courts follow in applying the meaningful access standard as follows: "Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit." *Am. Council of the Blind*, 525 F.3d at 1267.

This means, as discussed in more detail below, that covered entities must take *affirmative* steps to eliminate obstacles and thereby ensure meaningful access. *See Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015) (K.B. Jackson, J.). Conversely, when an entity fails to affirmatively assess people's accommodation needs and provide the accommodations needed to "meaningful[ly] access" the program, the entity violates the Rehabilitation Act. *See Pierce*, 128 F.3d at 267-72; *Armstrong v. Davis*, 275 F.3d 849, 858-59, 870-72 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05, 510-15 (2005) (clarifying that the deferential-to-prisons standard of *Turner v. Safley*, 482 US. 78 (1987), applies only where the right asserted is "inconsistent with proper incarceration").

In addition, the regulations implementing the Rehabilitation Act, which the Supreme Court recognized as an "important source of guidance," *Choate*, 469 U.S. at 304 n.24, forbid regulated entities from using "criteria or methods of administration the purpose or effect of which would— (i) Subject qualified handicapped persons to discrimination on the basis of handicap; or (ii) Defeat or substantially impair accomplishment of the objectives of a program or activity with respect to handicapped persons," 28 C.F.R. § 39.130(b)(3). This requirement prohibits adopting "a know-nothing, do-nothing policy of non-administration," *Dunn v. Dunn*, 318 F.R.D. 652, 665 n.12 (M.D. Ala. 2016), that results in discrimination against people with disabilities, "including by failing to accommodate them," *id.* At 664.

Here, Defendants' systematic failure to assess whether and what types of accommodations Plaintiffs require, and to provide such accommodations, deprives Plaintiffs of an equal opportunity to succeed on supervision. *See* 28 C.F.R. § 39.130(b)(1)(ii); *Choate*, 469 U.S. at 304-05. In addition, Defendants "administ[er]" their policies and practices in ways that have "the effect of" "[s]ubject[ing]" Plaintiffs "to discrimination on the basis of" disability, 28 C.F.R. § 39.130(b)(3)(i), and of "[d]efeat[ing] or substantially impair[ing]" the objectives of supervision, *see id.* § 39.130(b)(3)(ii), which include "help[ing] individuals reintegrate into society as constructive individuals as soon as they are able[.]" *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972) (discussing parole); *accord Johnson v. United States*, 529 U.S. 694, 708-09 (2000) (similar for supervised release).

Defendants do not have a system to affirmatively assess whether people need legally required accommodations or to provide such accommodations when needed. Defendants admit they have no policies regarding evaluating whether people on supervision need reasonable accommodations or providing such accommodations. Verriest Decl. Ex. A (CSOSA 6/23 FOIA Response) at 2–4; Ex. C (Commission 6/20 FOIA Response) at 1–2; Ex. D (Email from Commission to A. Verriest (Aug. 18, 2023)). Nor do Defendants have any procedures by which people on supervision can request accommodations. Verriest Decl. Ex. A (CSOSA 6/23 FOIA Response) at 2–4; Ex. C (Commission 6/20 FOIA Response) at 1–2; Ex. D (Email from Commission to A. Verriest (Aug. 18, 2023)); *see also* Edmondson Decl. ¶ 13.

Instead, the Commission and CSOSA impose highly standardized conditions on all individuals on supervision through an automated process, irrespective of whether the failure to accommodate people's disabilities would deny them an equal opportunity to satisfy those conditions. *See* Verriest Decl. Ex. H (CSOSA Operations Manual), ch. II, V, VI; Verriest Decl.

Ex. I (Commission Operations Manual), pp. 201, 220-22. Defendants then routinely enforce these rules without providing needed accommodations. *See* Edmondson Decl. ¶¶ 21-22.

Defendants place some people with mental health conditions on "mental health supervision" but, in practice, this means only *more* onerous conditions, such as "increased drug testing, extra programming, rigid meeting locations, and more frequent meetings." *Id.* ¶ 19. The "'mental health' supervision program does not involve providing reasonable accommodations," *id.* ¶ 20, as is evidenced by CSOSA's admission that it has no "policies, procedures, guidelines, or any other rules or instructions" on "[p]roviding … reasonable accommodations." Verriest Decl. Ex. A (CSOSA 6/23 FOIA Response) at 1-2; *see* Verriest Decl. Ex. E (CSOSA 9/5 FOIA Response) at 2.

