**Rashida Edmondson Declaration**

1. My name is Rashida Edmondson. I am the Chief of the Parole Division at the Public Defender Service for the District of Columbia (PDS).
2. I started as a staff attorney in the Division 17 years ago, and have served as the Division's Chief for four years. In this role, I supervise nine attorneys who represent people on parole and supervised release at revocation hearings before the U.S. Parole Commission. I also carry an active caseload and directly represent clients in front of the U.S. Parole Commission.
3. I have represented and have supervised the representation of thousands of people in parole and supervised release (supervision) revocation hearings.
4. PDS represents nearly all of the people subjected to supervision revocation hearings in Washington, D.C.
5. Many of our clients have disabilities, including mental health, intellectual/developmental, and physical disabilities. On any given day of probable cause hearings, when newly arrested supervisees meet their attorneys and have their first hearings in front of the Commission, we are assigned to several people subjected to revocation who have disabilities. It is a virtual guarantee that there will be at least one person on the docket who has one or more disabilities, and there are often dockets with over half of the people having disabilities.
6. Our clients with disabilities regularly have heightened difficulties complying with supervision rules due to their disabilities. For example, many clients have difficulties physically accessing locations for required meetings, keeping track of their supervision appointments, meaningfully engaging with their supervision officers, and attending mandated appointments while experiencing serious health issues.
7. Many of our clients with disabilities need reasonable accommodations to their supervision rules in order to have a meaningful chance of completing their supervision requirements. Reasonable accommodations for our clients could include explaining their supervision conditions in plain language, providing appointment reminders and transportation assistance, and flexibly scheduling clients' meeting times, locations, and frequencies based on clients' individual needs and abilities.

8. The United States Parole Commission (the Commission) and Court Services and Offender Supervision Agency (CSOSA) do not have a practice of providing reasonable accommodations to people on supervision.
9. To my knowledge, neither agency has any policies, guidance, or procedures regarding providing reasonable accommodations to people on supervision. Further, to my knowledge the agencies do not publicly advise people of their rights under federal disability laws, including their rights to reasonable accommodations. Additionally, there is no formal process for individuals on supervision or their attorneys to provide information about their disabilities or accommodation needs.
10. The Commission imposes "general" and "special" supervision conditions on people released to supervision.
11. Neither individuals serving supervision, nor their attorneys, are present when the Commission imposes a person's initial supervision conditions, or imposes or modifies conditions outside of revocation hearing.
12. The Commission does not request information from people on supervision regarding their disabilities or consider whether they need reasonable accommodations in order to have an equal opportunity to succeed on supervision.
13. There is no system for attorneys to seek reasonable accommodations to supervision conditions imposed by the Commission.
14. After the Commission imposes conditions, CSOSA determines and oversees the details of those supervision rules and creates supervision plans.
15. CSOSA uses automated risk assessment tools to create a "prescriptive supervision plan" called a PSP.
16. In theory, a supervision officer can override, or make changes to, the PSP. However, in my experience, modification of the PSP rarely, if ever, occurs in practice.
17. When creating the PSP or setting the details of supervision terms, CSOSA does not solicit information from individuals on supervision about their disability-related limitations and needs for accommodations.
18. Attorneys are not present when CSOSA creates the PSP or sets the details of supervision terms.

