# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

W. MATHIS, et al.

                Plaintiffs,

v.

UNITED STATES PAROLE COMMISSION,
et al.,

                Defendants.

Civil Action No. 1:24-cv-01312-TNM

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................2

    I.      Section 504 Is Judicially Enforceable. .............................................................2

           A.    There Is an Implied Right of Action To Enforce Section 504. ...................2

           B.    This Court Has Inherent Equitable Power To Enforce the Rehabilitation Act. ......................................................................................10

    II.    Plaintiffs Are Likely To Succeed on the Merits of Their Section 504 Claims. ............................................................................................................14

           A.    Requiring Plaintiffs To Navigate Supervision Without Needed Accommodations, in and of Itself, Constitutes Discrimination. ...............16

           B.    Defendants Are Discriminating Against Plaintiffs "Solely by Reason of" Disability. ..........................................................................17

    III.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief. .......................22

    IV.    The Remaining Factors Favor Preliminary Injunctive Relief. ..............................24

CONCLUSION .................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alexander v. Choate,*
469 U.S. 287 (1985)......................................................................................16, 17, 18

*Alexander v. Sandoval,*
532 U.S. 275 (2001)............................................................................................2, 3, 4, 9

*\*Am. Council of the Blind v. Paulson,*
463 F. Supp. 2d 51 (D.D.C. 2006),
*aff'd*, 525 F.3d 1256 (D.C. Cir. 2008) ..............................................................4, 10, 13

*\*Am. Council of the Blind v. Paulson,*
525 F.3d 1256 (D.C. Cir. 2008)....................................................................7, 16, 18, 19

*Am. Council of the Blind v. Paulson,*
581 F. Supp. 2d 1 (D.D.C. 2008) ................................................................................7

*Am. School of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902)......................................................................................................10

*\*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015)......................................................................2, 10, 11, 12, 13

*Bannister v. U.S. Parole Comm'n,*
2019 WL 1330636 (D.D.C. Mar. 25, 2019)...............................................................6

*Bonnette v. D.C. Ct. of Appeals,*
796 F. Supp. 2d 164 (D.D.C. 2011) .............................................................17, 22, 23

*Callicotte v. Carlucci,*
698 F. Supp. 944 (D.D.C. 1988) ..............................................................................24

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979)....................................................................................................3, 8, 9

*Carroll v. Safford,*
3 How. 441 (1845) .....................................................................................................10

*Clark v. Skinner,*
937 F.2d 123 (4th Cir. 1991) ...................................................................................5

*Cousins v. Dep't of Transp.*,
   880 F. 2d 603 (1st Cir. 1989) ........................................................................5

*Crown Castle Fiber, L.L.C.. v. City of Pasadena*,
   76 F.4th 425 (5th Cir. 2023) .......................................................................13

*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018)..............................................................25

*DaVita, Inc. v. Amy's Kitchen, Inc.*,
   981 F.3d 664 (9th Cir. 2020) ......................................................................25

*Day v. District of Columbia*,
   894 F. Supp. 2d 1 (D.D.C. 2012).................................................................16

*Doe v. Att'y Gen. of U.S.*,
   941 F.2d 780 (9th Cir. 1991) .........................................................................9

*Gomez-Perez v. Potter*,
   553 U.S. 474 (2008).......................................................................................8

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
   599 U.S. 166 (2023) ...............................................................................11, 12

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003)..............................................................19, 20, 22

*Holland v. Florida*,
   560 U.S. 631 (2010).....................................................................................11

*Honig v. Doe*,
   484 U.S. 305 (1988)......................................................................................24

*Hutchins v. District of Columbia*,
   188 F.3d 531 (D.C. Cir. 1999) .....................................................................14

*J.L. v. Soc. Sec. Admin.*,
   971 F.2d 260 (9th Cir. 1992) ..........................................................................4

*Lane v. Pena*,
   867 F. Supp. 1050 (D.D.C. 1994), *vacated in part on other grounds as
   explained in Lane v. Pena*, 518 U.S. 187 (1996)...................................4, 13

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)..........................................................................25

*Lee v. U.S. Agency for Int'l Dev.*,
   859 F.3d 74 (D.C. Cir. 2017) .........................................................................2

*Luke v. Texas*,
46 F.4th 301 (5th Cir. 2022) ...................................................................17, 23

*McQuiggin v. Perkins*,
569 U.S. 383 (2013).............................................................................................11

*McRaniels v. U.S. Dep't of Veterans Affs.*,
2017 WL 2259622 (W.D. Wis. May 19, 2017) .........................................6

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)........................................................................................8, 9

*Morrissey v. Brewer*,
408 U.S. 471 (1972).............................................................................................17

*Moya v. U.S. Dep't of Homeland Sec.*,
975 F.3d 120 (2d Cir. 2020)..........................................................................5

*Murphy v. District of Columbia*,
590 F. Supp. 3d 175 (D.D.C. 2022) ...........................................................21

*\*Nat'l Ass'n of the Deaf v. Trump*,
486 F. Supp. 3d 45 (D.D.C. 2020)..............................3, 4, 5, 6, 7, 8, 13

*Ne. Fla. Ch. of Assoc. Gen. Contractors v. City of Jacksonville*,
508 U.S. 656 (1993).............................................................................................22

*Osborn v. Bank of United States*,
9 Wheat. 738 (1824) .........................................................................................10

*Peebles v. Potter*,
354 F.3d 761 (8th Cir. 2004) ......................................................................18

*Pierce v. District of Columbia*,
128 F. Supp. 3d 250 (D.D.C. 2015)....................................................16, 20

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946)............................................................................................11

*Sai v. Dep't of Homeland Sec.*,
149 F. Supp. 3d 99 (D.D.C. 2015)............................................................5, 6

*Schine by Short v. N.Y. State Off. for People with Dev. Disabilities*,
2017 WL 9485650 (E.D.N.Y. Jan. 5, 2017), *report and recommendation
adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017)...........................18

*Shirley v. Devine*,
670 F.2d 1188 (D.C. Cir. 1982)...................................................................24

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ............................................................................................17

*United States v. Law*,
  528 F.3d 888 (D.C. Cir. 2008) ..............................................................................7

*Verizon Md., Inc. v. Pub. Serv. Comm'n*,
  535 U.S. 635 (2002) ...................................................................................11, 12

*Washington v. Fed. Bureau of Prisons*,
  2019 WL 2125246 (D.S.C. Jan. 3, 2019), *report and recommendation
  adopted*, 2019 WL 1349516 (D.S.C. Mar. 26, 2019) ............................................5

## STATUTES

20 U.S.C. § 1681(a) ..................................................................................................3

29 U.S.C.
  § 794(a) ........................................................................................................2, 8, 16
  § 794a(b) ..............................................................................................................10

42 U.S.C.
  § 1396a(a)(30)(A) ................................................................................................12
  § 2000d..................................................................................................................3
  § 12101(a) ............................................................................................................25
  § 12101(b) ............................................................................................................25

