# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

WILLIAM MATHIS, et al.

     Plaintiffs,

v.

UNITED STATES PAROLE COMMISSION, et al.

     Defendants.

Civil Action No. 24-cv-01312-TNM

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ................................................................................................................1

LEGAL STANDARD.......................................................................................................5

ARGUMENT ...................................................................................................................6

I.      Section 504 is Judicially Enforceable .................................................................6

     A.      There is an Implied Right of Action to Enforce Section 504 .................6

     B.      The Court Has Equitable Power to Enforce the Rehabilitation Act ....................21

II.     Sovereign Immunity Does Not Bar Plaintiffs' Claims ......................................24

CONCLUSION................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967)................................................................................................19, 20

*\*Alexander v. Sandoval,*
532 U.S. 275 (2001).....................................................................6, 7, 14, 15, 17, 19

*\*Am. Council of the Blind v. Paulson,*
463 F. Supp. 2d 51 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008).....10, 11, 23, 25, 26

*\*Am. Council of the Blind v. Paulson,*
525 F.3d 1256 (D.C. Cir. 2008).........................................................10, 15, 16, 17

*Am. Council of the Blind v. Paulson,*
581 F. Supp. 2d 1 (D.D.C. 2008)........................................................................15

*American School of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902)..............................................................................................21

*\*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015).............................................................................21, 22, 23, 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................................................5

*Bannister v. U.S. Parole Commission,*
2019 WL 1330636 (D.D.C. Mar. 25, 2019)...................................................13, 14

*Barnes v. Gorman,*
536 U.S. 181 (2002)...........................................................................................19

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..............................................................................................5

*Cannon v. Univ. of Chi.,*
441 U.S. 677 (1979).........................................................................................7, 8

*Carroll v. Safford,*
3 How. 441 (1845).............................................................................................21

*Chamber of Com. Of U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996)......................................................................24, 25

*Cherokee Nation v. Dep't of the Interior*,
No. 19-cv-2154, 2020 WL 224486 (D.D.C. Jan. 15, 2020).......................................25

*Clark v. Skinner*,
937 F.2d 123 (4th Cir. 1991) ...................................................13, 16, 26, 27

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989) (en banc)......................................12, 13, 16

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
76 F.4th 425 (5th Cir. 2023) ...................................................................24

*Doe v. Att'y Gen. of U.S.*,
941 F.2d 780 (9th Cir. 1991) .....................................................................8

*Dugan v. Rank*,
372 U.S. 609 (1963)................................................................................26

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
503 U.S. 60 (1992)..................................................................................10

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) .................................................................20

*Gomez-Perez v. Potter*,
553 U.S. 474 (2008).................................................................................8

*Health & Hosp. Corp. of Marion Cnty. V. Talevski*,
599 U.S. 166 (2023)................................................................................22

*Holland v. Florida*,
560 U.S. 631 (2010)................................................................................21

*J.L. v. Soc. Sec. Admin.*,
971 F.2d 260 (9th Cir. 1992) ...................................................................12

*Lane v. Pena*,
867 F. Supp. 1050, 1053 (D.D.C. 1994), *vacated in part on other grounds as
explained in Lane v. Pena*, 518 U.S. 187 (1996) ........................11, 12, 24

*Lane v. Pena*,
518 U.S. 187 (1996)....................................................................8, 11, 12, 25

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949)................................................................................26

*Lee v. U.S. Agency for Int'l Dev.*,
859 F.3d 74 (D.C. Cir. 2017) (per curiam) ...............................................6

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ...................................................................................19, 20

*Loper Bright Enters. v. Raimondo,*
    No. 22-451, 2024 WL 3208360 (S. Ct. June 28, 2024) ........................................19

*Marbury v. Madison,*
    5 U.S. 137 (1803) ..................................................................................................19

*McQuiggin v. Perkins,*
    569 U.S. 383 (2013) ..............................................................................................21

*McRaniels v. U.S. Dep't of Veterans Affs.,*
    2017 WL 2259622 (W.D. Wis. May 19, 2017) ....................................................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
    456 U.S. 353 (1982) ................................................................................................8

*Modderno v. King,*
    82 F.3d 1059 (D.C. Cir. 1996) ..............................................................................12

*Moya v. U.S. Dep't of Homeland Sec.,*
    975 F.3d 120 (2d Cir. 2020) .............................................................................12, 13

*\*Nat'l Ass'n of the Deaf v. Trump,*
    486 F. Supp. 3d 45 (D.D.C. 2020) ............................................................. *passim*

*Orozco v. Garland,*
    60 F. 4th 684 (D.C. Cir. 2023) ..............................................................................25

*Osborn v. Bank of United States,*
    9 Wheat. 738 (1824) ..............................................................................................21

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ..............................................................................19

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946) ..............................................................................................21

*Sai v. Dep't of Homeland Sec.,*
    149 F. Supp. 3d 99 (D.D.C. 2015) ...........................................................12, 13, 19

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996) ...........................................................................................21, 22

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ..............................................................................26

*Verizon Md., Inc. v. Pub. Serv. Comm'n*,
    535 U.S. 635 (2002) ................................................................................................22

*Wash. Toxics Coal. v. EPA*,
    413 F.3d 1024 (9th Cir. 2005), *abrogated on other grounds as recognized by
    Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ...................19

*Washington v. Fed. Bureau of Prisons*,
    2019 WL 2125246 (D.S.C. Jan. 3, 2019), *report and recommendation
    adopted*, 2019 WL 1349516 (D.S.C. Mar. 26, 2019) ............................................13

## STATUTES

5 U.S.C.
    § 702 ........................................................................................................................25
    § 704 ....................................................................................................................11, 19

20 U.S.C. § 1681(a) ..............................................................................................................7

29 U.S.C.
    § 794(a) ..........................................................................................................*passim*
    § 794a(2) ..................................................................................................................25
    § 794a(a)(1) ................................................................................................................9
    § 794a(a)(2) ................................................................................................................9
    § 794a(b) ......................................................................................................10, 25, 26

42 U.S.C.
    § 1396a(a)(30)(A) .....................................................................................................23
    § 2000d .......................................................................................................................7
    § 2000d-1 ............................................................................................................10, 15
    § 2000e-5(g) ...............................................................................................................9
    § 2000e-16 ................................................................................................................10

## RULES

Fed. R. Civ. P. 8(a)(2) ..........................................................................................................5

## REGULATIONS

28 C.F.R. pt. 35, Appendix B, subpt. F ..........................................................................18, 19

28 C.F.R. § 39.170 ..............................................................................................................18

49 Fed. Reg. 35,724 ...........................................................................................................18

## OTHER AUTHORITIES

Guide to Disability Rights Laws, Americans with Dyabilities Act (ADA) (Last
    updated: February 28, 2020), https://www.ada.gov/resources/disability-rights-
    guide/.........................................................................................................................18

S. Rep. No. 93-1297 (1974)............................................................................................7

S. Rep. No. 95-890 (1978)............................................................................................10

S. Rep. No. 95-890 (1978)............................................................................................26

Defendants are discriminating against people who are on supervision in Washington, D.C., and they do not argue otherwise in their Motion to Dismiss. Defendants do not dispute that Plaintiffs have stated a substantive claim that Defendants systematically fail to accommodate them. Nor do they dispute that this systematic failure to accommodate violates the Rehabilitation Act. Instead, Defendants argue solely that the Rehabilitation Act—a law intended to prevent and remedy discrimination by federal government agencies—is not judicially enforceable against those agencies.

