**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WILLIAM MATHIS and KENNEDY DAVIS**, *individually and on behalf of all others similarly situated*, | |
| Plaintiffs, | |
| v. | Case No. 1:24-cv-01312 (TNM) |
| **UNITED STATES PAROLE COMMISSION**, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Two men on lifetime parole claim they face disability discrimination from two federal agencies that supervise them. So these men, William Mathis and Kennedy Davis (together, "the Parolees"), now sue those federal agencies, the U.S. Parole Commission and the Court Services and Offender Supervision Agency, and the heads of those agencies in their official capacities (collectively, "the Government").

The Parolees' suit stakes out narrow ground; it charges one count of disability discrimination, in violation of the Rehabilitation Act. But this one-count Complaint packs a punch. It alleges that the Government forces the Parolees to navigate the strictures of supervision without accommodations for their disabilities. The Parolees also seek a preliminary injunction, wanting the alleged discrimination to stop now. The Government opposes their request and argues the Complaint should be dismissed for failure to state a claim.

The Parolees prevail. They will likely succeed on the merits of their claim because they have—at least in this preliminary posture—shown that the Government has violated Section 504

of the Rehabilitation Act.  And though that Act does not provide the Parolees with a private right of action, they may sue in equity under *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 326–27 (2015).  Absent immediate relief, the Parolees will face irreparable harm; namely, obstacles to success on supervision solely because of their disabilities, which expose them to downstream harms like revocation and reincarceration.  Finally, equity and the public interest also favor preliminary intervention.  So the Court will grant the Parolees' Motion for a Preliminary Injunction and deny the Government's Motion to Dismiss.

## I.

Start with some background on the supervision system for District of Columbia Code offenders who reside in Washington, D.C.[1]  Supervision comes in two forms: parole or supervised release.  Timing explains the difference.  Parole applied to offenses committed before August 5, 2000.  But after that date, parole was abolished and replaced with supervised release. *See* Sentencing Reform Amendment Act of 2000, D.C. Law 13-302.

Two federal agencies work together to supervise D.C. Code offenders.  The U.S. Parole Commission possesses major decision-making authority and takes the lead in administering the programs.  *See* National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745; 28 C.F.R. § 2.70(a) (describing authority over parole decisions for D.C. Code offenders); *id.* § 2.200(a) (similar for supervised release).  It sets general supervision conditions and decides whether an offender's term of parole or supervised release should be continued, revoked, or terminated.  *See* 28 C.F.R. § 2.70(a)–(b); *id.* § 2.200(a)–(b).

---

[1] For clarity's sake, this case only concerns individuals who are on supervision for violating D.C. Code, not federal law.

The Court Services and Offender Supervision Agency ("CSOSA") implements the Commission's decisions.  It provides the actual "supervision, through qualified supervision officers, for offenders on probation, parole, and supervised release pursuant to the District of Columbia Code."  Revitalization Act § 11233(c)(1) (codified at D.C. Code § 24-133(c)(1)).  Practically speaking, CSOSA's officers (known as "CSOs") handle the day-to-day supervision.  They ensure offenders comply with their conditions, set the location and frequency of check-ins, and initially assess supervision violations.  Compl. ¶ 15, ECF No. 1.  CSOs respond to non-compliance with "graduated sanctions."  Those sanctions start with increased supervision requirements.  *Id.*  But they can escalate to an Alleged Violation Report ("AVR")—a recommendation that the Commission issue an arrest warrant and begin revocation proceedings.  *Id.*

So the Commission and CSOSA both supervise people who committed offenses under D.C. law.  And they must work together to revoke supervision and reincarcerate an offender.

Sometimes revocation and reincarceration follow a second criminal offense.  But "technical violations" can trigger discipline, too.  Technical violations happen when an offender on supervision violates a condition of release—like missing an appointment with a CSO, failing to get a job, or skipping a drug test.  A. Verriest Decl. Ex. F (CSOSA Congressional Budget Justification Fiscal Year 2024) at 35.[2]  These violations are "technical" because they stem from supervision conditions, not criminal law.  Still, offenders who commit purely technical violations can face jailtime.  *Id.*

---

[2] Verriest's Declaration appears as an attachment to Plaintiffs' Motion for Preliminary Injunction.  *See* ECF Nos. 3-6 through 3-15.

Offenders with disabilities are especially susceptible to accruing technical violations. Compl. ¶¶ 25, 28.  According to the Complaint, physical disabilities can impede mobility, making it difficult for an offender to travel to a mandatory check-in with his CSO.  *Id.* ¶ 26. Chronic health conditions present similar difficulties and might require an offender to balance CSO check-ins with medical appointments or hospitalization.  *Id.*  Then there are mental, intellectual, and developmental disabilities that may frustrate an offender's ability to grasp certain conditions or participate in required programs.  *Id.* ¶ 27.  Given these obstacles, the Parolees allege that "people with disabilities are more likely to be found in violation of terms of supervision" than their non-disabled counterparts.  *Id.* ¶ 28.

