UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**KENNEDY DAVIS**,

          Plaintiff,

     v.

**UNITED STATES PAROLE COMMISSION**, *et al.*,

          Defendants.

Case No. 1:24-cv-01312 (TNM)

### MEMORANDUM ORDER

Kennedy Davis is on parole. He allegedly faces systemic disability discrimination from the two federal agencies that supervise him. And he insists he is not alone.[1] So he moves for class certification to litigate on behalf of other disabled individuals on parole and supervised release who also suffer from discrimination. Defendants—the U.S. Parole Commission, the Court Services and Offender Supervision Agency, and the heads of those agencies in their official capacities (collectively, "the Government")—oppose class certification. They say the class does not satisfy some prerequisites: members do not share a common injury, and Davis's claim is not typical for the class. The Court disagrees. The supervision program allegedly harbors a system-wide flaw that injures the entire class—Davis included—and can be remedied through the same injunctive relief. So the Court will certify Davis's proposed class and appoint Davis's lawyers as class counsel.

---

[1] William Mathis was previously a named Plaintiff but passed away in mid-2024. ECF No. 34. Counsel voluntarily dismissed his claim, *id.*, leaving Davis as the sole named Plaintiff.

I.

The Court begins by summarizing the supervision system for offenders in Washington, D.C., who were convicted under D.C. law. Parole and supervised release are both forms of post-incarceration supervision. Parole applies to offenses committed before August 5, 2000, while supervised release applies to any crimes committed after that date. *See* Sentencing Reform Amendment Act of 2000, D.C. Law 13-302.

Two federal agencies work together to supervise D.C. Code offenders. The U.S. Parole Commission is the lead agency and has major decision-making authority. *See* National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745; 28 C.F.R. § 2.70(a) (parole); *id.* § 2.200(a) (supervised release). It sets general supervision conditions and decides whether an offender's term of parole or supervised release should be continued, revoked, or terminated. *See* 28 C.F.R. § 2.70(a)–(b); *id.* § 2.200(a)–(b).

The Court Services and Offender Supervision Agency ("CSOSA") implements the Commission's decisions. Its officers, known as CSOs, provide the day-to-day "supervision . . . for offenders on probation, parole, and supervised release pursuant to the District of Columbia Code." Revitalization Act § 11233(c)(1) (codified at D.C. Code § 24-133(c)(1)). They ensure offenders comply with their conditions, set the location and frequency of check-ins, and initially assess supervision violations. Compl. ¶ 15, ECF No. 1. CSOs respond to non-compliance with "graduated sanctions." *Id.* Those sanctions start with increased supervision requirements. *Id.* But they can escalate to an Alleged Violation Report—a recommendation that the Commission issue an arrest warrant and begin revocation proceedings. *Id.*

The Commission and CSOSA also work together to decide when an offender should have his supervision revoked and be reincarcerated. Sometimes revocation and reincarceration are triggered by a new criminal offense. But "technical violations" can trigger discipline too. Technical violations happen when an offender violates a condition of release—like missing an appointment with a CSO, failing to get a job, or skipping a drug test. CSOSA FY2024 Budget Justification, ECF No. 3-12, at 35. Though technical violations are typically not premised on criminal conduct, they can still lead to jailtime. *Id.*

According to the Complaint, offenders with disabilities are especially susceptible to technical violations. Compl. ¶¶ 25, 28. Physical disabilities can impede mobility, making it difficult for an offender to travel to a mandatory check-in with his CSO. *Id.* ¶ 26. Chronic health conditions present similar difficulties and might require an offender to balance CSO check-ins with medical appointments or hospitalization. *Id.* Then there are mental, intellectual, and developmental disabilities that may frustrate an offender's ability to grasp certain conditions or participate in required programs. *Id.* ¶ 27. Given these obstacles, Davis alleges that "people with disabilities are more likely to be found in violation of terms of supervision" than their non-disabled counterparts. *Id.* ¶ 28.

Davis is a 48-year-old man on lifetime parole because of his convictions for Second-Degree Murder and Possession of a Firearm During a Crime of Violence. *Mathis v. U.S. Parole Comm'n*, 24-cv-01312, 2024 WL 4056568, at *3 (D.D.C. Sept. 5, 2024). Davis experiences chronic pain stemming from third-degree burns on his bones and ribs—injuries that have required multiple rounds of surgery. K. Davis Decl., ECF No. 40-15, ¶¶ 5–6. Davis also has mental health conditions, including depression, anxiety, and PTSD, for which he has received mental health treatment. *Id.* ¶¶ 7–9. His last set of parole conditions required him to report to

3

his CSO as requested, get drug tested in-person twice a week, and report every address change. *Id.* ¶ 11.

