# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WILLIAM MATHIS and KENNEDY DAVIS, *individually and on behalf of all others similarly situated,*<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES PAROLE COMMISSION, *et al.,*<br><br>        Defendants. | Case No. 1:24-cv-01312-TNM<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**REDACTED** |

## PLAINTIFFS' MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

      A.     Factual Background ...................................................................................3

           1.     Defendants and Their Supervision System ...............................3

           2.     Plaintiffs and Their Heightened Barriers to Navigating Supervision ..........5

      B.     Procedural Background ..............................................................................6

LEGAL STANDARD ...........................................................................................8

ARGUMENT .........................................................................................................9

I.      PLAINTIFFS ARE DISABLED AND OTHERWISE QUALIFIED FOR A PROGRAM CARRIED OUT BY FEDERAL EXECUTIVE AGENCIES .......................9

II.     PLAINTIFFS ARE EXCLUDED FROM, DENIED THE BENEFIT OF, OR SUBJECT TO DISCRIMINATION THROUGHOUT THE SUPERVISION PROCESS BY REASON OF THEIR DISABILITIES .......................11

      A.     Defendants Routinely Fail To Provide Reasonable Accommodations To Class Members Who Need Them To Succeed On Supervision .........12

      B.     Defendants Have No System to Ensure People with Disabilities Reliably and Consistently Receive Needed Accommodations ...........20

           1.     Defendants Lack Written Policies Or Procedures For Assessing And Providing Accommodations .........21

           2.     Defendants Lack a System For Identifying Disabilities and Accommodation Needs .........23

           3.     Defendants Fail to Notify Supervisees of Their Rights ...........25

           4.     Defendants Lack a System For Requesting Accommodations .........26

           5.     Defendants Lack a System For Grieving Failures To Accommodate .........27

           6.     Defendants Lack a Centralized Accommodations Coordinator .........27

           7.     Defendants Fail to Train Staff on Any Aspect of the Accommodations Process .........28

8.  Defendants Lack a System for Tracking Accommodations Within And Between Agencies................................................................30

C.  An Ad Hoc Accommodations Process Is Not Sufficient As A Matter Of Law ........................................................................................................32

CONCLUSION................................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Council of the Blind v. Paulson,*
525 F.3d 1256 (D.C. Cir. 2008) ....................................................................7, 9, 11

*Armstrong v. Brown,*
857 F. Supp. 2d 919 (N.D. Cal. 2012), *order enforced* (Aug. 28, 2012), *order aff'd, appeal dismissed,* 732 F.3d 993 (9th Cir. 2013) ......................................26

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ........................................................................23, 30

*Armstrong v. Davis,*
No. C 94-02307 CW, 1999 WL 35799705 (N.D. Cal. Dec. 22, 1999)..............25, 27

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 326-27 (2015) ......................................................................................7

*Brooklyn Ctr. for Indep. of Disabled v. Bloomberg,*
980 F. Supp. 2d 588 (S.D.N.Y. 2013)..........................................................22, 33

*Brown v. Dep't of Pub. Safety & Corr. Servs.,*
383 F. Supp. 3d 519 (D. Md. 2019) ...................................................................25

*Cal. Found. For Indep. Living Ctrs. v. County of Sacramento,*
142 F. Supp. 3d 1035 (E.D. Cal. 2015)...............................................................34

*Clark v. California,*
739 F. Supp. 2d 1168 (N.D. Cal. 2010) .............................................................23

*Clarkson v. Coughlin,*
898 F. Supp. 1019 (S.D.N.Y. 1995)..............................................................25, 27

*Communities Actively Living Indep. & Free v. City of Los Angeles,*
No. CV 09-0287, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011)...........................22

*Culley v. Cumberland Valley Sch. Dist.,*
758 F. App'x 301 (3d Cir. 2018) .......................................................................33

*Disabled in Action v. Bd. of Elections in City of N.Y.,*
752 F.3d 189 (2d Cir. 2014).............................................................................33

*Dunn v. Dunn,*
318 F.R.D. 652 (M.D. Ala. 2016).....................................................................20

*Harrison v. Rubin,*
   174 F.3d 249 (D.C. Cir. 1999) .................................................................................9

*Lewis v. Cain,*
   No. 3:15-CV-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021) .....................27, 28

*Pierce v. County of Orange,*
   761 F. Supp. 2d 915 (C.D. Cal. 2011) ....................................................................28

*\*Pierce v. District of Columbia,*
   128 F. Supp. 3d 250 (D.D.C. 2015) ................................................................8, 9, 20

*Talavera v. Shah,*
   638 F.3d 303 (D.C. Cir. 2011) ..................................................................................8

*Tellis v. LeBlanc,*
   No. CV 18-541, 2022 WL 22861739 (W.D. La. Nov. 1, 2022) .........................23, 26

## STATUTES

29 U.S.C.
   § 705(20)(B)............................................................................................................10
   § 794.......................................................................................................................1, 6
   § 794(a) .................................................................................................................9, 10

42 U.S.C. § 12102(4)(A)..................................................................................................10

## RULES

Fed. R. Civ. P.
   12(b)(6) .....................................................................................................................6
   23(b)(2) .....................................................................................................................8
   56...............................................................................................................................1
   56(c)(1) ......................................................................................................................8

Local Rule
   7(f).............................................................................................................................1
   7(h).............................................................................................................................1

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiff Kennedy Davis, on behalf of himself and all others similarly situated (collectively, "Plaintiffs"), hereby requests that the Court enter partial summary judgment that the U.S. Parole Commission ("the Commission") and its Chairman, as well as the Court Services and Offender Supervision Agency ("CSOSA") and its Director (collectively, "Defendants"), violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"), in their administration of parole and supervised release (collectively, "supervision"). Pursuant to Local Rule 7(f), Plaintiffs respectfully request oral argument on this motion. If the Court grants partial summary judgment, Plaintiffs request that the Court expeditiously set a status conference on remedy proceedings.

## INTRODUCTION

In granting a preliminary injunction, this Court held that requiring people with disabilities "to navigate supervision without offering reasonable accommodations" violates the Rehabilitation Act. ECF No. 31 at 11. Now all of the facts are in, and they show Defendants do just that. Time and again, even when confronted with obvious indications of supervisees' disabilities, Defendants fail to provide accommodations, initiate revocation proceedings for violations related to those disabilities, and then release the supervisees back to the very same conditions that, absent accommodations, they were unable to comply with in the first place. Individuals' personal experiences paint a cohesive picture: at every step of the supervision process, Defendants fail to make reasonable accommodations for supervisees' disabilities. That is unsurprising because Defendants have no system for identifying disabilities, assessing people's accommodation needs, receiving and evaluating requests for accommodations, providing accommodations, grieving denials of accommodations, tracking provided accommodations, or communicating information about disabilities and accommodations within and between their respective organizations. Defendants provide essentially no training to their staff on these issues, lack designated

accommodation coordinators, and fail to even notify people on supervision of their basic rights under the Rehabilitation Act.

Summary judgment on liability should therefore be granted. As this Court previously recognized in granting a preliminary injunction to named Plaintiffs, Plaintiffs "undisputedly satisfy" three of the four elements of their Rehabilitation Act claim: they (1) have "qualifying disabilities," (2) "are 'otherwise qualified' for supervision," which is (3) a program carried out by two federal agencies, the Commission and CSOSA. ECF No. 31 at 9-10. And as the undisputed evidence shows, the final element is satisfied too: Plaintiffs are excluded from, denied the benefit of, or subject to discrimination under Defendants' supervision program by reason of their disabilities. Defendants' systemic failure to assess accommodation needs and provide required accommodations deprives Plaintiffs of an equal opportunity to reintegrate into their communities through supervision.

To the extent Defendants may suggest that they sometimes accommodate people on an ad hoc basis, the undisputed factual record and personal experiences of class members show the opposite. There is no evidence that Defendants provide ad hoc accommodations on any sort of widespread basis. Indeed, throughout discovery, Defendants did not produce documents showing *any* specific examples of accommodations they claim to have provided, telling Plaintiffs that they are unable to do so because they do not track accommodation needs or provided accommodations. The absence of evidence from Defendants does not—and cannot—create a genuine dispute as to any material fact. And in any event, an ad hoc process that does not consistently provide reasonable accommodations is inadequate to satisfy Defendants' obligations under the Rehabilitation Act.

This Court should grant summary judgment to Plaintiffs on liability and expeditiously set a status conference to address remedy proceedings.

## BACKGROUND

### A.    Factual Background

#### 1.    Defendants and Their Supervision System

The Commission and CSOSA, both federal executive agencies, work together to administer supervision in the District.   Statement of Undisputed Material Facts In Support of Plaintiffs' Motion for Partial Summary Judgment ("SUMF") ¶¶ 1-3.   The Commission is responsible for setting the conditions of supervision and making final decisions regarding the continuation, revocation, or termination of supervision.   *Id.* ¶ 4.   CSOSA is responsible for the day-to-day aspects of supervision, including administering, enforcing, and adding detail to supervision conditions.   *Id.* ¶¶ 5-6, 11.

Everyone, regardless of disability, starts at the same baseline:   The Commission imposes the same "general" conditions on all people on parole and supervised release.   *Id.* ¶ 8.   The Commission may impose additional heightened "special" conditions, such as requiring participation in drug treatment.   *Id.* ¶ 9.   Neither the person on supervision nor their attorney is present when these conditions are imposed.   *Id.* ¶ 10.   CSOSA then determines the details of supervision conditions, such as how frequently people must report or the treatment program in which they must participate.   *Id.* ¶ 11.

CSOSA's community supervision officers ("CSOs") monitor people on supervision.   *Id.* ¶ 12.   CSOs make the initial determination as to whether someone has violated the conditions of supervision.   *Id.* ¶ 13.   This includes violations for alleged new crimes as well as "technical" violations.   *Id.* ¶ 14. Technical violations occur when someone's conduct does not violate criminal law, but rather the administrative terms of supervision, such as missing an appointment with their

3

CSO, failing to obtain or maintain a job, or missing a drug test. *Id.* ¶ 15. CSOs generally have discretion to respond to alleged violations informally; to apply "graduated sanctions," such as increasing the frequency of appointments or substance-use testing, requiring GPS location monitoring, or setting a curfew; or to file an alleged violation report ("AVR"). *Id.* ¶ 17. An AVR alerts the Commission to alleged violations and can request that the Commission issue an arrest warrant and begin the revocation process. *Id.* ¶¶ 18-19.

If the Commission issues an arrest warrant, the individual on supervision is incarcerated at the D.C. Jail while awaiting their probable cause hearing. *Id.* ¶ 20. At the probable cause hearing, a Commission hearing examiner determines if there is probable cause to support the alleged violation and, if so, whether the person should nonetheless be reinstated to supervision or if they should proceed to a final revocation hearing. *Id.* ¶¶ 22-23. If the Commission decides to proceed to a final revocation hearing, the individual is incarcerated at the D.C. Jail for the weeks or months prior to that hearing. *Id.* ¶ 24. At the final revocation hearing, a Commission hearing examiner listens to evidence from the CSO, the supervisee, and the supervisee's counsel to make a recommendation as to whether supervision should be reinstated or revoked and, if revoked, the length of the sentence. *Id.* ¶ 25. The Commission can override a hearing examiner's recommendation at both the probable cause and final revocation hearing stages, including by lengthening the recommended sentence. *Id.* ¶ 26. If the Commission reinstates the person to supervision, it can modify their supervision conditions. *Id.* ¶ 27. The Commission documents any changes to supervision conditions, or instructions to CSOSA following the revocation process, on a Notice of Action form, which is issued to CSOSA following revocation proceedings. *Id.* ¶ 28. If the Notice of Action does not list changes to supervision conditions, it means the original conditions apply. *Id.* ¶ 29.

### 2.    Plaintiffs and Their Heightened Barriers to Navigating Supervision

Plaintiffs are a class of "all people with a disability who are on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need accommodations in order to have an equal opportunity to succeed on parole or supervised release." *Id.* ¶ 34. As Defendants are aware, many people under their supervision have disabilities, including physical, sensory, mental health, intellectual, and developmental disabilities. *Id.* ¶¶ 36, 38, 39. For instance, CSOSA's own estimates show that, of the people under its supervision and subject to the Commission's release authority between June 1, 2022, and March 15, 2025, *90%* had some indication of disability. *Id.* ¶ 40. Mental health disabilities, in particular, are widespread. *Id.* ¶ 42 (estimating as many as 25% of individuals entering supervision "reported mental health issues at intake").

People with disabilities face heightened barriers to complying with their supervision requirements. *Id.* ¶ 44. For example, they may have difficulty understanding their supervision conditions, remembering and timely attending appointments, and physically accessing meeting locations. *Id.* ¶ 45. For those reasons, it is often exceedingly difficult for people with disabilities to meet supervision requirements without reasonable accommodations. *Id.* ¶ 46. At the same time, reasonable accommodations are often simple and impose little or no cost, such as explaining supervision rules in plain language, providing appointment reminders, and flexibly scheduling meeting times, locations, and frequencies based on people's needs and abilities. *Id.*

Absent accommodations, people with disabilities are regularly unable to follow their supervision rules—leading to technical violations, revocation, and incarceration. *Id.* ¶¶ 47-48. Individuals with mental disabilities are almost twice as likely to have an AVR filed against them for a technical violation than the general supervision population. *Id.* ¶ 49. Even when a person's disabilities contribute to their technical violations, the Commission routinely revokes their

5

supervision—sometimes over the recommendation of a hearing examiner. *Id.* ¶¶ 26, 47-48. The Commission also regularly reinstates people to supervision under the very same conditions that, due to their disability-related barriers, they struggled to follow—without providing accommodations. *Id.* ¶ 50.