Defendants' lack of a system for assessing accommodation needs and providing reasonable accommodations denies Plaintiffs meaningful access to the benefits of supervision. For example, due to Mr. Mathis's mobility issues and frequent medical appointments, he often struggles to attend his supervision-mandated meetings. Mathis Decl. ¶¶ 7–11. Although Mr. Mathis provided his CSO with a list of his VA hospital appointments and asked that his meetings be scheduled around them, his CSO "never offered to change [his] appointment dates" or make any other accommodation like meeting at Mr. Mathis's home or allowing him to check in by phone. *Id.* ¶ 12. Further, Mr. Mathis's CSO subsequently required him to wear a GPS ankle monitor, even after Mr. Mathis told her that the monitor posed grave health risks given his medical conditions—risks that his VA doctor confirmed. *Id.* ¶¶ 13, 15-17. Indeed, as soon as the GPS monitor was put on Mr. Mathis's ankle, his ankle began to swell. *Id.* ¶ 15. The monitor also made it even harder, and more painful, for Mr. Mathis to walk. *Id.* ¶ 16. The following month, Defendants arrested Mr. Mathis for technical violations of his parole, even though he was at the VA hospital on three of

the four days he was accused of missing supervision meetings and had been wearing his GPS monitor the whole time. *Id.* ¶¶ 26–27.

Likewise, as to Mr. Davis, following his surgery for his third-degree burns, he had to use a wheelchair, crutches, and then a walker to move around—which made it harder, and more time-intensive, to get to his supervision appointments. Davis Decl. ¶ 21. Nevertheless, his CSO did not change his supervision conditions in response to his mobility needs. *Id.* ¶ 26. Defendants also recently incarcerated Mr. Davis for a technical violation due to his mental health disabilities. *Id.* ¶¶ 33-36, 38. Mr. Davis was required to report to his CSO by phone, but he did not have a working phone. *Id.* ¶¶ 33-34. Mr. Davis became increasingly anxious, and his anxiety and PTSD made it difficult for him to problem-solve and find an alternative way to contact his CSO. *Id.* ¶¶ 34-35; Seltzer Decl. ¶¶ 14-15. Due to his mental health conditions, Mr. Davis experienced "tunnel vision"—he repeatedly and exclusively sought help from his mental health provider at ULS, without pivoting to another solution. Davis Decl. ¶ 35; Seltzer Decl. ¶¶ 13-15. Even though Defendants knew Mr. Davis was getting help for his mental health conditions, they revoked his supervision and the Commission sentenced him to a year in prison. Davis Decl. ¶¶ 44-45.

Named Plaintiffs' experiences are anything but isolated instances. Defendants have failed to accommodate (a) an individual on supervision whom they knew had paranoid schizophrenia, which made it virtually impossible to leave home to report for required meetings, Edmondson Decl. ¶ 34, (b) a person whom they knew had severe back pain that left his legs numb and made it difficult to walk, and therefore made it arduous to get to supervision-mandated meetings, *id.* ¶ 35; and (c) a person who was partially paralyzed and whom the Commission even acknowledged was medically unable to comply with his supervision, *id.* ¶¶ 36, 37. These disability-related barriers

make it even harder for people to reintegrate into their communities—frustrating the very purpose of the supervision system.

This unequal access occurs by reason of Plaintiffs' disabilities. Supervision can be onerous for anyone. But due to their disabilities, Plaintiffs confront additional barriers not faced by their non-disabled counterparts. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272-80, 291 (2d Cir. 2003). For example, because of their disabilities, Plaintiffs have heightened difficulties physically getting to locations required by their supervision, understanding their supervision requirements, problem-solving and thinking through solutions when they encounter barriers to compliance, and attending mandated appointments while experiencing serious health issues. *See* Edmondson Decl. ¶¶ 6-7; Mathis Decl. ¶¶ 8-10; Davis Decl. ¶ 17-26; Seltzer Decl. ¶¶ 14-15.

Plaintiffs face these barriers routinely, and—absent relief—will continue confronting them in the future. Plaintiffs thus seek reasonable accommodations to remove "obstacle[s] that impede[] their access to" supervision. *See Am. Council of the Blind*, 525 F.3d at 1267.