19. The Commission and CSOSA put some people on "mental health" supervision. In practice, "mental health" supervision entails added requirements, such as increased drug testing, extra programming, rigid meeting locations, and more frequent meetings.
20. The "mental health" supervision program does not involve providing reasonable accommodations.
21. The Commission and CSOSA have a practice of enforcing supervision rules without assessing people's needs for reasonable accommodations or providing needed accommodations.
22. Even where the Commission and CSOSA are aware that a client has a disability and needs reasonable accommodations to their supervision rules, the entities regularly enforce supervision rules without providing needed accommodations.
23. As a result, our clients with disabilities are routinely accused of supervision violations.
24. This impacts our clients' ability to succeed on supervision.
25. When clients do well on supervision and avoid violations, they have access to benefits including the possibility of early termination of their supervision.
26. When clients are unsuccessful on supervision and are accused of violations, they face consequences including added supervision conditions, extension of their supervision sentences, and revocation and incarceration.
27. Revocation also results in periods of incarceration. When a person on supervision is accused of a violation—even a technical violation that would not otherwise constitute a crime—they are automatically put in jail.
28. Clients in jail regularly lose their housing, jobs, ability to care for dependents, and access to health care and medications.
29. Being in the jail is also harmful to people with disabilities, due to the lack of access to appropriate mental and physical healthcare at the jail.
30. Further, in my experience, clients' mental and physical health issues become exacerbated during and after periods of incarceration. The threat of incarceration that looms over my clients who have difficulty meeting their requirement has caused them severe anxiety and stress.
31. During revocation hearings, my colleagues and I regularly raise our clients' disabilities and the manner in which their disability-related limitations have impeded compliance with supervision.

32. However, the Commission regularly fails to consider our clients' disability-related limitations and accommodation needs in the revocation process.
33. The Commission regularly revokes our clients' supervision and incarcerates them for violations that they know stemmed from a disability-related limitation. Other times, the Commission reinstates our clients to supervision, and returns them to the community with the same conditions that their known disability demonstrably precludes them from following, without making any reasonable accommodations.
34. For example, one individual I represented who was on parole had paranoid schizophrenia. He felt nervous around other people and was often afraid to leave his house. As a result, he occasionally spent a week or more in his house without leaving. His disability made it difficult for him to make it to appointments in the community. His disability also made it difficult for him to plan and complete tasks, which made it hard for him to keep track of and organize his supervision requirements. His CSO and the Commission were aware of his disability, but they never made any offer to change his conditions to accommodate it. He was recently incarcerated during revocation hearings for failing to comply with these technical requirements of supervision. Although he was ultimately reinstated, the Commission imposed the very same requirements that his disability made it difficult for him to comply with.
35. In another example, an individual with extreme nerve pain in his back that left his legs numb for long periods of time was forced to attend multiple monthly supervision appointments far from his home despite telling his CSO about his difficulty walking. This individual had back surgery in November of 2023 to place screws in his spine and address a bulging disc. His back pain persisted after the surgery, and he continues to experience leg numbness after walking long periods. Despite this disability, CSOSA and the Commission have failed to provide reasonable accommodations. In fact, they have increased the number and frequency of his supervision conditions even though his parole has not been revoked for over five years. In November of 2023, after his surgery, the Commission had him arrested for alleged technical violations of his parole. Although the Commission did not revoke his parole, it held him at the D.C. Jail for nearly three months, and he was released to continued supervision without any accommodations.
36. Another client of mine had physical disabilities, including paralysis that left him in a wheelchair. This disability, which the Commission and CSOSA were aware of, made it

difficult for him to travel throughout the city and make it to his supervision appointments. The Commission and CSOSA never offered any accommodation to this individual. The Commission nonetheless incarcerated him twice for technical violations of supervision, including not attending these appointments.

37. The Commission refuses to accommodate people's disabilities even when they are aware of, and explicitly acknowledge, how difficult compliance with supervision is because of these disabilities. In fact, I have seen the Commission impose conditions on my clients without any accommodation after explicitly acknowledging that my clients' disabilities will make compliance with supervision impossible. For example, as to my client who was paralyzed, a hearing examiner for the Commission explicitly acknowledged that he was medically unable to comply with supervision. Nonetheless, the Commission incarcerated him for several weeks for not complying with these very conditions, and then reimposed the same conditions when he was released. When he was again re-arrested for not complying with these same conditions of supervision, the Commission held him in the D.C. jail for over a month and he nearly lost his housing.

I declare under penalty of perjury under the laws of the United States of America that the above statement is true and correct.

Executed on April 18, 2024

_____
Rashida Edmondson