Rehabilitation Act
  § 504....................................................................1, 2, 3, 4, 5, 8, 9, 10, 14, 19
  § 505......................................................................................................................8

## RULES

Local Civil Rule 7 ....................................................................................................25

## REGULATIONS

28 C.F.R.
  § 2.19(a)(5) ..........................................................................................................15
  § 2.19(b)(1) ..........................................................................................................15
  § 2.78....................................................................................................................15
  § 2.83(e) ..............................................................................................................15
  § 2.85(a) ................................................................................................................6
  § 2.95....................................................................................................................24
  § 2.95(c) ..............................................................................................................24
  § 2.208..................................................................................................................24
  § 39.130(b)............................................................................................................16

29 C.F.R. § 2.77 ...................................................................................................................15

## OTHER AUTHORITIES

124 Cong. Rec. 30349 (1978) ................................................................................................3

S. Rep. No. 95-890 (1978) ..................................................................................................10

S. Rep. No. 93-1297 (1974) ..................................................................................................3

Defendants do not dispute that the federal government's post-conviction supervision system in Washington, D.C. systematically fails to accommodate people with disabilities, as required by Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"). Instead, Defendants' opposition rests on the stunning assertion that they can discriminate freely without any judicial oversight. Specifically, Defendants contend that there is no cause of action for injunctive relief against federal executive agencies under Section 504. That is wrong. Congress created a private right of action by expressly choosing the same rights-creating language that the federal courts had repeatedly held to imply a cause of action in other antidiscrimination statutes. And, regardless, Supreme Court precedent makes clear that this Court has inherent equitable power to enjoin federal officials who violate the Rehabilitation Act.

Defendants' remaining arguments rest on a fundamental mischaracterization of Plaintiffs' claims. On the merits, Defendants primarily contend that Plaintiffs' parole revocations were not due to their disabilities. But Plaintiffs do not challenge any individual revocation decision. Rather, Plaintiffs challenge Defendants' systematic failure to provide reasonable accommodations necessary for supervisees to have an equal opportunity to succeed on supervision, or to even assess their accommodation needs. Defendants' failure to provide Plaintiffs with the reasonable accommodations they require, in and of itself, constitutes disability discrimination and causes irreparable harm—regardless of whether other consequences, such as incarceration and revocation, follow. And contrary to Defendants' contentions, that harm is far from speculative. Each day that Plaintiffs are forced to navigate unique obstacles to their success on supervision as a result of Defendants' failure to accommodate them is another day that Plaintiffs suffer the serious harms of discrimination. For those reasons and because the remaining equitable factors support relief, this Court should grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

### I.    Section 504 Is Judicially Enforceable.

The centerpiece of Defendants' opposition is the radical contention that courts have no authority to enforce Section 504's antidiscrimination mandate against executive agencies. That is wrong for two independent reasons. First, Section 504 grants an implied private right of action. Second, even if it did not, this Court has inherent equitable power to enjoin violations of the Rehabilitation Act by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

### A.    There Is an Implied Right of Action To Enforce Section 504.

Congress created an implied private right of action for substantive violations of Section 504 by executive agencies like Defendants. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Therefore, courts must "determine whether [the relevant statute] displays an intent to create not just a private right but also a private remedy." *Id.* This analysis "begins with the text and structure of the statute" and may include a review of the context in which the law was enacted. *Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77-78 (D.C. Cir. 2017) (per curiam). Here, those considerations establish that Congress intended to create a private right of action for individuals suing executive agencies for substantive violations of Section 504's antidiscrimination provision.

Section 504 uses the same classic "'rights-creating' language" that the Supreme Court has consistently recognized creates a private cause of action. *Sandoval*, 532 U.S. at 288; *see id.* at 280. Section 504 guarantees that "[n]o otherwise qualified individual with a disability . . . shall . . . be subjected to discrimination . . . under any program or activity conducted by an Executive agency." 29 U.S.C. § 794(a). The relevant language precisely mirrors the language in Titles VI and IX that the Supreme Court has determined creates a private right to sue. *See Sandoval*, 532 U.S. at 278-80

(recognizing existence of private right of action under Title VI, which provides that "[n]o person . . . shall, on the ground of race, color, or national origin, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. § 2000d); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979) (same under Title IX, which provides that "[n]o person . . . shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a)). As the Supreme Court has explained, such language is "the most accurate indicator of the propriety of implication of a cause of action" because it indicates an intent to create not just a right but a remedy. *Cannon*, 441 U.S. at 690 n.13; *accord Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 53 (D.D.C. 2020).

Here, Congress intentionally "modeled" the language of Section 504 on the "parallel language . . . of Title VI, which Congress knew had been interpreted to provide private rights of action." *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 54; *see* S. Rep. No. 93-1297, at 39-40 (1974) ("Section 504 was patterned after, and is almost identical to, the anti-discrimination language of [Title VI]" and "permit[s] a judicial remedy through a private action"); 124 Cong. Rec. 30349 (1978) (discussing "continuing intention of Congress that private actions be allowed under titles VI and VII of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972 and title V of the Rehabilitation Act of 1973"). Given that Congress used "'the verbatim statutory text that courts had previously interpreted to create a private right of action'" and that "'[t]he drafters explicitly assumed [Section 504] would be interpreted and applied as Title VI had been,'" this Court "may properly conclude that Congress created a private right of action in the Rehabilitation Act." *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 54 (first quoting *Sandoval*, 532 U.S. at 288, then quoting *Cannon*, 441 U.S. at 694-95).

Congress's intent to create a right of action under Section 504 is especially clear because the statute does not provide any alternative enforcement mechanism to protect against discrimination by executive agencies in the conduct of programs they operate. In *Sandoval*, the Court concluded that Congress had not intended to create a private right of action against a state for violating disparate-impact regulations in part because the regulating agency could bring suit itself. 532 U.S. at 289-90. But here, there is no possibility of such agency enforcement as the entity discriminating is the agency itself. Thus, it is especially apparent here that Congress intended to create both a private right *and* a private remedy.

Indeed, contrary to what Defendants suggest, the "general consensus" in this Circuit and "across the country" is that Section 504 creates a private right of action "against Executive agencies for injunctive and declaratory relief" for substantive violations of Section 504. *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 55 (collecting cases). For example, in *American Council of the Blind v. Paulson*, this Court held that Section 504 "contemplates awards of declaratory and injunctive relief" against an executive agency. *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 58 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008). Similarly, in *Lane v. Pena*, this Court granted an injunction against an executive agency for violating Section 504. *Lane v. Pena*, 867 F. Supp. 1050, 1053 (D.D.C. 1994), *vacated in part on other grounds as explained in Lane v. Pena*, 518 U.S. 187, 190 (1996) (noting that "the Government did not dispute the propriety of th[e] injunctive relief" but only of the damages award); *see also J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 264 (9th Cir. 1992) (holding that plaintiffs may obtain equitable relief to remedy an executive agency's Section 504 violations), *disapproved on other grounds by Lane*, 518 U.S. at 191.