Defendants are wrong. Congress created a private right of action for Section 504 by expressly choosing the same rights-creating language that federal courts have repeatedly held to imply a cause of action in other antidiscrimination statutes. The Department of Justice's own website advises without qualification that the Rehabilitation Act may "be enforced through private lawsuits,"[1] and numerous courts have recognized the same in cases like this one. And regardless, Supreme Court precedent makes clear that this Court has inherent equitable power to enjoin federal officials who violate the Rehabilitation Act. The Court should thus deny Defendants' Motion to Dismiss.

## BACKGROUND

This case is about how the federal government's post-conviction supervision system in Washington, D.C. fails to reasonably accommodate people with disabilities, as required by law. The two named plaintiffs—Mr. Mathis and Mr. Davis—have disabilities that Defendants have not reasonably accommodated. Dkt. No. 1 (Complaint) ¶ 58. As a result of Defendants' failure to accommodate, named Plaintiffs—as well as similarly situated proposed class members

---

[1] Guide to Disability Rights Laws, Americans with Disabilities Act (ADA) (Last updated Feb. 28, 2020), https://www.ada.gov/resources/disability-rights-guide/.

1

(collectively, "Plaintiffs")—are forced to navigate supervision without an equal opportunity to successfully meet its requirements and complete supervision. *Id.* ¶ 60. This failure to accommodate Plaintiffs' disabilities, in and of itself, constitutes discrimination in violation of the Rehabilitation Act. *Id.* ¶¶ 146-47, 153-54. Plaintiffs also face downstream harms as a result of this discrimination, including added supervision conditions; extensions of their supervision terms; and revocation and incarceration—all of which can exacerbate their mental and physical health conditions. *Id.* ¶¶ 15-19, 60-70.

Plaintiff Mathis is a 70-year-old military veteran with congestive heart failure, which leaves him dizzy and short of breath. *Id.* ¶¶ 71-73. This disability makes it hard for him to walk around the city to get to his myriad supervision appointments each week and to attend supervision appointments that regularly conflict with the necessary medical appointments and frequent hospitalizations that arise from his disability. *Id.* ¶¶ 73-77. Although Mr. Mathis provided his Community Supervision Officer ("CSO") a list of his Veterans Affairs ("VA") hospital appointments and asked that his supervision appointments be scheduled around them, his CSO did not do so, forcing him to choose between treating his congestive heart failure and complying with the terms of his supervision. *Id.* ¶¶ 77-78. In 2023, the Court Services and Offender Supervision Agency ("CSOSA") added a GPS monitoring condition to Mr. Mathis's parole even though Mr. Mathis explained, as his VA doctor advised, that the monitor posed grave health risks given his medical condition. *Id.* ¶¶ 79-82. The CSO provided no accommodation and so Mr. Mathis wore the monitor, suffering health consequences as a result. *See id.* ¶¶ 83, 85.

In January 2024, Defendants incarcerated Mr. Mathis for technical parole violations, including failing to report to his CSO and a positive test for marijuana. *Id.* ¶ 88. However, on three of the four days he was accused of missing appointments, Mr. Mathis was at the VA hospital being

treated for heart failure, and he had stayed in regular contact with his CSO throughout this period. *See id.* ¶¶ 85-89. While incarcerated by Defendants, Mr. Mathis was forced to miss a previously scheduled medical appointment—which Defendants knew about—to get a defibrillator that would have treated his congestive heart failure. *Id.* ¶ 90-93. Defendants released Mr. Mathis a few days after detaining him, requiring him to comply with essentially the same conditions as before— conditions that, as discussed above, Defendants knew Mr. Mathis's disability made it extremely difficult for him to meet. Once again, they provided no accommodations. *Id.* ¶ 94.

Plaintiff Davis lives with chronic pain stemming from third-degree burns, which make it difficult for him to get to supervision appointments and navigate conflicts between those obligations and necessary medical appointments, including surgeries for his burns. *Id.* ¶¶ 97, 101. At various points following surgery, Mr. Davis used a wheelchair, crutches, and a walker to get around. *Id.* ¶ 101. Nevertheless, his CSO did not modify his supervision conditions in response to his mobility needs. *Id.* ¶ 105. Mr. Davis also has anxiety, depression, and posttraumatic stress disorder ("PTSD"), which make it difficult for him to track and attend all of his supervision appointments, including drug testing twice a week and regular reporting to his CSO via phone and in person. *Id.* ¶¶ 98-99, 103. Despite their awareness of his disability-related barriers, Defendants have not assessed Mr. Davis's accommodation needs or provided reasonable accommodations. *Id.* ¶¶ 104-05.

In August 2023, Defendants arrested Mr. Davis for failing to contact his CSO via phone for a period of less than two weeks, even though he made it to every single one of his drug testing appointments and tested negative during that period. *Id.* ¶¶ 111-12. Mr. Davis did not have a working phone and his mental health disabilities made it exceedingly difficult for him to find an alternative way to meet his reporting obligations. *Id.* ¶ 109. His anxiety and PTSD gave him

"tunnel vision," causing him to repeatedly and exclusively pursue one solution without pivoting to another option. *Id.* ¶¶ 109-10. Even though Defendants knew that Mr. Davis was getting help for his mental health conditions and was making efforts to follow his supervision rules despite his disability-related barriers, the United States Parole Commission ("Commission") revoked Mr. Davis's supervision and sentenced him to 12 months in prison. *Id.* ¶¶ 19, 104, 111. While incarcerated, Mr. Davis missed a necessary scheduled third surgery for his burns. *Id.* ¶¶ 113-14. He is not receiving adequate treatment for his burns in prison and still has not received this surgery. *Id.* ¶ 115. Given Defendants' past practices and lack of a system to provide accommodations, it is a practical certainty that upon release Mr. Davis will be subject to the same parole conditions that his disabilities make it almost impossible to follow. *Id.* ¶ 116.