And the Parolees' personal experiences bear this out, at least going by the allegations in the Complaint and materials filed in support of their Motion for Preliminary Injunction.  William Mathis is a 70-year-old military veteran who committed First-Degree Murder while Armed.  W. Mathis Decl. ¶¶ 1–3, ECF No. 3-2; Defs.' Mot. Dismiss at 5,[3] ECF No. 25.  Mathis was convicted of this offense in 1985 and began serving his lifetime parole term in 2006.  Defs.' Mot. Dismiss at 5.  He now has congestive heart failure that has landed him in the hospital four times since October 2023.  W. Mathis Decl. ¶¶ 4–5.  His chronic condition leaves him dizzy and short of breath, symptoms that complicate his ability to walk.  *Id.* ¶ 6.  As a result, Mathis uses a walker whenever he leaves home.  *Id.*

Mathis's heart condition complicate his supervision obligations, which entail weekly drug tests and semiweekly, in-person appointments with his CSO.  *Id.* ¶¶ 7–9.  For instance, the check-ins often get double-booked with Mathis's medical appointments, forcing him to choose between them.  *Id.* ¶¶ 10–11.  Mathis has flagged this problem with his CSO "numerous times"

---

[3] The Court's page citations refer to the pagination generated by CM/ECF.

and given her "a list of his medical appointments." *Id.* ¶ 12.  But she has never offered to change the appointment dates or locations.  *Id.*

Mathis initially managed.  But then things slid sideways toward the end of 2023.  He had frequent appointments at the VA hospital, causing him to miss three check-ins.  *Id.* ¶ 27.  As the skips added up, the Government required him to wear a GPS ankle monitor.  *Id.* ¶ 13. Mathis's doctor warned against this device, saying it would dangerously restrict blood flow in Mathis's leg and cause swelling.  *Id.* ¶ 17.  Mathis relayed these concerns to his CSO, but she attached the monitor anyway.  *Id.* ¶¶ 15–16.  Swelling followed, as did pain and discomfort.  *Id.*  Mathis missed another check-in and tested positive for marijuana.  *Id.* ¶¶ 26–27.

So when Mathis reported for his next check-in on January 22, he was arrested for technical violations and held in custody.  *Id.* ¶ 30.  The next day, Mathis told a hearing examiner that he had heart surgery scheduled for January 26.  *Id.* ¶ 33.  Although the examiner recommended that the Commission release him for this "important medical procedure," the Commission rejected the recommendation and ordered him held in the D.C. Jail.  *Id.* ¶¶ 34–35.  So he stayed there until he was released on January 30 and reinstated on supervision.  *Id.* ¶¶ 36–37.  Mathis missed his surgery and remains on supervision without any accommodations.  *Id.* ¶¶ 35, 37.

Kennedy Davis has a similar story.  He is a 48-year-old man who committed Second-Degree Murder and Possession of a Firearm During a Crime of Violence.  Defs.' Mot. Dismiss at 6.  He was convicted of these offenses in 1995 and began serving lifetime parole in 2011.  *Id.*; K. Davis Decl. ¶¶ 1, 3–4, ECF No. 3-3.  Davis experiences chronic pain stemming from third-degree burns on his bones and ribs—wounds that have required multiple rounds of surgery.  K. Davis Decl. ¶¶ 5–6.  Davis also has mental health conditions, including depression, anxiety, and

PTSD, for which he has received mental health treatment.  *Id.* ¶¶ 7–9.  Davis has been on parole

since 2011.  *Id.* ¶ 4.  His conditions require him to report to his CSO as requested, get drug tested

in-person twice a week, and report every address change.  *Id.* ¶ 11.

Like Mathis, Davis's disabilities have complicated his ability to succeed on supervision.

*Id.* ¶ 17.  His burns make it hard for him to move around.  *Id.* ¶ 18.  After some of his surgeries,

he relied on a wheelchair, crutches, and a walker.  *Id.* ¶¶ 20–21.  Yet Davis still recognizes the

importance of showing up to his CSO appointments.  *Id.* ¶ 32.  When he was initially

hospitalized for his burns, for instance, he left the hospital against a doctor's orders to meet with

his CSO.  *Id.* ¶ 5.

Davis's mental health issues also complicate matters.  Take his most recent revocation for

failing to check-in by phone.  *Id.* ¶¶ 34–38.  When Davis was placed on supervision, he "did not

have [his] own phone."  *Id.* ¶ 34.  So his re-entry advocate at University Legal Services (a

community-based organization that assists people with disabilities) gave him one.  *Id.* ¶ 34.  But

ULS forgot to put minutes on it.  *Id.*  When Davis realized the oversight, he "got very anxious

and scared."  *Id.* ¶ 35.  He knew he had to check-in.  *Id.*  But instead of rationally thinking

through the situation and contacting his CSO by another means, he kept trying to reach ULS—

they were "the people [he] trust[ed]."  *Id.* ¶¶ 35–36.

Davis eventually reached ULS, but by then it was too late.  Citing the missed check-in,

Davis's CSO submitted an AVR and pursued revocation.  Compl. ¶ 111; K. Davis Decl. ¶¶ 38.

And although Davis had reported for drug testing on all required occasions—and tested negative

each time—he was arrested on August 3, 2023.  Compl. ¶¶ 111–12.  The arrest caused him to

miss a surgery for his burns on August 8.  *Id.* ¶ 113; K. Davis Decl. ¶ 40.  And on October 4, the

Commission imposed a 12-month sentence for Davis's technical violation.  K. Davis Decl. ¶¶ 42–44.  Davis still appears to be serving that sentence.  *Id.* ¶ 2.

According to CSOSA's own data, the Parolees' experiences are not unique.  That data reveals that 17% of people on supervision between June 22 and May 2023 had a mental disability, but 30% of people who had an AVR submitted solely for technical violations had mental disabilities.  A. Verriest Decl. Ex. A (CSOSA 6/23 FOIA Response) at 6–7.  In other words, offenders with mental disabilities are overrepresented when it comes to technical violations.  Another comparison makes the same point.  While 10% of all individuals on supervision committed a technical violation, that number creeps to 18% among the mentally disabled population.  *Id.*  The Government's data goes dark beyond this because it concededly does not track "intellectual, developmental, or physical disabilities."  *Id.* at 7.