Davis's disabilities have impeded his ability to succeed on supervision. *Id.* ¶ 17. His burns limit his mobility, which makes it harder for him to travel to drug tests and CSO check-ins. *Id.* ¶¶ 18–21. And at times, his medical needs have been pitted against his supervision conditions. For instance, when he was first hospitalized for his burns, he left the hospital against his doctor's orders so he could check in with his CSO as required. *Id.* ¶ 5.

Davis's mental health issues also present an obstacle, as shown by one incident in 2023 where he failed to check-in with his CSO by phone. *Id.* ¶¶ 34–38. When Davis was placed on supervision, he "did not have [his] own phone." *Id.* ¶ 34. So his re-entry advocate at University Legal Services ("ULS," a community-based organization that assists people with disabilities) gave him one. *Id.* ¶ 34. But ULS forgot to put minutes on it. *Id.* When Davis realized the oversight, he "got very anxious and scared" because he knew he had to check in. *Id.* ¶ 35. So instead of rationally thinking through the situation and contacting his CSO by another means, he kept trying to reach ULS because they were "the people [he] trust[ed]." *Id.* ¶¶ 35–36.

Davis eventually reached ULS, but by then it was too late. Citing his technical violation of failing to check-in, Davis's CSO submitted a violation report and pursued revocation. Compl. ¶ 111; K. Davis Decl. ¶ 38. He was arrested in August 2023, which caused him to miss a scheduled surgery for his burns. Compl. ¶¶ 111–13; K. Davis Decl. ¶ 40. And because of his technical violation, the Commission imposed a 12-month reincarceration sentence. Compl. ¶ 114; K. Davis Decl. ¶¶ 42–44.

While serving his sentence, Davis filed this suit. *See* Compl. ¶ 114. His one-count Complaint alleges a violation of the Rehabilitation Act, 29 U.S.C. § 794. Compl. at 30. He

challenges the Government's ongoing and system-wide failure to assess "disabilities or make any reasonable accommodations at any point during the course of . . . supervision." *Id.* ¶ 152. On top of this, Davis says the Government lacks any foundational system or policy for disability assessment and accommodation. *Id.* ¶ 149. So even if a disabled offender wants to request accommodation, there is no "formal process" to do so. *Id.* Davis alleges these failures strip him and the proposed class "of meaningful access to the benefits of supervision due to their disabilities." *Id.* ¶ 153.

He requested, among other things, a preliminary injunction. *Mathis*, 2024 WL 4056568, at *1. The Court granted Davis's request, finding that he is likely to succeed on the merits. *Id.* at *4–*12. The Court concluded the Government was likely injuring Davis by requiring him "to navigate supervision without offering reasonable accommodations." *Id.* at *5. And it explained that this "obstacle[] to equal access" is an injury that exists independently of any downstream consequences such as revocation of supervision or reincarceration. *Id.* So the Court granted a preliminary injunction and ordered the Government to comply with the Rehabilitation Act with respect to Davis. *See id.* at *14. But it denied Davis's request to extend the injunction to cover similarly situated offenders. *Id.*

Davis now moves for class certification, hoping to expand his case to cover other disabled offenders. Renewed Mot. to Cert. Class ("Mot. to Cert."), ECF No. 40.[2] He proposes a class consisting of

> all people with a disability who are on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need

---

[2] The Court denied without prejudice a prior motion for class certification from Davis because he failed to comply with Local Civil Rule 7(m) and consult the Government before filing it. ECF No. 33.

5

accommodations in order to have an equal opportunity to succeed on parole or supervised release.

*Id.* at 1.

The Government opposes certification and identifies a litany of supposed deficiencies with the proposed class.  Defs.' Opp'n to Class Cert. ("Opp'n"), ECF No. 42.  It says the proposed class does not share a common legal or factual foundation because the legal and factual underpinnings vary between the different stages and types of supervision.  *Id.* at 7–12.  And it argues Davis's situation is atypical because his sentence of lifetime parole makes his claim distinguishable from the class's claims.  *Id.* at 12–13.  It does, however, concede that it lacks a "written policy requiring assessment and accommodation of disabilities."  Opp'n at 10.  And it does not have any "formal process through which an individual may seek such accommodations."  Answer, ECF No. 38, ¶ 149.