### B.     Procedural Background

On May 6, 2024, Kennedy Davis and William Mathis filed this class action against the Commission; CSOSA; Patricia K. Cushwa, in her official capacity as Acting Chairwoman of the Commission; and Richard S. Tischner, in his official capacity as Director of CSOSA, seeking declaratory and injunctive relief. ECF No. 1. Plaintiffs brought a single claim for violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. ECF No. 21-1 ¶¶ 139-55. They alleged that "Defendants' systematic failure to assess whether and what types of accommodations Plaintiffs require, and to provide such accommodations, deprives Plaintiffs of an equal opportunity to succeed on supervision" and discriminates against them "on the basis of disability." *Id.* ¶¶ 146-47.

Concurrently, Plaintiffs moved for a preliminary injunction. ECF No. 3. Defendants opposed that motion, arguing that Plaintiffs lacked a private right of action under the Rehabilitation Act and that Plaintiffs were not "denied the benefits of supervisory release 'solely by reason' of their disabilities" because they "failed to meet multiple obligations of their supervised release." ECF No. 16 at 3-9, 13. While the preliminary injunction motion was pending, Defendants moved to dismiss the operative complaint under Rule 12(b)(6), arguing again that "there is no private right of action to pursue the injunctive relief [Plaintiffs] seek under the Rehabilitation Act." ECF No. 25-1 at 1.

The Court granted the preliminary injunction as to the named Plaintiffs[1] and denied Defendants' motion to dismiss. ECF Nos. 31, 32. On Plaintiffs' likelihood of success on the merits, the Court reasoned that Plaintiffs "undisputedly satisfy the first, second, and fourth elements" of a Section 504 claim: "'(1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, . . . and (4) the program or activity is carried out by a federal executive agency or with federal funds.'" ECF No. 31 at 9 (quoting *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008)). The Court rejected Defendants' arguments on the third element—whether Plaintiffs "face discrimination 'solely by reason' of their disabilities." *Id.* at 11-12. The Court reasoned that Plaintiffs' "claim under the Act ripened the moment their disabilities made it harder for them—compared to their non-disabled counterparts—to participate in the Government's supervision programs without reasonable accommodations." *Id.* at 11-12. For example, former named Plaintiff William "Mathis's congestive heart failure impeded his ability to make it to his CSO check-ins" and named Plaintiff Kennedy "Davis's anxiety and PTSD impeded his ability to phone his CSO." *Id.* at 11 (citing Compl. ¶¶ 89, 109-10). The Court also held that, despite lacking a private right of action, Plaintiffs "may sue in equity under *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 326-27 (2015)." *Id.* at 2; *see also id.* at 12-25. The Court held that the irreparable harm and equitable factors favored granting the preliminary injunction. ECF No. 31 at 25-27. Defendants then answered the complaint. ECF No. 38.

Plaintiffs moved for class certification,[2] ECF No. 40, which the Court granted, ECF No. 47. As relevant here, the Court reasoned that Plaintiffs met the commonality requirement because they

---

[1] Mr. Mathis passed away in mid-2024, and Plaintiffs voluntarily dismissed his claim. *See* ECF No. 34.

[2] Plaintiffs previously moved for class certification, ECF No. 2, which the Court denied without prejudice based on the local rules' requirement of pre-filing consultation, which Plaintiffs could

alleged a "'*systematic* failure to assess' and accommodate disabilities"—i.e., the lack of a "cogent system of accommodating disabilities"—which "comes from a ubiquitous deficiency that permeates the entire supervision system, harming all class members at every turn." ECF No. 47 at 10-12 (citation omitted). Likewise, the Court held that Plaintiffs met Rule 23(b)(2)'s requirement that relief be uniform for the entire class because Plaintiffs' "claim . . . hinges on a system-wide violation of the Rehabilitation Act," and "[i]f the Complaint is correct, the same injunctive remedy is necessary for each class member." *Id.* at 16-17. As noted above, the certified class consists of "all people with a disability who are on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need accommodations in order to have an equal opportunity to succeed on parole or supervised release." *Id.* at 17.

Following discovery, Plaintiffs now bring this motion for summary judgment on liability.

## LEGAL STANDARD

A motion for summary judgment should be granted if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" "show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(1). "[E]vidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 264 (D.D.C. 2015) (quoting *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011)). But "the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Id.* Rather, "the contested fact must be material"—meaning that "it could

---

not meet when the case was filed as Defendants' counsel had not yet been assigned, ECF No. 33 at 1.

8

establish an element of a claim or defense and, therefore, 'might affect the outcome of the suit under the governing law'"—and "the dispute must be genuine" in that "'the evidence presents a sufficient disagreement to require submission to a jury.'" *Id.* at 264-65 (citations omitted).

## ARGUMENT

Summary judgment on liability is warranted. Under the Rehabilitation Act, Plaintiffs "must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity" by reason of their disability, "and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008); 29 U.S.C. § 794(a).[3] Defendants have admitted the second and fourth elements. And the first is easily met. The third element is the only contested element, and the undisputed evidence shows there is no genuine dispute that Plaintiffs have been excluded from, denied the benefit of, or subject to discrimination because they face "obstacles to success on supervision solely because of their disabilities, which expose them to downstream harms like revocation and reincarceration." ECF No. 31 at 2.

## I. PLAINTIFFS ARE DISABLED AND OTHERWISE QUALIFIED FOR A PROGRAM CARRIED OUT BY FEDERAL EXECUTIVE AGENCIES

As this Court previously recognized in granting a preliminary injunction, the named Plaintiffs "undisputedly satisfy the first, second, and fourth elements." ECF No. 31 at 9. They have (1) "qualifying disabilities" and (2) "are 'otherwise qualified' for supervision," which is (4) a

---

[3] Courts interpret Section 504 Rehabilitation Act claims "interchangeabl[y]" with claims under Title II of the Americans with Disabilities Act ("ADA"). *Am. Council of the Blind*, 525 F.3d at 1260 n.2; *accord Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) (claims "under the two statutes are virtually identical").

9

program carried out by two federal agencies, the Commission and CSOSA. *Id.* at 9-10 (citation omitted). The undisputed evidence compels the same conclusion as to the class.

Defendants admit, as they must, that CSOSA and the Commission are federal agencies. SUMF ¶ 3. They further admit that named Plaintiff Kennedy Davis is qualified for parole. *See Id.* ¶ 30. And the rest of the class is also "on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision," *id.* ¶ 34, so they are also "otherwise qualified" for supervision.

Plaintiffs all have qualifying disabilities too. This Court previously found that Mr. Davis was likely to meet that requirement when granting the motion for a preliminary injunction, ECF No. 31 at 9, and that conclusion is supported by the undisputed evidence, *see, e.g.*, SUMF ¶¶ 31-33. The rest of the class also has qualifying disabilities because, by definition, class members have "a disability" under the Rehabilitation Act. *Id.* ¶ 35; *see* 29 U.S.C. § 794(a); 29 U.S.C. § 705(20)(B) (defining disability as "a physical or mental impairment which substantially limits one or more major life activities"). People on parole or supervised release without disabilities are not members of the class that this Court certified. ECF No. 47 at 5-6, 18. And the undisputed evidence shows that class members have disabilities including physical, mental health, intellectual, and developmental disabilities that limit major life activities such as walking, thinking, concentrating, and interacting with others. *Id.* ¶¶ 33, 35-36, 51-52, 59-60, 77, 120. Congress has made clear that the term "disability" "shall be construed in favor of broad coverage," and there can be no dispute that Plaintiffs' disabilities qualify. 42 U.S.C. § 12102(4)(A). Plaintiffs have therefore met their minimal burden to show that they each have at least one qualifying disability.

While Defendants do not systematically track the number of people under their supervision with disabilities, SUMF ¶¶ 201-206, 248, they admit that "high numbers of people on parole or

10

supervised release have disabilities and thus may need reasonable accommodations to have an equal opportunity to succeed on supervision." *Id.* ¶ 38. As CSOSA's own estimates show, 90% of people on supervision have some indication of disability. *Id.* ¶ 40. For the Commission's part, a former hearing examiner testified that approximately 25% of his monthly revocation hearings over 11 years involved individuals with physical or mental disabilities. *Id.* ¶ 41. Mental health disabilities, in particular, are common. *Id.* ¶ 43. In 2022, "nearly 25%" of those entering supervision "reported mental health issues at intake." *Id.* ¶ 42.

For all those reasons, there is no dispute of material fact that Plaintiffs satisfy the first, second, and fourth elements of their Rehabilitation Act claim.

## II. PLAINTIFFS ARE EXCLUDED FROM, DENIED THE BENEFIT OF, OR SUBJECT TO DISCRIMINATION THROUGHOUT THE SUPERVISION PROCESS BY REASON OF THEIR DISABILITIES

As this Court previously explained, to meet the third element of the Rehabilitation Act's test, Plaintiffs must show that "they face 'obstacle[s]'" to equal access to supervision "solely because of their disabilities." ECF No. 31 at 11 (quoting *Am. Council of the Blind*, 525 F.3d at 1267). This "injury []exists independently of any downstream consequences such as revocation of supervision or reincarceration." ECF No. 47 at 5 (citing ECF No. 31 at 11); *see id.* at 14 ("The operative harm alleged here is the failure to offer reasonable accommodations, not the later ramifications."). Plaintiffs have made that showing based on the undisputed evidence.

Defendants discriminate against people with disabilities by requiring them to "'navigate supervision without offering reasonable accommodations.'" *Id.* at 5 (citation omitted). Class members' experiences show that Defendants' failure to accommodate is widespread. That is unsurprising because Defendants have no system for identifying disabilities and accommodation needs, requesting accommodations, providing accommodations, grieving failures to provide accommodations, or tracking provided accommodations. To the extent Defendants contend that

they have an ad hoc system of providing accommodations, that is unsupported by the record and would be legally inadequate in any event.

### A. Defendants Routinely Fail To Provide Reasonable Accommodations To Class Members Who Need Them To Succeed On Supervision

As this Court has recognized, people with disabilities face barriers to complying with their supervision conditions. *See* ECF No. 31 at 11-12. Plaintiffs' expert explained—and Defendants do not dispute—that these barriers can include obstacles to understanding supervision conditions, remembering when meetings will occur, physically getting to required locations, and navigating supervision requirements while managing chronic health conditions. SUMF ¶ 45.

Defendants and their employees *admit* that "disabilities can make it harder for someone to comply with their supervision requirements." *Id.* ¶ 44; *id.* (Commission agreeing that limited mobility "would make it more difficult" to attend appointments); *id.* (same for memory issues); *id.* (CSOSA acknowledging that disabilities "may impact the person's ability to comply with supervision requirements"). Individual CSOs have also acknowledged that their supervisees' disabilities impact compliance. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████ Commission hearing examiners have likewise recognized supervisees' disability barriers during revocation proceedings. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

12

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

People with disabilities thus regularly need reasonable accommodations to have an equal opportunity to succeed on supervision. As Plaintiffs' expert explained—and Defendants do not dispute—"accommodations must be tailored to individual circumstances" and "could include: modifying reporting schedules, such as adjusting meeting locations and times"; "providing written materials in large print, plain language, or Braille"; "and ensuring that any supervision programs (such as drug/alcohol or mental health treatment) are appropriate to the individual's disability-related needs (e.g., reading comprehension level, trauma history, or mobility limitations)." *Id.* ¶ 46.

Absent accommodations, people with disabilities are often unable to meet their supervision requirements, leading to technical violations, revocation, and incarceration. *See id.* ¶ 47. Indeed, CSOSA has admitted that people with mental disabilities are almost twice as likely to be accused of technical violations than the general supervision population. *See id.* ¶ 49. This undermines the very purpose of supervision: helping people "reintegrate to society" and "ensur[ing] successful completion of supervision." *Id.* ¶ 7.

As the undisputed evidence shows, class members with disabilities have struggled to comply with the terms of their supervision—yet Defendants have made no accommodations. Below, Plaintiffs provide ten examples of people under Defendants' supervision, drawn from documents that have been submitted under seal. Their experiences are typical of the class and align with the experiences of named Plaintiff Mr. Davis and former named Plaintiff Mr. Mathis.

13

*See id.* ¶¶ 120-66. As these stories show, and as Plaintiffs' expert concluded, Defendants routinely fail to provide accommodations for documented or obvious disabilities, even when people request them and even when their CSOs or hearing examiners recognize that they face unaccommodated obstacles due to their disabilities. *See id.* ¶¶ 51-178; Ex. 23 to Declaration of Christine C. Smith in Support of Plaintiffs' Motion for Partial Summary Judgment, Attachment 2 to Expert Report of Kelly Mitchell. For example, CSOs routinely fail to offer home or telephonic visits even when their supervisees are hospitalized, have mobility limitations, or are undergoing acute mental-health crises that make in-person reporting difficult or even impossible. *See, e.g.,* SUMF ¶¶ 53-54, 57, 60-61, 68, 70-72, 76, 91-95; ECF No. 31 at 4-7 (same for named plaintiff Mr. Davis and former named Plaintiff Mr. Mathis). CSOs routinely punish supervisees with memory issues or cognitive impairments for failing to remember their supervision requirements, without providing any accommodation such as appointment reminders or simplified instructions. *See, e.g.,* SUMF ¶¶ 51, 57, 59, 65-68, 77-80, 87-89. When supervisees disclose that their mental health treatment is inadequate or request help during an active mental health crisis, CSOs routinely direct them to self-navigate helping them access mental health treatment or providing any other accommodation. *See, e.g., id.* ¶¶ 82-83, 91-97. And while some hearing examiners have recognized that people's disabilities contributed to their violations and recommended release, those hearing examiners often fail to propose changes to the underlying conditions of supervision, and the Commission frequently overrides their recommendation and incarcerates the supervisee anyway. *Id.* ¶¶ 66-69, 73-76, 107-11, 116-18.

All of these circumstances and more are described in detail below, which again, are just a small sample of Defendants' routine failures to accommodate.