Precedent confirms that Defendants' systematic failure to affirmatively assess people's accommodation needs and provide reasonable accommodations violates federal disability law. Defendants have "an affirmative duty to assess the potential accommodation needs of [individuals] with known disabilities . . . and to provide the accommodations that are necessary for those [individuals] to access [their] programs and services." *Pierce*, 128 F. Supp. 3d at 272. Indeed, "[n]othing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned." *Id.* at 269. Defendants must "gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 272 (D.D.C. 2018) (quoting *Updike*

*v. Multnomah Cnty.*, 870 F.3d 939, 954 (9th Cir. 2017)) (alteration in original). Thus, then-Judge Ketanji Brown Jackson held that D.C. "violated Section 504 and Title II [of the ADA] as a matter of law when it failed to evaluate [a disabled individual's] need for accommodation at the time he was taken into custody." *Pierce*, 128 F. Supp. 3d at 267.

A systematic failure to affirmatively assess the need for and to provide reasonable accommodations therefore constitutes disability discrimination. For example, the Ninth Circuit upheld a class-wide injunction requiring California's parole board "to identify . . . which prisoners have a disability, create and maintain a system for tracking disabled prisoners and parolees, and provide them with accommodations at parole and parole revocation proceedings." *Armstrong*, 275 F.3d at 859; *see id.* at 879. The court explained that since federal disability laws "require a public entity to accommodate individuals it has identified as disabled, some form of tracking system is necessary in order to enable the [parole board] to comply with the [law]." *Id.* at 876 (internal citation omitted). Likewise, following a bench trial, a Louisiana federal court held that a prison employed unlawful methods of administration, in violation of the Rehabilitation Act and ADA, by "[f]ailing to identify and track disabilities and accommodation requests in a meaningful way[.]" *Lewis v. Cain*, No. 15-cv-318, 2021 WL 1219988, at *59 (M.D. La. Mar. 31, 2021); *see also Tellis v. LeBlanc*, No. 18-541, 2022 WL67572, at *8-10 (W.D. La. Jan. 6, 2022) (denying defendants' motion for summary judgment on similar claim); *Dunn*, 318 F.R.D. at 665, 683-84 (approving class certification and settlement on similar claim); Stipulated Order for Permanent Injunctive Relief, Dkt. 438, *L.H. v. Schwarzenegger*, No. 6-cv-2042, at 14-16 (E.D. Cal. Oct. 7, 2008) (approving class settlement on similar claim in parole revocation context).

Defendants' systematic failure to accommodate means that Plaintiffs do not have the same opportunity to participate in, and benefit from, their supervision as nondisabled people—which

alone "is, by definition, a lack of meaningful access" under the Rehabilitation Act. *Luke v. Texas*, 46 F. 4th 301, 306 (5th Cir. 2022). That is so "regardless of whether any additional injury follows." *Id.* (citing *Tenn. v. Lane*, 541 U.S. 509, 532-33 (2004)); *accord Am. Council of the Blind*, 525 F.3d at 1270 (vision-impaired plaintiffs' lack of "meaningful access" to U.S. paper currency violated Rehabilitation Act, even absent evidence they were otherwise harmed). For example, the Fifth Circuit held that a plaintiff was denied "meaningful access" to probation because, given his disability, he could not understand meetings with his probation officer—even though the plaintiff "successfully" "completed the terms of his probation." *Luke*, 46 F.4th at 306. Similarly, the Tenth Circuit held that a plaintiff with a hearing disability "was denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals," even though his lawyer attended the hearing, and the hearing resulted in dismissal of all charges. *Robertson v. Las Animas Cnty Sheriff's Dept*, 500 F.3d 1185, 1199 (10th Cir. 2007). Relatedly, this Court held that a plaintiff was "injured" under the Rehabilitation Act when he could not "meaningfully access and participate in his interrogations" due to his psychiatric disability—"even if … his prosecution and confinement were inevitable." *Montgomery v. District of Columbia*, No. 18-cv-1928, 2022 WL 1618741, at \*24-25 (D.D.C. May 23, 2022); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 405 (D. Md. 2011) (plaintiff was denied "meaningful access" to probation-mandated program she could not understand due to her disability, even though she was not accused of violating her probation).

Defendants "cannot stand idly by while people with disabilities attempt to utilize programs and services designed for" non-disabled people. *Pierce*, 128 F. Supp. 3d at 266. Rather, Defendants must systematically, and affirmatively, determine what, if any, reasonable accommodations

Plaintiffs require in order to have an equal opportunity to succeed on supervision, and provide such accommodations based on their individual needs.