This consensus was previously shared by the federal government itself. Less than a decade ago, the government argued to this Court that "the Rehabilitation Act 'implies a private right of

action to sue for injunctive relief in federal court' for violations of the *substantive* rights protected by Section 504" by executive agencies, but not for "violations of the *administrative* rules" issued under that statute. *Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 110 (D.D.C. 2015) (quoting government briefing). Yet recently, the government has reversed course and argued that there is *no* private right of action for either substantive *or* regulatory violations.

While the government's original distinction between substantive and regulatory violations finds some support in the case law, *see Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 56, there is little support for Defendants' current suggestion that Section 504 provides no remedy against executive agencies for violations of *substantive* rights. Indeed, all the out-of-circuit cases that Defendants cite addressed only the question of whether plaintiffs had a cause of action against "executive agencies [acting] in their *regulatory* capacity." *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 126 (2d Cir. 2020) (emphasis added); *see* Opp. Br. at 6 (citing *Moya*; *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Dep't of Transp.*, 880 F. 2d 603, 610 (1st Cir. 1989) (en banc)). *Moya*, for instance, concerned whether plaintiffs could "sue [immigration] agencies for discriminatory regulations" governing the waiver of certain tests required for citizenship. Likewise, *Cousins* and *Clark* concerned challenges to an agency's "refusal to amend, modify, or waive [] regulation[s]" mandating that commercial truck drivers meet certain physical requirements. *Cousins*, 880 F.2d at 605; *see Clark*, 937 F.2d at 124-25. Numerous courts have distinguished these cases as involving challenges to regulations governing the plaintiffs' conduct, and have thus permitted suits for injunctive relief against executive agencies alleged to have violated the Rehabilitation Act substantively by denying reasonable accommodations in their own programs. *See, e.g.*, *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 56; *Washington v. Fed. Bureau of Prisons*, 2019 WL 2125246, at *8 (D.S.C. Jan. 3, 2019), *report and recommendation adopted*,

2019 WL 1349516 (D.S.C. Mar. 26, 2019); *McRaniels v. U.S. Dep't of Veterans Affs.*, 2017 WL 2259622, at *4 (W.D. Wis. May 19, 2017). *Sai*, which addressed an agency's failure to respond to the plaintiff's administrative complaints in the time required by the agency's regulations, is the only case Defendants have identified that seriously considered and rejected this regulatory-vs.-substantive-rights distinction. 149 F. Supp. 3d at 112-15. But as Judge Boasberg explained, that case was decided "[w]ithout the benefit of" meaningful "adversarial briefing" and contradicts the text of the Rehabilitation Act. *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 56-57; *see supra* at 2-3.

Defendants also point to *Bannister v. U.S. Parole Commission*, 2019 WL 1330636 (D.D.C. Mar. 25, 2019), but that case is consistent with the distinction that the government previously advocated between regulatory and substantive violations—not with Defendants' current view that the Rehabilitation Act provides no remedy for substantive violations. In *Bannister*, the plaintiff brought both a substantive failure-to-accommodate claim and a claim that the Commission failed to promulgate regulations. *Id.* at *1-3. The district court evaluated the plaintiff's failure-to-accommodate claim and rejected it on the merits—*not* because the plaintiff lacked a cause of action. *Id.* at *4-6. Only when assessing the plaintiff's request for injunctive relief "compelling the Commission to adopt regulations" did the court find no cause of action. *Id.* at *6 (stating that the cause of action "would arise under the [Administrative Procedure Act ("APA")]," "if it exists").

Here, Plaintiffs do not seek "an injunction requiring regulatory changes," Opp. Br. at 6, but instead challenge Defendants' substantive violations of the Rehabilitation Act with respect to their own programs. Unlike in *Bannister*, Plaintiffs do not seek an order compelling Defendants to promulgate any notice-and-comment regulations. And unlike in *Cousins* and *Clark*, Plaintiffs are not requesting a change to existing regulations, such as those governing "general conditions of release," 28 C.F.R. § 2.85(a) (parole); *id.* § 2.204(a) (supervised release), nor are they seeking a

blanket exemption for people with disabilities. Rather, Plaintiffs are simply seeking an order requiring Defendants to evaluate the needs of people with disabilities and provide accommodations to meet them. That is a straightforward request that Defendants conduct their own program in compliance with the Rehabilitation Act, which courts routinely grant. *See, e.g.*, *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 59-61 (enjoining White House to make COVID-19 briefings accessible to hearing-impaired plaintiffs); *Am. Council of the Blind v. Paulson*, 581 F. Supp. 2d 1, 2 (D.D.C. 2008) (enjoining Treasury Department to make currency accessible to vision-impaired plaintiffs); *see also Am. Council of the Blind*, 525 F.3d 1256 (affirming summary judgment to plaintiffs seeking currency redesign).

Accepting Defendants' position would run contrary to the weight of authority and would undermine Congress's intent in enacting the Rehabilitation Act. Importantly, Defendants' view is not that Plaintiffs have sued under the wrong statute (i.e., the Rehabilitation Act instead of the APA), but rather that Plaintiffs have *no* remedy for their disability discrimination *at all*, under *any* statute. *See* Opp. Br. at 6.[1] If accepted, that extreme position would subvert Congress's core purpose in enacting the Rehabilitation Act: "to ensure that members of the disabled community could . . . fully participate in society," such as by reintegrating into society through supervision. *Am. Council of the Blind*, 525 F.3d at 1259. It is simply not plausible that Congress enacted a sweeping statute to protect the rights of people with disabilities—a statute expressly modeled on other antidiscrimination laws that courts had repeatedly interpreted to imply private rights of

---

[1] Plaintiffs reserve all rights to challenge Defendants' actions under the APA and disagree with Defendants' contention that review would not be available because "the Commission's imposition of parole conditions is a decision committed to agency discretion as a matter of law" or because the agencies' decisions are not final. Opp. Br. at 6-7. Defendants also make cursory mention of the National Appeals Board, *id.* at 7, but nowhere suggest that Plaintiffs failed to meet any applicable administrative exhaustion requirement. *See United States v. Law*, 528 F.3d 888, 908 n.11 (D.C. Cir. 2008) (treating argument as waived where litigant "failed to develop it").

action—with the intent of depriving such individuals of any ability to enforce those protections against executive agencies. *Cf. Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 57 (emphasizing that "following *Sai* . . . would leave Plaintiffs without a judicial remedy"). This Court should reject that contention as inconsistent with the text of the Rehabilitation Act.