The experiences of Mr. Mathis and Mr. Davis illustrate how people with disabilities regularly face higher barriers to succeeding on supervision than their counterparts without disabilities. *Id.* ¶ 25. This includes difficulties physically accessing required meeting locations; understanding their supervision conditions; keeping track of shifting appointments; meaningfully engaging with their supervision officers; and navigating conflicts between their supervision obligations and critical health care needs. *Id.* ¶¶ 26-27. As a result, people with disabilities regularly need accommodations to their supervision rules to afford them an equal opportunity to adhere to their requirements and complete supervision. *Id.* ¶ 29. Indeed, Defendants have expressly acknowledged that success on standard supervision conditions is impossible for some people with disabilities. *See id.* ¶ 53. Reasonable accommodations are often simple and impose little or no cost, such as explaining supervision conditions in plain language; providing appointment reminders and transportation assistance; and flexibly scheduling meeting times, locations, and frequencies based on people's individual needs and abilities. *Id.* ¶ 29.

Mr. Mathis and Mr. Davis are also emblematic of Defendants' systematic failure to accommodate the disabilities of people under their supervision. According to CSOSA's own data, of nearly 3,000 people on active parole or supervised release in D.C. between June 2022 and May 2023, 484—or over 17%—had a mental disability. *Id.* ¶ 22. CSOSA has also reported that physical health conditions are "common" among the supervised population. *Id.* ¶¶ 23, 56. Despite being aware that high numbers of people under their supervision have disabilities, the Commission and CSOSA systematically fail to assess whether individuals need reasonable accommodations to meaningfully access their supervision and, if so, what types of accomodations. *Id.* ¶ 59. Indeed, Defendants admit that they have no policies or procedures regarding the provision of reasonable accommodations to people with disabilities on supervision. *Id.* ¶ 43. And at no point does the Commission assess whether such individuals need reasonable accommodations to have an equal opportunity to succeed on supervision. *See id.* ¶¶ 36-43. Defendants' failure to accommodate persists at all stages of the supervision process: when the agencies impose supervision conditions, enforce those conditions, revoke supervision for technical violations of those conditions, and release people to the very same conditions that, absent reasonable accommodations for their disabilities, they could not follow to begin with. *Id.* ¶¶ 42-43, 48-53.

## LEGAL STANDARD

When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts in the complaint and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint will survive a Rule 12(b)(6) motion to dismiss if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The inquiry must focus on whether the facts pled, if true, would entitle the plaintiff to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

**ARGUMENT**

The government rests its Motion to Dismiss on a single argument: that Section 504 of the Rehabilitation Act is not judicially enforceable against executive agencies. It does not contest, in other words, that Plaintiffs have stated a substantive claim for disability discrimination. So the only question is whether this Court is permitted to hear that claim in the first place. For the reasons that follow, Plaintiffs have a cause of action under Section 504 of the Rehabilitation Act; this Court has equitable power to enjoin violations of that Act by federal officials in any event; and, as the government agrees, sovereign immunity does not apply.

**I.    Section 504 is Judicially Enforceable**

**A.    There is an Implied Right of Action to Enforce Section 504**

Congress created an implied private right of action for substantive violations of Section 504 by executive agencies like Defendants. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Therefore, courts must "determine whether [the relevant statute] displays an intent to create not just a private right but also a private remedy." *Id.* This analysis "begins with the text and structure of the statute" and may include a review of the context in which the law was enacted. *Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77-78 (D.C. Cir. 2017) (per curiam). Here, those considerations all establish that Congress intended to create a private right of action for individuals suing executive agencies for substantive violations of Section 504's antidiscrimination provision.

**1.    Text, Structure, Precedent, and Purpose All Show Congress's Intent to Create an Implied Right of Action**

a. Text and Structure: Section 504 uses the same classic "'rights-creating' language" that the Supreme Court has consistently recognized creates a private cause of action. *Sandoval*, 532 U.S. at 288; *see id.* at 280. Section 504 guarantees that "[n]o otherwise qualified individual with a

disability . . . shall . . . be subjected to discrimination . . . under any program or activity conducted by an Executive agency." 29 U.S.C. § 794(a). That language precisely mirrors the language in Titles VI and IX that the Supreme Court has held creates a private right to sue. *See Sandoval*, 532 U.S. at 278-80 (recognizing existence of private right of action under Title VI, which provides that "[n]o person . . . shall, on the ground of race, color, or national origin, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. § 2000d); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979) (same under Title IX, which provides that "[n]o person . . . shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a)).

That mirroring was by design: when Congress first enacted the Rehabilitation Act in 1973, it intentionally "modeled" the language of Section 504 on the "parallel language . . . of Title VI, which Congress knew had been interpreted to provide private rights of action." *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 54 (D.D.C. 2020); *see* S. Rep. No. 93-1297, at 39-40 (1974) ("Section 504 was patterned after, and is almost identical to, the anti-discrimination language of [Title VI]" and "permit[s] a judicial remedy through a private action"). By 1973, "at least a dozen" federal courts had interpreted Title VI's nearly identical language to create a cause of action. *Cannon*, 441 U.S. at 696 & nn.20-21. Congress's choice to incorporate that text almost verbatim into Section 504 is "the most accurate indicator of the propriety of implication of a cause of action." *Id.* at 690 n.13; *see Sandoval*, 532 U.S. at 280 (reiterating the reasoning of *Cannon* on this point).

Congress's amendments to the Rehabilitation Act in 1978 reinforce that Congress intended to create not just a right to be free from discrimination based on disability but also a judicial remedy. In 1978, Congress amended the Rehabilitation Act to add executive agencies to the list of actors prohibited from discriminating under Section 504. 29 U.S.C. § 794(a). By that time, at least

four federal courts of appeal had interpreted Section 504 itself to create an implied right of action—and none had held otherwise. *See Doe v. Att'y Gen. of U.S.*, 941 F.2d 780, 786 (9th Cir. 1991), *disapproved on other grounds by Lane v. Pena*, 518 U.S. 187 (1996). Congress is "presume[d]" to be "thoroughly familiar with . . . important precedents from [the Supreme Court] and other federal courts" like these decisions when it acts. *Cannon*, 441 U.S. at 699; *accord, e.g.*, *Gomez-Perez v. Potter*, 553 U.S. 474, 485 (2008).

In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379, 386-87 (1982), for example, the Supreme Court held that Congress had preserved an implied cause of action that "federal courts routinely and consistently had recognized" in the Commodities Exchange Act by leaving the text implying the cause of action in place when it amended other language in the statute. "[C]ongressional debate" on the 1978 amendments to the Rehabilitation Act likewise "demonstrates that Congress *knew* that the courts had interpreted section 504 to provide" for private enforcement. *Doe*, 941 F.2d at 786. Against that backdrop, "the fact that a comprehensive reexamination and significant amendment" of the Rehabilitation Act "left intact the statutory provision[] under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that review." *Curran*, 456 U.S. at 381-82; *see Doe*, 941 F.2d at 789-90.