Nor does the Government accommodate offenders with disabilities.  CSOSA processes new supervision participants using automatic tools like the "Triage Screener" and the "Dynamic Risk Assessment for Offender Reentry."  A. Verriest Decl. Ex. F (CSOSA Congressional Budget Justification Fiscal Year 2024) at 7, 52–53.  These automated assessments generate a baseline supervision plan for each participant.  *Id.*  But the assessments do not account for disabilities or propose reasonable accommodations.  *Id.*  In fact, CSOSA conducted an "exhaustive search" of its policies stretching back nine years and "yielded no guidance/instruction/etc." concerning the need to evaluate or reasonably accommodate offenders with disabilities.  A. Verriest Decl. Ex. A (CSOSA 6/23 FOIA Response) at 1–2.  Relatedly, the Government also lacks any "guidance/instruction/etc. regarding the provision of notice to supervisees" concerning their right to request reasonable accommodations for their disabilities.  *Id.*

So the Parolees sued, claiming the Government is committing disability discrimination in violation of Rehabilitation Act.  Compl. ¶¶ 139–55.  The Parolees also asked the Court to preliminarily enjoin the Government from continuing the alleged discrimination.  *See* Pls.' Mot. Prelim. Inj., ECF No. 3.  The Government opposes the Parolees' request for a preliminary injunction.  *See* Defs.' Opp'n to Pls.' Mot. Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 16.  And following in-person arguments on the preliminary injunction, the Government filed an expedited dismissal motion.  *See* Defs.' Mot. Dismiss.  These motions are now ripe.

## II.

To obtain a preliminary injunction, the Parolees must clearly show that they are (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *accord Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022).  The last two factors merge in cases like this one where "the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

To survive a motion to dismiss under Rule 12(b)(6), the Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

**III.**

The Court evaluates each preliminary injunction factor in turn.

**A.**

**1.**

The Parolees are likely to succeed on the merits of their Rehabilitation Act claim.

Section 504 of the Act states:  "No otherwise qualified individual with a disability in the United

States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance or under any program or

activity conducted by any Executive agency[.]"  29 U.S.C. § 794(a).[4]

To prove disability discrimination under this language, the Parolees "must show that

(1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise

qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under

any program or activity" solely by reason of their disability, "and (4) the program or activity is

carried out by a federal executive agency or with federal funds."  *Am. Council of the Blind v.*

*Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).

The Parolees undisputedly satisfy the first, second, and fourth elements.

*Element One*:  the Parolees have qualifying disabilities.  Section 504 defines the phrase

"individual with a disability" as "any person who has a disability" under the Americans with

Disabilities Act.  29 U.S.C. § 705(20)(B); *see also id.* § 794(a).  The ADA, in turn, says "[t]he

---

[4] This case revolves around three sections in the Rehabilitation Act.  For ease of reference, here
are their originally codified locations in Title 29 of the U.S. Code:
- Rehabilitation Act § 501 = 29 U.S.C. § 791
- Rehabilitation Act § 504 = 29 U.S.C. § 794
- Rehabilitation Act § 505 = 29 U.S.C. § 794a

term 'disability' means . . . a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).  The Parolees meet this definition.  Mathis has congestive heart failure, which substantially limits his ability to walk.  W. Mathis Decl. ¶¶ 4, 6. Davis, too, has trouble walking because of his third-degree burns.  K. Davis Decl. ¶¶ 5, 18, 21. And he also suffers from mental health conditions like anxiety, depression, and PTSD.  *Id.* ¶ 7. Walking, thinking, concentrating, and interacting with others are major life activities.  *See* 28 C.F.R. § 35.108(c)(1).  So the Parolees meet the first element.

*Element Two*:  the Parolees are "otherwise qualified" for supervision.  *Am. Council of the Blind*, 525 F.3d at 1266.  An individual with a disability is "qualified" for a program if they meet "the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity."  28 C.F.R. § 39.103.  Here, the Parolees have been placed on supervision and are subject to its terms.  So they meet the essential eligibility requirements established by the Government to participate in supervision.  That takes care of the second element.

*Element Four*:  Parole and supervised release count as "program[s] or activitie[s] carried out by . . . Executive agenc[ies] within the meaning of section 504."  *Am. Council of the Blind*, 525 F.3d at 1266.  The phrase "program or activity" carries an "expansive meaning" that encompasses "anything a Federal agency does."  *Id.* at 1266 n.13 (cleaned up).  And the Commission and CSOSA both count as federal agencies.  *See* Parole Commission and Reorganization Act, Pub. L. No. 94-233, § 4202, 90 Stat. 219, 219 (1976) (establishing the Commission "as an independent agency in the Department of Justice"); Revitalization Act § 11233(a) (establishing CSOSA "within the executive branch of the Federal Government").  So the Parolees likewise satisfy the fourth element.

But the Government argues that the Parolees fail the third element.  Specifically, it disputes whether they face discrimination "solely by reason" of their disabilities.  Defs.' PI Opp'n at 13 (quoting 29 U.S.C. § 794(a).  As the Government points out, "both Mathis and Davis admit that they failed to meet multiple obligations of their supervised release" conditions.  *Id.*  Mathis missed a drug testing appointment and tested positive for marijuana.  *See* Compl. ¶ 88.  And Davis failed to contact his CSO over the phone.  *Id.* ¶¶ 109, 111.  According to the Government, these violations—not their disabilities—caused the Parolees' supervision consequences.

But the Government misses the mark.  The Parolees have shown that they face "obstacle[s]," solely because of their disabilities, "that impede[] their access to a government benefit or program."  *Am. Council of the Blind*, 525 F.3d at 1267.  Mathis's congestive heart failure impeded his ability to make it to his CSO check-ins.  Compl. ¶ 89.  Davis's anxiety and PTSD impeded his ability to phone his CSO.  *Id.* ¶¶ 109–10.  In other words, the Government injured them by requiring them to navigate supervision without offering reasonable accommodations.  *That* injury—obstacles to equal access—exists "solely by reason" of their disabilities.  29 U.S.C. § 794(a).