With this background in mind, the Court now turns to Davis's motion for class certification.

## II.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  Under the right circumstances, a class representative may litigate for others who "possess the same interest and suffer the same injury."  *Id.* at 348–49 (cleaned up).  The party seeking certification bears the burden of "affirmatively demonstrat[ing] his compliance" with five requirements in Rule 23 of the Federal Rules of Civil Procedure.  *Id.* at 350.

Rule 23(a) gives the first four requirements: (1) numerosity, meaning "the class is so numerous that joinder of all members is impracticable"; (2) commonality, meaning "there are questions of law or fact common to the class"; (3) typicality, meaning "the claims . . . of the representative parties are typical of the claims . . . of the class"; and (4) adequacy, meaning "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(1)–(4).

Rule 23(b) provides the fifth requirement, though plaintiffs can satisfy it in various ways. Davis picks Rule 23(b)(2), which applies when the opposing party "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

In evaluating proposed classes, courts may need to "touch[] aspects of the merits." *Wal-Mart*, 564 U.S. at 351. Still, the ultimate question is whether the proposed class satisfies Rule 23, not "whether the . . . plaintiffs have stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). If a court certifies a class, it must also decide who should represent the class. Fed. R. Civ. P. 23(g).

### III.

The Government disputes commonality, typicality, and the Rule 23(b)(2) requirement. But Davis prevails. The Court is satisfied that Davis and the proposed class members allege a common harm stemming from a common source—discrimination from the Government's systemic failure to assess and accommodate disabilities. The Court is also unpersuaded by the Government's assertion that Davis's claim lacks typicality. On this front, the Government misapprehends the harm. Its arguments focus on the possible downstream effects of

discrimination, but the discrimination *itself* is the harm.  The proposed class also satisfies Rule 23(b) because Davis alleges a harm and seeks a remedy that apply uniformly across the class.

The Court evaluates in turn each of the four requirements in Rule 23(a) and the requirement in Rule 23(b)(2).

### A.

Start with numerosity.  Proposed classes must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  There is no brightline rule on the necessary number of members, but courts have approximated forty as a safe baseline.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012); *see also Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 117 (D.D.C. 2017).  Courts seldom need to calculate an exact class size though, *see Marcus*, 687 F.3d at 596, because precision is generally unnecessary "as long as the plaintiffs provide a reasonable basis for their estimate."  *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 26 (D.D.C. 2001).

The Government does not dispute numerosity, and its own calculations show the proposed class easily satisfies the requirement.  CSOSA estimates that between January 2022 and May 2023, at least 484 offenders under supervision had a mental disability.  *See* P. Davis Decl. Ex. 1 (CSOSA FOIA Response) ECF 40-2, at 6.  But the Rehabilitation Act applies equally to mental and physical disabilities.  29 U.S.C. § 705(20)(A).  So that number is likely highly underinclusive because it does not account for individuals with physical disabilities.  Thus, CSOSA's estimates provide a reasonable evidentiary basis to conclude the class will encompass hundreds of members or more.  Applying "common sense" to this evidence, *Marcus*, 687 F.3d at 596, the Court finds that joining hundreds of plaintiffs is impracticable.  So the proposed class is sufficiently numerous.

**B.**

Next up is commonality. Commonality requires that each class member suffer from the same harm. *Wal-Mart*, 564 U.S. at 350. As with many legal questions, choosing the right level of generality for the comparison can be tricky. The Supreme Court has cautioned that suffering the same harm means something more than "merely . . . suffer[ing] a violation of the same provision of law." *Id.* Instead, the class's joint injury must spring from a "common contention"—a shared *root cause*, not just a shared outcome. *Id.* By ascertaining the "truth or falsity" of that contention, a court will necessarily "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In other words, courts must determine whether addressing an injury's root cause for one class member will also fix the problem for other members.