Supervisee 1 (███████): ████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

████████████████

Supervisee 2 (███████): ████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

██████████████

Supervisee 3 (█████████████): ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

Supervisee 4 (████████████): ████████████████████████

████████████████████████████████████████████

██ █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

Supervisee 5 (█████████): ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████

Supervisee 6 (█████████): ████████████████████

████████████████████████████ █████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

Supervisee 7 (████████): ██████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

17

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Supervisee 8 (███████): ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

Supervisee 9 (███████): ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

18

███████████████████████████████████████████████

████████████████████████████████████

Supervisee 10 (████████): ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

██████

Other Supervisees:  The above stories are not unique.  As explained in previous filings, other individuals have suffered similar harms.  *See, e.g.*, ECF 3-1 at 9-13, 18-20.  For example, despite knowing that a supervisee had paranoid schizophrenia, which made him afraid to leave his house and hindered his ability to report for required supervision meetings, his CSO and the Commission never provided any accommodations.  SUMF ¶¶ 167-68.  Instead, Defendants incarcerated him for technical violations, and then reinstated him under the very same requirements he had previously struggled to comply with due to his disabilities.  *Id.* ¶ 169.  Defendants likewise failed to accommodate another supervisee whose extreme nerve pain in his back made it difficult to walk.  *Id.* ¶ 170.  Even after this supervisee told his CSO about his mobility limitations, his CSO still required him to attend monthly supervision appointments far from his home.  *Id.* ¶¶ 170-71.  Following revocation proceedings for technical violations, the Commission released him back to supervision, without any accommodations.  *Id.* ¶ 172.  Finally, Defendants

19

similarly failed to accommodate another supervisee with paralysis that left him in a wheelchair, making it difficult to travel to supervision appointments. *Id.* ¶¶ 173-74. Although the Commission and CSOSA were aware of his mobility limitations, they never offered any accommodations. *Id.* ¶ 174. Instead, Defendants incarcerated him twice for technical supervision violations, including failing to attend in-person appointments. *Id.* ¶ 175. During his first revocation hearing, a hearing examiner "explicitly acknowledged that he was medically unable to comply with supervision." *Id.* ¶ 176. Nevertheless, the Commission detained him in the D.C. Jail for multiple weeks, then released him back onto the same conditions he had been found medically unable to comply with. *Id.* ¶ 177. When he was subsequently arrested for failing to meet those conditions, the Commission detained him for over a month. *Id.* ¶ 178.

These stories are just the tip of the iceberg. At every step of the revocation process, Defendants fail to accommodate individuals with disabilities, denying them the equal opportunity to succeed on supervision and reintegrate into their communities.

**B.      Defendants Have No System to Ensure People with Disabilities Reliably and Consistently Receive Needed Accommodations**

Defendants' routine failures to provide accommodations, including in the examples described above, are unsurprising because Defendants have no formal mechanisms for identifying accommodation needs, requesting accommodations, providing accommodations, grieving failures to accommodate, or tracking or communicating about accommodations within and between the agencies. The Rehabilitation Act requires covered entities to "take affirmative steps" to assess accommodation needs and provide reasonable accommodations. *Pierce*, 128 F. Supp. 3d at 271. "[A] know-nothing, do-nothing policy of non-administration" does not suffice. *Dunn v. Dunn*, 318 F.R.D. 652, 665 n.12 (M.D. Ala. 2016). Yet that is exactly what Defendants have.

20

Plaintiffs' expert (and the only expert in this case) explained that, to ensure that people reliably and consistently receive needed accommodations, supervision agencies should have: (1) written policies and procedures regarding accommodations, (2) a system to identify individuals with disabilities and their accommodation needs, (3) notice of rights to accommodations, (4) a process to request accommodations, (5) a process for grieving failures to accommodate, (6) a designated accommodation coordinator, (7) staff training on assessing accommodation needs and providing accommodations, and (8) a system to track and monitor accommodations. SUMF ¶ 179.

The undisputed evidence shows that Defendants "do not have *any* of the[se] key features of a system to provide reasonable accommodations in a systematic and consistent manner." *Id.* ¶ 180 (emphasis added). Indeed, Defendants admit that they "ha[ve] no formal, official, or standardized system or process for providing reasonable accommodations to individuals with Disabilities on Supervision." *Id.* ¶ 181; *accord id.* ¶ 182 (similar for CSOSA).

### 1.    Defendants Lack Written Policies Or Procedures For Assessing And Providing Accommodations

An agency that does not memorialize its policies and procedures in writing and instead relies on purported ad hoc accommodations will find it "exceedingly difficult—if not impossible" to satisfy its obligations under the Rehabilitation Act. *Id.* ¶ 183. Absent written policies, "officers lack a clear understanding of when and how to identify accommodation needs, respond to requests, or recognize potential barriers during the supervision and revocation process." *Id.* Further, "[i]n the absence of written standards, practices may vary widely from officer to officer, resulting in unequal treatment of individuals with disabilities and increasing the likelihood that people will not receive accommodations." *Id.* Written policies and procedures also "make it possible to evaluate whether the agency is meeting its obligations" under the Rehabilitation Act "and to correct problems when they are not." *Id.* And, crucially, written policies "are necessary for the system to

21

function at scale. Without written procedures, any efforts to accommodate individuals with disabilities remain ad hoc and unsustainable." *Id.* Thus, "[a] functioning, durable system requires formalized rules that all staff can follow and apply consistently." *Id.*; *see, e.g.*, *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 644 (S.D.N.Y. 2013) (finding that defendant's "*ad hoc* accommodations" plan to address accommodation needs on "a case-by-case basis" was "'both legally inadequate and practically unrealistic'" (quoting *Communities Actively Living Indep. & Free v. City of Los Angeles*, No. CV 09-0287, 2011 WL 4595993, at *14 (C.D. Cal. Feb. 10, 2011)).

Defendants concede that written policies are key to a functioning supervision system in general. SUMF ¶ 184. CSOSA uses written policies and procedures "to ensure that CSOs are aware of their responsibilities" and to ensure accountability and consistency "regardless of which CSO is applying the guidance." *Id.* ¶¶ 185-88. Likewise, the Commission uses written policies and procedures "to ensure that everybody's treated the same," "hearing examiners and commissioners are acting consistently," "staff are aware of the steps they must take in particular scenarios," and "policies are memorialized and outlast changes in personnel." *Id.* ¶ 189.

Yet despite recognizing the importance of written guidance generally, Defendants have no such guidance for assessing and providing accommodations. Both agencies admitted in their Answer that they "have not put in place any guidance, instructions, or policies requiring assessing people's disability-related accommodation needs when initially setting supervision requirements, requiring provision of reasonable accommodations for people's disabilities as they become known, or providing a means by which people with disabilities can request reasonable accommodations." *Id.* ¶ 190. Both made similar admissions in response to FOIA requests. *Id.* ¶ 191 (CSOSA admitting that despite an "exhaustive search of all guidance, dating back to 2015," it could find no

22

guidance on how to "[e]valuat[e] whether people on parole or supervised released need reasonable accommodations" or how to "[p]rovid[e]" such accommodations if needed); *id.* (similar for Commission). And in depositions, Defendants again admitted that they do not have any policies, procedures, or guidelines related to providing accommodations for disabilities. *Id.* ¶ 192 (CSOSA); *id.* ¶ 194 (Commission).

In sum, the undisputed facts show that Defendants have no written materials whatsoever about assessing or providing accommodations to people on supervision.

### 2. Defendants Lack a System For Identifying Disabilities and Accommodation Needs

Even if Defendants had a systematic way to accommodate people with disabilities (which they do not, *see infra* Section II.B.3-6), they do not know who those people are or what they need. Identifying disability-related needs is "critical for ensuring that supervision conditions are tailored appropriately." SUMF ¶ 195. Thus, as courts have repeatedly held, some "tracking system" to "determine which [supervisees] suffer from disabilities, and what their disabilities are . . . is necessary . . . to comply" with the Rehabilitation Act. *Armstrong v. Davis*, 275 F.3d 849, 876 (9th Cir. 2001); *see also Clark v. California*, 739 F. Supp. 2d 1168, 1190 (N.D. Cal. 2010) ("[I]t is essential that defendants accurately identify prisoners with [] disabilities in order to ensure those prisoners receive the protections and accommodations required under . . . federal law."); *Tellis v. LeBlanc*, No. CV 18-541, 2022 WL 22861739, at *58 (W.D. La. Nov. 1, 2022) (violation of the ADA "can occur when a public entity 'employ[s] no system or an inadequate system for identifying and tracking prisoners with disabilities'" (citation omitted)).

Such a system must "proactiv[ely] identif[y] and assess[] . . . disability-related needs" "at the outset." SUMF ¶ 196. This is critical for several reasons. Not all disabled people know that they have a disability or that they can request and are entitled to reasonable accommodations. *Id.*

23

¶ 197. Further, certain disabilities, such as "communication disorders, intellectual disabilities, [traumatic brain injuries], or severe mental illness," can make it difficult for a person to communicate their disabilities or to understand questions about disabilities. *Id.* ¶ 198. Additionally, "[g]iven the significant power that supervision staff have over the lives of people on supervision, individuals may fear judgment, retaliation, or being labeled 'difficult'—deterring them from requesting accommodations." *Id.* ¶ 199. Without proactive identification, supervisees face otherwise "avoidable barriers to compliance, such as misunderstanding conditions, missing appointments, or struggling to access required programs." *Id.* ¶ 200.

Defendants have "no formal policies, procedures, or guidelines instructing officers how to evaluate" whether individuals have disabilities or accommodation needs. *Id.* ¶¶ 201, 212-13. Nor does CSOSA provide training regarding how to assess if a person has disabilities. *Id.* ¶ 214, 242. CSOSA also does not provide a set of questions a CSO should ask to learn if their supervisee has a disability. *Id.* ¶ 202. Little wonder then that CSOs do not "ask supervisees if they need accommodations for their disability" when "setting the requirements" for supervision, "[o]ver the course of supervision[,]" or "[d]uring the revocation process." *Id.* ¶¶ 215, 226.

The Commission likewise has no policies, procedures, guidelines, or other rules or instructions with controlling effect regarding evaluating people on supervision for disabilities. *Id.* ¶¶ 203, 216. It does not use any standardized screening tool to identify people on supervision with disabilities, *id.* ¶ 205, and does not maintain a list of supervisees with disabilities, *id.* ¶ 258. And while in 2025, the Commission added a textbox to several forms that "prompts the hearing examiner to ask questions and find out" if the supervisee has any disabilities or accommodations, hearing examiners are not trained on "what questions to ask in order to fill out [the] box," and they

24

can and do submit these forms with an empty box. *Id.* ¶¶ 207-09. Indeed, the system does not even inform examiners when they have left the box blank. *Id.* ¶ 210-11.

Thus, in policy and in practice, neither Defendant has any meaningful system to identify individuals with disabilities.

### 3.    Defendants Fail to Notify Supervisees of Their Rights

Another "foundational element of any functional accommodations system" is providing individuals with disabilities with notice of their rights to accommodations and how to receive such accommodations. *Id.* ¶ 217; *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 555 (D. Md. 2019) (requiring Department of Corrections to "'make available' to disabled inmates information about the ADA and its 'applicability'" (citation omitted)); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1032, 1044 (S.D.N.Y. 1995) (holding that Department of Corrections' "failure to provide notice of rights to accommodations and available assistance" constitutes a violation of the ADA). "[C]lear, repeated, and accessible" notice is required. SUMF ¶ 217; *see Armstrong v. Davis*, No. C 94-02307 CW, 1999 WL 35799705, at *36 (N.D. Cal. Dec. 22, 1999) (holding that "belated notice is insufficient to apprise prisoners and parolees of . . . the protections against discrimination assured them by the ADA"). Without notice of their rights, "many supervisees will not have the knowledge to advocate for themselves, access necessary accommodations, or seek redress." SUMF ¶ 218.

Defendants have repeatedly admitted, in both FOIA responses and discovery, that they have no guidance or instruction regarding notifying supervisees of their rights under the Rehabilitation Act. *See id.* ¶¶ 219-22. The Commission admitted it provides no notice of rights when supervisees "enter supervision" or "while they are on supervision." *Id.* ¶ 219. CSOSA admitted it does not have any policies regarding notifying supervisees of their rights under the Rehabilitation Act. *Id.* ¶ 220. And during a deposition, defense counsel "represent[ed] to"

Plaintiffs' expert witness that "CSOSA and USPC . . . have not been notifying individuals of their rights . . . to seek accommodations." *Id.* ¶ 221. Accordingly, it is undisputed that Defendants do not notify class members of these rights.

### 4. Defendants Lack a System For Requesting Accommodations

Establishing a "consistent, accessible, and well-understood method for submitting accommodation requests" is key to ensuring that individuals with disabilities have a "fair and meaningful opportunity to comply with their supervision conditions." *Id.* ¶ 223. Forcing individuals to rely on "informal, inconsistent, or discretionary" methods of requesting accommodations fails to meet the Rehabilitation Act requirements and "contribute[s] to preventable supervision failures." *Id.* ¶ 224; *see Armstrong v. Brown*, 857 F. Supp. 2d 919, 955 (N.D. Cal. 2012) (lack of access to "functional and timely [] procedures at county jails to request and obtain disability accommodations" violated ADA), *order enforced* (Aug. 28, 2012), *order aff'd, appeal dismissed*, 732 F.3d 993 (9th Cir. 2013); *Tellis*, 2024 WL 3470644, at *74 (defendant's "fail[ure] to maintain and implement an adequate system by which inmates can request and receive reasonable accommodations for their mental illness" violated ADA).

Defendants admit that they do not have a formal process through which an individual on supervision may request accommodations. SUMF ¶ 225. CSOSA admits that there is no "formal written process" for supervisees "to request accommodations" when they "first enter[] supervision[,]" "[d]uring supervision[,]" "during the revocation hearing process," or upon reinstatement to supervision after revocation. *Id.* ¶ 226. Further, even if a supervisee were able to request an accommodation, CSOSA has no policy regarding how CSOs should decide whether to provide an accommodation or deny an accommodation request. *Id.* ¶ 227.