**B.     Defendants' Failure To Provide Reasonable Accommodations Is Causing Plaintiffs Irreparable Harm.**

Plaintiffs have established that they have suffered—and likely will continue to suffer—irreparable harm absent injunctive relief.

1. <u>Denial of Equal Treatment</u>: The "denial of equal treatment" is itself an injury, regardless of whether individuals ultimately obtain the benefit sought. *Ne. Fla. Ch. of Assoc. General Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also Gresham v. Windrush Partners, Ltd*., 730 F.2d 1417, 1423 (11th Cir. 1984) ("irreparable injury may be presumed from the fact of discrimination"). Thus, courts routinely hold that requiring individuals with disabilities to operate "under discriminatory conditions"—including by failing to provide necessary reasonable accommodations—"is itself a form of irreparable injury." *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011) (collecting cases); *see also Doe v. Judicial Nominating Com'n*, 906 F. Supp. 1534, 1545 (S.D. Fla. 1995) ("Discrimination on the basis of disability is the type of harm that warrants injunctive relief."). For example, this Court held that requiring a law school graduate to take the bar exam without reasonable accommodations constitutes irreparable injury, irrespective of the possibility that she might pass the test. *Bonnette*, 796 F. Supp. 2d at 187. Similarly, failure to "reasonably accommodate" people with disabilities during their immigration proceedings "constitutes irreparable harm"—regardless of whether additional consequences, such as prolonged detention or removal, are imposed. *Franco-Gonzalez v. Holder*, No. 10-cv-2211, 2013 WL 3674492, at *16 (C.D. Cal. Apr. 23, 2013). And as discussed above, the inability to meaningfully access probation, in and of itself, constitutes disability discrimination. *Luke*, 46 F. 4th at 306.

Here, absent injunctive relief, Defendants will continue to administer supervision in a discriminatory manner—without systematically assessing what, if any, reasonable accommodations Plaintiffs require to meaningfully access supervision, and without providing such accommodations. As a direct result, Plaintiffs will be forced to continue navigating wide-ranging and complex supervision rules without the individual accommodations they need, and to which they are legally entitled. This, alone, constitutes irreparable harm.

2. Consequences of the Denial of Equal Treatment: Plaintiffs will also continue to suffer significant and irreparable injuries from Defendants' conduct above and beyond discrimination itself, including an increased risk of arrest, incarceration, and prolonged supervision—all of which can exacerbate Plaintiffs' mental and physical health conditions, jeopardize their jobs and housing, and lead to severe emotional distress.

Defendants' systematic failure to provide legally mandated accommodations puts Plaintiffs at heightened risk of being accused of supervision violations, which can trigger sanctions including incarceration—an "undeniably substantial and irreparable harm." *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 & n.20 (D.D.C. 2002) (collecting cases). Defendants regularly incarcerate people for alleged supervision violations due to their disabilities. Edmondson Decl. ¶¶ 33-36. For example, Mr. Davis is currently serving a 12-month prison sentence for a technical violation related to his disabilities. Davis Decl. ¶¶ 2, 27, 30-44. Due to this incarceration, he missed a necessary third surgery for his burns. *Id.* ¶ 40. He still has not gotten that surgery while in prison. *Id.* ¶ 48. And beyond the surgery, neither the D.C. Jail, where he was detained pending revocation, nor Federal Correctional Institution-Loretto ("FCI-Loretto"), where he is currently imprisoned, has provided adequate treatment for his burns. *Id.* ¶ 40. Incarceration also exacerbates Mr. Davis's mental health conditions, making him feel even more anxious, hopeless, and discouraged. *Id.*

¶¶ 41, 49-50. Nevertheless, Mr. Davis is not taking medication for his mental health conditions while incarcerated, because he is afraid that exhibiting side-effects, such as slurred speech, can make it appear he is intoxicated and may lead to placement in solitary confinement. *Id.* ¶ 50. Additionally, in January 2024, Mr. Mathis spent about ten days in jail for violations related to missing supervision meetings that occurred while he was hospitalized for his congestive heart failure. Mathis Decl. ¶¶ 26-27, 31. While incarcerated, he missed a scheduled appointment to get a defibrillator for his congestive heart failure. *Id.* ¶¶ 33, 35.