That inconsistency is further underscored by Defendants' decision to focus not on the text of Section 504 but on the 1978 amendments to the Rehabilitation Act in Section 505. *See* Opp. Br. at 4. In 1978, Congress amended the Rehabilitation Act to (1) add executive agencies as actors prohibited from discriminating under Section 504 and (2) clarify the remedies, including monetary damages, available to plaintiffs suing the government for discrimination in employment and funding, in Section 505. *See* 29 U.S.C. § 794(a) (Section 504); *id.* § 794a(a) (Section 505); *Lane*, 518 U.S. at 193; *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 51-53. Defendants argue that Section 505 shows that Congress wanted to grant a remedy for discrimination by the government as an employer and funder, but not for discrimination by executive agencies. Opp. Br. at 4-5.

But the text and context prove precisely the opposite. When a court interprets legislation, "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with . . . important precedents from [the Supreme Court] and other federal courts and that it expected its enactment to be interpreted in conformity with them." *Cannon*, 441 U.S. at 699; *accord, e.g.*, *Gomez-Perez v. Potter*, 553 U.S. 474, 485 (2008). That presumption applies equally to recognition of an implied cause of action. *See, e.g.*, *Cannon,* 441 U.S. at 695-98 & nn.20-21. For example, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379, 386 (1982), the Supreme Court held that Congress had preserved an implied cause of action that "federal courts routinely and consistently had recognized" in the Commodities Exchange Act by substantially amending the statute and leaving the text implying the cause of action in place.

8

That is precisely what Congress did here in 1978 in expanding the scope of Section 504 without limiting in any way the language that courts had construed to create an implied right of action. Prior to the 1978 amendments, "federal courts routinely and consistently had recognized an implied private cause of action" under Section 504, making it part of the "'contemporary legal context' in which Congress legislated." *Id.* at 379-81 (discussing principle as to the Commodities Exchange Act); *see Doe v. Att'y Gen. of U.S.*, 941 F.2d 780, 786 (9th Cir. 1991) (collecting cases discussing the existence of an implied right of action in the Rehabilitation Act), *disapproved on other grounds by Lane*, 518 U.S. 187. Indeed, the "congressional debate on the amendments demonstrates that Congress knew that the courts had interpreted section 504 to provide this means of enforcement." *Doe*, 941 F.2d at 786. Against that backdrop, "the fact that a comprehensive reexamination and significant amendment" of the Rehabilitation Act "left intact the statutory provision[] under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that review," *Curran*, 456 U.S. at 381-82, including for the new prohibition on discrimination by executive agencies.[2]

Indeed, rather than set out the new coverage of executive agencies in a separate section, "Congress appended th[at] new coverage to the end of the pre-existing sentence under which the private cause of action had been implied." *Doe*, 941 F.2d at 790. Thus, it is clear "[t]hat Congress intended violations of the new clause to be enforced in the same way as violations of the pre-existing clause." *Id.* That interpretation is further reinforced by the fact that Congress authorized "attorney's fees" for successful suits in "*any* action or proceeding to enforce or charge a violation

---

[2] Although *Sandoval* narrowed the test for finding implied rights of action going forward, it did not cast any doubt on the Court's prior holding in *Cannon* recognizing the significance of Congress's decision to deploy and preserve language previously held to imply a right of action. *See* 532 U.S. at 280 (reiterating the reasoning of *Cannon* on this point).

of a provision of this subchapter," without limiting the underlying violation to suits against the federal government as an employer or provider of federal funds. 29 U.S.C. § 794a(b) (emphasis added); *see also* S. Rep. No. 95-890, at 19 (1978) ("[T]he availability of attorney's fees should assist in vindicating private rights of action . . . under section . . . 504"); *Am. Council of the Blind*, 463 F. Supp. 2d at 58 ("[T]here would be no purpose in crafting a provision allowing attorney fees unless the statute contemplates awards of declaratory and injunctive relief."). Thus, text, structure, and context all show that Congress meant to preserve the Rehabilitation Act's implied right of action, including for suits against executive agencies. Accordingly, this Court should hold that Plaintiffs have a cause of action under the Rehabilitation Act.

### B.    This Court Has Inherent Equitable Power To Enforce the Rehabilitation Act.

This Court's equitable power to enforce federal law provides an independent basis to enjoin Defendants' violations of the Rehabilitation Act.

As the Supreme Court explained in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), federal courts possess inherent equitable powers to enjoin violations of federal law by federal officers: "[W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. . . . [T]hat has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials." *Id.* at 326-27 (citations omitted). This tradition is one of long lineage, as Justice Scalia chronicled in his opinion for the Court: Regarding federal officials specifically, the Court cited *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); the Court's discussion further cited *Osborn v. Bank of United States*, 9 Wheat. 738 (1824), and *Carroll v. Safford,* 3 How. 441 (1845); and the Court explained that the "long history of judicial review of illegal executive action" "trac[es] back to England." *Id.* at 327.

10

"Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *accord, e.g., McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) ("[W]e will not construe a statute to displace courts' traditional equitable authority absent the clearest command." (quoting *Holland v. Florida*, 560 U.S. 631, 646 (2010))). No textual foreclosure of this Court's "jurisdiction in equity" exists here.

The Court has found such foreclosure by inference only in two scenarios: first, where Congress has provided a "detailed and exclusive remedial scheme," *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 647 (2002) (discussing *Seminole Tribe v. Florida*, 517 U.S. 44 (1996)); and second, where a statute contains an alternative remedy *and* the right at issue is "judicially unadministrable," *Armstrong*, 575 U.S. at 328.[3] Neither scenario is present here.

This case does not implicate the first scenario because, if the Court holds that no implied right of action exists for claims like Plaintiffs', then Congress has prescribed no remedy at all for them in the Rehabilitation Act—much less an "exclusive" one that would render enforcement via courts' inherent equitable power "*inconsistent* with" a "'detailed'" and "limited" "'remedial scheme'" that "Congress had prescribed." *Verizon Md.*, 535 U.S. at 647 (quoting *Seminole Tribe*, 517 U.S. at 74) (emphasis added); *cf. Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 187 (2023) (instructing as to foreclosure of 42 U.S.C. § 1983 remedy that the "sine qua non" of implied congressional foreclosure of extant remedies is "incompatibility" between the preexisting remedy "and the enforcement scheme that Congress has enacted"). The existence of

---

[3] Although *Seminole Tribe* and *Verizon Maryland* both concerned whether federal courts had jurisdiction over state defendants notwithstanding sovereign immunity, *Armstrong* cited both cases in considering the scope of the equitable cause of action, *id.* at 327-28—the word "jurisdiction," in fact, does not even appear in the majority opinion in *Armstrong*—thus revealing that these cases inform the equitable-power analysis as well.

agency-crafted administrative processes that could assist Plaintiffs would not alter this conclusion. While such procedures might show that the agency did not believe judicial enforcement necessary, only *Congress* can strip courts of their traditional equitable powers. *See Talevski*, 599 U.S. at 187 ("[T]he inquiry boils down to what *Congress* intended, as divined from text and context." (emphasis added)); *Armstrong*, 575 U.S. at 329 ("*Congress* may displace the equitable relief that is traditionally available to enforce federal law." (emphasis added)); *Verizon Md.*, 535 U.S. at 647-48 (assessing inconsistency of judicial enforcement with statutory scheme "that *Congress* had prescribed" (emphasis added)). Thus, no detailed and exclusive remedial scheme forecloses Plaintiffs' invocation of federal courts' equitable power to enjoin Rehabilitation Act violations.