Indeed, rather than set out the new coverage of executive agencies in a separate section, "Congress appended th[at] new coverage to the end of the pre-existing sentence under which the private cause of action had been implied." *Doe*, 941 F.2d at 790. Thus, it is clear "[t]hat Congress intended violations of the new clause to be enforced in the same way as violations of the pre-existing clause": through private litigation brought by private parties. *Id.*

Contrary to Defendants' contentions, the language Congress simultaneously added in Section 505 does nothing to undermine this cause of action. In 1978, in addition to prohibiting federal agencies from discriminating under Section 504, Congress added language in Section 505 to align private enforcement of the Rehabilitation Act's prohibitions against employment discrimination and discrimination by federally funded entities with private enforcement of the Civil Rights Act of 1964's parallel provisions. Specifically, Section 505(a)(1) provides that the "remedies, procedures, and rights" of Title VII of the Civil Rights Act of 1964 shall apply to suits against the government for employment discrimination. 29 U.S.C. § 794a(a)(1). And Section 505(a)(2) provides that the "remedies, procedures, and rights" of Title VI of the Civil Rights Act of 1964 shall apply to suits against federally funded entities and the agencies funding them. 29 U.S.C. § 794a(a)(2). Section 505(a) does not identify a similar analogue for, and thus does not expressly impose the Civil Rights Act's "remedies, procedures and rights" as to, suits against federal agencies regarding their own programs or activities.

Defendants attempt to leverage this fact to argue that Congress intended to foreclose a cause of action for claims against federal agencies regarding their own programs or activities. But that misunderstands Section 505(a)'s purpose. Instead of creating a new right of action, Section 505(a) was added to align enforcement of the Rehabilitation Act's protections against disability discrimination with the Civil Rights Act's protections against race, sex, and national origin discrimination. This is clear from Section 505(a)'s text, which provides specific "procedures" and authorizes new "remedies," quite apart from a right of action for injunctive relief, not previously authorized by the Rehabilitation Act. Section 505(a)(1), for instance, allows individuals who have suffered employment discrimination to seek review before the Equal Employment Opportunity Commission and to petition for backpay in administrative and judicial forums. 42 U.S.C. §§ 2000e-

5(g), -16. Section 505(a)(2) likewise creates new procedures and remedies, including authorizing money damages and empowering federal agencies to withhold funds from programs that engage in discrimination. *Id.* § 2000d-1; *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 70 (1992). In short, nothing in Section 505(a) indicates a silent intent to withdraw the cause of action for injunctive relief that Congress had created—and federal courts had long recognized—in Section 504.

Section 505(b) further undercuts Defendants' misguided reading of § 505(a). Section 505(b) states that "[i]n *any* action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b) (emphasis added). That provision makes no distinction based on the type of action, and it is not limited to suits concerning employment discrimination or discrimination by federally funded entities. As this Court has explained, "there would be no purpose in crafting a provision allowing attorney fees unless the statute contemplates awards of declaratory and injunctive relief" against federal agencies for discrimination in their own programs. *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 58 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *see also* S. Rep. No. 95-890, at 19 (1978) ("[T]he availability of attorney's fees should assist in vindicating private rights of action . . . under section . . . 504"). Thus, Section 505(b) reinforces the conclusion that Congress intended to preserve a private right of action for all suits under Section 504, including against agencies for discrimination in their own programs and activities.

Finally, Defendants fare no better in their assertion that Section 505(a) shows that Congress wanted to limit suits concerning disability discrimination by federal programs to the Administrative Procedure Act ("APA"). Had Congress wanted to achieve that result, it could have

10

easily done so by "direct[ing] those plaintiffs who seek relief from Executive agencies' violations of section 504 to rely on the Administrative Procedure Act," just as it had directed plaintiffs seeking relief from employment discrimination to look to the remedies, procedures, and rights of Title VII and plaintiffs seeking relief from discrimination by federally funded entities to look to the same in Title VI. *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 54. But Congress imposed no such direction. *Id.* Defendants criticize *National Association of the Deaf* for failing to "explain why it would have been necessary (or even important) for Congress" to direct plaintiffs to rely exclusively on the APA. Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 8. But as that Court explained, Section 504's rights-creating language indicates an intent to create a private right of action that is *broader* than the APA, since Section 504's "reference to 'any Executive agency' is meant to be more inclusive" than "the APA's definition of an agency." 486 F. Supp. 3d at 54-55 (noting that the former includes the "Executive Office of the President," while the latter may not). It also applies to *all* discrimination by executive agencies, not just discrimination that may implicate final agency action. *Compare* 29 U.S.C. § 794(a), *with* 5 U.S.C. § 704. Thus, had Congress meant to limit plaintiffs to the APA despite Section 504's broad rights-creating language, it would have said so. *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 54-55.

b. Precedent: Case law confirms what statutory text and structure make plain: Contrary to Defendants' assertions, the "general consensus" in this Circuit and "across the country" is that Section 504 authorizes suits "against Executive agencies for injunctive and declaratory relief" for substantive violations of Section 504. *Id.* at 55 (collecting cases). For example, in *American Council of the Blind v. Paulson*, this Court held that Section 504 "contemplates awards of declaratory and injunctive relief" against executive agencies. 463 F. Supp. 2d at 58. Similarly, in *Lane v. Pena*, this Court granted an injunction against an executive agency for violating Section

504. 867 F. Supp. 1050, 1053 (D.D.C. 1994), *vacated in part on other grounds as explained in Lane v. Pena*, 518 U.S. 187, 190 (1996) (noting that "the Government did not dispute the propriety of th[e] injunctive relief" but only of the damages award); *see also J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 264 (9th Cir. 1992) (holding that plaintiffs may obtain equitable relief to remedy an executive agency's Section 504 violations), *disapproved on other grounds by Lane*, 518 U.S. at 191; *Modderno v. King*, 82 F.3d 1059, 1060 (D.C. Cir. 1996) (evaluating plaintiffs' claim against an agency for discrimination in its health insurance program without questioning whether plaintiff had a cause of action).

This consensus was previously shared by the federal government itself. Less than a decade ago, the government argued to this Court that "the Rehabilitation Act 'implies a private right of action to sue for injunctive relief in federal court' for violations of the *substantive* rights protected by Section 504" by executive agencies, but not for "violations of the *administrative* rules" issued under that statute. *Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 110 (D.D.C. 2015) (quoting government briefing). Yet recently, the government has reversed course and argued that there is *no* private right of action for either substantive *or* regulatory violations. *See Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 55-56.