Of course, the Parolees' unequal-treatment injury can lead to downstream harms (like revocation or reincarceration).  But the Government errs by focusing on the immediate cause of these downstream harms (like a positive marijuana test or a missed call).  The Rehabilitation Act puts the focus on "discrimination" itself, not the consequences it causes.  29 U.S.C. § 794(a); *e.g.*, *Am. Council of the Blind*, 525 F.3d at 1270 (rejecting the "astounding proposition" that "the visually impaired have not been denied meaningful access to U.S. paper currency in view of the absence of evidence of their being frequently defrauded").  This means the Parolees' claim under

the Act ripened the moment their disabilities made it harder for them—compared to their non-disabled counterparts—to participate in the Government's supervision programs without reasonable accommodations.  *See Am. Council of the Blind*, 525 F.3d at 1267.

In sum, the Parolees have made a "clear showing" that the Government violated Section 504 of the Rehabilitation Act.  *See Singh*, 56 F.4th at 95.

**2.**

No matter, says the Government.  In its view, the Parolees have no private right of action under the Rehabilitation Act.  The Act bans disability discrimination by three types of actors:

> (1) by federal agencies in their capacities as employers (call this the "federal-employer provision"), 29 U.S.C. § 791;

> (2) by entities that "receiv[e] Federal financial assistance" to run a "program or activity" (the "funding-recipient provision"), *id.* § 794(a); and

> (3) "by any Executive agency" that conducts "any program or activity" (the "program-conductor provision"), *id.*

The parties agree that the Parolees' challenge involves the program-conductor provision.  *See* Pls.' Reply in Supp. of Pls.' Mot. Prelim. Inj. ("Pls.' PI Reply") at 9, ECF No. 17; Defs.' PI Opp'n at 8 & n.2.  And their consensus makes sense:  the Parolees claim that two Executive agencies (the Commission and CSOSA) conduct two programs (parole and supervised release) in a manner that discriminates on the basis of disability.  So this is a program-conductor lawsuit.

The Government argues that Congress never created a cause of action for private individuals to enforce the program-conductor provision.  It is right.  But the Parolees may still obtain the relief they seek because the Court has inherent equitable power to enjoin the Government from further violating the Rehabilitation Act.  *See Armstrong*, 575 U.S. at 326–27.

**a.**

The Rehabilitation Act lacks a private right of action to enforce the program-conductor provision—the Act's ban on disability discrimination "under any program or activity conducted by any Executive agency."  29 U.S.C. § 794(a).

First things first:  the Parolees need more than a statutory right against discrimination to sue in federal court; they need a private right of action.  And "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979).  Instead, "private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Here, that means the Court must analyze whether the Rehabilitation Act "displays an intent to create not just a private right but also a private remedy."  *Id.*  Absent congressional intent to create a private remedy, "a cause of action does not exist and [the Court] may not create one, no matter how desirable that might be as a policy matter."  *Id.* at 286–87.

Congress can either expressly or impliedly convey its intent to create a private right of action.  *Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017) (per curiam).  Express private rights of action are easy to spot because they "state, in so many words, that the law permits a claimant to bring a claim in federal court."  *Id.* (cleaned up).

The Rehabilitation Act offers two good examples.  Section 501 forbids disability discrimination by the federal government in its capacity as an employer.  *See* 29 U.S.C. § 791.  And Section 505 of the Act says any employee "aggrieved by" a violation of Section 501 may sue using "[t]he remedies, procedures, and rights set forth in" Title VII of the Civil Rights Act of 1964.  *Id.* § 794a(a)(1).  Likewise, Section 504 forbids disability discrimination by entities that

"receiv[e] Federal financial assistance" to run a "program or activity." *Id.* § 794(a). And Section 505 says that "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under" Section 504 can sue using "[t]he remedies, procedures and rights set forth in" Title VI of the Civil Rights Act. *Id.* § 794a(a)(2). Two sets of substantive federal rights; two corresponding private rights of action.

But the parallelism ends there. To be sure, a second clause in Section 504(a) prohibits disability discrimination "under any program or activity *conducted by* any Executive agency." *Id.* § 794(a) (emphasis added). Yet Section 505 "makes no mention whatsoever of 'program[s] or activit[ies] conducted by any Executive agency,' the plainly more far-reaching language Congress employed in § 504(a) itself." *Lane v. Pena*, 518 U.S. 187, 192–93 (1996) (quoting 29 U.S.C. § 794(a)). Given this lack of language, the parties agree that the Rehabilitation Act contains no *express* private right of action to enforce the program-conductor provision in Section 504(a).

So the issue becomes whether Congress *implicitly* created a private right of action for that provision. "Determining whether Congress intended to create an implied cause of action begins with the text and structure of the statute." *Lee*, 859 F.3d at 77 (citing *Touche Ross & Co. v. Redington*, 422 U.S. 560, 568 (1979)). Statutory history and "legal context" also play a role in the analysis, but "only to the extent [these markers] clarif[y] text." *Sandoval*, 532 U.S. at 288.

The Parolees hang their hats on the text of Section 504(a). It says: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a).

The Parolees argue that this provision "uses the same classic 'rights-creating language' that the Supreme Court has consistently recognized creates a private cause of action." Pls.' PI Reply at 9 (citing *Sandoval*, 532 U.S. at 288, 280). And they have a point. The Court has found implied private rights of action in Title VI and Title IX, which each use similar language. *See Sandoval*, 532 U.S. at 278–80 (recognizing implied private right of action under Title VI, which provides that "[n]o person . . . shall, on the ground of race, color, or national origin, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. § 2000d); *Cannon*, 441 U.S. at 709 (same under Title IX, which provides that "[n]o person . . . shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a)). So, the Parolees contend, similar language in the Rehabilitation Act should merit similar treatment. *See* Pl.'s Reply at 10.