To illustrate this concept, consider a failed attempt to certify a class in an Individuals with Disabilities Education Act (IDEA) case. In *DL v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013), the proposed class encompassed schoolchildren who were each allegedly harmed by a school district's improper IDEA implementation. *Id.* at 122. But which section of the IDEA the school district violated changed between children. *Id.* at 127–28. Consequently, the specific "policies and practices" at issue also varied. *Id.* at 127. Even though the entire class alleged some violation of the IDEA, the claims lacked commonality because resolving one child's claim would not resolve that of the next child. *See id.* So the proposed class failed because there was "no single or uniform policy or practice that bridge[d]" all the claims. *Id.* at 127. Put another way, there were no "common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*,

84 N.Y.U. L. Rev. 97, 132 (2009)). The crux of commonality is thus whether a court can uniformly remedy the harm "in one stroke" for all class members. *Id.*

1.

According to Davis, all class members suffer the same harm for the same reason: the Government is systemically violating the Rehabilitation Act by failing to assess "disabilities or make any reasonable accommodations at any point during the course of . . . supervision." Compl. ¶ 152.

In response, the Government contends the class will rely on multiple legal theories and fact patterns, much like the failed class in *DL*. Opp'n at 11. It says the class will inevitably allege "injuries at several distinct phases of the supervision process as carried out by two different defendants." *Id.* at 9. For example, one plaintiff may allege a failure to accommodate when the Commission imposes general conditions of supervision. But another may identify a failure to accommodate when CSOSA sets specific conditions. So, the Government reasons, these claims are each "based on a separate and distinct legal theory" because they happen at different stages with different agencies. *Id.* at 11.

But the Government's divide-and-conquer approach will not do. Davis is challenging the "*systematic* failure to assess" and accommodate disabilities in a program the agencies jointly administer. Compl. ¶ 147 (emphasis added). He alleges that the Commission and CSOSA are both failing to act at every phase of supervision despite their statutory obligation to accommodate offenders' disabilities. *See* Compl. ¶ 152. And "in a civil-rights suit" such as this, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005); *see*

*also DL v. District of Columbia*, 302 F.R.D. 1, 13 (D.D.C. 2013), ("[C]ourts have properly certified classes challenging uniform practices of failure [to enact policies] or inaction."), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017).

So when properly viewed through this lens of a multi-agency system-wide failure to accommodate, the facts and law will not meaningfully vary between class members. The nature and source of the harm does not turn on the stage or agency; it comes from a ubiquitous deficiency that permeates the entire supervision system, harming all class members at every turn. In other words, a "uniform policy or practice . . . bridges" the class's claims. *DL*, 713 F.3d at 127. Thus, the claims are positioned for resolution "in one stroke." *Wal-Mart*, 564 U.S. at 350.

**2.**

The Government's attempt to distinguish parole and supervised release fares no better. Opp'n at 9. Davis asserts without rebuttal that the Government "use[s] the same system to establish supervision requirements for every person" on both parole and supervised release. Mot. for Cert. at 4 (cleaned up). While the Government announces there are "legally significant" distinctions between the programs, it offers no concrete examples. *See* Opp'n at 9–10.

Perhaps it lacks relevant illustrations because there is, in fact, no difference between the general conditions for parole and supervised released. *Compare* 28 C.F.R. § 2.204(a)(1) (general supervised release conditions) *and* 28 C.F.R. § 2.85(a)(1) (general parole conditions, which cross-reference to the general supervised release conditions). Nor does CSOSA distinguish between parole and supervised release when creating specific supervision conditions, known as "Prescriptive Supervision Plans." *See* CSOSA Operations Manual (2018), ECF No. 40-9, at PDF pp. 116–25. So there is no reason to conclude the facts or law underpinning the class's allegation change when considering parole versus supervised release. If the programs have some

unidentified minor differences, those distinctions do not sever the common thread that binds together the class's claims.

### 3.

Next, the Government says there is no commonality because "it is a certainty that many members of the proposed class will have no injury to allege." Opp'n at 10. It insists that despite its lack of a blanket policy requiring accommodation, it does provide individually tailored accommodations both "in setting conditions of supervision and in evaluating alleged violations." *Id.* So while individual plaintiffs may feel their disabilities were not properly accommodated, those personalized claims do "not exist" on a class-wide basis. *Id.*

The Government's argument puts the cart before the horse and focuses on "whether the . . . plaintiffs . . . will prevail on the merits." *Eisen*, 417 U.S. at 178 (cleaned up). The proposed class allegedly suffers uniform harm from a system-wide failure to assess and accommodate disabilities, not a deficiency linked to the specific accommodations for any single plaintiff. If the Government does in fact have a cogent system of accommodating disabilities that it has applied to "many" plaintiffs, Opp'n at 10, Davis's claim to the contrary will probably ultimately fail. And if it fails, the entire class is poised to fail together. So a "common answer[]" is still "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (cleaned up).