The Commission likewise admits that it "has no formal, official, or standardized system or process for individuals with Disabilities to seek or otherwise request reasonable accommodations"

26

during supervision, including during revocation proceedings. *Id.* ¶ 228. The Commission further admits there is no "direct point of contact" for submitting an accommodation request. *Id.* ¶ 229.

It is therefore beyond dispute that supervisees do not have a clear way to request accommodations at any stage of supervision.

### 5.    Defendants Lack a System For Grieving Failures To Accommodate

A formal grievance process serves as "a critical safeguard that ensures individuals with disabilities can enforce their rights" because, without "a functional grievance mechanism, individuals are left without recourse when they encounter disability-related barriers to compliance." *Id.* ¶ 231. An adequate grievance system requires "a clear, accessible, and responsive . . . process for individuals with disabilities to challenge the denial, delay, or inadequate provision of reasonable accommodations," including impartial review, protection from retaliation, and tracking mechanisms to "identify systemic issues or repeated failures to accommodate." *Id.* ¶ 232; *see also Armstrong*, 1999 WL 35799705, at *36; *Clarkson*, 898 F. Supp. at 1045 ("[F]ailure to establish an effective grievance procedure for class members regarding accommodations . . . violat[es] [] the ADA.").

It is undisputed that Defendants have no grievance process for these purposes, SUMF ¶ 233, and without a formal grievance process, people on supervision have no way to challenge a failure to accommodate them.

### 6.    Defendants Lack a Centralized Accommodations Coordinator

Agencies should generally designate a specific Accommodations Coordinator because, without "a dedicated and knowledgeable point of contact, accommodation processes often become fragmented, inconsistently applied, and overly reliant on individual officer discretion." *Id.* ¶ 234; *see Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *51 (M.D. La. Mar. 31, 2021) ("[L]ack of a qualified ADA Coordinator contributes to [the agency's] system-wide failure to comply with

27

the ADA."). Such a coordinator can provide "[s]ubject [m]atter [e]xpertise" and centralized oversight; "track accommodation requests, monitor implementation, [and] identify systemic trends"; and offer leadership in training and policy development. *Id.* ¶ 235.

Neither CSOSA nor the Commission has a "designated disability accommodations coordinator" to ensure that supervisees with disabilities receive accommodations. *Id.* ¶ 236.[4] Without a designated coordinator, there is no centralized accountability for ensuring that supervisees with disabilities are identified, informed of their rights, and provided with the accommodations they need.

7.    **Defendants Fail to Train Staff on Any Aspect of the Accommodations Process**

Staff training is "[a] central pillar of any effective supervision system" because it is "the mechanism by which policies, rights, and procedures become actionable and consistently applied." *Id.* ¶ 237; *Lewis*, 2021 WL 1219988, at *51 ("[L]ack of training contributes to the systemic failure to accommodate disable [*sic*] inmates as required by the ADA."); *Pierce v. County of Orange*, 761 F. Supp. 2d 915, 953-54 (C.D. Cal. 2011) (holding that "provid[ing] training for ADA compliance officers in the different [jail] facilities" was "necessary" under federal disability law). Without "structured, recurring training," supervision officials "are left to navigate complex disability-related issues without adequate preparation, resulting in inconsistent practices and harm to supervisees." SUMF ¶ 238. Staff training should address legal obligations, disability identification, accommodation assessment and provision, procedures for supervisees to request accommodations and to grieve failures to accommodate, and tracking and communication about

---

[4] While CSOSA has a staff member in its human resources office who addresses accommodation requests from CSOSA *employees* under *Section 501* of the Rehabilitation Act (which covers employees), there is no one at CSOSA "whose role focuses on disability accommodations for supervisees" under *Section 504*. SUMF ¶ 236.

28

accommodation needs. *Id.* ¶ 239. In the absence of such training, CSOs "may not know what constitutes a disability, what an accommodation is, or that people are legally entitled to accommodations—let alone how to provide accommodations." *Id.* ¶ 240.

CSOSA admits that it has never offered "any training or information sessions regarding the Rehabilitation Act" or "any aspect of disability law" to its staff. *Id.* ¶ 241. CSOSA further admits that it does not train supervision officials on how to: "identify and observe disabilities," "assess if a person has disabilities," "determine what accommodations are appropriate for disabilities," "provide accommodations for disabilities," or "determine if an accommodation for a disability is working effectively." *Id.* ¶ 242. Nor does CSOSA provide training on "how to document a person's disabilities and accommodation needs," "how to communicate with the Commission about a person's disability and accommodation needs," or "how to communicate with other CSOs" or the supervising CSO "about a person's disabilities and accommodation needs." *Id.* And while CSOSA provides general risk, needs, responsivity ("RNR") training, RNR training "is not specific to disability" and does not provide any "guidance on how to craft reasonable accommodations." *Id.* ¶ 243.

For its part, the Commission admits that it offers no training on the Rehabilitation Act, "how to assess if a person has disabilities," "how to determine if a person is facing barriers to follow supervising rules due to their disabilities and may need accommodations," "how to determine what disability accommodations are appropriate," "how to provide disability accommodations," or how to determine if "accommodations . . . that have been provided are working effectively." *Id.* ¶ 244. As for revocation hearings, the Commission offers no training to hearing examiners or others on "how to consider a person's disability-related barrier when assessing an AVR" or "deciding whether to hold a revocation hearing." *Id.* And the Commission

29

requires no training *at all* for its commissioners—disability-related or otherwise. Commissioners "get approved by the Senate and they just start working." *Id.* ¶ 245.

### 8.    Defendants Lack a System for Tracking Accommodations Within And Between Agencies

"To ensure that accommodations for individuals with disabilities are provided consistently, effectively, and equitably, supervision agencies must implement structured systems for tracking, monitoring, and quality assurance." *Id.* ¶ 246. Without such systems, "agencies cannot evaluate whether their accommodations processes are functioning, or whether individuals are being placed at heightened risk of supervision failures." *Id.*; *cf. Armstrong*, 275 F.3d at 876 ("some form of tracking system is necessary" to comply with the ADA). Further, agencies must systematically communicate information about supervisees' disabilities, accommodation needs, and accommodations provided to other relevant officials within and beyond their agencies. Such systems ensure, for example, that "if an individual's supervision officer changes, the new officer is aware of their disability-related barriers and accommodation needs" and that when the Commission "is evaluating whether to revoke an individual's supervision," the Commission has the "relevant information about how a supervisee's unaccommodated disability may have contributed to the alleged violation." SUMF ¶ 247. It is undisputed that Defendants have no such tracking or communication mechanisms.

CSOSA admits it has no system for tracking all disabilities, accommodations provided, accommodation requests, or decisions regarding accommodation requests. *Id.* ¶¶ 248-49, 260; *see id.* ¶ 249 ("Q Is CSOSA able to provide a list of all such accommodation requests, denials and grants? A No."). CSOSA does not track the frequency with which its CSOs grant or deny accommodation requests. *Id.* ¶ 250. And during a deposition, defense counsel represented to Plaintiffs' expert that "CSOSA and USPC have admitted they do not regularly track individuals

30

with disabilities, nor do they have . . . regular reporting on accommodations." *Id.* ¶ 251. While CSOSA has suggested it has some ad hoc ways of noting a supervisee has a disability or is receiving an accommodation, CSOSA has no consistent mechanism for doing so—nor does it require CSOs to do so. For example, although CSOSA has indicated that disabilities and accommodations may be noted in a supervisee's running record, CSOSA does not require CSOs to make such notes, train them on how to do so, or provide any consistent keywords or purpose codes to do so. *Id.* ¶¶ 252-57. Additionally, while CSOSA's case management system has a "disability flag" feature, CSOSA does not require CSOs to use this feature. *Id.* ¶¶ 255-56. And even if it did, the flag provides little actionable information. It "does not indicate" the kind of disability a person has, or whether the person is receiving accommodations. *Id.* ¶ 257 (flag could mean anything from the existence of "special needs" to "referrals outstanding.").

For its part, the Commission has admitted that it does not "maintain a list of supervisees with disabilities" or "track disability accommodations provided by CSOSA." *Id.* ¶ 258. The Commission likewise has stated that it "has no way of identifying" individuals who have been provided accommodations because it has no "searchable" database. *Id.* ¶ 259; *see also id.* ¶ 260.

Compounding these failures, neither agency has any policy for communicating information about supervisees' disabilities, accommodation needs, or accommodations provided to the other agency, or to supervision officials within their own agency. *Id.* ¶¶ 261-62. The Commission admits it "has no formal, official, or standardized system or process for relaying to or discussing with CSOSA any request for a reasonable accommodation," "any accommodations provided," "or any other documentation related to the Disability of such an individual." *Id.* ¶ 261. CSOSA also stated that there is "no formal directive" for CSOs to communicate to the Commission that a supervisee needs accommodations. *Id.* ¶ 262. Nor does CSOSA provide any training on how to

31

communicate about disabilities or accommodation needs to the Commission. *Id.* ¶ 241. While CSOSA has suggested that disabilities "can be" noted in its annual progress reports to the Commission, they are "not required" to be. *Id.* ¶ 263.

Further, within CSOSA, CSOs change regularly. *Id.* ¶ 264. Yet CSOs are not required to list accommodations when transferring supervision to a new CSO, nor is the new CSO required to review the entire running record or search that record for information related to disabilities or accommodations. *Id.* ¶¶ 265-66. And as noted above, CSOSA does not even require CSOs to use specific keywords or purpose codes to flag that the individual they are supervising has a disability or has been provided accommodations, so new CSOs cannot reliably search for that information in any event. *Id.* ¶ 254. And CSOSA provides no training whatsoever on how to communicate with other CSOs regarding a person's disabilities and accommodation needs. *Id.* ¶ 241.

Thus, even if a supervision official were to provide a supervisee an accommodation, others within their department or other agencies would have no guaranteed way to know about it.

\* \* \*

In short, the undisputed evidence shows that Defendants have no formal mechanisms to ensure that accommodations are reliably and consistently provided. Without such mechanisms, it is exceedingly difficult for agencies like Defendants to provide accommodations to everyone in their programs on a widespread and consistent basis. *Id.* ¶¶ 179, 183. As a result, Plaintiffs are routinely excluded from, denied the benefits of, and subject to discrimination at every stage of the supervision process on the basis of their disabilities. *See supra* Section II.A.

## C. An Ad Hoc Accommodations Process Is Not Sufficient As A Matter Of Law

The undisputed evidence shows that Defendants do not provide accommodations on any consistent, systematic, or widespread basis. To the extent that Defendants may nevertheless contend that they occasionally provide accommodations on a one-off basis, they have presented

no evidence of such ad hoc accommodations, and such an ad hoc process would be legally inadequate in any event.

Crucially, Defendants have presented no evidence that they provide any accommodations on an ad hoc basis. When asked for "[a]ll Documents to support CSOSA's contention that it 'has used informal practices to identify, document, and address reasonable accommodations,'" CSOSA responded "there are no responsive records as the practices referenced are, by CSOSA's own contention, 'informal,' provided on a case-by-case basis, and not searchable." SUMF ¶ 267. In response to the same question, the Commission likewise responded that "it has no way of identifying such individuals as accommodations are assessed and provided on a case-by-case basis and are not searchable." *Id.* ¶ 268.

Further, as a matter of law, ad hoc accommodations are insufficient to satisfy Defendants' obligations under the Rehabilitation Act. *Brooklyn Ctr. for Indep. of Disabled*, 980 F. Supp. 2d at 642-44 ("[R]eliance on ad hoc accommodations" and making decisions on a "case-by-case basis," "rather than planning in advance to meet the needs of people with disabilities," is both "legally inadequate and practically unrealistic." (citation omitted)); *see also Culley v. Cumberland Valley Sch. Dist.*, 758 F. App'x 301, 306 (3d Cir. 2018) (affirming grant of judgment to plaintiff and emphasizing that "reactive," "ad hoc accommodations" are not enough).

Courts routinely reject defendants' attempts to rely on ad hoc accommodations, especially where, as here, there is no evidence that such accommodations have been implemented on a widespread basis. For example, the Second Circuit held that "[a city board of election's] ad hoc policy of remedying barriers to access as they occur [was] inadequate, especially as [the board] d[id] not respond to many accessibility issues even after they [were] brought to its attention." *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 201 (2d Cir. 2014). Likewise,

33

a California district court previously held that it was not sufficient for a county to rely on "first responders to make individual judgments" as to how to best accommodate individuals with disabilities during an evacuation when those first responders had not "receive[d] training" on how to do so and therefore could not be relied on to consistently provide legally adequate accommodations to all. *Cal. Found. For Indep. Living Ctrs. v. County of Sacramento*, 142 F. Supp. 3d 1035, 1063 (E.D. Cal. 2015).

The same is true here. Without any written policy explaining how to decide whether and what types of accommodations to provide, any training on how to make those decisions, and any system to document or communicate about provided accommodations, CSOs, hearing examiners, and Commissioners cannot be relied upon to consistently provide the reasonable accommodations that Plaintiffs are entitled to under the law.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs on liability and expeditiously set a status conference to determine and schedule remedy proceedings.