Beyond arrest and incarceration, individuals deemed non-compliant with supervision could have their supervision terms extended for years, or decades, into the future. Where people are not able to maintain contact with their supervision officer, Defendants can consider them to have "absconded"—a determination that will stop the running of the clock on their term of supervision and prevent its expiration. 28 C.F.R. §§ 2.85(d), 2.204(e). And if the Commission is dissatisfied with an individual's performance on supervised release "[a]t any time," it can "submit to the Superior Court a motion to extend the term of supervised release to the maximum term authorized by law, if less than the maximum authorized term was originally imposed." 28 C.F.R. § 2.210(a). Meanwhile, Plaintiffs will remain unable to access benefits of supervision, such as early termination of supervision, available to those whom Defendants deem to have complied with their supervision and who avoid revocation for a period of years. *See* 28 C.F.R. §§ 2.95, 2.208.

Absent injunctive relief, Plaintiffs will continue to live under a constant and pervasive threat of sanctions, including incarceration, for inadvertent, unknowing, or unavoidable rule violations. *See* Davis Decl. ¶¶ 22-26; Mathis Decl. ¶¶ 37-38. It is "reasonable to expect" that Plaintiffs will remain unable to meaningfully access their supervision, and at risk of punishment—further destabilizing their lives. *See Honig v. Doe*, 484 U.S. 305, 319-20 (1988).

C. **The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.**

The balance of equities and the public interest merge in cases against the government. Thus, where the relief sought is squarely within the public interest, there can be no harm to the government. *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511-12 (D.C. Cir. 2016).

Here, the public—and therefore the government—"has a strong interest in the effective enforcement of the Rehabilitation Act." *Callicotte v. Carlucci*, 698 F. Supp. 944, 951 (D.D.C. 1988) (citing *Shirley v. Devine*, 670 F.2d 1188 (D.C. Cir. 1982)); *see also Enyart v. Nat'l Conf. of Bar Examiners*, 630 F.3d 1153, 1167 (9th Cir. 2011) ("public interest is served by requiring entities to take steps to 'assure equality of opportunity' for people with disabilities") (internal citation omitted). Indeed, the Rehabilitation Act and ADA reflect Congress's view that the public has an interest in eradicating discrimination against people with disabilities. *See, e.g.*, 42 U.S.C. § 12101(a)(8) ("continuing existence of unfair and unnecessary discrimination and prejudice" against people with disabilities "costs the United States billions of dollars"); *id.* § (a)(7) (public interest served by requiring entities to take steps to "assure equality of opportunity" for individuals with disabilities).

Plaintiffs' irreparable injuries plainly outweigh any alleged harm to Defendants. Because granting Plaintiffs' requested relief advances the public interest, the Commission and CSOSA cannot credibly argue that an injunction will cause them any genuine harm. Indeed, the public interest is *advanced* by a well-functioning supervision system that ensures people with disabilities have an equal opportunity to succeed on supervision and reintegrate into society. Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is substantial public interest 'in having government agencies abide by the federal

laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations omitted). Accordingly, these factors weigh in favor of issuing preliminary injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: May 6, 2024

ALLISON FRANKEL
(*Pro Hac Vice* Motion Forthcoming)
afrankel@aclu.org
ASHIKA VERRIEST (D.C. Bar No. 90001468)
averriest@aclu.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, NY 10004
Tel.: (617) 650-7741

SCOTT MICHELMAN (D.C. Bar No. 1006945)
smichelman@acludc.org
MICHAEL PERLOFF (D.C. Bar No. 1601047)
mperloff@acludc.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF THE DISTRICT OF
    COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel.: (202) 457-0800

Respectfully submitted,

*/s/ Hanna M. Perry*
HANNA M. PERRY (D.C. Bar No. 90003756)
hperry@pdsdc.org
PUBLIC DEFENDER SERVICE FOR THE
    DISTRICT OF COLUMBIA
633 3rd Street NW
Washington, D.C. 20004
Tel.: (202) 579-0633

SAMIR DEGER-SEN (D.C. Bar No. 1510881)
samir.deger-sen@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel.: (212) 906-1200
Fax: (212) 751-4864

PETER E. DAVIS (D.C. Bar No. 1686093)
peter.davis@lw.com
CHRISTINE C. SMITH (D.C. Bar No. 1658087)
christine.smith@lw.com
JORDAN L. HUGHES (D.C. Bar No. 90004355)
jordan.hughes@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Plaintiffs and the Proposed Class*