The second scenario giving rise to foreclosure of equitable enforcement—the path laid out in *Armstrong* itself—is also absent here. That scenario requires that two conditions are met: (1) there exists an alternative remedy *and* (2) the right at issue is "judicially unadministrable." *Armstrong*, 575 U.S. at 328 (specifying that the alternative remedy present in the statute at issue "might not, *by itself*, preclude the availability of equitable relief," "[b]ut it does so when combined with the judicially unadministrable nature" of the statutory text).

Here, at minimum, the right at issue is not "judicially unadministrable." *Id.* Illustrating that concept, the Medicaid Act provision at issue in *Armstrong* required states, with respect to a particular healthcare service, to "provide such methods and procedures" regarding "utilization" and "payment" as "necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers." 42 U.S.C. § 1396a(a)(30)(A), quoted in *Armstrong*, 575 U.S. at 323. The Court found this requirement "judicially unadministrable" because "[i]t is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide

for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" *Id.* at 328.

By contrast, the Rehabilitation Act's prohibition on disability discrimination is neither too broad nor nonspecific for judicial enforcement—as reflected in this Court's regular enforcement of the Rehabilitation Act (regardless of the precise cause of action invoked). *See, e.g., Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 59-61 (enforcing the Rehabilitation Act against White House officials for the failure to provide sign language interpretation at briefings); *Am. Council of the Blind*, 463 F. Supp. 2d at 63 (enforcing the Rehabilitation Act against the Secretary of the Treasury for discrimination as to currency design); *Lane*, 867 F. Supp. at 1074-75 (granting injunction against the U.S. Merchant Marine Academy for violating the Rehabilitation Act).

Finally, the availability of inherent equitable power is independent of whether a statutory cause of action, implied or otherwise, exists. In *Armstrong* itself, Justice Scalia's lead opinion analyzed the implied-right-of-action question independently from the equitable-power question. *Compare* 575 U.S. at 326-31 (majority opinion) (considering enforcement in equity), *with id.* at 331-32 (plurality opinion) (considering implied right of action under the Medicaid Act). And in *Crown Castle Fiber, L.L.C.. v. City of Pasadena*, 76 F.4th 425 (5th Cir. 2023), the court held that a plaintiff could invoke the federal courts' equitable power alone to enjoin a city from enforcing land-use standards in a manner the plaintiffs alleged would violate a federal statute—"[e]ven though [the statute] does not confer a private right" enforceable via § 1983. *Id.* at 433-35.

Accordingly, if the Court determines that Plaintiffs lack a cause of action under the Rehabilitation Act itself, Plaintiffs may nonetheless enforce the act via the Court's historic equitable power to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27.

## II.    Plaintiffs Are Likely To Succeed on The Merits of Their Section 504 Claims.

Plaintiffs' evidence of systematic discrimination is undisputed. The Commission and CSOSA are aware that substantial numbers of people on supervision, including Mr. Mathis and Mr. Davis,[4] have disabilities. *See* Declaration of Ashika Verriest ("Verriest Decl.") Ex. A (CSOSA response to Freedom of Information Act request (June 23, 2023) ("CSOSA 6/23 FOIA Response") (ECF 3-7); Declaration of W. Mathis ("Mathis Decl.") ¶¶ 12, 15, 33-37 (ECF 3-2); Declaration of K. Davis ("Davis Decl.") ¶¶ 20-21, 45 (ECF 3-3); Declaration of Rashida Edmondson ("Edmondson Decl.") ¶¶ 5, 22, 31-37 (ECF 3-5). Yet Defendants have no policies, procedures, or rules regarding (1) "[e]valuating whether people on parole or supervised release have disabilities"; (2) "[e]valuating whether people on parole or supervised release need reasonable accommodations"; or (3) "[p]roviding people on parole or supervised release reasonable accommodations." Verriest Decl. Ex. C (Commission response to Freedom of Information Act request (June 20, 2023) at 1-2 ("Commission 6/20 FOIA Response") (ECF 3-9); *see* Ex. D (Email from Commission to A. Verriest (Aug. 18, 2023)) (ECF 3-10); CSOSA 6/23 FOIA Response. Defendants also lack any procedures by which individuals on supervision can request accommodations. CSOSA 6/23 FOIA Response; Commission 6/20 FOIA Response; *see also* Edmondson Decl. ¶ 13. As a result, Defendants systematically fail to accommodate people with

---

[4] This Court should ignore Defendants' passing argument that the complaint improperly used initials for Plaintiffs' first names. *See* Opp. Br. at 1 n.1. Defendants have not made a motion nor sought any relief, and plainly know named Plaintiffs' identities. Moreover, courts "need not consider cursory arguments made only in a footnote[.]" *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999). In any case, this Court has allowed complaints using initials for parties' first names. *See* ECF 1, *Cottingham v. Lojacono*, No. 18-cv-1684 (D.D.C. July 18, 2018) (complaint listing plaintiff as "M.B. Cottingham"); ECF 50-2, *Black Lives Matter D.C. v. Trump*, No. 20-cv-1469 (D.D.C. Sept. 1, 2020) (amended complaint, permitted by Court, listing defendants including "S. Buchanan," "C.W. Meyer," "C.I. Murphy," and "T.C. Payne").

disabilities, including Mr. Mathis and Mr. Davis. *See* Mathis Decl. ¶¶ 19-21; Davis Decl. ¶¶ 14-15.

Defendants do not dispute these facts or offer any contrary evidence. Defendants' only reference to their practices for people with disabilities—"mental health" supervision and various parole regulations Defendants describe as "providing accommodations in certain instances," Opp. Br. at 13—actually underscores *Plaintiffs'* core contention. Defendants' "mental health" supervision is practically the opposite of an accommodation. It is a heightened form of supervision that entails *added* requirements, such as increased drug testing, extra programming, and more frequent meetings—with no provision for accommodations. Edmondson Decl. ¶¶ 19-20. Indeed, Defendants admit that they have no "policies, procedures, guidelines, or any other rules or instructions" on "[p]roviding . . . reasonable accommodations." CSOSA 6/23 FOIA Response at 1-2; *see* A. Verriest Decl. Ex. E (CSOSA response to Freedom of Information Act request (Sept. 5, 2023)) at 2 (ECF 3-11). And the parole regulations Defendants cite concern criteria for release from prison to parole, *see* Opp. Br. at 7 (citing 28 C.F.R. §§ 2.19(a)(5), (b)(1) (general parole)); *id.* at 13 (citing geriatric parole and medical parole regulations).[5] None of these regulations discusses the parole rules applicable if such individuals are released—let alone mentions reasonable accommodations necessary to ensure supervision is feasible given the individuals' disabilities. *See* 28 C.F.R. §§ 2.19(a)(5), (b)(1); *id.* § 2.77; *id.* § 2.78.