While the government's original distinction between substantive and regulatory violations finds support in the statute and case law as explained below, *see id.* at 56; *infra* at 14-15, there is little support for Defendants' current suggestion that Section 504 provides no remedy against executive agencies for violations of *substantive* rights. Indeed, all the out-of-circuit cases that Defendants cite addressed only the question of whether plaintiffs had a cause of action against "executive agencies [acting] in their *regulatory* capacity." *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 126 (2d Cir. 2020) (emphasis added); *see* Dkt. No. 25-1 (Gov't Mot. to Dismiss) at

7 (citing *Moya*; *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc)). *Moya*, for instance, concerned whether plaintiffs could "sue [immigration] agencies for discriminatory regulations" governing the waiver of certain tests required for citizenship. 975 F.3d at 128. Likewise, *Cousins* and *Clark* concerned challenges to an agency's "refusal to amend, modify, or waive [] regulation[s]" mandating that commercial truck drivers meet certain physical requirements. *Cousins*, 880 F.2d at 605; *see Clark*, 937 F.2d at 124-25.

Numerous courts have distinguished these cases as involving challenges to federal executive agencies' conduct as *regulators*, and have thus permitted suits for injunctive relief against executive agencies alleged to have violated the Rehabilitation Act *substantively* by denying reasonable accommodations in their own programs. *See, e.g.*, *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 56; *Washington v. Fed. Bureau of Prisons*, 2019 WL 2125246, at *8 (D.S.C. Jan. 3, 2019), *report and recommendation adopted*, 2019 WL 1349516 (D.S.C. Mar. 26, 2019); *McRaniels v. U.S. Dep't of Veterans Affs.*, 2017 WL 2259622, at *4 (W.D. Wis. May 19, 2017). *Sai*, which addressed an agency's failure to respond to the plaintiff's administrative complaints in the time required by the agency's regulations, is the only case Defendants have identified that seriously considered and rejected this regulatory-vs.-substantive-rights distinction. 149 F. Supp. 3d at 112-15. But as Judge Boasberg explained, that case was decided "[w]ithout the benefit of" meaningful "adversarial briefing" and contradicts the text of the Rehabilitation Act. *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 56-57.

Defendants also point to *Bannister v. U.S. Parole Commission*, 2019 WL 1330636 (D.D.C. Mar. 25, 2019), but that case is consistent with the distinction that the government previously advocated between regulatory and substantive violations—not with Defendants' current view that

the Rehabilitation Act provides no remedy for substantive violations. In *Bannister*, the plaintiff brought both a substantive failure-to-accommodate claim and a claim that the Commission failed to promulgate regulations. *Id.* at *1-3. The district court evaluated the plaintiff's failure-to-accommodate claim and rejected it on the merits—*not* because the plaintiff lacked a cause of action. *Id.* at *4-6. Only when assessing the plaintiff's request for injunctive relief "compelling the Commission to adopt regulations" did the court find no cause of action. *Id.* at *6 (stating that the cause of action "would arise under the [APA]," "if it exists").

In their Motion to Dismiss, Defendants disclaim the distinction they previously advanced on the ground that "the statutory text of the Rehabilitation Act does not distinguish along these lines." Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 9. But the text draws precisely this distinction. Section 504 contains two different provisions directed at the conduct of executive agencies. The first is person-centric: "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). That provision contains the classic rights-creating language that the Supreme Court and others have long recognized creates a private right of action. *See supra* at 7-8. The second is agency-centric: "The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978." 29 U.S.C. § 794(a). That provision focuses not on the "individuals protected," but on "the agencies that will do the regulating." *Sandoval*, 532 U.S. at 289. As such, it "reveals no congressional intent to create a private right of action." *Id.*

Indeed, the Supreme Court has drawn this same substantive-rights-vs.-regulatory distinction in the context of Title VI, on which the Rehabilitation Act is modeled. Section 601 of Title VI, which contains the "no person . . . shall . . . be subjected to discrimination" language, creates a private right of action. *Id.* at 279-80, 288. Section 602, by contrast, does not. *Id.* at 289. That provision states that "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [§ 601] . . . by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1. The Supreme Court explained that this language does not create a private right of action because it focuses on the regulating agency, not the individuals being protected. *Sandoval*, 532 U.S. at 289. The two separate provisions of Section 504 of the Rehabilitation Act mirror Sections 601 and 602 of Title VI, and for each statute, only the provision providing individual substantive rights is enforceable through private litigation.

The government further argues that, even if the distinction stands, Plaintiffs lack a cause of action because their "claims seek to enjoin the Commission and CSOSA to implement policies and regulations." Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 10. That misunderstands Plaintiffs' claims. Plaintiffs seek to enjoin the Commission and CSOSA to evaluate the needs of people with disabilities and provide the accommodations required by law. That is a straightforward request that Defendants conduct their own program in compliance with the Rehabilitation Act, which courts routinely grant. *See, e.g.*, *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 59-61 (enjoining White House to make COVID-19 briefings accessible to hearing-impaired plaintiffs); *Am. Council of the Blind v. Paulson*, 581 F. Supp. 2d 1, 2 (D.D.C. 2008) (enjoining Treasury Department to make currency accessible to vision-impaired plaintiffs); *see also Am. Council of the Blind*, 525 F.3d 1256 (affirming summary judgment to plaintiffs seeking currency redesign). While Defendants could promulgate regulations in order to meet these legal obligations, nothing in Plaintiffs' requested

relief requires them to do so. Furthermore, Plaintiffs' "discussi[on] [of] Defendants' [] failures to have 'any system' or 'any guidance, instructions, or policies' to accommodate disabled individuals," Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 10, is evidence that Defendants are violating the law, not a request that this Court order Defendants to issue specific regulations or guidance as relief to redress those violations.

In order to illustrate the distinction between substantive and regulatory challenges, it is useful to compare Plaintiffs' claims to others they could have brought that may have required a "regulatory" action under the APA. For instance, CSOSA has not "promulgate[d] such regulations as may be necessary to carry out" Section 504, as required by the statute. 29 U.S.C. § 794(a). Plaintiffs' complaint did not challenge this failure. Had Plaintiffs brought such a claim, it would have a required that CSOSA promulgate the required regulations.