Yet the Rehabilitation Act's structure—one not shared by Title VI or Title IX—dooms this argument. Recall that the Act contains three discrete prohibitions on disability discrimination: the federal-employer provision (29 U.S.C. § 791), the funding-recipient provision (*id.* § 794(a)), and the program-conductor provision (*id.*). But Congress only created private rights of action for the first two categories, not the last. Section 505(a)(1) applies to "any complaint under [Section 501]." *Id.* § 794a(a)(1). And Section 505(a)(2) applies to "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [Section 504]." *Id.* § 794a(a)(2). But again, Section 505 "makes no mention whatsoever of 'program[s] or activit[ies] *conducted by* any Executive agency.'" *Lane*, 518 U.S. at 192 (emphasis added). So the Rehabilitation Act's "liability and remedy provisions" exhibit a "curious" mismatch. *Id.* at 193.

That mismatch triggers the negative-implication canon:  the existence of explicit private rights of action for the federal-employer and funding-recipient provisions "implies the exclusion" of a right of action for the program-conductor provision.  Scalia & Garner, Reading Law: The Interpretation of Legal Texts 107 (2012).  And today hardly marks the first time this principle cut against the recognition of an implied right of action.  Take *Touche Ross & Co. v. Redington*, for example.  442 U.S. at 569.  There, the Court found that § 17(a) of the Securities and Exchange Act of 1934 implied no private right of action.  *Id.*  Why?  In part because "§ 17(a) [was] flanked by provisions of the 1934 Act that explicitly grant[ed] private causes of action." *Id.* at 571–72.  "Obviously, then," said the Court, "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."  *Id.* at 572.  So too here.

The Parolees try to overcome the mismatch with statutory history and contemporary legal context, saying they seal the case for an implied right.  Two points in history matter to the analysis: 1973 and 1978.  Congress enacted the Rehabilitation Act in 1973.  *See* Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355, 394.  Back then, the law only barred disability "discrimination under any program or activity receiving Federal financial assistance."  *Id.* § 504.  The private rights of action came along in 1978 when Congress added Section 505.  *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978 ("Rehabilitation Act Amend."), Pub. L. No. 95-602, § 120, 92 Stat. 2955, 2982–83.  Before then, none existed.

To round out the point, the Parolees draw on contemporary legal context.  Prior to 1978, they say, federal courts routinely interpreted Section 504 itself to create an implied right of action.  *See Doe v. Att'y Gen. of U.S.*, 941 F.2d 780, 786 (9th Cir. 1991) (collecting cases).  Since then, the Supreme Court has forsaken this practice, recognizing that the legislature, not the

judiciary, properly creates rights. *See Alexander*, 532 U.S. at 286. But the pre-amendment context still matters, the Parolees argue, because Congress is "presume[d]" to be "thoroughly familiar with . . . important precedents from [the Supreme Court] and other federal courts" when it legislates. *Cannon*, 441 U.S. at 699. So when Congress passes a "significant amendment" to a law, but leaves "intact the statutory provisions under which the federal courts had implied a cause of action," that constitutes "evidence that Congress affirmatively intended to preserve that remedy." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381–82 (1982). The Parolees contend that happened here, meaning the pre-1978 implied cause of action still lurks in the ether. *See* Pls.' PI Reply at 15–17; Pls.' Opp'n to Defs.' Mot. Dismiss ("Pls.' MTD Opp'n") at 14–16, ECF No. 27.

It does not, for two reasons. *First*, the preservation principle in *Merrill Lynch* turned on the fact that Congress "left intact the statutory provisions under which the federal courts had implied a cause of action." 456 U.S. at 381. Indeed, the law at issue there—an amendment to the Commodity Exchange Act—was "*silent* on the subject of private judicial remedies." *Id.* at 367 (emphasis added). By contrast, the 1978 Rehabilitation Act amendment says a lot about the subject. It added a whole new section on private judicial remedies—just not for the kind of claim brought by the Parolees. *See* Rehabilitation Act Amend. § 120, 92 Stat. at 2982–83. Because Congress legislated in the exact sphere previously left to judicial interpretation, *Merrill Lynch* sits far afield. *Cf. McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) (recognizing that statutes can "displace courts' traditional equitable authority" with a clear command).

*Second*, even if the preservation principle applied, it could only possibly preserve an implied private right of action against "any program or activity receiving Federal financial assistance." Rehabilitation Act § 504, 87 Stat. at 394. That does not help the Parolees because

their claim lies against a "program or activity conducted by [an] Executive agency."  29 U.S.C. § 794(a); *see also* Compl. ¶¶ 139–55.  Yet Congress added the program-conductor provision in the same 1978 amendment that added the private rights of action.  *See* Rehabilitation Act Amend. § 119, 92 Stat. at 2982.  So before 1978, no federal court had recognized an implied private right to enforce the program-conductor provision—it did not exist yet.

The Parolees lean next on statutory purpose.[5]  As the D.C. Circuit explained, Congress enacted "the Rehabilitation Act to ensure that members of the disabled community could live independently and fully participate in society."  *Am. Council of the Blind*, 525 F.3d at 1259.  Given this, the Parolees say that "it is simply not plausible" for them to "have *no* remedy for their disability discrimination."  Pls.' MTD Opp'n at 24.  But it is plausible; Congress often passes statutes that prohibit certain conduct yet provide no private right of action.