\* \* \*

In sum, Davis's proposed class shares a common harm stemming from a common source. The applicable facts and law overlap between class members, so the class's claims are common and can be resolved together.

## C.

Next up is typicality. It requires a "nexus between the class representative's claims . . . and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Generally, typicality exists if the claims all "stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (quoting 7A Wright et al., Federal Practice and Procedure § 1764). The facts for each claim need not be identical, but they cannot "markedly differ[]." *Kornberg*, 741 F.2d at 1337. Any discussion of factual variation should focus on "the nature of the claims . . . not the individual characteristics of the plaintiff." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 52 (D.D.C. 2010) (cleaned up).

The Government believes Davis's claim lacks typicality. He is on lifetime parole, while other class members have shorter terms of supervision. Opp'n at 12–13. For the latter, "failure to comply with their supervision requirements can result in more time spent in supervision, including possibly an extension of the supervised release terms." Opp'n at 13. In contrast, Davis's lifetime parole means his supervision cannot be extended even if his disability results in a violation. While the Government's explanation is opaque, it implies this distinction is significant and makes Davis's claim atypical.[3]

At best, the Government has identified an inconsequential factual variation about Davis's characteristics, not the nature of his claim. *Radosti*, 717 F. Supp. 2d at 52. At worst, its argument fundamentally misapprehends the core of this case. The Rehabilitation Act prohibits

---

[3] The Government also questions whether the class will cover individuals who are under the Commission's purview but not CSOSA's supervision. Opp'n at 12. Davis's proposed class clearly encompasses only those who are supervised by both the Commission *and* CSOSA. Mot. to Cert. at 1; Pl.'s Reply, ECF No. 44, at 15.

disability discrimination full stop, not merely discrimination that causes secondary harms like an extension of supervision. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1270 (D.C. Cir. 2008). To suggest otherwise is an "astounding proposition." *Id.* The operative harm alleged here is the *failure to offer reasonable accommodations*, not the later ramifications. The Commission continues to focus on downstream maladies, despite the Court's unequivocal statement that "[t]he 'denial of equal treatment' *itself* counts as an injury . . . . The law requires no further downstream harms." *Mathis*, 2024 WL 4056568, at *13. (quoting *Ne. Fla. Ch. of Assoc. Gen. Contractors. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

Besides, even if the Court considered downstream harms, it would not help the Government. Davis, like the rest of the proposed class, could have his supervision terminated early if he met various criteria including successful compliance with his conditions. 28 C.F.R. § 2.95 (parole); 28 C.F.R. § 2.208 (supervised release). A failure to accommodate allegedly increases the risk of non-compliance, thereby stripping those with disabilities of equal access to early termination.

Instead, the Court finds that Davis satisfies typicality. His claim is typical to those of the class: the Government's systematic failure to assess and accommodate disabilities deprives him of equal access to the benefits of supervision. The contours of this claim span Davis and the entire class regardless of the disability, the necessary accommodation, the downstream harm, or the length of supervision. In sum, Davis's claim is typical for the class because it "stem[s] from . . . a unitary course of conduct" and is "based on the same legal or remedial theory." *Azar*, 925 F.3d at 1322.

**D.**

The fourth requirement in Rule 23(a) is adequacy. It protects class members from being saddled with a representative who does not "competently and fairly" advocate for their interests. *Azar*, 925 F.3d at 1312. There are two components. First, the class representative "must not have antagonistic or conflicting interests with the unnamed members of the class." *Id.* (cleaned up). Second, the representative "must appear able to vigorously prosecute the interests of the class through qualified counsel." *Id.* (cleaned up). Adequacy "is not a stringent requirement." *Hoyte v. District of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017). "A class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (cleaned up). But in "flagrant cases" where representatives "display an alarming unfamiliarity with the suit," courts may decline certification. *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 210 (D.D.C. 2018) (cleaned up).