Dated: February 17, 2026                          Respectfully submitted,

                                             */s/ Christine C. Smith*

ALLISON FRANKEL (*Pro Hac Vice*)                  HANNA M. PERRY
afrankel@aclu.org                                 D.C. Bar No. 90003756
ASHIKA VERRIEST                                   hperry@pdsdc.org
D.C. Bar No. 90001468                             ZOÉ FRIEDLAND
averriest@aclu.org                                D.C. Bar No. 1781910
AMERICAN CIVIL LIBERTIES UNION                    zfriedland@pdsdc.org
    FOUNDATION                 PUBLIC DEFENDER SERVICE FOR THE
125 Broad Street                                      DISTRICT OF COLUMBIA
New York, NY 10004                                633 3rd Street NW
Tel.: (212) 549-2500                              Washington, D.C. 20004
                                             Tel.: (202) 579-0633

SCOTT MICHELMAN
D.C. Bar No. 1006945                              SAMIR DEGER-SEN
smichelman@acludc.org                             D.C. Bar No. 1510881

34

MICHAEL PERLOFF
D.C. Bar No. 1601047
mperloff@acludc.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF THE DISTRICT OF
    COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel.: (202) 457-0800

WARD A. PENFOLD (*Pro Hac Vice*)
ward.penfold@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel.: (312) 876-7700
Fax: (312) 993-9767

samir.deger-sen@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel.: (212) 906-1200
Fax: (212) 751-4864

CHRISTINE C. SMITH
D.C. Bar No. 1658087
christine.smith@lw.com
CHANELLE N. JONES
D.C. Bar No. 90033820
chanelle.jones@lw.com
DANAYIT MUSEE
D.C. Bar No. 1735499
danayit.musee@lw.com
LIA ROSE BARRETT
D.C. Bar No. 90008536
lia.barrett@lw.com
ELIZABETH H. MCELVEIN
D.C. Bar No. 90010703
elizabeth.mcelvein@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Plaintiffs*

35

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WILLIAM MATHIS and KENNEDY DAVIS, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES PAROLE COMMISSION, *et al.*, <br><br> Defendants. | Case No. 1:24-cv-01312-TNM <br><br> **REDACTED** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Plaintiffs hereby submit this Statement of Undisputed

Material Facts in support of Plaintiffs' Motion for Partial Summary Judgment. Exhibits referenced

below are attached to the Declaration of Christine C. Smith In Support Of Plaintiffs' Motion For

Partial Summary Judgment.[1]

**Background on United States Parole Commission and the Court Services and Offender
Supervision Agency**

1. Defendants the United States Parole Commission ("USPC" or "the Commission")

and Court Services & Offender Supervision Agency ("CSOSA") work together to administer

parole and supervised release ("supervision") in the District of Columbia. **Ex. 1**, Answer ¶ 13

**(**ECF No. 38); National Capital Revitalization and Self-Government Improvement Act of 1997,

---

[1] Capitalized terms not defined herein are the same as those defined in Plaintiffs' concurrently-filed Motion for Partial Summary Judgment. Exhibit numbers are bolded the first time they appear.

Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745; 28 C.F.R. § 2.70(a) (parole); *id.* § 2.200(a) (supervised release).

2.      The fundamental distinction between parole and supervised release is based on when an individual was convicted.  Parole applies to individuals convicted of felony offenses before August 5, 2000, while supervised release applies to people convicted of felony offenses on or after August 5, 2000.  **Ex. 2**, CSOSA Operations Manual (2018), at ch. II, p.6, 12 (ECF No. 40-9).  There is no functional difference for purposes of this lawsuit.

3.      The Commission and CSOSA are federal executive agencies.  Ex. 1 (Answer) ¶¶ 5-8; **Ex. 3**, Deposition of CSOSA, by and through its designated representative, Kaitlin Forsha (Dec.15, 2025), at 47:12-15; **Ex. 4**, Deposition of Oscar Vela, Individually and as a Designated Representative of the United States Parole Commission (Dec. 17, 2025), at 38:14-22.

4.      The Commission is responsible for setting the conditions of supervision and making final decisions regarding the continuation, revocation, or termination of supervision.  Ex. 1 (Answer) ¶ 14.

5.      CSOSA is responsible for the day-to-day aspects of supervision.  *Id.* ¶ 15.

6.      CSOSA enforces the conditions that have been established by the Commission. Ex. 3 (CSOSA Dep.) at 47:4-7.

7.      Purposes of supervision include "to help supervisees reintegrate to society . . . and to ensure successful completion of supervision."  *Id.* at 54:18-55:8; *see also* **Ex. 5**, CSOSA, *Who We Are: Mission, Goals, and Guiding Principles*, https://www.csosa.gov/mission-goals-guiding-principles/.

**Defendants' General Approach To Supervision**

*Setting Supervision Conditions*

8.      The Commission sets the same "general" conditions for all supervisees.  Ex. 4 (Commission Dep.) at 42:7-9, 123:11-17; Ex. 3 (CSOSA Dep.) at 132:14-17.

9.      The Commission may then impose additional heightened "special" conditions, such as requiring participation in drug treatment.  Ex. 4 (Commission Dep.) at 131:6-12; 28 C.F.R. §§ 2.85(b), 2.204(b).

10.      Neither the person on supervision nor their attorney is present when the Commission imposes conditions.  Ex. 4 (Commission Dep.) at 119:12-19.

11.      CSOSA sets details of the conditions imposed by the Commission, such as by specifying how frequently people must report to appointments with a CSO or which treatment program they must participate in.  Ex. 2 (CSOSA Operations Manual (2018)) at ch. II, pp. 11-13, ch. III, pp. 11-14.

12.      CSOs employed by CSOSA monitor those on supervision.  Ex. 3 (CSOSA Dep.) at 56:7-22, 61:2-9.

13.      CSOs make the initial determination as to whether someone has violated the conditions of supervision.  Ex. 2 (CSOSA Operations Manual (2018)) at ch. II, p.5.

*Addressing Violations Of Supervision Conditions*

14.      People may violate supervision conditions by committing a new criminal offense or by committing "technical" violations.  **Ex. 6**, CSOSA's FY 2024 Budget Request Summary Statement and Frequently Asked Questions document (Mar. 9, 2023), at 23 (ECF No. 40-3).

15.      Technical violations occur when someone's conduct does not violate criminal law, but rather the administrative terms of supervision, such as missing an appointment with a CSO, failing to get a job, or skipping a drug test.  **Ex. 7**, CSOSA's Congressional Budget Justification

3

for its Community Supervision Program for Fiscal Year 2024 (Mar. 9, 2023), at 35 (ECF No. 40-10).

16.    Technical violations can trigger discipline, including jail time. *Id.*

17.    CSOs generally have discretion to respond to alleged violations—including technical violations—informally; to apply "graduated sanctions," such as increasing the frequency of appointments, increasing substance use testing, requiring GPS location monitoring, or imposing a curfew; or to file an alleged violation report ("AVR"). Ex. 2 (CSOSA Operations Manual (2018)) at ch. II, p. 1, ch. VI, pp. 56-57; Ex. 7 (CSOSA FY2024 Budget Justification) at 22; **Ex. 8**, Court Services and Offender Supervision Agency for the District of Columbia, Strategic Plan, Fiscal Years 2022-2026, at 30 (ECF No. 40-6); Ex. 1 (Answer) ¶ 63.

18.    An AVR is a report generated by a CSO that alerts the Commission to alleged supervision violations. Ex. 4 (Commission Dep.) at 145:11-15.

19.    An AVR can request that the Commission issue an arrest warrant and begin the revocation process. Ex. 2 (CSOSA Operations Manual (2018)) at ch. II, p. 1, ch. VI, pp. 56-57; Ex. 1 (Answer) ¶ 15; Ex. 4 (Commission Dep.) at 146:13-15.

20.    If the Commission issues an arrest warrant, the person on supervision is incarcerated at the D.C. Jail while awaiting their probable cause hearing. Ex. 4 (Commission Dep.) at 166:7-167:1.

21.    Each year, CSOs seek the arrest of hundreds of D.C. residents for solely technical violations of their conditions of supervision. Ex. 7 (CSOSA FY2024 Budget Justification) at 31.

22.    When a supervisee is accused of a supervision violation, a Commission hearing examiner conducts a probable cause hearing. Ex. 4 (Commission Dep.) at 108:2-109:2.

23.     At a probable cause hearing, the hearing examiner determines if there is probable cause to support the alleged violation and, if so, whether the person should nonetheless be reinstated to supervision or if they should proceed to a final revocation hearing.  **Ex. 9**, MATHIS-USPC-0000011-13 (28 C.F.R. § 2.214(a), (d)).

24.     If the Commission decides to proceed to a final revocation hearing, the individual is incarcerated at the D.C. Jail for the weeks or months prior to that hearing.  *Id.* (28 C.F.R. §§ 2.214(d)(2), 2.215(f)) (Commission regulations requiring local revocation hearing to be held within 65 days).

25.     At the final revocation hearing, a hearing examiner listens to evidence from the CSO, the supervisee, and the supervisee's counsel to make a recommendation as to whether supervision should be reinstated or revoked and, if revoked, the length of the sentence.  Ex. 4 (Commission Dep.) at 159:21-160:17.

26.     The Commission can override the recommendation of the hearing examiner at both the probable cause and final revocation hearing stages, including by lengthening the recommended sentence.  *Id.* at 59:1-6, 179:3-5, 217:18-22.

27.     If the Commission reinstates the person to supervision, it can modify the person's supervision conditions.  **Ex. 10**, Commission Rules and Procedures at 257 (ECF No. 3-15); 28 C.F.R. § 2.218.

28.     The Commission documents any changes to supervision conditions or instructions to CSOSA following the revocation process on a Notice of Action form.  Ex. 4 (Commission Dep.) at 174:3-11.

29.     If the Notice of Action does not list changes to supervision conditions, the original conditions still apply.  *Id.* at 219:16-220:16.

5

**Background on Plaintiffs**

30.     Kennedy Davis is a 50-year-old Black man on lifetime parole.  **Ex. 11**, Declaration of Kennedy Davis in Support of Renewed Motion for Class Certification ¶¶ 1-4 (ECF No. 40-15); Ex. 1 (Answer) ¶¶ 4, 95-96.

31.     Mr. Davis experiences chronic pain stemming from third-degree burns on his bones and ribs—injuries that have required multiple rounds of surgery.  Ex. 11 (K. Davis Decl.) ¶¶ 5-6.

32.     Mr. Davis's burns and corresponding surgeries substantially limit his ability to walk.  He has had to use a wheelchair, crutches, and a walker at various times while on parole.  *Id.* ¶¶ 18-21.

33.     Mr. Davis also has depression, anxiety, and posttraumatic stress disorder (PTSD), which substantially limit his ability to think, concentrate, and interact with others.  *Id.* ¶ 7; **Ex. 12**, Declaration of Tamara Seltzer ¶¶ 9-10, 14 (ECF No. 3-4).  This makes it difficult for him to keep track of and attend all of his supervision appointments, such as drug testing twice a week and regular reporting to his CSO via phone and in person—on top of frequent medical appointments for his burns and mental health treatment.  Ex. 11 (K. Davis Decl.) ¶¶ 7, 11-15.

34.     This Court certified Mr. Davis and his attorneys to represent a class of "all people with a disability who are on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need accommodations in order to have an equal opportunity to succeed on parole or supervised release." **Ex. 13**, Memorandum Order at 5-6, 18 (ECF No. 47).

35.     Class members each have at least one disability within the meaning of the Rehabilitation Act.  *Id.*

6

36.    Example categories of disabilities include: physical, sensory, mental health, intellectual, and developmental disabilities.  **Ex. 14**, Expert Report of Kelly Mitchell (Sept. 16, 2025), at 9-13.

37.    Class members are on or will be on parole or supervised release (collectively, "supervision") in the District of Columbia under the Commission's and CSOSA's supervision. Ex. 13 (Class Cert. Memorandum Order) at 5-6, 18.

## Defendants' Awareness Of Plaintiffs' Disabilities

38.    CSOSA and the Commission are aware that a significant number of people under their supervision have disabilities.  Ex. 1 (Answer) ¶ 22; *id.* ¶ 148 ("High numbers of people on parole or supervised release have disabilities and thus may need reasonable accommodations to have an equal opportunity to succeed on supervision.").

39.    Both mental and physical health conditions are common among the supervised population.  *Id.* ¶ 23; Ex. 8 (CSOSA 2022-2026 Strategic Plan) at 14.

40.    CSOSA has made varying estimates of the percentage of people under its supervision with a disability.  CSOSA has estimated that of the 3,582 individuals who were under CSOSA's supervision and subject to the Commission's release authority between June 1, 2022, and March 15, 2025, 3,222 (90%) had some indication of disability.  **Ex. 15**, Defendants' July 11, 2025 Updated Narrative Response to Plaintiffs' Request for Production, at 3.

41.    In the 11 years that Mr. Vela spent as a hearing examiner, approximately "one or two" of "eight hearings a month" he conducted involved "people with disabilities, if we're classifying a disability as [] physical or mental."  Ex. 4 (Commission Dep.) at 161:3-10.

42.    In 2022, "nearly 25%" of those entering supervision "reported mental health issues at intake."  Ex. 1 (Answer) ¶ 22.

7

43. CSOSA has observed a "proliferation of . . . mental health challenges" among the "supervised population" "over the past several years."  Ex. 8 (CSOSA 2022-2026 Strategic Plan) at 4.

**Impact Of Disabilities On People's Ability to Navigate Supervision**

44. Defendants acknowledge that people with disabilities face heightened barriers to complying with their supervision requirements.  Ex. 4 (Commission Dep.) at 163:18-21 (Commission agreeing that "disabilities can make it harder for someone to comply with their supervision requirements"); *see, e.g.*, *id.* at 161:13-16 (Commission agreeing that limited mobility "would make it more difficult" to attend appointments); *id.* at 163:6-9 (same for memory issues); **Ex. 16**, Attachment 1 to Defendants' May 12, 2025 Response to Interrogatories, at 3 (CSOSA acknowledging that a potential disability "may impact the person's ability to comply with supervision requirements").

45. As Plaintiffs' expert explained, people with disabilities can, for example, have difficulty understanding their supervision conditions, remembering and timely attending appointments, physically accessing meeting locations, and navigating supervision requirements while managing chronic health conditions.  Ex. 14 (Mitchell Rep.) at 7, 9-13; **Ex. 17,** Deposition of Kelly Mitchell, at 32:7-18.