Defendants' opposition rests primarily on mischaracterizations of the relevant legal framework and Plaintiffs' claims. First, Defendants misconstrue the Rehabilitation Act and erroneously focus on the causes of Plaintiffs' incarceration, ignoring their primary alleged injury:

---

[5] Defendants' opposition brief cites 28 C.F.R. § 2.83(e), which concerns release planning, and 29 C.F.R. § 2.77, which does not exist. Plaintiffs presume Defendants meant to cite 28 C.F.R. § 2.78, the geriatric parole regulation, and 28 C.F.R. § 2.77, the medical parole regulation.

being required to navigate supervision without needed accommodations. Second, Defendants misapply the causation standard. Plaintiffs' undisputed evidence shows that, solely by reason of their disabilities, they need reasonable accommodations to have an equal opportunity to reintegrate into the community on supervision—and Defendants are failing to provide these accommodations. Accordingly, Plaintiffs are likely to succeed on the merits of their claims.

### A.    Requiring Plaintiffs To Navigate Supervision Without Needed Accommodations, in and of Itself, Constitutes Discrimination.

Defendants inaccurately assert that the Rehabilitation Act forbids only "categorical exclusion" from a government program. Opp. Br. at 8. But categorical exclusion is just one form of discrimination that the Rehabilitation Act prohibits. *See* 29 U.S.C. § 794(a) (providing that no individual shall "[1] be excluded from the participation in, [2] be denied the benefits of, or [3] be subjected to discrimination under" a covered program or activity based on disability). The Department of Justice itself has recognized through its regulations that the Act forbids not only outright denials of service, *see* 28 C.F.R. § 39.130(b)(1)(i), but also depriving people with disabilities of an equal opportunity to benefit from a service, *id.* §§ 39.130(b)(1)(ii)-(iii).

As relevant here, the Rehabilitation Act requires Defendants to "provide reasonable accommodations that would permit disabled individuals to access programs and services[.]" *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 268 (D.D.C. 2015) (citing *Alexander v. Choate*, 469 U.S. 287, 295 (1985)); *see also Am. Council of the Blind*, 525 F.3d at 1267; 28 C.F.R. §§ 39.130(b)(1)(i)-(iii). Additionally, the Act prohibits Defendants from administering their policies and practices in ways that have "the effect of subjecting" Plaintiffs to "discrimination on the basis of disability" or of "defeating or substantially impairing accomplishment of the objectives" of the program, *Day v. District of Columbia*, 894 F. Supp. 2d 1, 4 (D.D.C. 2012) (citation omitted); 28 C.F.R. §§ 39.130(b)(3)(i)-(ii), in this case supervision. Thus, Defendants'

16

focus on whether individuals with disabilities are "categorically exclude[d]" from supervision is misplaced.

That misplaced focus leads Defendants to erroneously concentrate their defense on the legality of Defendants' decisions to incarcerate Plaintiffs for violations. But supervision exists not simply to allow people to stay out of prison. Rather, its "purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). Moreover, the purpose of accommodations is not to assure "equal results," but to "assure evenhanded treatment." *Choate*, 469 U.S. at 304. In other words, Defendants must ensure that people with disabilities who need accommodations, like named Plaintiffs, are on an equal playing field during supervision—not that they are never again incarcerated. *See id.* Requiring Plaintiffs to, on a daily basis, navigate supervision without the accommodations they need constitutes disability discrimination in and of itself, "regardless of whether any additional injury follows." *Luke v. Texas*, 46 F.4th 301, 306 (5th Cir. 2022) (citing *Tennessee v. Lane*, 541 U.S. 509, 532-33 (2004)) (lack of meaningful access to probation is, itself, disability discrimination); *see also Bonnette v. D.C. Ct. of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011) (requirement to take test without reasonable accommodations is discriminatory regardless of whether plaintiff passes or fails).

## B.    Defendants Are Discriminating Against Plaintiffs "Solely by Reason of" Disability.

Defendants' contention that Plaintiffs have failed to show that their "incarceration occurred 'solely' as a result of [their] disability," Opp. Br. at 9, mistakes both the law and the facts. Defendants misapply the causation standard, focusing on the cause of Plaintiffs' *downstream harms* (incarceration) rather than the cause of their *injury*: being required to navigate supervision without needed accommodations. Plaintiffs' undisputed evidence shows that, solely by reason of

disability, they need accommodations to have the same opportunity to reintegrate into society on supervision as people without disabilities—accommodations Defendants do not provide.

The Rehabilitation Act does not require Plaintiffs to prove that Defendants were subjectively motivated solely by disability in failing to accommodate them. Such a rule would conflict with the very reason the Rehabilitation Act requires accommodations: to prevent discrimination arising from "benign neglect." *Choate*, 469 U.S. at 296. Additionally, it "would create an anomaly—a wheel-chair bound employee, properly owed a duty of accommodation, would have to show that the employer's failure to accommodate the employee's inability to walk was caused by the employee's inability to walk," rather than, say, the employer's desire to save money. *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004).

Instead, the relevant inquiry is whether, solely by reason of their disabilities, plaintiffs face "obstacle[s] that impede[] their access to a government program or benefit" that others do not, and therefore need accommodations. *Am. Council of the Blind*, 525 F.3d at 1268. Such is the case here. "Plaintiff[s] do[] not claim that [they] required and/or [were] denied a reasonable accommodation for any reason other than [their] disability." *Schine by Short v. N.Y. State Off. for People with Dev. Disabilities*, 2017 WL 9485650, at *4 (E.D.N.Y. Jan. 5, 2017), *report and recommendation adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017). Put differently, if not for Plaintiffs' disabilities, they would not need accommodations; Defendants' duty to accommodate them would not exist, and Defendants' failure to accommodate would not be discriminatory.

By focusing on the wrong point of analysis—Plaintiffs' downstream harms rather than their injury of discrimination due to Defendants' failure to accommodate—Defendants also misapply the Rehabilitation Act's causation standard more generally. As the Second Circuit explained in a case challenging a defendant's systematic failure to accommodate, a successful failure-to-

18

accommodate claim requires only that the disability was a "substantial factor" in plaintiffs' "ultimate difficulty" in accessing the benefits of a program, even if "there are other contributory causes" as well. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278, 291 (2d Cir. 2003) (applying this standard to Rehabilitation Act and ADA claims). This approach comports with the D.C. Circuit's conclusion that courts should "construe section 504 *in pari materia* with Title II of the ADA" because the statutes " are similar in substance . . . [and consequently] cases interpreting either are applicable and interchangeable." *Am. Council of the Blind*, 525 F.3d at 1260 n.2 (cleaned up) (collecting cases).