Similarly, it is useful to compare this case to the cases relied on by Defendants. In *Cousins*, the plaintiff challenged the Department of Transportation's failure "to amend, modify, or waive its regulation" preventing him from working as a truck driver. 880 F.2d at 605. And in *Clark,* the plaintiff brought suit against "the United States government in its capacity as a regulator" and sought an amendment to Department of Transportation regulations regarding its prohibition of "limb-impaired persons from driving commercial vehicles in interstate commerce without a waiver." 937 F.2d at 124-25. By contrast, here Plaintiffs do not challenge Defendants' regulations (or failure to issue regulations), and unlike *Cousins* and *Clark*, relief does not require a regulatory remedy. Instead, Plaintiffs challenge Defendants' discriminatory conduct—conduct that can be remedied by a range of actions, so long as they are appropriate and effective in remedying the discrimination. *See Am. Council of the Blind*, 525 F.3d at 1260 (leaving the Treasury Secretary to choose the means of bringing U.S. currency into compliance with section 504).

c. <u>Purpose</u>: Finally, accepting Defendants' position that Plaintiffs lack a cause of action here would severely undermine Congress's intent in enacting the Rehabilitation Act. Importantly, Defendants' have not taken the position not that Plaintiffs have sued under the wrong statute (i.e., the Rehabilitation Act instead of the APA), but rather that Plaintiffs have *no* remedy for their disability discrimination *at all*, under *any* statute. *See* Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 4 n.2; *see also* Dkt. No. 16 (Gov't Opp. to Mot. for Preliminary Injunction) at 6-7. If accepted, that extreme position would subvert Congress's core purpose in enacting the Rehabilitation Act: "to ensure that members of the disabled community could . . . fully participate in society," such as by reintegrating into society through supervision. *Am. Council of the Blind*, 525 F.3d at 1259. It is simply not plausible that Congress enacted a sweeping statute to protect the rights of people with disabilities—a statute expressly modeled on other antidiscrimination laws that courts had repeatedly interpreted to imply private rights of action—with the intent of depriving such individuals of any ability to enforce those protections against executive agencies. *Cf. Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 57 (emphasizing that "following *Sai* . . . would leave Plaintiffs without a judicial remedy").

That is especially so because, unlike in other contexts where the Supreme Court has found no private right of action, the statute here does not provide any meaningful alternative enforcement mechanism to protect against discrimination by executive agencies in the conduct of the programs they operate. In *Sandoval*, the Court concluded that Congress had not intended to create a private right of action against a state for violating disparate-impact regulations in part because the regulating agency itself could bring suit. 532 U.S. at 289-90. But here, there is no possibility of such enforcement as the entity discriminating is the agency itself. Thus, it is especially apparent here that Congress intended to create both a private right *and* a private remedy.

17

2.    **Defendants' Grab Bag of Other Arguments Do Not Show that Plaintiffs Lack a Cause of Action**

Defendants rely on the existence of two sources outside of the Rehabilitation Act to argue that Plaintiffs lack a cause of action: (a) a 1984 regulation; and (b) the APA. Neither supports Defendants' argument that Plaintiffs have no cause of action under the Rehabilitation Act.

a. <u>1984 Regulation</u>: Defendants argue that the Department of Justice "acknowledged and accounted for the absence of a right of action to enforce the relevant provision of the Rehabilitation Act" in a 1984 regulation, Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 10 (citing 49 Fed. Reg. 35,724, 35,732).[2] But that very same regulation clarifies that "the issue of the availability of a private right of action" is "beyond our jurisdiction" and thus is "for the courts to decide." 49 Fed. Reg. 35,724, 35,733. Beyond the fact that Defendants' cherry-picked quote mischaracterizes what the regulation says on this issue, the government has frequently stated that Section 504 *does* create a private right of action. In its own current guidance on disability rights law, the Department of Justice states without qualification that "Section 504 may also be enforced through private lawsuits."[3] Similarly, in its preamble to its regulations on discrimination under the Americans with Disabilities Act (ADA), the Department of Justice notes that there is a private right of action to enforce both the ADA and the Rehabilitation Act: "As with section 504, there is also a private right of action for

---

[2] Contrary to the government's argument, 28 C.F.R. § 39.170 was not created as the exclusive "enforcement" mechanism for Section 504, but instead to provide an *additional* avenue for relief pursuant to the Rehabilitation Act's mandate that the head of each Executive agency "shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978." 29 U.S.C. § 794(a); *see* 28 C.F.R. Part 35, Appendix B, Subpart F, Compliance Procedures ("[C]onsistent with section 504, it is not the Committee's intent that persons with disabilities need to exhaust Federal administrative remedies before exercising their private right of action.").

[3] Guide to Disability Rights Laws, Americans with Dyabilities Act (ADA) (Last updated Feb. 28, 2020), https://www.ada.gov/resources/disability-rights-guide/.

persons with disabilities, which includes the full panoply of remedies." 28 C.F.R. Part 35, Appendix B, Subpart F, Compliance Procedures. Furthermore, the government only recently began arguing that Section 504 categorically forecloses an implied right of action. *Cf. Sai*, 149 F. Supp. 3d at 110 (quoting government briefing). Regardless, the government's own view on whether Section 504 provides a private right of action, which is contradictory at best, does not control. *See Loper Bright Enters. v. Raimondo*, No. 22-451, 2024 WL 3208360, at *9 (U.S. June 28, 2024) ("It is emphatically the province and duty of the judicial department to say what the law is." (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803))).

b. <u>APA</u>: The government's contention that a cause of action under the Rehabilitation Act would be a "duplicate, redundant right of action" that "mirror[s] relief that is already—and only— available through the APA" rests on a logical fallacy. Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 10. The APA embodies a "basic presumption of judicial review" of agency action, *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)), but it only provides a right to judicial review of "final agency action for which there is no other adequate remedy," *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017) (quoting 5 U.S.C. § 704). The inverse is not true: The existence of the APA does not preclude Congress from providing remedies for specific agency violations. In other words, the APA provides a backstop where other remedies fall short; it was not intended to supplant otherwise available remedies.

Congress has frequently created laws that provide a cause of action to challenge agency conduct, despite the existence of the APA. *See, e.g.*, *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (finding an implied private right of action under Title VI, leaving it "beyond dispute that private individuals may sue to enforce" the law outside of the APA (quoting *Sandoval*, 532 U.S. at 280)); *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005) ("Because this substantive statute

independently authorizes a private right of action, the APA does not govern the plaintiffs' claims."), *abrogated on other grounds as recognized by Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir. 2015). In fact, where Congress has specifically regulated in an area, the cause of action within that law takes precedence over the APA's. *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (review under the APA is unavailable where Congress has "otherwise provided a special and adequate review procedure," even where "the alternative remedy [does] not provide relief identical to the relief under the APA, so long as it offers relief of the same genre." (internal quotations and citation omitted)). Here, for instance, Congress has specifically prohibited discrimination by the federal government. And it is this discrimination that Plaintiffs' complaint addresses—not any particular parole revocation decision or other final agency action whose challenge would ordinarily proceed under the APA.