Consider the Public Utility Regulatory Policies Act of 1978.  *See* 16 U.S.C. § 824a-3.  It caps the price a utility company can pay for electricity and requires the company to "provide data to their state regulator."  *Swecker v. Fed. Energy Reg. Comm'n*, Civ. A. No. 21-1590 (RCL), 2022 WL 4534944, at *1 (D.D.C. Sept. 28, 2022).  But if a utility company thumbs its nose at this law, a private citizen lacks an "implied cause of action" to enforce it.  *Id.* at *4.  A similar scheme exists in the Davis-Bacon Act, 40 U.S.C. § 276a(a), which guarantees construction

---

[5] They also argue that the attorney's fee provision in Section 505(b) favors the recognition of an implied right.  *See* Pls.' PI Reply at 16; Pls.' MTD Opp'n at 17.  That provision states:  "In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  29 U.S.C. § 794a(b).  This language follows two paragraphs extending private rights of action to enforce the Rehabilitation Act.  *See id.* § 794a(a)(1)–(2).  So the fee provision only applies to "any action or proceeding" brought under those paragraphs.  *Id.* § 794a(b).  It does not—by itself—create another private right of action to enforce the program-conductor provision in Section 504(a).

workers minimum wages but gives them no private right of action.  *See Univ. Rsch. Ass'n, Inc. v. Coutu*, 450 U.S. 754, 771–73 (1981).

At any rate, "[v]ague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text regarding the specific issue under consideration."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993).  Congress knew how to create private rights of action for certain types of disability discrimination—it did so twice in the Rehabilitation Act.  *See* 29 U.S.C. § 794a(a)(1)–(2).  But it stopped short of creating one for the program-conductor provision.  *See* § 794(a).  When text and structure both "weigh[] against implication of a private remedy," purpose has little role to play.  *Touche Ross & Co.*, 442 U.S. at 571.

That leaves precedent.  And the Parolees face an uphill climb because the weight of circuit authority cuts against an implied private remedy for the program-conductor provision.  Although the D.C. Circuit has not analyzed the issue, four circuits have.  Three found no implied right.  *See Moya v. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 126 (4th Cir. 1991); *Cousins v. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989) (en banc).  One did.  *See J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 268–70 (9th Cir. 1992).

The Parolees argue that *Moya*, *Clark*, and *Cousins* are distinguishable because they all dealt with discrimination stemming from a federal agency's *regulations*, not its *substantive* conduct.  *See* Pls.' MTD Opp'n at 19–20.  So, they reason, there should be an implied right to challenge substantive violations of the Rehabilitation Act, even if that right does not extend to regulatory violations.  *See id.*

This regulatory-substantive distinction suffers from several flaws.  For starters, it lacks any footing in the statutory text.  Section 504(a) generally prohibits discrimination "under any program or activity conducted by any Executive agency."  29 U.S.C. § 794(a).  So liability

attaches whenever an agency conducts a "program or activity" in a discriminatory manner—
whether that happens through implementing regulations or so-called "substantive" conduct.  In
other words, the program-conductor provision "presumably includ[es] regulatory programs" and
substantive conduct alike.  *Cousins*, 880 F.2d at 605.

The distinction is also highly malleable:  Any "regulatory" violation could be reframed as
a "substantive" violation, and vice versa.  *Moya* involved a challenge to "discriminatory
regulations" governing the waiver of certain tests required for citizenship.  975 F.3d at 128.  And
*Cousins* involved a challenge to "DOT regulations [that] allow drivers to apply for a waiver of
some of the . . . physical qualifications" required for operating a tractor trailer.  880 F.2d at 604.
But fixating on the word "regulations" misses the point—the regulations in *Moya* and *Cousins*
allegedly violated those plaintiffs' substantive rights under the Rehabilitation Act.  *Clark* makes
the case nicely.  It, too, involved a challenge to a "waiver regulation" for commercial drivers.
937 F.2d at 124.  Yet when the Fourth Circuit addressed the implied right question, it assumed
that the regulation might make "the Department of Transportation . . . guilty of a *substantive
violation* of the Rehabilitation Act."  *Id.* at 125 (emphasis added).

Then there caselaw from this district, which offers a mixed bag.  The Parolees rely on
*National Association of the Deaf v. Trump* ("*NAD*"), where the court held that "Congress
intended to create a private cause of action" for grievances under the program-conductor
provision.  486 F. Supp. 3d 45, 53–57 (D.D.C. 2020).  But that holding conflicts with *SAI v.
Department of Homeland Security*, which held that the Rehabilitation Act provides no "cause of
action for a substantive claim of disability discrimination in a federal program or activity."  149
F. Supp. 3d 99, 113–15 (D.D.C. 2015).

*SAI* charts the most persuasive path forward.  It properly weighs the impact of the right-remedy disparity in Sections 504 and 505.[6]  *See id.* ("The Act expressly specifies the remedies available to 'any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance,' *id.* § 794a(a)(2), but it says nothing about the remedies available to a person aggrieved by discrimination in a 'program or activity conducted by an[ ] Executive agency,' *id.* § 794(a)." (citing *Lane*, 518 U.S. at 192)).  By contrast, *NAD* looks past this structural disparity, *see* 486 F. Supp. at 54–55, which ultimately proves fatal to the Parolees' argument.  For this reason alone, the Court finds *SAI*'s reasoning more persuasive.

Not all hope is lost for the Parolees.  As the Second Circuit noted in *Moya*, "Congress expressly provided two alternative mechanisms to enforce" the Rehabilitation Act's program-conductor provision.  975 F.3d at 128.  Agencies must "promulgate such regulations as may be necessary to carry out" Section 504(a)'s antidiscrimination mandate.  29 U.S.C. § 794(a).  And, as three circuits have found, persons aggrieved under the program-conductor provision may bring a claim under the Administrative Procedure Act.  *See Moya*, 975 F.3d at 128; *Cousins*, 880 F.2d at 605–06; *Clark*, 937 F.2d at 125–26; *see also SAI*, 149 F. Supp. 3d at 113–14 (finding review available under the APA).  Failing that, federal courts have inherent equitable power to enjoin violations of the Rehabilitation Act.  This final avenue allows the Parolees' suit to proceed.