The Government does not contest Davis's adequacy as a class representative, and the Court is satisfied he meets both requirements. First, Davis and the other class members will benefit from the same injunctive relief, so Davis does not have divergent interests. Plus, as Davis points out, there is no risk of a financial conflict of interest because he is not seeking any monetary damages. Mot. to Cert. at 24. Second, Davis appears able to advance the class's collective interests through experienced counsel. He has a general understanding of the issues in the case, *see* K. Davis Decl. ¶¶ 14–19, 51, and declarations from his lawyers catalogue the experience necessary to "vigorously prosecute" the case. *See* S. Deger-Sen Decl. ¶¶ 4–11, ECF No. 40-17; S. Michelman Decl. ¶¶ 3–13, ECF No. 40-18; H. Perry Decl. ¶¶ 3–7, ECF No. 40-19;

A. Verriest Decl. ¶¶ 3–11, ECF No. 40-20.  The Court thus finds that Davis meets the adequacy requirements for acting as a class representative.

\* \* \*

To recap, the class is numerous because Government records indicate it will have hundreds of members.  It has commonality because all class members allegedly suffer the same harm for the same reason:  discrimination because of the Government's wholesale failure to consider and accommodate disabilities during supervision.  Davis's claim is typical to those of the class because they all hinge on the same systemic failure and share an injunctive remedial theory.  And Davis is an adequate class representative with counsel well-suited to handle the litigation.  Davis and his proposed class meet the four requirements in Rule 23(a).

### E.

The proposed class also meets the fifth and final requirement found in Rule 23(b)(2). Recall that this rule applies when the opposing party "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  The touchstone is whether relief is "indivisible"—that is, whether "the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (cleaned up).  "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples of what [Rule 23](b)(2) is meant to capture." *Id.* at 361 (cleaned up).

Relief is indivisible.  The class is not bringing piecemeal challenges to individual accommodation decisions.  The claim instead hinges on a system-wide violation of the Rehabilitation Act that either harms all class members or none.  If the Complaint is correct, the

16

same injunctive remedy is necessary for each class member. But if the Complaint is incorrect, it fails for all members in unison. The class thus satisfies Rule 23(b)(2).

\* \* \*

Having found that Davis's proposed class meets all five requirements of Rule 23, the Court will certify a class consisting of all people with a disability who are on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need accommodations to have an equal opportunity to succeed on parole or supervised release.

## F.

Next, the Court appoints class counsel. Fed. R. Civ. P. 23(g). In doing so, the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Davis is well represented. His lawyers hail from the Public Defender Service for the District of Columbia, the American Civil Liberties Union, the American Civil Liberties Union of the District of Columbia, and Latham & Watkins, LLP. Mot. to Cert. at 26–27. They are seasoned litigators, with experience representing criminal defendants, prisoners, and civil rights plaintiffs. *See* S. Deger-Sen Decl. ¶¶ 4–11; S. Michelman Decl. ¶¶ 3–13; H. Perry Decl. ¶¶ 3–7; A. Verriest Decl. ¶¶ 3–11. Most of them also have experience litigating class actions. *See* S. Deger-Sen Decl. ¶ 4; Michelman Decl. ¶¶ 3–8; H. Perry Decl. ¶ 4; A. Verriest Decl. ¶ 8.

Considerable work has gone into this case already, as shown by the robust Complaint and multiple rounds of briefing from counsel. Despite its opposition to class certification, the Government lodges no objection to Davis's lawyers acting as class counsel. *See* Opp'n at 1, 15. The Court thus finds that Davis's lawyers have done considerable work identifying and investigating the claim; they have experience handling class actions and the type of claim here; they are knowledgeable on applicable laws; and they have been willing to commit resources to this litigation. For these reasons, the Court appoints Davis's current lawyers as class counsel.

## IV.

Davis's proposed class meets the requirements of Rules 23(a) and 23(b)(2). Class certification will provide an effective means of resolving a case affecting hundreds of disabled individuals on parole and supervised release. For these reasons, it is

**ORDERED** that Plaintiff's [40] Renewed Motion for Class Certification and Appointment of Counsel is **GRANTED**; and it is further

**ORDERED** that this case is certified as a class action on behalf of all people with a disability who are on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need accommodations to have an equal opportunity to succeed on parole or supervised release; and it is further

**ORDERED** that the following counsel currently representing Davis are appointed to serve as class counsel:

Christine Casey Smith

Hanna Perry

Allison Frankel

Ashika Verriest

Lia Rose Barrett

Michael Krevans Perloff

Peter E. Davis

Scott Michelman

Zoe E. Friedland

Samir Deger-Sen

**SO ORDERED.**

Dated: February 11, 2025                                 TREVOR N. McFADDEN
                                                                                United States District Judge