46. Accordingly, it is often exceedingly difficult for people with disabilities to meet supervision requirements without reasonable accommodations.  Ex. 14 (Mitchell Rep.) at 16. Accommodations "must be tailored to individual circumstances," but common accommodations that might benefit many people include:  "modifying reporting schedules, such as adjusting meeting locations and times"; "providing written materials in large print, plain language, or Braille"; "and ensuring that any supervision programs (such as drug/alcohol or mental health

treatment) are appropriate to the individual's disability-related needs (e.g., reading comprehension level, trauma history, or mobility limitations)." *Id.* at 7-8; *see also id.* at 14-15.

47.    Absent accommodations, people with disabilities are regularly unable to follow their supervision rules, leading to technical violations, revocation, and incarceration. *Id.* at 9; **Ex. 18**, Declaration of Rashida Edmonson in Support of Renewed Motion for Class Certification ¶ 33 (ECF No. 40-14).

48.    The Commission regularly revokes supervision and requires a new term of incarceration for supervisees with disabilities who are accused of technical violations. *See* Ex. 18 (Edmonson Decl.) ¶¶ 27, 33; Ex. 7 (CSOSA FY2024 Budget Justification) at 35; Ex. 17 (Mitchell Dep) at 33:3-6.

49.    Individuals with "mental disabilities" are almost twice as likely to have an AVR filed against them for a technical violation than the general supervision population. **Ex. 19**, CSOSA Response to Freedom of Information Act Request (June 23, 2023), at 7-8 (ECF No. 40-2); Ex. 1 (Answer) ¶ 65.

50.    The Commission also often reinstates individuals with disabilities to supervision, and reimposes the same conditions as before, without modifications to address the barriers that led to the violation. *See infra* ¶¶ 75-76, 118-19, 165; Ex. 18 (Edmonson Decl.) ¶ 33.

**Examples of Plaintiffs' Experiences**

*Supervisee 1 (███████████)*

51.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

52. █████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

53. █████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

54. █████████████████████████████████████████████

████████████████████████████ ████████████████████████████

████████

55. █████████████████████████████████████████████

██████████████████████████████████████████████

56. █████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

57. █████████████████████████████████████████████

███████████████████████████████████████

***Supervisee 2 (*** ██████████████ ***)***

58. █████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

59. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

60. ████████████████████████████████████████████████████

████████████████████████████████████████

61. ████████████████████████████████████████████████████

█████████████████████████████████████████████

62. ████████████████████████████████████████████████████

███████████████████████████████████████████████████

63. ████████████████████████████████████████████████████

█████████████████████████████████████████████████

64. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█

65. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

66. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

67. ███████████████████████████████████████████

████████████████████████ ██ ██████████████████████

████████████████████████████████████████████████

68. ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

69. ███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

*Supervisee 3 (*██████████████*)*

70. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

71. ███████████████████████████████████████████

█████████████████████████████████████████████

72. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

73. ███████████████████████████████████████████

██████████████████████████████

12

74. ███████████████████████████████████████████

████████████████████████████████ █████████████████

████████████████████████████

75. ███████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

76. ███████████████████████████████████████████

█████████████████████████████████████████████████

██████████

*Supervisee 4 (*██████████████████)

77. ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

78. ███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████

79. ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

80. ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

13

81. ███████████████████████████████████████████████

82. ███████████████████████████████████████████████

83. ███████████████████████████████████████████████

14



*Supervisee 5 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛)*

84. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

85. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

86. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

*Supervisee 6 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛)*

87. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

88. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

89. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

90. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

15

*Supervisee 7 (‌‌‌‌‌‌‌‌‌‌)*

91. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

92. ███████████████████████████████████

███████████████████████████████████████

██████

93. ███████████████████████████████████

█████████████████

94. ███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

95. ███████████████████████████████████

███████████████████████████████████████

96. ███████████████████████████████████

███████████████████████████████████████

██████████████████████

97. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████

16



98. ████████████████████████████████████

████████████████████████████

99.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

*Supervisee 8 (*████████████*)*

100.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

101.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

102.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████

103.     ██████████████████████████████ █ ██████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

17

*Supervisee 9 (⬛⬛⬛⬛⬛⬛⬛)*

104. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

105. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

106. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

107. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

108. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

109. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

18



110. ███████████████████████████████████
███████████████████████████████████████
████████████████████████

111. ███████████████████████████████████
█████████████████████████████████

*Supervisee 10 (*███████████*)*

112. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████

113. ███████████████████████████████████
██████

114. ███████████████████████████████████
███████████████████████████████████████
██████

115. ███████████████████████████████████
███████████████████████████████████████
█████████████████████████

116. ███████████████████████████████████
███████████████████████████████████████
███████████

117. ███████████████████████████████████
███████████████████████████████ ████████████
███████████████████████████████████

19

118. ████████████████████████████████████████████████████████

██

119. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

*Mr. Kennedy Davis*

120.    Mr. Davis has disabilities including chronic pain and mobility limitations stemming from third-degree burns and mental health conditions including depression, anxiety, and PTSD. *See supra* ¶¶ 31-33.

121.    Supervision records reflect that Defendants were aware that Mr. Davis has disabilities.    **Ex. 38**, MATHIS-LW-CSOSA-094538, -094630, -094632, -094639-40, -094652, -094688-711, at -094652, -094632.

122.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████    *Id.* at -094630, -094632.

123.    ████████████████████████████████████████████

████████████████████████████████    *Id.* at -094640.

124.    CSOSA acknowledged that Mr. Davis's CSO was ████████████████████

████████████████████████████████████████████████████████

████████    *Id.*

125.    ████████████████████████████████████████████████

████████████████████████    *Id.* at -094652.

126. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉    *Id.* at -094538.

127. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉    *Id.* at -094710-11.

128. Multiple times during March and April of 2023, Mr. Davis's CSOs noted that he had ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *Id.* at -094704-05, -094707.

129. The Commission was aware that Mr. Davis needed treatment for his burns no later than April 2022, when Mr. Davis's counsel discussed his need for treatment during his revocation hearing. **Ex. 39**, Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Admission (Apr. 30, 2025), at 2.

130. The Commission was aware that Mr. Davis had mental health disabilities no later than his October 2023 revocation hearing, when Mr. Davis's mental health provider from University Legal Services ("ULS") testified at his hearing. Ex. 11 (K. Davis. Decl.) ¶ 42; Ex. 12 (Seltzer Decl.) ¶ 19.

131. At the time Defendants created and imposed Mr. Davis's conditions of supervision, they did not assess whether he might need reasonable accommodations to have an equal opportunity to succeed on supervision. Ex. 1 (Answer) ¶¶ 152, 105.

132. At the time Defendants submitted their Answer, they had no record of ever asking Mr. Davis whether his disabilities make it harder to follow his supervision rules or if he needs reasonable accommodations or of advising him of his right to reasonable accommodations. *Id.* ¶ 105.

133. As a condition of his parole, Mr. Davis was required to report to the supervision office and get drug tested in-person twice a week. Ex. 11 (K. Davis Decl.) ¶¶ 30-32; Ex. 1 (Answer) ¶ 99.

134.    Following his surgery for his third-degree burns, Mr. Davis had to use a wheelchair, crutches, and then a walker to move around—which made it harder, and more time-intensive, to get to his supervision appointments.  Ex. 11 (K. Davis Decl.) ¶¶ 17, 21.

135.    While receiving treatment for his burns, Mr. Davis left the hospital against his doctor's orders to meet with his CSO because Defendants failed to offer alternative arrangements. *Id.* ¶ 5.

136.    Nearly all of Mr. Davis's CSOs failed to adjust his supervision conditions in response to his mobility needs.  *Id.* ¶ 26.

137.    Mr. Davis's anxiety, depression, and PTSD make it overwhelming to track and attend his supervision requirements.  *Id.* ¶¶ 7, 12.

138.    Mr. Davis has to take medications for his mental health that make him tired and nauseous, and cause slurred speech and headaches, making it harder to track and attend appointments.  *Id.* ¶ 23.

139.    In July 2023, Mr. Davis was required to report to his CSO by phone, but he did not have a working phone.  *Id.* ¶¶ 33-34.

140.    Mr. Davis was "very anxious and scared" about the fact that he could not meet this requirement.  *Id.* ¶ 35.

141.    Mr. Davis's mental health conditions make it difficult for him to trust new people and ask for help.  *Id.* ¶ 36; Ex. 12 (Seltzer Decl.) ¶¶ 10-14.

142.    Due to his anxiety and PTSD, Mr. Davis experienced "tunnel vision," meaning he focused exclusively on one solution—contacting his mental health advocate at ULS for help. Ex. 12 (Seltzer Decl.) ¶ 15.  When that did not work, he was not able to consider an alternative solution.  Ex. 11 (K. Davis. Decl.) ¶ 35; Ex. 11 (Seltzer Decl.) ¶¶ 13-15.

143. After eleven days without Mr. Davis contacting his CSO, his CSO submitted an AVR, seeking Mr. Davis's arrest for failing to contact his CSO via phone. Ex. 1 (Answer) ¶ 111.

144. His CSO pursued revocation for this reporting violation even though, during that same period, Mr. Davis was reporting for drug testing on all required occasions and tested negative each time. *Id.*

145. Mr. Davis was arrested for this technical reporting violation on August 3, 2023, and spent two months in jail before his revocation hearing. *Id.* ¶ 112.

146. While in jail, Mr. Davis could not receive the medical treatment he needed for his burns, including a surgery that had been scheduled for August 8, 2023. *Id.* ¶ 113.

147. At Mr. Davis's revocation hearing on October 4, 2023, ULS explained how Mr. Davis had continued to try to follow his supervision rules, including attending all of his drug testing appointments and repeatedly contacting ULS for help so he could call his CSO. Ex. 12 (K, Davis Decl.) ¶ 42.

148. The hearing examiner recommended that Mr. Davis serve a 5-month sentence. *Id.* ¶ 43.

149. The Commission overrode this recommendation and imposed a 12-month sentence. *Id.* ¶¶ 44-45.

150. Incarceration worsened Mr. Davis's mental health. *Id.* ¶ 50.

151. In prison, Mr. Davis could not obtain the needed treatment for his burns, or the surgery that he needed. *Id.* ¶ 48.

23

*Mr. William Mathis*

152.    Before he passed away in 2024, former named plaintiff William Mathis, a then-70-year-old military veteran, was serving lifetime parole. **Ex. 40**, Declaration of William Mathis in Support of Prelim. Inj., ¶¶ 1-3 (ECF No. 3-2).

153.    Mr. Mathis had congestive heart failure, which left him dizzy and short of breath, and required him to use a walker whenever he left the house. *Id.* ¶¶ 4, 6-8.  This made it difficult for Mr. Mathis to move around the city to get to his supervision appointments each week. *Id.*

154.    His supervision appointments were often "on the same day" as his medical appointments and hospitalizations for his health condition at the Veterans Affairs ("VA") hospital—a problem that made it "difficult for [him] to manage [his] supervision appointments" and that he flagged for his CSO numerous times. *Id.* ¶¶ 9-10, 12.  However, his CSO "never offered to change [his] appointment dates" or provide any other accommodation. *Id.* ¶¶ 9-12.

155.    In December 2023, CSOSA added a GPS monitoring condition to Mr. Mathis's parole. *Id.* ¶ 13.

156.    Mr. Mathis informed his CSO that the GPS monitor was "dangerous for [his] health" because the device would restrict blood flow and cause swelling. *Id.* ¶¶ 15, 17.

157.    Having received no accommodation, Mr. Mathis chose to wear the GPS monitor rather than risk violating his parole by removing it. *Id.* ¶¶ 17-18.

158.    The monitor caused his ankle to swell and made it even harder to walk. *Id.* ¶¶ 15-16.

159.    In January 2024, Defendants incarcerated Mr. Mathis for technical parole violations, including for failing to report to his CSO. *Id.* ¶ 26.

24

160. On three of the four days Mr. Mathis was accused of missing appointments, he was at the VA hospital being treated for heart failure. *Id.* ¶ 27.

161. Mr. Mathis stayed in regular contact with his CSO throughout his period—reporting to supervision on five other occasions and wearing his GPS monitor as required. *Id.* ¶¶ 28-29.

162. When Mr. Mathis reported to his CSO's office on January 22, 2024, he was arrested for technical parole violations and put in jail. *Id*. ¶ 30.

163. Mr. Mathis's incarceration forced him to miss a previously-scheduled medical appointment—that Defendants knew about—to get a defibrillator that would have treated his congestive heart failure. *Id.* ¶¶ 33-35.

164. Even though the hearing examiner at his probable cause hearing agreed he should be released for this important medical procedure, the Commission rejected this recommendation and kept him incarcerated. *Id.* ¶¶ 34-35.

165. A few days later, Defendants released Mr. Mathis back to parole on substantially the same conditions that his known disability made it hard to follow in the first place, without any accommodations. *Id.* ¶ 37.

166. In June 2024, Mr. Mathis passed away. **Ex. 41**, Plaintiffs' Notice of Death and Voluntary Dismissal of Claim (ECF No. 34).

### *Other Supervisees Represented By The D.C. Public Defender Service*

167. One individual represented by the D.C. Public Defender Service had paranoid schizophrenia, which made him afraid to leave his house and hindered his ability to report for required supervision meetings. Ex. 18 (Edmondson Decl.) ¶ 34.