*American Council of the Blind* illustrates the proper analysis. There, the D.C. Circuit held that vision-impaired plaintiffs lacked meaningful access to U.S. currency, even though they could have "purchas[ed] expensive computer equipment" or adopted other "coping mechanisms" to distinguish the bills' denominations. *Id.* at 1269-70. In other words, even though one cause of plaintiffs' inability to read the bills' denominations was the fact that they could not afford or chose not to "purchas[e] expensive computer equipment," the Court still concluded that the plaintiffs had been discriminated against "solely by reason of" their disability. *Id.*

On the facts, Plaintiffs' uncontroverted evidence shows that people under Defendants' supervision, including named Plaintiffs, do not have an equal opportunity to succeed on supervision solely by reason of their disabilities. Importantly, Defendants have submitted no evidence disputing that people with disabilities under their supervision "regularly have heightened difficulties complying with supervision rules due to their disabilities" and thus "need reasonable accommodations to their supervision rules in order to have a meaningful chance of completing their supervision requirements." Edmondson Decl. ¶¶ 6-7; *see also id.* ¶¶ 34-36. Defendants' arguments in their briefs are not evidence that can refute Plaintiffs' sworn declarations.

19

With respect to named Plaintiffs, it is undisputed that Mr. Mathis—a 70-year-old military veteran—has congestive heart failure, which limits his mobility; regularly leaves him dizzy and short of breath; and requires frequent hospitalization and medical appointments. Mathis Decl. ¶¶ 1-6. Contrary to Defendants' mischaracterization, Mr. Mathis does not argue that "having hospital appointments" is a disability. Opp. Br. at 8. Rather, Mr. Mathis has shown that, due to his congestive heart failure—a covered disability under the Rehabilitation Act—it is exceedingly difficult for him to move throughout the city to attend his myriad supervision obligations. Mathis Decl. ¶¶ 6-8. Further, the hospitalizations and medical appointments that are a function of his disability often conflict with his supervision requirements—forcing him to choose between his health and complying with his supervision rules. *Id.* ¶¶ 5, 9-11. But for his disability, Mr. Mathis would not have trouble walking to his supervision appointments and would not require these hospitalizations. Because Mr. Mathis's "disability makes it difficult for [him] to access benefits that are available to both those with and without disabilities," *Henrietta D.*, 331 F.3d at 277, (i.e., the opportunity to successfully reintegrate to society via supervision), he is entitled to an accommodation, and Defendants' failure to provide one constitutes unlawful discrimination "solely by reason of" his disability under the Rehabilitation Act.

Defendants claim that Mr. Mathis "does not make any allegation or argument that he requested a change to his supervisory obligations because his health conditions made it difficult to attend them." Opp. Br. at 8. That is both irrelevant and inaccurate. It is irrelevant because Defendants have an "affirmative duty" to assess Mr. Mathis's accommodation needs "without regard to whether or not" he "made a specific request for accommodation." *Pierce*, 128 F. Supp. 3d at 272. It is inaccurate because Defendants themselves acknowledge that Mr. Mathis *did* request an accommodation: He "provided his [Community Supervision Officer] with a list of all of his

[Veterans Affairs] hospital appointments" for his congestive heart failure "and asked that his meetings be scheduled around them[.]'" Opp. Br. at 8 (citing Mem. at 8); *accord* Mathis Decl. ¶ 12. An accommodation request "does not have to be in writing or formally invoke the magic words 'reasonable accommodation.'" *Murphy v. District of Columbia*, 590 F. Supp. 3d 175, 183 (D.D.C. 2022) (cleaned up). Mr. Mathis's supervision officer never agreed to change his appointment dates, or otherwise accommodate his health condition. Mathis Decl. ¶ 12. Moreover, on a separate occasion, Mr. Mathis sought an accommodation to a GPS monitoring condition, informing his supervision officer that his "medical issues made the GPS monitor dangerous for [his] health"—as confirmed by his doctor at the VA hospital. *Id.* ¶¶ 13, 15, 17. Mr. Mathis's supervision officer nevertheless required him to wear the monitor, which immediately caused Mr. Mathis's ankle to swell and made it "even harder for [him] to walk." *Id.* ¶ 16.

Turning to Mr. Davis, Defendants do not contest that Mr. Davis has disabilities and related limitations. The uncontroverted evidence shows that Mr. Davis lives with chronic pain and mobility limitations stemming from third-degree burns, as well as anxiety, depression, and posttraumatic stress disorder ("PTSD"). Davis Decl. ¶¶ 5-7. Mr. Davis's physical disabilities make it difficult for him to attend in-person supervision meetings, which have been required throughout the course of his supervision. *Id.* ¶¶ 19-22. At one point following surgery for his burns, he had to use a wheelchair, crutches, and then a walker to move, which made it harder, and more time-intensive, to get to his required in-person supervision appointments. *Id.* ¶ 21. Nevertheless, his supervision officer did not change his supervision conditions in response to his mobility needs. *Id.* While Mr. Davis has recently been required to report via phone, he still must attend other supervision appointments in person, such as twice-weekly drug testing. *Id.* ¶¶ 11-12.

Mr. Davis's mental health disabilities also create barriers to meeting his supervision conditions. *Id.* ¶¶ 22-26; Declaration of Tamara Seltzer ("Seltzer Decl.") ¶¶ 14-15. For example, when Mr. Davis realized he could not satisfy his telephone reporting requirement because he lacked a working phone, his mental health disabilities made it exceedingly difficult for him to problem-solve and find an alternative way to meet his reporting obligation. Davis Decl. ¶¶ 33-35; Seltzer Decl. ¶¶ 14-15. Uncontroverted record evidence shows that his mental health conditions led to "tunnel vision"—causing him to repeatedly and exclusively pursue one solution without pivoting to another option. Davis Decl. ¶ 35; Seltzer Decl. ¶¶ 13-15. Even though Defendants knew Mr. Davis was receiving help for his mental health conditions, they revoked his supervision and the Commission sentenced him to a year in prison. Davis Decl. ¶¶ 44-45. But for his disabilities, Mr. Davis would not have these physical and mental barriers to supervision. Thus, Mr. Davis has disabilities that make it difficult for him to access supervision, entitling him to accommodations—and rendering Defendants' failure to accommodate him discrimination solely by reason of disability. *See Henrietta D.*, 331 F.3d at 277.

## III. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

Plaintiffs have demonstrated that they will suffer irreparable harm absent injunctive relief. In focusing on the likelihood that Defendants will incarcerate Plaintiffs for violations or prolong their supervision, Opp. Br. at 9-12, Defendants ignore Plaintiffs' primary form of irreparable harm: being forced to comply with supervision conditions on a day-to-day basis without the accommodations they need to have an equal opportunity to succeed.

The "denial of equal treatment" is an injury, regardless of whether individuals ultimately obtain the benefit sought. *Ne. Fla. Ch. of Assoc. Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Courts routinely hold that forcing individuals with disabilities to operate "under discriminatory    conditions"—including    by    failing    to    provide    necessary    reasonable

accommodations—"is itself a form of irreparable injury." *Bonnette*, 796 F. Supp. 2d at 187 (collecting cases). Thus, requiring Plaintiffs to navigate supervision without legally-mandated accommodations, in and of itself, constitutes irreparable harm—regardless of whether they are incarcerated for supervision violations as a result. *See Luke*, 46 F. 4th at 306.