Finally, the government's argument is incompatible with the "basic presumption of judicial review" of agency action. *Lincoln*, 508 U.S. at 190 (quoting *Abbott Labs.*, 387 U.S. at 140). The government wants it both ways. It argues that the fact that the APA sometimes provides a cause of action against the government proves that the Rehabilitation Act does not. But at the same time, the government does not "imply or concede" that the APA would provide relief here. Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 4 n.2; *see* Dkt. No. 16 (Gov't Opp. to Mot. for Preliminary Injunction) at 6-7 (arguing relief is not available under the APA). Thus, despite the presumption of review, and the fact that Congress has specifically prohibited discrimination by federal agencies under Section 504, Defendants' argument appears to be the stunning assertion that there is no judicial remedy for agency discrimination on the basis of disability.

### B.    The Court Has Equitable Power to Enforce the Rehabilitation Act

This Court's equitable power to enforce federal law provides an independent basis to enjoin Defendants' violations of the Rehabilitation Act. Although Plaintiffs made this argument in their preliminary injunction briefing, *see* Dkt. 17 (Plfs. Reply to Mot. for Preliminary Injunction) at 10-13, Defendants' motion to dismiss ignores it entirely. That is because Defendants have no answer.

As the Supreme Court explained in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), federal courts possess inherent equitable powers to enjoin violations of federal law by federal officers: "[W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. . . . [T]hat has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials." *Id.* at 326-27 (citations omitted). This tradition is one of long lineage, as Justice Scalia chronicled in his opinion for the Court: Regarding federal officials specifically, the Court cited *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); the Court's discussion further cited *Osborn v. Bank of United States*, 9 Wheat. 738 (1824), and *Carroll v. Safford,* 3 How. 441 (1845); and the Court explained that the "long history of judicial review of illegal executive action" "trac[es] back to England." *Id.* at 327.

"Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *accord, e.g., McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) ("[W]e will not construe a statute to displace courts' traditional equitable authority absent the clearest command." (quoting *Holland v. Florida*, 560 U.S. 631, 646 (2010)). No textual foreclosure of this Court's "jurisdiction in equity" exists here.

The Court has found such foreclosure by inference only in two scenarios: first, where Congress has provided a "detailed and exclusive remedial scheme," *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 647 (2002) (discussing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)); and second, where a statute contains an alternative remedy *and* the right at issue is "judicially unadministrable," *Armstrong*, 575 U.S. at 328. Neither scenario is present here.

This case does not implicate the first scenario because, if the Court holds that no implied right of action exists for claims like Plaintiffs', then Congress has prescribed no remedy at all for them in the Rehabilitation Act—much less an "exclusive" one that would render enforcement via courts' inherent equitable power "*inconsistent* with" a "'detailed'" and "limited" "'remedial scheme'" that "Congress had prescribed." *Verizon Md.*, 535 U.S. at 647 (quoting *Seminole Tribe*, 517 U.S. at 74) (emphasis added); *cf. Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 187 (2023) (instructing as to foreclosure of 42 U.S.C. § 1983 remedy that the "sine qua non" of implied congressional foreclosure of extant remedies is "incompatibility" between the preexisting remedy "and the enforcement scheme that Congress has enacted"). The existence of agency-crafted administrative processes would not alter this conclusion. At most, such procedures might show that the agency did not believe judicial enforcement necessary, but only *Congress* itself can strip courts of their traditional equitable powers. *See Armstrong*, 575 U.S. at 329 ("*Congress* may displace the equitable relief that is traditionally available to enforce federal law." (emphasis added)); *Talevski*, 599 U.S. at 187 ("[T]he inquiry boils down to what *Congress* intended, as divined from text and context." (emphasis added)); *Verizon Md.*, 535 U.S. at 647-48 (assessing inconsistency of judicial enforcement with statutory scheme "that *Congress* had prescribed" (emphasis added)). Thus, no detailed and exclusive remedial scheme forecloses

Plaintiffs' invocation of federal courts' equitable power to enjoin violations of the Rehabilitation Act.

The second scenario giving rise to foreclosure of equitable enforcement—the path laid out in *Armstrong* itself—is also absent here. That scenario requires that two conditions are met: (1) there exists an alternative remedy *and* (2) the right at issue is "judicially unadministrable." *Armstrong*, 575 U.S. at 328 (specifying that the alternative remedy present in the statute at issue "might not, *by itself*, preclude the availability of equitable relief," "[b]ut it does so when combined with the judicially unadministrable nature" of the statutory text).

Here, at minimum, the right at issue is not "judicially unadministrable." *Id.* Illustrating that concept, the Medicaid Act provision at issue in *Armstrong* required States, with respect to a particular healthcare service, to "provide such methods and procedures" regarding "utilization" and "payment" as "necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers." *Id.* at 323 (quoting 42 U.S.C. § 1396a(a)(30)(A)). The Court found this requirement "judicially unadministrable" because "[i]t is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" *Id.* at 328.

By contrast, the Rehabilitation Act's prohibition on disability discrimination is neither too broad nor nonspecific for judicial enforcement—as reflected in this Court's regular enforcement of the Rehabilitation Act (regardless of the precise cause of action invoked). *See, e.g., Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 59-61 (enforcing the Rehabilitation Act against White House officials for the failure to provide sign language interpretation at briefings); *Am. Council of the*

*Blind*, 463 F. Supp. 2d at 63 (enforcing the Rehabilitation Act against the Secretary of the Treasury for discrimination as to currency design); *Lane*, 867 F. Supp. at 1074-75 (granting injunction against the U.S. Merchant Marine Academy for violating the Rehabilitation Act).

Finally, the availability of inherent equitable power is independent of whether a statutory cause of action, implied or otherwise, exists. In *Armstrong* itself, Justice Scalia's lead opinion analyzed the implied-right-of-action question independently from the equitable-power question. *Compare* 575 U.S. at 326-31 (majority opinion) (considering enforcement in equity), *with id.* at 331-32 (plurality opinion) (considering implied right of action under the Medicaid Act). And in *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425 (5th Cir. 2023), the court held that a plaintiff could invoke the federal courts' equitable power alone to enjoin a city from enforcing land-use standards in a manner the plaintiffs alleged would violate a federal statute—"[e]ven though [the statute] does not confer a private right" enforceable via § 1983. *Id.* at 433-35.

Accordingly, if the Court determines that Plaintiffs lack a cause of action under the Rehabilitation Act itself, Plaintiffs may nonetheless enforce the act via the court's historic equitable power to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27.