---

[6] The Ninth Circuit suggested that this disparity stems from poor reconciliation of House and Senate drafts of the 1978 amendment.  *See Doe*, 941 F.2d at 787 n.13.  Perhaps.  But the law's enacted text controls, and it is not the courts' job to fix congressional errors.  *See* Scalia & Garner, *supra*, at 369 (discussing "[t]he false notion that committee reports and floor speeches are worthwhile aids in statutory construction").

**b.**

Courts possess inherent equitable power to enjoin the Government from violating the Rehabilitation Act.  The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law."  *Armstrong*, 575 U.S. at 326.  This power also extends "to violations of federal law by federal officials."  *Id.* at 327.  And it operates even in the absence of a statutory cause of action.  *Compare id.* at 326–31 (majority opinion) (considering enforcement in equity), *with id.* at 331–32 (plurality opinion) (considering implied right of action under the Medicaid Act); *accord Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 433–35 (5th Cir. 2023) (permitting equitable relief "[e]ven though [the statute] does not confer a private right" of action).

So by default, federal courts have "jurisdiction in equity."  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).  And the "full scope of [this] jurisdiction is to be recognized and applied," *id.*, absent only "the clearest command" otherwise in a statute, *McQuiggin*, 569 U.S. at 397.  This limiting command can be either express or implied.  *See Porter*, 328 U.S. at 398 (stating a statute can restrict equity jurisdiction "in so many words, or by a necessary and inescapable inference").

The Rehabilitation Act does not explicitly displace the Court's equity jurisdiction.  *See generally* 29 U.S.C. §§ 701 et seq.  And statutes implicitly displace equity jurisdiction in only two scenarios: (1) where Congress has provided a "detailed and exclusive remedial scheme," *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 647 (2002); or (2) where a statute contains an alternative remedy and the right at issue is "judicially unadministrable," *Armstrong*, 575 U.S. at 328.  Neither scenario exists here.

This case falls beyond the first scenario because the Rehabilitation Act boasts no "detailed and exclusive remedial scheme." *Id.* at 647. *Seminole Tribe of Fla. v. Florida* illustrates what one of those schemes looks like. 517 U.S. 44 (1996). In that case, a tribe sued to enforce a duty to negotiate under the Indian Gaming Regulatory Act. *Id.* at 74. But that Act contained "intricate procedures" that created "a detailed remedial scheme for the enforcement against a State of a statutorily created right." *Id.* Those procedures whittled the judicial power down to three levers: a court could order negotiation, mediation, or notification to the Secretary of Interior. *See id.* at 74–75. According to the Court, "this quite modest set of sanctions" illustrated Congress's intent to displace courts' traditional equitable powers. *Id.* at 75.

The Rehabilitation Act paints a very different picture. Beyond in-house rulemaking, it prescribes no remedy at all for the Parolees or other individuals mounting a challenge under the program-conductor provision. *See* 29 U.S.C. § 794(a). So far from setting out a "detailed and exclusive remedial scheme," the Rehabilitation Act "places no restriction on the relief a court can award." *Verizon*, 535 U.S. at 647.

Nor does this case fit within the second scenario. That scenario requires the presence of two conditions: an alternative remedy *and* a "judicially unadministrable" right. *Armstrong*, 575 U.S. at 328. Both conditions existed in *Armstrong*, which involved a suit by Medicaid providers "to enforce § 30(A) of the Medicaid Act." *Id.* at 322. First, Congress provided a single remedy "for a State's failure to comply with Medicaid's requirements"—"the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* at 328 (citing 42 U.S.C. § 1396c). But that, "*by itself*," was not enough to "preclude the availability of equitable relief." *Id.*

It also took "the judicially unadministrable nature of § 30(A)'s text." *Id.* That text broadly mandated "that state plans provide for payments that are 'consistent with efficiency,

economy, and quality of care,' all the while 'safeguarding against unnecessary utilization of . . . care and services.'"  *Id.* (cleaned up).  The "sheer complexity" of this standard, "coupled with the express provision of an administrative remedy," "preclude[d] private enforcement of § 30(A) in the courts."  *Id.* at 329.

At a minimum, the antidiscrimination mandate in the Rehabilitation Act's program-conductor provision is judicially administrable.  Federal courts routinely administer antidiscrimination laws, including the Rehabilitation Act.  *See, e.g.*, *NAD*, 486 F. Supp. 3d at 59–61 (enforcing the Rehabilitation Act against White House officials for the failure to provide sign language interpretation at briefings); *Am. Council of the Blind*, 463 F. Supp. 2d at 63 (enforcing the Rehabilitation Act against the Secretary of the Treasury for discrimination as to currency design); *Lane*, 867 F. Supp. at 1074–75 (granting injunction against the U.S. Merchant Marine Academy for violating the Rehabilitation Act).

Because neither scenario for implicit displacement exists, the "full scope" of this Court's "jurisdiction in equity" can provide the Parolees a remedy.  *Porter*, 328 U.S. at 398.

The Government argues that *Ziglar v. Abassi*, 510 U.S. 120, 133 (2017), forbids equitable relief absent a private right of action in the Rehabilitation Act.  *See* Defs.' Reply in Supp. of Defs.' Mot. Dismiss at 8–9.  But *Ziglar* only addressed the judiciary's power "to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation."  510 U.S. at 133.  Its talk of damages for constitutional violations does not disturb the "long history" of equitable remedies available for "violations of federal law by federal officials."  *Armstrong*, 575 U.S. at 327.