25

168. While the individual's CSO and the Commission were aware of the individual's disability, they never provided any accommodations. *Id.*

169. Instead, Defendants incarcerated him for technical violations, and then reinstated him under "the very same requirements that his disability made it difficult for him to comply with." *Id.*

170. Another individual on parole had extreme nerve pain in his back that left his legs numb for long periods and made it difficult to walk. *Id.* ¶ 35. Even after he told his CSO about his mobility limitations, his CSO required him to attend multiple monthly supervision appointments far from his home. *Id.*

171. His CSO did not provide accommodations. Instead, Defendants "increased the number and frequency of his supervision conditions even though his parole ha[d] not been revoked for over five years." *Id.*

172. Following back surgery—which led to continued leg numbness and back pain—the Commission arrested him for alleged technical violations. *Id.* The Commission held him at the D.C. Jail for nearly three months before releasing him to continued supervision without any accommodations. *Id.*

173. Another D.C. Public Defender Service client had paralysis that left him in a wheelchair, making it difficult to travel to supervision appointments. *Id.* ¶ 36.

174. The Commission and CSOSA were aware of his disability-related mobility limitations, but never offered any accommodations. *Id.*

175. Instead, Defendants incarcerated him twice for technical supervision violations, including failing to attend in-person appointments. *Id.*

26

176.    During his first revocation hearing, a hearing examiner "explicitly acknowledged that he was medically unable to comply with supervision." *Id.* ¶¶ 36-37.

177.    Nonetheless, the Commission detained him in the D.C. Jail for multiple weeks, and then reimposed the same conditions he had been found medically unable to comply with. *Id.* ¶ 37.

178.    When he was subsequently arrested for failing to meet those very same conditions, the Commission detained him for over a month, putting him at risk of losing his housing. *Id.*

**Lack of System to Ensure People Reliably and Consistently Receive Needed Accommodations**

179.    As Plaintiffs' expert explained, to ensure people reliably and consistently receive needed accommodations, supervision agencies should have:  (1) written policies and procedures regarding accommodations, (2) a system to identify individuals with disabilities and their accommodation needs, (3) notice of rights to accommodations, (4) a system to request accommodations, (5) a system for grieving failures to accommodate, (6) a designated accommodation coordinator, (7) staff training on assessing accommodation needs and providing accommodations, and (8) a system to track and monitor accommodations.  Ex. 14 (Mitchell Rep.) at 8.

180.    Defendants "do not have any of the key features of a system to provide reasonable accommodations in a systematic and consistent manner." *Id.*

181.    The Commission has "no formal, official, or standardized system or process for providing reasonable accommodations to individuals with Disabilities on Supervision." **Ex. 42**, Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories (May 12, 2025), at 5.

27

182.    CSOSA has "no guidance on providing people with reasonable accommodations." **Ex. 43**, September 5, 2023 letter from CSOSA to Ashika Verriest, regarding FOIA Request, at 1-2 (ECF 40-11).

### *Lack of Written Policies and Procedures Regarding Accommodations*

183.    As Plaintiffs' expert explained, absent written policies regarding accommodations, "officers lack a clear understanding of when and how to identify accommodation needs, respond to requests, or recognize potential barriers during the supervision and revocation process."  Ex. 14 (Mitchell Rep.) at 16.  Further, "[i]n the absence of written standards, practices may vary widely from officer to officer, resulting in unequal treatment of individuals with disabilities and increasing the likelihood that people will not receive accommodations." *Id.*  Written policies and procedures also "make it possible to evaluate whether the agency is meeting its obligations" under the Rehabilitation Act "and to correct problems when they are not."  *Id.*  And, crucially, written policies "are necessary for the system to function at scale."  *Id.*  Without written procedures, it is "exceedingly difficult—if not impossible—for a supervision agency to meet its accommodation obligations," and "any efforts to accommodate individuals with disabilities remain ad hoc and unsustainable." *Id.*  Thus, "[a] functioning, durable system requires formalized rules that all staff can follow and apply consistently." *Id.*

184.    Defendants recognize the importance of written policies and procedures.  Ex. 3 (CSOSA Dep.) at 71:18-72:20; Ex. 4 (Commission Dep.) at 70:21-72:10.

185.    CSOSA uses written policies and procedures "to ensure consistency and accountability." Ex. 3 (CSOSA Dep.) at 71:18-20.

186.    Accountability means that supervisees, CSOs, supervisory CSOs, and anyone else covered by particular guidance does the things "laid out for them." *Id.* at 71:18-72:6.

28

187.    Consistency means "application" of "[t]he agency's expectations" for CSOs is "consistent regardless of which CSO is applying the [] guidance."  *Id.* at 71:18-72:16.

188.    CSOSA also uses written policies and procedures "to ensure that CSOs are aware of their responsibilities."  *Id.* at 71:18-72:20.

189.    The Commission uses written policies and procedures "to ensure that everybody's treated the same in a fair and just manner, individuals are addressed the same"; "to ensure that hearing examiners and commissioners are acting consistently so that similarly situated supervisees are treated similarly"; "to memorialize those policy procedures in writing"; "to ensure that hearing examiners and commissioners are aware of the responsibilities"; "to ensure that staff are aware of the steps they must take in particular scenarios"; and "to ensure that policies are memorialized and outlast changes in personnel."  Ex. 4 (Commission Dep.) at 70:21-72:10.

190.    Nevertheless, Defendants admit that they "have not put in place any guidance, instructions, or policies" regarding disabilities—including guidance/instructions/policies "requiring assessing people's disability-related accommodation needs when initially setting supervision requirements, requiring provision of reasonable accommodations for people's disabilities as they become known, or providing a means by which people with disabilities can request reasonable accommodations."  Ex. 1 (Answer) ¶ 150; *id.* ¶¶ 42-44.

191.    CSOSA admitted that despite an "exhaustive search of all guidance, dating back to 2015," it could find no guidance on how to "[e]valuat[e] whether people on parole or supervised released need reasonable accommodations" or how to "[p]rovid[e]" such accommodations if needed.  Ex. 19, CSOSA 6/23 FOIA Response, at 1-2.  The Commission admitted the same. **Ex. 47**, June 20, 2023 letter from the Commission to Ashika Verriest, Esq., in response to her May

29

31, 2023 FOIA request, at 1-2 (ECF No. 40-4); **Ex. 48**, Email from Commission to A. Verriest (Aug. 18, 2023) (ECF 40-5).

192.    CSOSA confirmed that it "does not have any current policies as it relates to disabilities" for individuals on supervision, including policies on "evaluating whether people need reasonable accommodations" or providing accommodations.  Ex. 3 (CSOSA Dep.) at 81:13-82:12, 98:21-22.

193.    There is no policy requiring CSOSA to consider disabilities when setting the details of supervision requirements, such as the frequency of appointments, or when enforcing the conditions of supervision.  Ex. 1 (Answer) ¶ 43.

194.    The Commission confirmed that it has no "written policy" on "providing accommodations for disabilities" or the Rehabilitation Act.  Ex. 4 (Commission Dep.) at 80:21-81:12; Ex. 42 (Defs. 5/12 Resp. to Interrogatories) at 5.

### *Lack of System for Identification of Disabilities and Accommodation Needs*

195.    As Plaintiffs' expert explained, identifying disability-related needs is "critical for ensuring that supervision conditions are tailored appropriately."  Ex. 14 (Mitchell Rep.) at 16-17.

196.    She also explained that agencies must "proactiv[ely] identif[y] and assess[] . . . disability-related needs" "at the outset."  *Id.* at 17.

197.    Not all disabled people know that they have a disability.  Ex. 3 (CSOSA Dep.) at 153:8-11; Ex. 14 (Mitchell Rep.) at 17; Ex. 17 (Mitchell Dep.) at 47:24-48:4.

198.    Some disabilities, such as "communication disorders, intellectual disabilities, TBI, or severe mental illness" can make it difficult for a person to communicate their disabilities or to understand questions about disabilities.  Ex. 14 (Mitchell Rep.) at 13, 17; Ex. 3 (CSOSA Dep.) at 153:12-17; Ex. 17 (Mitchell Dep.) at 47:24-48:4.

199. Additionally, "[g]iven the significant power that supervision staff have over the lives of people on supervision, individuals may fear judgment, retaliation, or being labeled 'difficult'— deterring them from requesting accommodations." Ex. 14 (Mitchell Rep.) at 17.

200. Without proactive identification, supervisees face otherwise "avoidable barriers to compliance, such as misunderstanding conditions, missing appointments, or struggling to access required programs." *Id.*

201. Defendants have "no formal policies, procedures, or guidelines instructing officers how to evaluate" whether individuals have a disability. *Id.* at 25.

202. CSOSA does not provide specific questions a CSO should ask to learn if their supervisee has a disability. Ex. 3 (CSOSA Dep.) at 153:2-7.

203. The Commission does not have "any policies, procedures, guidelines or other rules or instructions with controlling effect regarding evaluating people on parole or supervised release for disabilities." Ex. 4 (Commission Dep.) at 79:1-15, 81:4-82:7.

204. The Commission does not "identif[y] [individuals] . . . as having a Disability." **Ex. 44,** Defendants' Objections and Responses to Plaintiffs' First Set of Requests for Production (Feb. 14, 2025), at 6.

205. The Commission does not use any "standardized screening tool" to identify people on supervision with disabilities. Ex. 4 (Commission Dep.) at 154:3-5.

206. The Commission does not provide training to either its hearing examiners or its case analysts on how to assess if a person has disabilities. *Id.* at 101:1-4, 144:2-5.

207. As of 2025, the Commission added a new textbox on the probable cause digest, prehearing assessment, and hearing summary forms entitled "Disabilities/Accommodations" that

31

"prompts the hearing examiner to ask questions and find out" if the supervisee has any disabilities or accommodations.  *Id.* at 28:20-29:5.

208.    Hearing examiners are not trained on "what questions to ask in order to fill out [the] box."  *Id.* at 94:19-22.

209.    Although hearing examiners are "instructed" to fill out the disability/accommodations textbox, they can still submit the form with an empty box.  *Id.* at 113:1-11; *see also id.* at 93:3-13, 92:9-12.

210.    The system does not inform hearing examiners when they have left the disability/accommodations textbox blank.  *Id.* at 93:8-13.

211.    The Commission has acknowledged that some forms have been submitted with the disability/accommodations textbox left blank.  Ex. 4 (Commission Dep.) at 113:9-11, 115:11-14; *see also* **Ex. 45**, MATHIS-USPC-00000343 (Commission Dep., Ex. 7); **Ex. 46**, MATHIS-USPC-00000484 (Commission Dep., Ex. 8).

212.    Defendants do not have an official, standardized system for assessing whether and what types of accommodations people on supervision require.  Ex. 1 (Answer) ¶ 149; Ex. 47 (Commission 6/20 FOIA Response) at 1-2; Ex. 19 (CSOSA 6/23 FOIA Response) at 2; Ex. 43 (CSOSA 9/5 FOIA Response) at 2; Ex. 48 (Email from Commission to A. Verriest (Aug. 18, 2023)).

213.    An "exhaustive search" of CSOSA's policies dating back nine years "yielded no guidance/instruction/etc." regarding evaluating whether people on supervision need reasonable accommodations.  Ex. 1 (Answer) ¶ 43.

214.    CSOSA does not train CSOs on "how to determine what accommodations are appropriate for disabilities" or "how to provide accommodations for disabilities." Ex. 3 (CSOSA Dep.) at 123:11-14, 124:2-8.

215.    CSOs do not "ask supervisees if they need accommodations for their disability" when "setting the requirements" for supervision or "[o]ver the course of supervision." *Id.* at 154:19-155:1; 181:8-12.

216.    The Commission does not have a single "document[] containing policies, procedures, guidelines or any other rules or instructions" on "[e]valuating whether people on parole of supervised release need reasonable accommodations." Ex. 47 (Commission 6/20 FOIA Response) at 1-2.

***Lack of Systems to Notify Supervisees of their Rights***

217.    As Plaintiffs expert explained, a "foundational element of any functional accommodations system" is providing individuals with disabilities with "clear, repeated, and accessible" notice of their rights to accommodation and how to receive such accommodation. Ex. 14 (Mitchell Rep.) at 18.

218.    She also explained that without notice of their rights, "many supervisees will not have the knowledge to advocate for themselves, access necessary accommodations, or seek redress." *Id.* at 27-28.

219.    The Commission does not provide supervisees with any information on their rights under the Rehabilitation Act when they enter supervision, when imposing supervision conditions, or "while they are on supervision." Ex. 4 (Commission Dep.) at 80:6-20; 136:2-6.

220.    CSOSA does not have any policies regarding notifying supervisees of their rights under the Rehabilitation Act. Ex. 3 (CSOSA Dep.) at 78:8-22.

33

221.   Defense counsel "represent[ed] to" Plaintiffs' expert that "CSOSA and USPC . . . have not been notifying individuals of their rights . . . to seek accommodations."  Ex. 17 (Mitchell Dep.) at 42:1-9.

222.   Defendants have no guidance or instruction regarding the provision of notice to supervisees of their rights under the Rehabilitation Act, including their rights to reasonable modifications that would ensure meaningful access to supervision.  Ex. 1 (Answer) ¶ 44; Ex. 19 (CSOSA 6/23 FOIA Response) at 2-3; Ex. 47 (Commission 6/20 FOIA Response) at 1-2; Ex. 48 (Email from Commission to A. Verriest (Aug. 18, 2023)).

### *Lack of System for Requesting Accommodations*

223.   As Plaintiffs' expert explained, establishing a "consistent, accessible, and well-understood method for submitting accommodation requests" is key to ensuring that individuals with disabilities have a "fair and meaningful opportunity to comply with supervision conditions." Ex. 14 (Mitchell Rep). at 18-19.

224.   She also explained that forcing individuals to rely on "informal, inconsistent, or discretionary" methods of requesting accommodations fails to meet the Rehabilitation Act requirements and "contribute[s] to preventable supervision failures."  *Id.* at 18.

225.   Defendants do not have a formal process through which an individual on supervision may request accommodations.  Ex. 1 (Answer) ¶¶ 149, 43.