Defendants' contentions that these harms are "speculative" and thus that preliminary injunctive relief would "have no effect" on Plaintiffs, Opp. Br. at 9-12, are mistaken. Right now, Mr. Mathis is being required to navigate stringent parole requirements without the accommodations necessary to ensure he has an equal opportunity to meet them. *See* Mathis Decl. ¶¶ 37-38. Preliminary injunctive relief will remedy this harm by requiring Defendants to assess his accommodation needs and provide necessary accommodations. Likewise, absent injunctive relief, Mr. Davis will be released back to parole upon completing his prison sentence in summer 2024 and—absent accommodations—he will once again be required to adhere to supervision conditions that his disability makes it exceedingly difficult to follow. Davis Decl. ¶¶ 2-3, 44. A preliminary injunction will remedy his harms by requiring Defendants to provide accommodations necessary to afford him an equal opportunity to reintegrate into the community on supervision.

In addition to the denial of equal treatment—itself sufficient to establish irreparable injury—Plaintiffs suffer further irreparable harms, including an increased risk of arrest, incarceration, and prolonged supervision, all of which can worsen their mental and physical health. Contrary to Defendants' assertions, Opp. Br. at 10-11, these harms are concrete and present. Mr. Davis is currently serving a 12-month prison sentence for a technical violation related to his disabilities. Davis Decl. ¶¶ 2, 27, 30-44. While incarcerated, he missed a critical surgery for his burns—which he still has not received—and his depression and anxiety have worsened. *Id.* ¶¶ 40-41, 48-50. In January 2024, Mr. Mathis was jailed for violations related to missing supervision

meetings while he was hospitalized for congestive heart failure. Mathis Decl. ¶¶ 26-27, 31. While incarcerated, he missed a scheduled appointment to get a defibrillator for his heart condition. *Id.* ¶¶ 33, 35. Absent accommodations, Plaintiffs face an imminent risk of serving supervision terms that set them up to fail, and thereby enduring irreparable harm to their health.

Further, Plaintiffs do not have an equal opportunity to access benefits of supervision, such as early termination. Contrary to Defendants' representation, Opp. Br. at 10-11, early termination is available to *all* people on supervision—including those, like Plaintiffs, serving lifetime parole. *See* 28 C.F.R. § 2.95; 28 C.F.R. § 2.208. In fact, the Commission "shall" terminate an individual's parole after five years unless it holds a hearing and makes a specific finding. *See* 28 C.F.R. § 2.95(c). But that five-year clock restarts after each revocation, which can occur for technical violations. *See id.* § 2.95(d). Thus, without necessary accommodations, Plaintiffs remain unable to access the benefit of early termination of their supervision terms.

Defendants' discussion of *Honig v. Doe*, 484 U.S. 305 (1988), mischaracterizes Plaintiffs' position. *See* Opp. Br. at 11. Plaintiffs do not claim that they are wholly incapable of attending any supervision appointment. Rather, Plaintiffs contend that since Defendants systematically fail to provide accommodations, absent relief, it is "reasonable to expect" that they will remain unable to meaningfully access their supervision due to their disabilities. *See Honig*, 484 U.S. at 319-20.

## IV.    The Remaining Factors Favor Preliminary Injunctive Relief.

Defendants do not dispute that the public—and therefore the government—"has a strong interest in the effective enforcement of the Rehabilitation Act." *Callicotte v. Carlucci*, 698 F. Supp. 944, 951 (D.D.C. 1988) (citing *Shirley v. Devine*, 670 F.2d 1188 (D.C. Cir. 1982)). Instead, Defendants contend that they have operated supervision without a system to assess people's accommodation needs or to provide accommodations for "so long" that relief is unwarranted. Opp. Br. at 12-14. But an unlawful practice is not immune from challenge simply because it is

entrenched. Indeed, Congress passed the ADA and Rehabilitation Act to correct widespread and longstanding discrimination by "provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" 42 U.S.C. §§ 12101(a), (b); *see also DaVita, Inc. v. Amy's Kitchen, Inc.*, 981 F.3d 664, 675 (9th Cir. 2020) (ADA "aimed, as [its] central purpose, to address longstanding and entrenched discriminatory practices"). Plaintiffs do not face a higher burden because of the form of the injunction they seek: the D.C. Circuit "has rejected any distinction between a mandatory and prohibitory injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). The district court decisions Defendants cite to the contrary, Opp. Br. at 12-13, do not address *Newby*'s analysis on this point.

Defendants charge Plaintiffs with "impermissibly seeking class-wide relief without a certified class." Opp. Br. at 13. Yet Defendants simultaneously seek to delay a decision on class certification.[6] The Court may provisionally certify the class and grant class-wide preliminary injunctive relief to stop Defendants' discriminatory practices. *See, e.g.*, *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018); Pls. Class Cert. Mem at 2. At the very least, the Court should issue a preliminary injunction requiring Defendants to assess Mr. Mathis's and Mr. Davis's needs and accommodate them such that they have an equal opportunity to succeed on supervision.

## CONCLUSION

The Court should grant Plaintiffs' request for a preliminary injunction.

---

[6] Defendants' deadline to file their motion opposing class certification passed a week ago, Local Civil Rule 7, and they have not filed a motion for an extension or stay.

Dated: May 28, 2024

Respectfully submitted,

/s/ Peter E. Davis

ALLISON FRANKEL (*Pro Hac Vice*)
afrankel@aclu.org
ASHIKA VERRIEST
D.C. Bar No. 90001468
averriest@aclu.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, NY 10004
Tel.: (617) 650-7741

SCOTT MICHELMAN
D.C. Bar No. 1006945
smichelman@acludc.org
MICHAEL PERLOFF
D.C. Bar No. 1601047
mperloff@acludc.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF THE DISTRICT OF
    COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel.: (202) 457-0800

HANNA M. PERRY
D.C. Bar No. 90003756
hperry@pdsdc.org
ZOÉ E. FRIEDLAND
D.C. Bar No. 1781910
zfriedland@pdsdc.org
PUBLIC DEFENDER SERVICE FOR THE
    DISTRICT OF COLUMBIA
633 3rd Street NW
Washington, D.C. 20001
Tel.: (202) 579-0633

SAMIR DEGER-SEN
D.C. Bar No. 1510881
samir.deger-sen@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel.: (212) 906-1200
Fax: (212) 751-4864

PETER E. DAVIS
D.C. Bar No. 1686093
peter.davis@lw.com
CHRISTINE C. SMITH
D.C. Bar No. 1658087
christine.smith@lw.com
JORDAN L. HUGHES
D.C. Bar No. 90004355
jordan.hughes@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Plaintiffs and the Proposed
Class*

26