## II.    Sovereign Immunity Does Not Bar Plaintiffs' Claims

The Court instructed the parties to address whether Defendants have sovereign immunity from this lawsuit. *See* Minute Order, June 6, 2024. In response, the government stated that it is "not asserting sovereign immunity as a bar to Plaintiffs' Complaint[.]" Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 3. That concession makes sense because sovereign immunity does not bar Plaintiffs' claims for injunctive relief for several independent reasons.

First, as this Circuit has squarely and repeatedly held, the APA waives sovereign immunity for claims against federal agencies for "any suit *whether under the APA or not*." *Chamber of Com.*

*of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (emphasis added); *see also* 5 U.S.C. § 702 (providing that claims seeking injunctive relief from federal agencies "shall not be dismissed nor relief therein be denied on the ground that it is against the United States.").[4] This Court has thus explained that the "Government's waiver of immunity [under the APA] applies not only to the APA claim, but to [the plaintiff's] other claims as well, because the 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not.'" *Cherokee Nation v. Dep't of the Interior*, No. 19-cv-2154, 2020 WL 224486, at *2 (D.D.C. Jan. 15, 2020) (quoting *Reich*, 74 F.3d at 1328); *see also Orozco v. Garland*, 60 F. 4th 684, 691 (D.C. Cir. 2023) (sovereign immunity did not bar Rehabilitation Act claim because "Congress already waived the Government's immunity from actions seeking relief other than money damages" in Section 702 of the APA (cleaned up)).

Further, the Rehabilitation Act itself waives the government's sovereign immunity. Section 505(b) provides that a court may allow "a reasonable attorney's fee" "[i]n any action or proceeding to enforce or charge a violation of a provision of this subchapter." 29 U.S.C. § 794a(b). In *Lane v. Pena*, the Supreme Court referred to this attorney's fee provision as a "clear waiver of the Federal Government's sovereign immunity." 518 U.S. at 194 (permitting injunctive relief against the federal government under Section 504).[5] Building on this conclusion, the Court in *American*

---

[4] The government itself notes that the APA contains "a waiver of sovereign immunity for injunctive relief for claims properly brought thereunder." Dkt. No. 25-1 (Gov't Mot. to Dismiss) at 3–4. But the government's characterization is too narrow given this Circuit's holding that the APA's waiver of sovereign immunity is not limited to claims brought under the APA.

[5] The Court in *Lane* contrasted the "clarity" of this provision, which applies to "*any* action or proceeding" involving Section 504, with Section 505(a)(2), which provides monetary damages in the narrower category of cases involving a "recipient of Federal assistance or Federal provider of such assistance." 518 U.S. at 194; *compare* 29 U.S.C. § 794a(2) (emphasis added), *with* 29 U.S.C. § 794a(b).

*Council of Blind* held that "injunctive relief is available against the sovereign under [Section 504 of the Rehabilitation Act]." *Am. Council of Blind*, 463 F. Supp. 2d. at 58. The attorney's fee provision, the Court explained, presupposes that private litigants can bring a proceeding against the federal government to "enforce" or "charge a violation" of Section 504. 29 U.S.C. § 794a(b); *see Am. Council of the Blind*, 463 F. Supp. 2d at 58. Indeed, "there would be no purpose in crafting a provision allowing attorney fees unless the statute contemplates awards of declaratory and injunctive relief." *Am. Council of the Blind*, 463 F. Supp. 2d at 58. Consistent with the statutory text and structure, the Senate Report accompanying Section 505(b) noted that the availability of attorney's fees "should assist in vindicating private rights of actions in the case of section 502 and 503 cases, as well as those arising under section 501 and 504." *See* S. Rep. No. 95-890, p. 19 (1978).

Finally, regardless of whether the APA or Rehabilitation Act waive sovereign immunity for the federal agency defendants, no such immunity is available to the agencies' officials— Defendants Patricia Cushwa and Richard Tischner. "It is well-established that sovereign immunity does not bar suits for specific relief," such as injunctive or declaratory relief, "where the challenged actions of the officials are alleged to be . . . beyond statutory authority." *Clark*, 750 F.2d at 102; *see also Swan v. Clinton*, 100 F.3d 973, 981 & n.4 (D.C. Cir. 1996) (rejecting sovereign immunity in suit that challenged President Clinton's actions as "beyond [his] statutory authority" when neither statute under which the plaintiff brought suit waived sovereign immunity); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-23 (1963). Here, Plaintiffs have alleged that Defendants Cushwa and Tischner's actions in administering supervision without providing legally-mandated reasonable accommodations are

"beyond statutory authority." *Clark*, 750 F.2d at 102. Sovereign immunity is thus not a bar

to Plaintiffs' claims against those officials.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Dated: July 12, 2024                                    Respectfully Submitted,

                                                        */s/  Hanna M. Perry*

ALLISON FRANKEL (*Pro Hac Vice*)          HANNA M. PERRY
afrankel@aclu.org                         D.C. Bar No. 90003756
ASHIKA VERRIEST                           hperry@pdsdc.org
D.C. Bar No. 90001468                     ZOÉ FRIEDLAND
averriest@aclu.org                        D.C. Bar No. 1781910
AMERICAN CIVIL LIBERTIES UNION            PUBLIC DEFENDER SERVICE FOR THE
    FOUNDATION                                DISTRICT OF COLUMBIA
125 Broad Street                          633 3rd Street NW
New York, NY 10004                        Washington, D.C. 20004
Tel.: (617) 650-7741                      Tel.: (202) 579-0633


SCOTT MICHELMAN                           SAMIR DEGER-SEN
D.C. Bar No. 1006945                      D.C. Bar No. 1510881
smichelman@acludc.org                     samir.deger-sen@lw.com
MICHAEL PERLOFF                           LATHAM & WATKINS LLP
D.C. Bar No. 1601047                      1271 Avenue of the Americas
mperloff@acludc.org                       New York, NY 10020
AMERICAN CIVIL LIBERTIES UNION            Tel.: (212) 906-1200
    FOUNDATION OF THE DISTRICT OF         Fax: (212) 751-4864
    COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045                    PETER E. DAVIS
Tel.: (202) 457 0800                      D.C. Bar No. 1686093
                                          peter.davis@lw.com
                                          CHRISTINE C. SMITH
                                          D.C. Bar No. 1658087
                                          christine.smith@lw.com
                                          JORDAN L. HUGHES
                                          D.C. Bar No. 90004355
                                          jordan.hughes@lw.com
                                          LATHAM & WATKINS LLP
                                          555 Eleventh Street NW, Suite 1000
                                          Washington, D.C. 20004
                                          Tel.: (202) 637-2200

27

Fax: (202) 637-2201

*Attorneys for Plaintiffs and the Proposed Class*