Nor is the Government shielded by sovereign immunity.  In fact, the Government states it is "not asserting sovereign immunity as a bar to the Parolees' Complaint."  Defs.' Mot. Dismiss

at 3.  For good reason:  the Circuit has repeatedly held that the APA waives sovereign immunity

for claims against federal agencies for "any suit whether under the APA or not."  *Chamber of*

*Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also* 5 U.S.C. § 702 (providing

that claims for injunctive relief against federal agencies "shall not be dismissed nor relief therein

be denied on the ground that it is against the United States.").  It is also "well-established that

sovereign immunity does not bar suits for specific relief," like declaratory and injunctive relief,

"against government officials where the challenged actions of the officials are alleged to be . . .

beyond statutory authority."  *Clark v. Libr. of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984).  So

none of the Defendants here have sovereign immunity.

*       *       *

The Parolees are likely to succeed on the merits of their Rehabilitation Act claim.  So

they have also stated a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).

## B.

The Parolees will likely suffer irreparable harm absent a preliminary injunction.

Irreparable harm is a "high standard."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

290, 298 (D.C. Cir. 2006).  It requires an injury "both certain and great; it must be actual and not

theoretical."  *Id.*  And "the injury must be beyond remediation."  *Id.*

The Parolees meet this standard.  The Government forces them "to comply with

supervision conditions on a day-to-day basis without the accommodations they need to have an

equal opportunity to succeed."  Pls.' PI Reply at 29.  Davis and Mathis each support this

proposition with sworn declarations.  *See, e.g.*, W. Mathis Decl. ¶ 13 ("While I have been having

these serious health problems, my supervision requirements have only gotten harder."); K. Davis

Decl. ¶ 17 ("Because of my disabilities, it is hard for me to follow the rules of my supervision.").

And critically, the Government does not dispute their claimed injuries.  *See generally* Defs.' PI Opp'n.

Instead, the Government argues that neither Plaintiff currently faces an imminent "risk of arrest, incarceration, [or] prolonged supervision" because of the Government's conduct.  *Id.* at 15–16.  But this argument misunderstands the nature of their undisputed injury—unequal treatment in the administration of supervision, all because of their disabilities.

The "denial of equal treatment" *itself* counts as an injury, even if the Parolees ultimately share in the same degree of success as their nondisabled counterparts.  *Ne. Fla. Ch. of Assoc. Gen. Contractors. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  The law requires no further downstream harms.  For instance, the visually impaired are injured by nondescript paper currency, even in "the absence of evidence of their being frequently defrauded."  *Am. Council of the Blind*, 525 F.3d at 1270.  And a legally blind law school graduate is harmed by the bar exam, even if "it is possible that she will pass" without reasonable accommodations.  *Bonnette v. D.C. Ct. of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011).  Framed this way, the Parolees imminently face the prospect of complying with supervision requirements that do not reasonably accommodate their disabilities.

That kind of harm is irreparable.  *See id.* (collecting cases). The Court cannot undo the discrimination the Parolees have faced in the administration of their supervision.  Indeed, the law does not entitle them to money damages.  *See supra* Section III.A.2.  All that is left then, and all they seek, are forward-looking equitable remedies.  *See* Compl. at 33–34.

## C.

Finally, the balance of equities and the public interest favor the Parolees.  When balancing equities, the Court must "weigh[] the harm to [the Parolees] if there is no injunction

against the harm to [the Government] if there is." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Absent an injunction, the Parolees will be forced to participate in the Government's supervision programs on an unequal footing just because of their disabilities.  Yet the Government—specifically, two federal agencies and their officers— cannot credibly claim that an injunction will injure it.  After all, "the public," and therefore the Government, "has a strong interest in the effective enforcement of the Rehabilitation Act." *Callicotte v. Carlucci*, 698 F. Supp. 944, 951 (D.D.C. 1988) (citing *Shirley v. Devine*, 670 F.2d 1188 (D.C. Cir. 1982)); *see also Pursuing Am.'s Greatness*, 831 F.3d at 511 (stating a federal agency's harm "and the public interest are one and the same, because the government's interest *is* the public interest").

The Government contests none of this.  Instead, it says that preliminary relief is unwarranted because "the allegedly problematic practices date back to 2000, when the current system of supervised release was enacted."  Defs.' PI Opp'n at 17.  But time alone does not immunize unlawful practices.  And that rings especially true here because Congress designed the Rehabilitation Act to target disability discrimination that was "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect."  *Alexander v. Choate*, 469 U.S. 287, 295 (1985).

The Government also argues that the Parolees face a heightened burden because they seek an injunction that would change the status quo.  *See* Defs.' PI Opp'n at 17–18.  But the D.C. Circuit has long "rejected any distinction between a mandatory and prohibitory injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).  So the Parolees do not "face a higher burden of persuasion" given the form of relief they seek.  *Id.*

**IV.**

The Parolees are entitled to a preliminary injunction.  They have shown a likelihood of success on the merits of their Rehabilitation Act claim, that they will face irreparable harm absent immediate relief, and that the balance of equities and the public interest support their request.  Given the Parolees' likelihood of success on the merits, the Court will also deny the Government's Motion to Dismiss.

Although the Parolees ask that the injunction also cover all similarly situated D.C. offenders, the Court will not act so broadly yet.  Class certification issues remain to be addressed.  The Court is mindful that preliminary injunctions are an extraordinary remedy, never granted as of right.  *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 291 (D.D.C. 2020) (citing *Winter,* 555 U.S. at 24).  For today's purposes, it is enough to grant relief to those offenders who have sought it, having established their ongoing injuries.

Finally, the Parolees seek neither the imposition nor the removal of any particular regulation or practice.  The Court's Order thus avoids dictating specific changes that must be made by the Government.  The Court is confident the Government will carefully consider modifications to ensure compliance with both the Rehabilitation Act and the Revitalization Act.

A separate Order will issue today.



Dated: September 5, 2024                    _____
                                            TREVOR N. McFADDEN, U.S.D.J.