226.   CSOSA does not have a "formal written process" for supervisees to request accommodations when they "first enter[] supervision[,]" "[d]uring supervision[,]" "during the revocation hearing process," or upon reinstatement to supervision after revocation.  Ex. 3 (CSOSA Dep.) at 166:20-167:2, 180:5-9; 192:1-5, 199:15-20; Ex. 42 (Defs. 5/12 Resp. to Interrogatories) at 9; Answer ¶ 149.

227.    CSOSA has no policy regarding how CSOs should "decide whether to grant or deny an accommodations request." Ex. 3 (CSOSA Dep.) at 169:7-10.

228.    The Commission does not have a "formal, official, or standardized system or process for individuals with Disabilities to seek or otherwise request reasonable accommodations." Ex. 42 (Defs. 5/12 Resp. to Interrogatories) at 4; Ex. 4 (Commission Dep.) at 151:6-10.

229.    The Commission does not have a "direct point of contact" for supervisees to request disability accommodations during supervision. Ex. 4 (Commission Dep.) at 136:21-137:1-5.

230.    The Commission has a general email address on its website that "anybody can submit anything to," but supervisees are not informed that they can use this email as a way to request a disability accommodation. *Id.* at 137:6-16.

### *Lack of System for Grieving Failures to Accommodate*

231.    As Plaintiffs expert explained, a formal grievance process serves as "a critical safeguard that ensures individuals with disabilities can enforce their rights" because, without "a functional grievance mechanism, individuals are left without recourse when they encounter disability-related barriers to compliance." Ex. 14 (Mitchell Rep.) at 19-20.

232.    She also explained that an adequate grievance system requires "a clear, accessible, and responsive . . . process for individuals with disabilities to challenge the denial, delay, or inadequate provision of reasonable accommodations," including impartial review, protection from retaliation, and tracking mechanisms to "identify systemic issues or repeated failures to accommodate." *Id.*

233.    Neither CSOSA nor the Commission has a grievance process for supervisees to challenge a failure to provide a disability accommodation. Ex. 3 (CSOSA Dep.) at 200:11-14; Ex. 4 (Commission Dep.) at 153:18-21.

35

*Lack of a Centralized Accommodations Coordinator*

234.    As Plaintiffs expert explained, without "a dedicated and knowledgeable point of contact, accommodation processes often become fragmented, inconsistently applied, and overly reliant on individual officer discretion." Ex. 14 (Mitchell Rep.) at 20.

235.    She also explained that a coordinator can provide "[s]ubject [m]atter [e]xpertise" and centralized oversight; "track accommodation requests, monitor implementation, [and] identify systemic trends"; and offer leadership in training and policy development. *Id.* at 20-21.

236.    Neither CSOSA nor the Commission has a designated disability accommodations coordinator to ensure supervisees with disabilities receive accommodations. Ex. 3 (CSOSA Dep.) at 59:9-14; Ex. 4 (Commission Dep.) at 62:4-6. While CSOSA has a staff member in its human resources office who addresses accommodation requests from CSOSA employees under Section 501 of the Rehabilitation Act, there is no one at CSOSA "whose role focuses on disability accommodations for supervisees" under Section 504. Ex. 4 (CSOSA Dep.) at 60:7-10.

*Lack of Training on Accommodations Process*

237.    As Plaintiffs' expert explained, training is "[a] central pillar of any effective supervision system" because it is "the mechanism by which policies, rights, and procedures become actionable and consistently applied." Ex. 14 (Mitchell Rep.) at 21.

238.    She also explained that without "structured, recurring training," supervision officials "are left to navigate complex disability-related issues without adequate preparation, resulting in inconsistent practices and harm to supervisees." *Id.*

239.    Plaintiffs' expert stated that staff training should address legal obligations, disability identification, accommodation assessment and provision, procedures for supervisees to request accommodations and to grieve failures to accommodate, and tracking and communication about accommodation needs. *Id.* at 21-22.

36

240.    In the absence of such training, she explained, CSOs "may not know what constitutes a disability, what an accommodation is, or that people are legally entitled to accommodations—let alone how to provide accommodations." *Id.* at 29.

241.    CSOSA admits that it has never offered "any training or information sessions regarding the Rehabilitation Act" or on "any aspect of disability law." Ex. 3 (CSOSA Dep.) at 25:3-8, 121:19-122:4.

242.    CSOSA does not provide training on:

- how to "identify and observe disabilities," *id.* at 179:14-17;

- how to "assess if a person has disabilities," *id.* at 122:5-7;

- how to "determine what accommodations are appropriate for disabilities," *id.* at 123:11-14;

- how to "provide accommodations for disabilities," *id.* at 124:2-4;

- how to "determine if an accommodation for a disability is working effectively," *id.* at 124:5-8;

- "the process for supervisees to request accommodations," *id.* at 123:21-124:1;

- "how to document a person's disabilities and accommodation needs," *id.* at 128:8-11;

- "how to communicate with the Commission about a person's disability and accommodation needs," *id.* at 128:12-15; or

- "how to communicate with other CSOs" or the supervising CSO "about a person's disabilities and accommodation needs," *id.* at 128:16-21.

243.    CSOSA provides general risk, needs, responsivity ("RNR") training, but that RNR training "is not specific to disability" and does not provide any "guidance on how to craft reasonable accommodations."  *Id.* at 209:16-20, 123:8-10, 155:22-156:6, 116:21-117:6.

244.    The Commission offers no training on:

- the Rehabilitation Act, Ex. 4 (Commission Dep.) at 100:19-22;

- "how to assess if a person has disabilities," *id.* at 101:1-4;

- "how to determine if a person is facing barriers to follow supervision rules due to their disabilities and may need accommodations," *id.* at 101:5-10;

- "how to determine what disability accommodations are appropriate," *id.* at 101:11-14;

- "the process for supervisees to request disability accommodations," *id.* at 101:15-18;

- "how to provide disability accommodations," *id.* at 101:19-22;

- how to determine if "accommodations . . . that have been provided are working effectively," *id.* at 102:1-5;

- "how to consider a person's disability-related barrier when assessing an AVR" or "deciding whether to hold a revocation hearing," *id.* at 102:6-16;

- "how to document a person's disabilities and accommodation needs," *id.* at 102:17-20;

- "how to modify general or special conditions of supervision to accommodate disabilities," *id.* at 102:21-103:3;

- "how to communicate with CSOSA about a person's disabilities and accommodation needs," *id.* at 103:4-7; or

- "how to communicate with the Bureau of Prisons about a person's disabilities and accommodation needs," *id.* at 102:17-103:12.

245.    The Commission requires no training *at all* for its commissioners—disability-related or otherwise. *Id.* at 103:15-20. Commissioners "get approved by the Senate and they just start working." *Id.* at 103:22-104:4.

### *Lack of System to Track and Communicate About Accommodations*

246.    As Plaintiffs expert explained, "[t]o ensure that accommodations for individuals with disabilities are provided consistently, effectively, and equitably, supervision agencies must implement structured systems for tracking, monitoring, and quality assurance." Ex. 14 (Mitchell Rep.) at 22. Without such systems, "agencies cannot evaluate whether their accommodations processes are functioning, or whether individuals are being placed at heightened risk of supervision failures." *Id.*

247.    Inter-office and inter-agency communication help ensure that, "for instance, if an individual's supervision officer changes, the new supervision officer is aware of their disability-related barriers and accommodation needs" and "that when USPC is evaluating whether to revoke an individual's supervision, those officials have relevant information about how a supervisee's unaccommodated disability may have contributed to the alleged violation." *Id.* at 23.

248.    CSOSA has no system for tracking all disabilities. Ex. 3 (CSOSA Dep.) at 163:22-164:22.

249.    CSOSA does not maintain and cannot provide a list of accommodations requests, denials, or grants. Ex. 3 (CSOSA Dep.) at 165:19-21; *id.* at 171:18-20 ("Q Is CSOSA able to provide a list of all such accommodation requests, denials and grants? A No.").

250.    CSOSA does not track the frequency of accommodation grants or denials. Ex. 3 (CSOSA Dep.) at 171:21-172:1; *see also id.* at 165:19-21.

39

251.    Defense counsel represented to Plaintiffs' expert that "CSOSA and USPC have admitted they do not regularly track individuals with disabilities, nor do they have . . . regular reporting on accommodations."  Ex. 17 (Mitchell Dep.) at 63:19-25.

252.    Disabilities and accommodations may be noted in a supervisee's running record. Ex. 3 (CSOSA Dep.) at 92:12-18, 99:1-3.

253.    The running record is part of CSOSA's case management system and has a chronological series of notes entered by anyone at CSOSA with whom the supervisee has contact. *Id.* at 87:3-5, 93:19-95:19.

254.    CSOSA does not require CSOs to note disabilities or accommodations in the running record, train them on how to do so, or provide any consistent keywords or purpose codes to do so.  *Id.* at 210:7-12, 94:17-98:22.

255.    CSOSA's case management system has a "disability flag" feature.  *Id.* at 84:2-21, 85:2-3, 203:2-204:11; Ex. 19 (CSOSA 6/23 FOIA Response) at 2.

256.    CSOSA does not train or require CSOs to check the disability box or fill out its narrative field.  Ex. 3 (CSOSA Dep.) at 98:18-22, 101:10-20.

257.    The disability flag "does not indicate" what kind of disability an individual has or whether the individual is receiving accommodations; the flag could indicate an individual is "high risk," has "special needs," or has "referrals outstanding."  *Id.* at 205:21-206:2, 203:19-20.

258.    The Commission does not "maintain a list of supervisees with disabilities" or "track disability accommodations provided by CSOSA."  Ex. 4 (Commission Dep.) at 139:5-7, 153:22-154:2; **Ex. 49**, Defendants' Objections and Responses to Plaintiffs' Second Set of Interrogatories (July 2, 2025), at 2-3.

259.    The Commission stated that it "has no way of identifying" individuals who have been provided accommodations as it has no "searchable" database.  Ex. 49 (Defs. 7/2 Interrogatory Resp.) at 2-3.

260.    Accommodation decisions are not searchable in any CSOSA or Commission database.  Ex. 3 (CSOSA Dep.) at 165:22-166:2; Ex. 49 (Defs. 7/2 Interrogatory Resp.) at 3 (Commission); *id.* at 4 (CSOSA).

261.    The Commission "has no formal, official, or standardized system or process for relaying to or discussing with CSOSA any request for a reasonable accommodation," "any accommodations provided," "or any other documentation related to the Disability of such an individual."  Ex. 42 (Defs. 5/12 Resp. to Interrogatories) at 7.

262.    CSOSA stated that there is "no formal directive" for CSOs to communicate to the Commission that a supervisee needs accommodations.  Ex. 3 (CSOSA Dep.) at 211:15-212:7.

263.    CSOSA makes annual progress reports to "let the Parole Commission know how supervision is going," including "how the individual is doing" and how "they're adjusting to supervision."  Disabilities and accommodations "can be" but are "not required" to be included in the report.  *Id.* at 108:8-109:9, 110:14-112:13.

264.    CSOs change regularly.  Ex. 11 (K. Davis Decl.) at ¶ 26.

265.    CSOs are not required to list information about disabilities or accommodations when transferring supervision to a new CSO.  Ex. 3 (CSOSA Dep.) at 208:1-14.

266.    New CSOs are not required to review the entire running record or search that record for key words or other information related to disabilities or accommodations.  *Id.* at 210:2-12.

41

**No Evidence of Ad-Hoc Accommodations**

267.    When asked for "[a]ll Documents to support CSOSA's contention that it 'has used informal practices to identify, document, and address reasonable accommodations," CSOSA responded "there are no responsive records as the practices referenced are, by CSOSA's own contention, 'informal,' provided on a case-by-case basis, and not searchable." **Ex. 50**, Defendants' Objections and Responses to Plaintiffs' Second Set of Requests for Production (July 2, 2025), at 2-3.

268.    In response to a request for "all [d]ocuments to support the Commission's contention" that it assesses disabilities and "provide[s] reasonable accommodations where appropriate," the Commission likewise responded that "it has no way of identifying such individuals as accommodations are assessed and provided on a case-by-case basis and are not searchable." *Id.* at 5.

Dated: February 17, 2026

ALLISON FRANKEL (*Pro Hac Vice*)
afrankel@aclu.org
ASHIKA VERRIEST
D.C. Bar No. 90001468
averriest@aclu.org
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, NY 10004
Tel.: (212) 549-2500

SCOTT MICHELMAN
D.C. Bar No. 1006945
smichelman@acludc.org
MICHAEL PERLOFF
D.C. Bar No. 1601047
mperloff@acludc.org

Respectfully submitted,

*/s/ Christine C. Smith*
HANNA M. PERRY
D.C. Bar No. 90003756
hperry@pdsdc.org
ZOÉ FRIEDLAND
D.C. Bar No. 1781910
zfriedland@pdsdc.org
PUBLIC DEFENDER SERVICE FOR THE
    DISTRICT OF COLUMBIA
633 3rd Street NW
Washington, D.C. 20004
Tel.: (202) 579-0633

SAMIR DEGER-SEN
D.C. Bar No. 1510881
samir.deger-sen@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas

42

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF THE DISTRICT OF
    COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel.: (202) 457-0800

WARD A. PENFOLD (*Pro Hac Vice*)
ward.penfold@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel.: (312) 876-7700
Fax: (312) 993-9767

New York, NY 10020
Tel.: (212) 906-1200
Fax: (212) 751-4864

CHRISTINE C. SMITH
D.C. Bar No. 1658087
christine.smith@lw.com
CHANELLE N. JONES
D.C. Bar No. 90033820
chanelle.jones@lw.com
DANAYIT MUSEE
D.C. Bar No. 1735499
danayit.musee@lw.com
LIA ROSE BARRETT
D.C. Bar No. 90008536
lia.barrett@lw.com
ELIZABETH H. MCELVEIN
D.C. Bar No. 90010703
elizabeth.mcelvein@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Tel.: (202) 637-2200
Fax: (202) 637-2201

*Attorneys for Plaintiffs*

43