UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILLIAM MATHIS and KENNEDY DAVIS,
individually and on behalf of all other
similarly situated,

     *Plaintiffs*,

     v.

UNITED STATES PAROLE COMMISSION,
*et al.*,

     Defendants.

Case No. 24-1312 (TNM)

**DEFENDANT'S RESPONSE IN OPPOSITION AND COMBINED CROSS-MOTION
FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Introduction.................................................................................................................. 1

legal standard ............................................................................................................. 3

    I.      Summary Judgment ..................................................................................... 3

    II.     Section 504 of the Rehabilitation Act.................................................. 4

Statement of facts.................................................................................................. 4

Argument ...................................................................................................................... 10

    I.      Plaintiffs' Rehabilitation Act claim fails as a matter of law................................ 10

        A.     Plaintiffs fail to show documented disabilities. ........................................ 12

        B.     Plaintiffs fail to establish that they are "otherwise qualified" or that they are discriminated against solely on the basis of their alleged disability.... 13

        C.     Plaintiffs cannot show that the accommodations they now seek would not be unduly burdensome to the Agencies. .................................................. 18

    II.     The Testimony of Plaintiffs' Expert Should be Excluded, or In the Alternative, Afforded Little Weight. ................................................................................. 20

    III.   There is no redressable relief available to Plaintiffs............................................ 25

        A.     The Rehabilitation Act does not command or even permit the relief Plaintiffs seek............................................................................................. 25

        B.     Plaintiffs' Rehabilitation Act claim is prudentially moot. ........................ 27

        C.     The Court should abstain from ruling on Plaintiffs' claims. .................... 28

Conclusion ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) .................................................. 19

*Alexander v. Choate*, 469 U.S. 287 (1985) ........................................................................... 20, 21

*Ali v. Regan*, 111 F.4th 1264, 1269 (D.C. Cir. 2024) ..................................................................... 5

*Am. Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) ................................. passim

*Am. Council of the Blind v. Snow,* 311 F. Supp. 2d 86 (D.D.C. 2004) ......................................... 19

*Am. Public Transit Asso. v. Lewis*, 655 F.2d 1272 (D.C. Cir. 1981) ............................................ 14

*Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) ...................................................... 23, 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 3, 4

*Bannister v. United States Parole Comm'n*, 2019 U.S. Dist. LEXIS 49020 (D.D.C. Mar. 25, 2019)
............................................................................................................................................... 29, 30

*Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207 (D.C. Cir. 1997) 26, 27

*Carmichael*, 2015 U.S. Dist. LEXIS 193447 ........................................................................... 24, 25

*Carten v. Kent State Univ.*, 78 Fed. Appx. 499 (6th Cir. 2003) ............................................... 13, 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................................... 3, 4

*Chamber of Comm. v. U.S. Dep't of Energy*, 627 F.2d 289 (D.C. Cir. 1980) .............................. 31

*Cmty. for Creative Nonviolence v. Hess*, 745 F.2d 697 (D.C. Cir. 1984) .................................... 32

*Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184 (1st Cir. 1997) ...................... 25

*Czekalski v. Peters*, 475 F.3d 360 (D.C. Cir. 2007) ...................................................................... 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .................................... 23, 24

*Davis v. United States*, 307 A.3d 1066 (D.C. 2023) ..................................................................... 34

*Donovan v. Powell,* 70 F. Supp. 3d 460 (D.D.C. 2014) ................................................................ 18

*Durand v. Fairview Health Servs.*, 902 F.3d 836 (8th Cir. 2018) ................................................ 21

*G.E. v. Williamson Cnty. Bd. of Educ.*, 2026 U.S. App. LEXIS 4490 (6th Cir. 2026)................. 15

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) ........................................................................ 4

*Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1 (1979)..................................................... 33, 34

*Heller v. D.C.*, 801 F.3d 264 (D.C. Cir. 2015) ............................................................................ 23

*Johnson v. Cleveland City Sch. Dist.*, 443 Fed. App'x 974 (6th Cir. 2011); ............................... 14

*Jones ex rel. A.H. v. District of Columbia*, 805 F. Supp. 3d 218 (D.D.C. 2025).......................... 18

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................................. 3, 4

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 350 (1989)

..................................................................................................................................................... 33

*Norton v. SUWA*, 542 U.S. 55 (2004) ......................................................................................... 30

*Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486 (S.D.N.Y)................................................... 13

*Shirey v. Devine*, 670 F.2d 1188 (D.C. Cir. 1982)....................................................................... 31

*Southeastern Comm. College v. Davis*, 442 U.S. 397 (1979)................................................. 14, 31

*Taylor v. Norton*, 2006 U.S. Dist. LEXIS 22070 (D.D.C. Apr. 20, 2006) ................................. 34

*United Spinal v. O'Malley*, Civ. Act. No. 20-cv-2236 (TSC), 2024 U.S. Dist. LEXIS121504 (D.D.C July 11, 2024).............................................................................................................. 31, 32

*United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014)............................................................... 24

*Vann v. Angelone*, 73 F.3d 519 (4th Cir. 1996) .......................................................................... 33

*Ward v. McDonald*, 762 F.3d 24 (D.C. Cir. 2014) ................................................................. 21, 22

**Other Authorities**

D.C. Code § 24-133(c)(2) ....................................................................................................... 5

## Rules

Fed. R. Civ. P. 56(a) .............................................................................................................. 3

Fed. R. Evid. 401 ................................................................................................................. 20

Fed. R. Evid. 702 ................................................................................................................. 21

## Regulations

28 C.F.R. §§ 2.101 ................................................................................................................. 8

28 C.F.R. §§ 2.70 ................................................................................................................... 8

28 C.F.R. §§ 2.85 ................................................................................................................... 5

29 U.S.C. § 794 .................................................................................................................... 11

**INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, Defendants the United States Parole Commission ("USPC" or the "Commission") and the Court Services and Offender Supervision Agency ("CSOSA"), (together, the "Agencies"), by and through undersigned counsel, oppose Plaintiff's motion for summary judgment on the grounds that they have not made the requisite showing of undisputed material facts to support their single count under the Rehabilitation Act, 29 U.S.C. § 701 *et seq*. Defendants cross-move for summary judgment on the grounds that the relief Plaintiffs' seek is not redressable by this Court because it is not required under the Rehabilitation Act and is prudentially moot, is entirely committed to the discretion of the Agencies, and as such, the Court should abstain from ruling. In addition, Plaintiffs have failed to adduce competent evidence to establish that Defendants' current processes fail at a systemic level to provide meaningful access to their supervised release program for supervisees with disabilities. Plaintiffs at most present isolated examples, coupled with an opinion of an expert who lacks qualifications to offer the sweeping opinion that the existing ad hoc system is insufficient.

The Agencies agree with Plaintiffs that offenders who experience qualifying disabilities should be afforded a meaningful opportunity to successfully navigate parole and supervised release as individuals who do not face such handicaps. The Agencies exist to help parolees and supervised releasees (collectively, "supervisees") complete their terms of supervision and safely and successfully re-enter their communities. But Plaintiffs' Motion for Summary Judgment gets us no closer to that end.

In attempting to demonstrate discrimination under the Rehabilitation Act, Plaintiffs selectively extricate facts from the record, painting a woefully incomplete picture of how the Agencies administer their court-ordered supervised release programs. Plaintiffs grossly oversimplify the reasons for their failure to succeed under supervision and downplay the

importance of Community Supervision Officers (CSOs") having the discretion to offer tailored accommodations, as well as the frequency in which they utilize such discretion to Plaintiffs' benefit. The examples identified by Plaintiffs do not demonstrate a violation of the Rehabilitation Act because they do not establish that those supervisees are "otherwise qualified" individuals with disabilities, nor are they denied participation in supervised release *solely* on the basis of their alleged disabilities. Moreover, Plaintiffs have plainly failed to meet their burden of proving that the accommodations they now seek were previously requested from the Agencies and that they are not unduly burdensome or prohibitive for the Agencies to implement. Plaintiffs' incomplete recitation of the facts giving rise to their alleged violation of the Rehabilitation Act, and undue reliance on an expert who is not qualified to offer the sweeping opinions on which they rely   fail to raise a Rehabilitation Act violation, warranting summary judgment for the Defendants. At a minimum, significant factual disputes exist that preclude summary judgment in favor of Plaintiffs.

Moreover, the relief that Plaintiffs now seek, ultimately amounting to mandatory implementation of "formalized" policies and procedures that shift the burden to the Agencies to move beyond the scope of any such disabilities, and what reasonable accommodation, if any, would be appropriate, is not redressable by this Court. Since the beginning of this litigation, the Agencies have adopted new measures which render the formalized policies sought by the Plaintiffs prudentially moot. The adoption of such a policy is committed to agency discretion under the APA, and the Court should exercise abstention under the *Burford* doctrine in declining to adjudicate Plaintiffs claim. The Court should therefore deny Plaintiffs' motion for summary judgment and grant summary judgment in favor of Defendants.

**LEGAL STANDARD**

### I. <u>Summary Judgment</u>

Summary judgment is appropriate when the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "material fact" is one whose existence affects the outcome of the case. *Id.* at 248. A "genuine dispute" exists when the non-movant produces sufficient evidence of a material fact so that a fact finder is required to resolve the parties' differing versions at trial. *Id.* at 249.

Summary judgment endeavors to streamline litigation by disposing of factually unsupported claims or defenses and thereby determining whether trial is genuinely necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986)). A moving party may therefore succeed on summary judgment by showing that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A moving party may also succeed by pointing to the absence of evidence proffered by the nonmoving party. *Id*

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *Anderson*, 477 U.S. at 255 (1986). Nevertheless, conclusory assertions offered

without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II. Section 504 of the Rehabilitation Act

"To prove a violation of Section 504, [complainants] must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008). In addition, the disabled individual "bears the 'initial burden' of showing that a reasonable accommodation is possible" and "[o]nce that showing is made, an [agency] may still avoid liability by showing that the proposed accommodation would impose an 'undue hardship' on the [agency's] operations." *Ali v. Regan*, 111 F.4th 1264, 1269 (D.C. Cir. 2024) (citations omitted).

## STATEMENT OF FACTS

The Commission is an independent entity within the Department of Justice which oversees the parole system in the District of Columbia for all crimes occurring before August 5, 2000.[1] Parole is an opportunity for an offender to transition into the community as a returning citizen and permits early release from prison if certain rehabilitation and compliance measures have been demonstrated. An individual that is granted parole must abide by certain conditions of release and violations can result in revocation of parole and return to incarceration.

Prior to release on parole, the Commission holds a hearing to determine whether there is a reasonable probability that the supervisee can remain on release without violating the law and

---

[1] The D.C. Revitalization Act of 1997 required that the USPC assume responsibility for the parole system of D.C. Code offenders, in addition to its federal docket.

whether release would be "incompatible with the welfare of society." Vela Decl. ¶ 7. Sometimes, parole-eligible offenders are released through the Bureau of Prison's ("BOP") mandatory release process, for example, if they waive their parole hearings and release on parole, in which case no hearing is held, or if the Commission denies parole after a hearing and continues the offender to the expiration of their sentence, and after review of the offender's record, the Commission simply imposes any general conditions of supervision and any special conditions, if necessary. *Id.* ¶ 8. It is at this time that CSOSA may submit requests for special conditions. *Id.*

The Commission is also responsible for overseeing the supervised release system in the District of Columbia, under the new determinate sentencing scheme which replaced the District's parole system. *Id.* ¶ 4; *see* D.C. Code § 24-133(c)(2). Generally, no hearing is held before the Commission prior to an individual's release on supervised release. Thus, the Commission imposes general and special conditions of supervision based on the offender's record, and CSOSA may submit requests for special conditions. Vela Decl. ¶ 9.

For both parolees and supervised releasees, the Commission imposes general conditions of supervision, along with any special conditions it deems appropriate in that individual's case.[2] All of these conditions are relatively broad. *Id.* These conditions are then tailored by CSOSA into more specific requirements. *Id.* The Commission therefore has a limited role in the day-to-day mechanics of parole and supervised release and only becomes involved once supervisees are alleged to have violated the conditions of supervision through submission of an Alleged Violation Report ("AVR") by the supervisee's CSO. *Id.* ¶ 11, 12. When the Commission receives an AVR,

---

[2]     Examples of special conditions are requiring participation in a drug-treatment program for individuals with a drug addiction or requiring participation in a mental health treatment program for individuals with mental health concerns. Vela Decl. ¶ 7 n.1; *see also* 28 C.F.R. §§ 2.85(b), 2.204(b)(2).

it may decide to: take no action, issue a Letter of Reprimand, modify the conditions of release, conduct a community-based hearing before a Commission official, or issue a warrant. *Id.* ¶ 13. If a warrant is issued, the Commission then holds a probable cause hearing (with limited exceptions), and if probable cause is ultimately found, the Commission then holds a revocation hearing. *Id.* ¶ 14. The Commission considers disabilities at each stage of this process, to the extent they are raised by the supervisee or are otherwise obvious. *Id.* ¶¶ 17-19.

The Commission currently has a section entitled "Disabilities/Accommodations" on its Probable Cause Digests, Pre-Hearing Assessments, and Hearing Summary worksheets, which hearing examiners utilize in preparation for and during hearings. Vela Decl. ¶ 27. As of March 20, 2025, the Commission implemented training regarding disabilities and reasonable accommodations for its hearing examiners. *Id.* ¶ 28. The Commission is also in the process of modifying the language used on certificates of release and notices of action to inform the parolee or supervised releasee of his right to request accommodations and the manner in which to do so. *Id.* ¶ 29.

Established in 2000, CSOSA is an independent, federal Executive Branch agency that provides community supervision to adults on probation, parole, and supervised release in DC. Forsha Decl. ¶ 3. Regulations governing CSOSA are codified in Chapter VIII of Title 28 of the CFR. CSOSA supervises approximately 15,500 individuals, monitoring compliance with court-ordered conditions of release.

Principally, CSOSA works to increase public safety and prevent crime by reducing recidivism. Forsha Decl. ¶ 3. It achieves this goal by screening each offender's risk to the community and social needs, which results in a supervision plan to guide the supervision process. *Id.* ¶ 4. Offenders must report to their designated CSOs, and depending on the supervision

assessment, may be required to submit to drug testing and/or GPS monitoring. CSOSA operates six field units, two community-based learning labs, and the Reentry & Sanctions Center, a residential substance abuse treatment preparation facility. CSOs also work closely with police officers from the Metropolitan Police Department and the DC Housing Authority Police to routinely share information on high-risk offenders, conduct accountability tours—in which a CSO and a police officer visit offenders in the community, and host mass orientations, during which CSOs and police officers meet with offenders who have recently been released.[3] *Id.*

CSOs directly supervise offenders on parole, supervised release, and probation. This includes checking in with releasees and collateral contacts through in-office, home, and telephonic visits; enforcing the rules of supervision through graduated sanctions; and connecting them with services. *Id.* Sanctions for breaking rules related to supervision may include increased in-person contacts, day reporting, GPS monitoring, increased drug testing, community service, and short-term residential placement. CSOs communicate violations to the USPC through AVRs requesting Commission action, annual reports, or requests for additional conditions. *Id.*

CSOSA has a referral system to contract psychologists for offenders to undergo mental health screening to determine the need for more in-depth psychological evaluation and treatment. CSOSA also sometimes counsels offenders to register for the DC Healthcare Alliance or Medicaid to determine eligibility for and receive health and medical benefits. *Id.*

Although the Commission sets the general conditions and, if applicable, special conditions of parole or supervised release, once those conditions are set, the individual's CSO is responsible for determining what the detailed requirements of supervision will be. Vela Decl. ¶ 10-12. If the

---

[3]    *See* CSOSA, Who We Are, https://www.csosa.gov/our-history/ (last accessed May 4, 2026).

Commission determines that the alleged violations referred by CSOSA justify initiating proceedings against the supervisee, the Commission issues a warrant or summons for the supervisee based on the alleged violation. *Id.* ¶ 13. After the summons is responded to or the warrant is executed, the Commission may hold a probable cause hearing, unless the alleged violation is a criminal conviction, in which case no hearing is necessary. *See* 28 C.F.R. §§ 2.101(h), 2.214(h). Sometimes, if it finds probable cause, the Commission holds a revocation hearing to determine whether the individual's parole or supervised release will be revoked and, if so, what the repercussions will be. *See* 28 C.F.R. §§ 2.101(g), 2.214(g). In other cases, even if probable cause is found, the Commission chooses to "release and reinstate." *See id.* This decision may be made for a number of reasons, including to allow an individual to attend a drug-treatment program, or to account for a mitigating factor that seems to have led to the violation, such as a disability. Vela Decl. ¶ 15. The Commission has the sole authority to make revocation decisions. 28 C.F.R. §§ 2.70(e), 2.200(b).

CSOSA collects data about supervised individuals at intake. Forsha Decl. ¶ 5. CSOSA's intake form, used by the Reception and Processing ("RAP") Center has check boxes that allow an individual to identify if they are disabled. *Id.* There is additional space on the form prompting the individual to provide information regarding the alleged disability. *Id.* The information gathered during intake is reviewed by an Offender Processing Specialist ("OPS"), who uses it to conduct an intake interview. *Id.* The OPS will also review the individuals previously submitted records and may ask about noted disabilities during the interview intake. *Id.* The OPS documents any reported disabilities and information regarding management of such disabilities in the Physical Information screen in CSOSA's electronic case management system. Disabilities are also documented in case assignment "running record" entry to ensure accommodations can be considered. *Id.* That entry

may be viewed by the current, and all subsequent members of the supervision team assuming responsibility for the case. *Id.*

CSOSA investigators are also responsible for identifying and documenting disabilities during completion of Pre-Sentencing and Pre-Release Investigations. *Id*. Guided by Chapter 3 of the Office of Community Supervision and Intervention Services' ("OCSIS") Manual, CSOs are responsible for completing a "detailed report on a defendant's or inmate's criminal and social histories ([including among other things] physical and mental health. . . .)". Forsha Decl. ¶ 5. CSOs also obtain available medical information from incarceration records "to ensure that disability information is reviewed and documented." Forsha Decl. ¶ 5. All of these findings, described above, are documented in CSOSA's electronic case management system.

CSOSA is currently working on employing a new disability intake system, known as "SMART21." Forsha Decl. ¶ 6. This system will implement a new "Disability Data Collection Form," which is provided to supervisees who report or who are observed to have a physical or mental impairment that substantially limits a major life activity. *Id.* As shown in Ms. Forsha's declaration, the new questionnaire will ask supervisees: "Do you believe that your impairment/disability will interfere with your ability to successfully meet supervision obligations?", in addition to formally capturing supervisee's requests for reasonable accommodation. *Id*. All of the data collected through this new form will be compiled and allow CSOSA to produce reports showing: (1) how many individuals under CSOSA supervision have identified disabilities; (2) how many supervisees with disabilities have requested accommodation; and (3) how many requests for accommodation have been approved. *Id.*  This will also allow CSOSA to track approvals for accommodations, denials, and appeals. *Id.* An appeals process is explained in the Agency's new, informal agency policy. *Id.* Such Disability Data Collection Form

has been provided to the Office of General Counsel ("OGC") for review and approval. Forsha Decl. ¶ 6. After the approval process is completed, OCSIS plans to update the pending written guidance to include implementation. *Id.*

CSOs have significant flexibility in providing reasonable accommodations and have the authority to grant such requests. Forsha Decl. ¶ 5. For example, CSOs have the discretion to allow virtual appointments or visit the supervisee's home for check-ins, rather than require that the supervisee report to the office. *Id.*

If a CSO believes modification of or addition to any of the conditions imposed by the Commission would be appropriate, he or she fills out the Commission's F-1 modification form, in which CSOs can request the addition, removal, or modification of special conditions for individuals under supervised release. *Id.* The CSO includes with this form a memorandum which states the bases for the recommendations and sometimes includes recommendations to modify release conditions due to a disability. *Id.* If the Commission agrees, it modifies the conditions of supervision. *See* 28 C.F.R. §§ 2.85(c), 2.204(c)(1). CSOs may also communicate information regarding disabilities through the submission of AVRs and Annual Progress Reports, which document a supervisee's alleged non-compliance with release conditions, despite any documented reasonable accommodations. *Id.* "If accommodations have been made to remove barriers to supervision, the CSO will report that information on the Annual Progress Report." *Id.*

**ARGUMENT**

## I. **Plaintiffs' Rehabilitation Act claim fails as a matter of law.**

Plaintiffs' generally proffer that they succeed on their Rehabilitation Act claim as a matter of law through putting forth ten examples of supervisees which they allege face obstacles in access to parole and supervised release because of their alleged disabilities, and through citation to their expert's report, which  concludes without any demonstrable basis that the Agencies do not have

adequate systems in place to ensure people with disabilities reliably and consistently receive needed accommodations. Plf.'s Mot. at 20. But Plaintiffs have not shown that the undisputed material facts support their claim. As discussed below, going beyond the surface of the ten examples demonstrates their insufficiency to raise any inference of a lack of meaningful access under Defendants' current ad hoc approach.  And Plaintiffs' expert lacks the qualifications to make the sweeping conclusions on which Plaintiffs so heavily rely.  Consequently, Defendants are entitled to summary judgment on Plaintiffs' Rehabilitation Act claim.

Section 504 makes it unlawful for an "otherwise qualified individual with a disability" to "*solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added). None of the Plaintiffs or supervisees identified have adequately documented their disabilities in accordance with the standard of proof required under the Rehabilitation Act. But even if the Court were to find their self-identification sufficient, the record shows that the obstacles faced by Plaintiffs in successfully completing supervised release were due to a myriad of other factors. In the majority of cases, Plaintiffs never raised disabilities to the Agencies, and all have a majority of factors unrelated to their disabilities that resulted in their failure to succeed—including, but not limited to, committing new crimes, failing drug tests, and being in loss of contact status for years at a time—that would not be remedied by any of the suggested accommodations Plaintiffs subsequently raise. On the record before this Court, it is implausible to conclude that the supervisees were "denied participation in" or "denied the benefits of" the terms of supervised release solely on the basis of their self-diagnosed disabilities or that they were discriminated against on the basis of alleged disabilities. Plaintiffs' Rehabilitation Act claim therefore fails under the first, second, and third factors under

- 11 -

*American Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008). At minimum, there are significant questions of factual dispute that make summary judgment for the Plaintiffs inappropriate.

### A. Plaintiffs fail to show documented disabilities.

Plaintiffs have not shown that they are individuals with documented disabilities or otherwise qualified. Almost all of the Plaintiffs and supervisees cited to by Plaintiffs summarily allege that they suffer from disabilities, as that term is defined in the Rehabilitation Act, without providing any substantiation, such as medical documentation, opinions or third-party verification.[4] *See Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486 (S.D.N.Y) (declining to grant summary judgment where plaintiff failed to provide sufficient medical information to determine whether his requested accommodation was necessary). A publicly funded program is not required to provide accommodation under the Rehabilitation Act until it is made aware of a proper diagnosis and receives a specific request for accommodation. *See Carten v. Kent State Univ.*, 78 Fed. Appx. 499, 500-01 (6th Cir. 2003) (affirming summary judgment for defendants where plaintiffs did not establish learning disability or request for accommodation). The D.C. Circuit has held that although Section 504 prohibits discrimination, "it does not impose affirmative action to accommodate the handicapped." *Am. Public Transit Asso. v. Lewis*, 655 F.2d 1272, 1277-78 (D.C. Cir. 1981) (citing to *Southeastern Comm. College v. Davis*, 442 U.S. 397, 411 (1979) ("neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative obligation of all recipients of federal funds.")).

---

[4]    That is, except for the few that have anecdotal references to medical treatment in the running reports.

**B. Plaintiffs fail to establish that they are "otherwise qualified" or that they are discriminated against solely on the basis of their alleged disability.**

To meet factor 2, Plaintiffs bear the burden of showing that they "meet[] the essential eligibility requirements for participation in the [the] program[]," "with or without reasonable modifications to the rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." *See Johnson v. Cleveland City Sch. Dist.*, 443 Fed. App'x 974, 983 (6th Cir. 2011); *see also Carten v. Kent State Univ.*, 78 Fed. App'x. 499, 500 (6th Cir. 2003).

First, in most instances, Plaintiffs do not allege that they requested reasonable accommodations from their CSOs, nor from the Commission, either prior to the submission of an AVR or during the post-AVR proceedings such as probable cause hearings or revocation hearings, at which the supervisee has access to Counsel.[5] *See generally*, Plf.'s Statement of Undisputed Facts. Instead, they allege that the Agencies could have fashioned reasonable accommodations themselves absent a request by the Supervisee and they suggest that calendar meetings or other appointment reminders, elimination of in-person meeting requirements, and increased access to services would have made a difference in the outcomes of supervisees on supervised release. *Id.* But these requests were never made to the Agencies. For example, ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Compl. at 5, ECF No. 21-1. But the hearing summary and audio recording of Mr. Davis's revocation hearing in October 2023 tell a different

---

[5]    In one example provided by Plaintiffs, Supervisee 2's counsel stated during a hearing before the Commission, that although Supervisee 2 did not have great mobility and used a cane, he would be able to make appointments in-person. Plf.'s Ex. 25, MATHIS USPC00002197.

story. During that hearing, ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

Vela Decl. ¶ 22. ██████████████████████████████████████████

███████████████████████████████ *Id.* Mr. Davis then filed an appeal with the National Appeals Board,

through counsel, and made no mention of any disabilities. *Id.* Where Plaintiffs never properly

requested the accommodations they now seek, they cannot retroactively claim violation of the

Rehabilitation Act. *See G.E. v. Williamson Cnty. Bd. of Educ.*, 2026 U.S. App. LEXIS 4490, *16

(6th Cir. 2026) (declining to uphold Section 504 claim where plaintiff could not point to evidence

in the record showing he requested accommodations).

Second, there are numerous instances documented throughout the record in which the

Agencies provided reasonable accommodations for disabilities, at times even in the absence of a

request for them to do so. For example, the record reflects instances in which CSOSA did allow

for telephonic check-in or traveled directly to the supervisee to check-in, as well as instances where

Supervisees were referred to various mental health and other services. Plaintiffs' expert testified

that she observed instances like the above, where CSOs allowed for virtual check-ins, or texted

supervisees reminders to comply with their conditions of release, such as to remember to charge

their GPS monitor. Mitchell Dep. at 88:18-23. The record also reflects instances in which the

Commission released and reinstated a supervisee notwithstanding a finding of probable cause that

they had violated the conditions of supervision. *See, e.g.*, Ex. 18 (reinstating Mathis). Plaintiffs'

own expert testified that failure to act on an AVR could be seen as an accommodation. Mitchell

Dep. 82:5-6. As another example of an accommodation for a disability, after a reconsideration

hearing, in which the Commission heard testimony that Plaintiff Mathis was hospitalized for a

medical condition, the Commission ultimately released and reinstated Mr. Mathis to supervision based on his medical condition. Vela Decl. ¶ 25.

Third, there is no evidence in the record that Plaintiffs would have been able to successfully comply with their conditions of supervision even with the accommodations that Plaintiffs now suggest. This is because many of supervisees identified were unable to successfully complete their terms of release due to factors beyond their disabilities. For example, ███████████████████ ████████████████████████████████████████████████████ █████████████████████████████████. *See* MATHIS-USPC-00001448. As for ███████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████. *See* MATHIS-USPC-00000367-68, -00000372. While Plaintiffs' make much of ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. *See* MATHIS-LW-CSOSA-026236-37. █████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See* MATHIS-LW-CSOSA-017018-20. ███████████████████ ████████████████████████████████████████████████████████. These explanations involved using drug to cope with a personal tragedy and choosing not to check in to a treatment program due to wanting to spend more time with family. *See* MATHIS-USPC-00003436-37. ████████████████████████████

███████████████████████████████████████████████████

████████████████. *See* MATHIS-USPC-00009990.

Plainly, Plaintiffs cannot demonstrate that their alleged disabilities were the only obstacle standing in the way of their success on supervised release. This Court has held that "the causation standard under the Rehabilitation Act, which requires a showing that the plaintiff was discriminated against 'solely' by reason of her disability, is more stringent than the ADA's causation requirement." *Jones ex rel. A.H. v. District of Columbia*, 805 F. Supp. 3d 218 (D.D.C. 2025). Plaintiffs fall short of that stringent standard here. A reasonable jury could not find, based on the evidence presented by Plaintiffs, that they failed to complete supervised release solely by reason of their alleged disabilities. Instead, Plaintiffs and supervisees have failed to succeed under supervision because they committed new crimes, disappeared from contact, failed to complete required drug treatment programs, failed drug tests, refused to participate in mental health treatment or evaluation, or admitted that their violation behavior was attributable to reasons wholly outside their disabilities. Even if the Court were to conclude that Plaintiffs have met that burden as to some subset of the 10 identified individuals, such isolated evidence would not support the systemic claim asserted here. *See, e.g., Donovan v. Powell,* 70 F. Supp. 3d 460, 464 (D.D.C. 2014) (policy and practice claim cannot be supported by a claim based on a single request for accommodation). Although Defendants maintain they are entitled to summary judgment based on Plaintiffs' failure to meet their burden on causation, at a minimum, Plaintiffs have not shown that there is no genuine dispute on this issue such that they could obtain summary judgment in their favor against Defendants. For Plaintiffs to obtain summary judgment on their affirmative motion, the Court would have to conclude that Plaintiffs have established the requisite causation (and the

other factors discussed above) as a matter of law, while taking all inferences in favor of the government as the non-moving party.  Plainly, they have not met that burden.

Plaintiffs not only fail to establish discrimination solely on the basis of a disability, but they also fail to establish that any of the theoretical accommodations they now suggest would have changed the outcome in their case or would have been accepted as reasonable under the circumstances at the time. This is not a case where Plaintiffs have identified "an obstacle that impedes their access to a government program or benefit," rather, Plaintiffs seek to "expand the substantive scope of a program or benefit" that results in a "fundamental alteration to the existing program or benefit." *See Am. Council of the Blind*, 525 F.3d at 1268. Section 504, however, is not a guarantee of "equal access" but only "meaningful access," and individuals with disabilities have numerous opportunities within the supervision process to identify if they are disabled and request accommodations as addressed above.  *Am. Council of the Blind v. Snow,* 311 F. Supp. 2d 86, 89 (D.D.C. 2004); *cf. Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) ("'[a]n employer is not required to provide an employee th[e] accommodation he requests or prefers[;] the employer need only provide some reasonable accommodation.'"). Plaintiffs' focus on expanded access is thus misplaced.  The relevant question is whether they have been deprived of meaningful access, *id.,* and they have failed to make that showing.

Moreover, the accommodations Plaintiffs retroactively request, including that they should be allowed to forgo in-person visits with their CSO, undermine the purpose of supervised release generally, which is that they be *supervised*. For example, the sole remaining named Plaintiff, Kennedy Davis, implies that the accommodations he requires are ones that would render his supervision toothless. Davis now indicates, for the first time, that he struggled to meet the conditions of his supervision because his "mental health conditions make it difficult for him to

trust new people and ask for help," including "focus[ing] exclusively on one solution—contacting his mental health advocate at ULS"—rather than being able to check in with his CSO. Plfs.' Statement of Undisputed Material Facts ¶¶ 141-42. In other words, Mr. Davis now appears to suggest that his disabilities require an accommodation that would permit him to forgo checking in with his CSO. But such an accommodation is not reasonable, as it would undermine the very concept of supervision. This request, as well as the eight enumerated demands raised by Plaintiffs' expert, fundamentally alter the scope of supervised release, of which supervision is integral. The D.C. Circuit has recognized that federally funded programs are not required to expand benefits "simply to meet the reality that the handicapped have greater medical needs." *Am. Council of the Blind*, 525 F.3d at 1269 (citing to *Alexander v. Choate*, 469 U.S. 287, 295 (1985)). Thus, the Court should not do so here by allowing supervisees to dictate the exact conditions of their release, especially to the extent that supervision is no longer possible.

### C. Plaintiffs cannot show that the accommodations they now seek would not be unduly burdensome to the Agencies.

Defendants maintain that they are entitled to summary judgment. But were the Court to disagree, Plaintiffs would need to overcome an additional hurdle before the Court could grant summary judgment in Plaintiffs' favor. Defendants have raised the affirmative defense of undue hardship and Plaintiffs have not moved for summary judgment on that defense. Accordingly, Plaintiffs' affirmative request for summary judgment should be denied for this additional reason.

When applying the Rehabilitation Act, courts must keep in mind "two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985). The Act does not "require institutions to provide all requested auxiliary aids and services." *Durand v. Fairview Health Servs.*, 902 F.3d 836, 842 (8th Cir. 2018) (citation omitted). That is because

"[p]laintiffs are not entitled . . . to perfect access, or to remedies 'specially tailored' for their circumstances." *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 58 (D.D.C. 2006), *aff'd & remanded*, 525 F.3d 1256 (D.C. Cir. 2008). Courts have found that even where plaintiffs do not have "meaningful access," the "Accommodations are not reasonable if they would entail either 'undue financial and administrative burdens' or a 'fundamental alteration in the nature of a program.'"

The programmatic changes that Plaintiffs seek to have the Court order the Agencies to implement would cause an undue burden on the Agencies. A mandatory requirement that CSOSA and the Commission affirmatively identify disabilities amongst the supervisee population would be an undue burden. *Ward v. McDonald*, 762 F.3d 24, 31-32 (D.C. Cir. 2014) (recognizing that a need for an accommodation is often not obvious). This is true not only due to the high volume of individuals on parole and supervised release but due to the nature of disabilities, which are typically not "amenable to one-size-fits-all accommodations" and require "information about the nature of the . . . disability and the desired accommodation—information typically possessed only by the individual or her physician"—in order to be reasonably accommodated. *Id.* at 31. The reasonable approach—and the one utilized in Section 501 of the Rehabilitation Act—is to place the onus on the individual claiming to be disabled to make an accommodation request and provide supporting documentation. *See id*. Plaintiffs have identified no reason why a different approach is warranted under Section 504.

The programmatic changes that Plaintiffs propose would also fundamentally alter the nature of supervision. For example, Plaintiffs seek to eliminate in-person check-ins altogether for supervisees whose disabilities make in-person check-ins more difficult. But such an accommodation is unlikely to be reasonable, because it would fundamentally alter the nature of

- 19 -

"supervision." Plaintiffs' own expert concluded that she has never seen a case where reporting was not required as a part of a term of supervised release. Mitchell Dep. at 78.

Plaintiffs' desired relief also goes beyond the scope of what a court is permitted to order. For example, Plaintiffs' demand that the Agencies implement a written policy. MSJ at 21. However, any formal written policy that is not already included within the Commission's manual would require a regulation, which would necessitate rulemaking through the Federal Register. Vela Decl. 49:6-22. This Court cannot order the Plaintiffs to undertake rulemaking under the APA. *See infra* section III(a).

## II. <u>The Testimony of Plaintiffs' Expert Should be Excluded, or In the Alternative, Afforded Little Weight.</u>

Plaintiffs rely heavily on the testimony of Kelly Mitchell, their purported expert witness, in their motion and statement of undisputed material facts. Although the final twenty pages of Plaintiffs' Motion for Summary Judgment are stylized as factual contentions supporting their Rehabilitation Act violation claims, they actually consist of the expert report and recommendations from Plaintiffs' expert. Yet, the expert could not articulate a rational basis for her testimony during deposition, nor connect her conclusions to the facts at issue in this case, and as such her report should be excluded. Rule 702 of the Federal Rules of Evidence tasks a district court judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Courts are charged with a "gatekeeping" responsibility to ensure expert witnesses are offering reliable opinions that are related to the issues in a case. *See* Fed. R. Evid. 401; *Daubert,* 509 U.S. at 589. "Courts are obligated to 'determine whether [expert] testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.'" *See Heller v. D.C.*, 801 F.3d 264, 271 (D.C. Cir. 2015) (alterations in original) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 149 (1999); *see also Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d. 233, 245-246 (D.D.C. 2018). Before expert testimony may be admitted at trial, Federal Rule of Evidence 702 and *Daubert* require the Court to perform a "gatekeeping" function by "engag[ing] in a preliminary assessment of the scientific validity of the expert's reasoning or methodology." *Ambrosini v. Labarraque*, 101 F.3d 129, 138 n.11 (D.C. Cir. 1996) (citing *Daubert*, 509 U.S. at 592–93).

Specifically, the party seeking to introduce the opinion testimony must establish by a preponderance of the evidence the qualifications of the proffered expert and that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FRE 702; *see also United States v. Hite*, 769 F.3d 1154, 1168 (D.C. Cir. 2014) ("Expert testimony is admissible under Federal Rule of Evidence 702 if it will assist the jury to understand the evidence or determine a fact in issue"). In establishing the reliability of the expert's conclusions, the party proffering the expert need not prove that the expert's opinions are correct, but only that a qualified person has reached the opinions in a sound and methodologically reasonable manner. *Carmichael*, 2015 U.S. Dist. LEXIS 193447, at *20. Thus, in addition to the expert's qualifications, the Court "must focus solely on principles and methodology, not on the conclusions that they generate." *Ambrosini*, 101 F.3d at 133 (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 595).

Rule 104(a) of the Federal Rules of Evidence allows the Court to address admissibility questions preliminarily. While the contents and quality of expert reports may be the subject of *Daubert* motions – which are motions *in limine* by nature – the Court, nonetheless, may consider the competence of a plaintiff's expert report in a motion for summary judgment. *Carmichael v.*

- 21 -

*West*, No. 12-1969, 2015 U.S. Dist. LEXIS 193447, at *21 (D.D.C. Aug. 31, 2015); *Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("The *Daubert* regime can play a role during the summary judgment phase of civil litigation. If proffered expert testimony fails to cross *Daubert*'s threshold for admissibility, a district court may exclude that evidence from consideration when passing upon a motion for summary judgment."). In other words, where the plaintiff's proffered expert testimony could not carry the plaintiff's burden of proof at trial, the Court may grant summary judgment, dismissing plaintiff's case as a matter of law. That is what the Court should do in this case.

As a threshold matter, Ms. Mitchell is not qualified to opine on matters regarding how the Agencies administer supervised release. She has no professional experience consulting or working with the District of Columbia Department of Corrections or supervision programs, or consulting for programs outside the state of California. Mitchell Dep. 26:25; 27:1-7. She has no professional qualifications beyond a bachelors degree in government, and despite her expert reports stating that she possesses "25 years of experience working with justice-involved populations," during deposition, she stated that in many of her roles she had no responsibility relating to supervision or offenders on parole, *id.* at 17:23-24, and even when she did, it was not a day-to-day interaction, but high-level administerial roles. *Id.* at 20:10-25; *id.* at 21:9-11.

In forming her "opinion", Ms. Mitchell was asked four specific questions by Plaintiffs' counsel, Mitchell Dep. at 31:10-25; *id.* at 33:3-5.

> What are common barriers to following supervision requirements for people with disabilities?
> What types of accommodations could allow people to follow their supervision requirements?
> What are the key features of accommodation systems?
> Do USPC and CSOSA have systems to assess accommodation needs and accommodate people with disabilities, and does it appear that, in practice, USPC and CSOSA consistently assess and provide for accommodation needs?

Plf.'s Ex. 14 (Plf.'s Expert Report). Her conclusions are based solely on her limited experience, Mitchell Dep. 35:24-25, and on her review of materials provided by Plaintiffs' counsel, which consist entirely of legal documents created in anticipation of litigation in this case. Plf.'s Ex. 4 at 5-7, 30; Mitchell Dep. 29:7-10; 30:15-18. She was only provided with six examples of supervisees, only two of which were included in Plaintiff's motion. *Id.* Ms. Mitchell did not review the files of Mr. Mathis, Mr. Davis, Supervisee 2, Supervisee 3, Supervisee 9, Supervisee 10, or the "other supervisees." Nor did she review the Commission's files, at all, regarding the six individuals in her report that she highlighted in her report, leaving out critical information. Mitchell Dep. 94:21-96:9. Her testimony during deposition did not describe any methodology, explanation for her conclusions, or analysis that led to her testimony. Plf.'s Motion at 14-19; Mitchell Dep. 85:12-12; 88:10-11; 90:20-23; 94:4-11. Her severely cabined review did not evaluate how CSOs in the District of Columbia manage their caseloads, Mitchell Dep at 70, despite stating that caseload plays role in what accommodations may be able to be provided. Mitchell Dep.at 60.

Ms. Mitchell's conclusory assertions regarding the Agencies' obligations under the Rehabilitation Act should be excluded. *See Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (holding expert testimony that consists of legal conclusions cannot properly assist the trier of fact in understanding the evidence or determining a fact in issue). That is particularly the case where Ms. Mitchell's testimony tracks the exact language of the Rehabilitation Act, *see* Plf.'s Ex. 14 at 7 (Expert Report sections IV(A), (B), and (C) using language including "reasonable accommodation," improperly defining "reasonable accommodation," and stating that any system properly providing reasonable accommodations will necessarily have eight components including (1) written policies and procedures regarding assessing accommodation needs and providing accommodations; (2) a system to identify people

with disabilities and their potential accommodation needs; (3) notice of rights of accommodations; (4) a process to request accommodations; (5) a grievance process if accommodations are not granted; (7) training regarding assessing accommodation needs and providing accommodations; and (8) tracking, monitoring and quality assurance mechanisms"), and uses that language to form the basis of her opinions.  An expert cannot testify as to what the Agencies must do to avoid running afoul of the law. *Burkhart v. Washington Metropolitan Area Transit Authority,* 112 F.3d 1207, 1213 (D.C. Cir. 1997) (rejecting expert's testimony in Rehabilitation Act case where expert testified as to which specific accommodations were legally required). After listing these "required" features, Ms. Mitchell then summarily concludes that the Agencies do not have any of them, and *ipse dixit*, the Agencies do not consistently assess accommodation needs or provide necessary accommodations in practice. This is precisely the type of conclusory testimony that is impermissible because it is not grounded in an appropriate methodology, scientific basis, or reasoning necessitated by *Daubert*.

In the alternative, should the Court credit the expert's testimony, it should be afforded very little weight. Ms. Mitchell made several statements conflicting with her initial testimony and conclusions contained in her expert report and should therefore be considered unreliable. For example, despite concluding that CSOSA offered no reasonable accommodations, she stated that the failure to act on an AVR could be seen as a reasonable accommodation, Mitchell Dep. at 82, and noted instances where CSOs texted supervisees reminders regarding conditions of release. *Id*. at 88.

And many of the findings contained in Ms. Mitchell's unsubstantiated expert report are belied by the attestations in Ms. Forsha's Declaration. For example, CSOSA does have policies and procedures for assessing disabilities and making reasonable accommodations, Forsha Decl. ¶

- 24 -

5, and CSOSA's newly implemented intake forms will allow for tracking and reporting on disabilities and reasonable accommodations. *Id.* Moreover, additional training will be provided to employees, *id.*, and CSOs presently possess the resources to identify disabilities and the authority to provide reasonable accommodations as needed. *Id.* Regarding the Commission, it has already modified its hearing examiner forms to account for disabilities and reasonable accommodations during hearings, Vela Decl. ¶ 27, and implemented trainings to educate hearing examiners on identification of and reasonably accommodating for disabilities under the Rehabilitation Act. *Id.* ¶ 28. The majority of Ms. Mitchell's conclusions are based upon incorrect factual bases and should be discarded.

Based on the record evidence Plaintiffs have adduced, Plaintiffs claim amounts to speculative assertions that fail to establish any of the three elements of the test under *American Council of the Blind v. Paulson*, supra. Plaintiffs have not carried their burden of supporting a claim under the Rehabilitation Act.

### III. There is no redressable relief available to Plaintiffs.

#### A. The Rehabilitation Act does not command or even permit the relief Plaintiffs seek.

Plaintiffs' claim is not justiciable because there is no remedy available to this Court that would ameliorate their alleged harm. In denying Defendants' motion to dismiss, the Court ruled that the Rehabilitation Act prescribes "no remedy at all for the Parolees or other individuals mounting a challenged under the program-conductor provision." Mem. Op. at 22. The Court identified two other possible "mechanisms" on which Plaintiffs could potentially proceed—a claim under the Administrative Procedure Act ("APA") or the federal courts' "inherent power to enjoin violations of the Rehabilitation Act." Mem. Op. at 21. Plaintiffs, however, do not bring this action pursuant to the APA and thus that avenue is not available to them. *See Bannister v. United States*

*Parole Comm'n*, 2019 U.S. Dist. LEXIS 49020, \*23 (D.D.C. Mar. 25, 2019) (Court declined to consider plaintiff's APA claim when Plaintiff only brought claim under the Rehabilitation Act in its Complaint and dismissed Rehabilitation Act claim insofar as it sought to compel the agencies to adopt implementing regulations).  The Court concluded that Plaintiffs suit could proceed solely under the Courts' inherent power to enjoin violations of the Rehabilitation Act" (Mem. Op. at 21) but the power to "enjoin" is distinct from the power to order an agency to adopt a judicially-constructed program of the type requested by Plaintiffs, especially in an area where the Court lacks the required expertise.

Even if the Court determined it was permitted to review Plaintiff's Rehabilitation Act claim in accordance with its equitable powers, the remedies Plaintiffs request are committed purely to the discretion of the Agencies. Each of the remedies Plaintiffs suggest, i.e. implementing formal written policies and procedures; implementing a tracking system to identify disabilities; implementing a formal accommodation request system and a formal grievance process; designation of an Accommodations Coordinator; implementing new staff training; and implementing a system to track communications between the two Agencies, all seek to compel the Agencies to take systemic, agency-wide action. As the Court explained in *Bannister*:

> At bottom, the Rehabilitation Act provision upon which Plaintiff relies provides only a broad statutory mandate that the Commission must follow. The Supreme Court has made clear that courts are not empowered "to enter general orders compelling compliance with broad statutory mandates" and that "[g]eneral deficiencies in compliance ... lack the specificity requisite for agency action." *Norton*, 542 U.S. at 66; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[R]espondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."). As the Court noted in *Norton*, recognizing Plaintiff's claim here would necessarily "mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the [Rehabilitation Act], injecting the judge into day-to-day agency management." 542 U.S. at 66–67. The APA does not contemplate, nor could this court provide, such oversight.

*Bannister v. United States Parole Comm'n*, Civ. Act. No. 18-1397 (APM), 2020 WL 85229, at *3 (D.D.C. Jan. 7, 2020). If the Court were to rule that the Agencies were compelled to adopt any one of the remedies suggested by Plaintiffs, it would run afoul of the Supreme Court's caution in *Norton* against entering "general orders compelling compliance with broad statutory mandates." *Norton v. SUWA*, 542 U.S. 55 (2004).

Plaintiffs assert that the Agencies have an affirmative obligation to create a formal policy to identify disabilities amongst the supervisee population, but such an endeavor is not mandated by the Rehabilitation Act, nor is it feasible. This type of onerous and affirmative burden is precisely the type of relief the Supreme Court determined was inappropriate under Section 504 of the Rehabilitation Act in *Southeastern Comm. College v. Davis,* 442 U.S. 397 (1979). In that case, the Supreme Court held that "Section 504 does not refer at all to affirmative action, and except as it applies to federal employers it does not provide for implementation by administrative action." *Id.* at 411; *see also Shirey v. Devine*, 670 F.2d 1188, 1201 (D.C. Cir. 1982) ("The Supreme Court apparently has the same understanding of what affirmative action means. In construing Section 504 of the Rehabilitation Act it stressed that that section did not require affirmative action and implied that 'affirmative action' would demand steps beyond mere 'evenhanded treatment.'").

### B.  Plaintiffs' Rehabilitation Act claim is prudentially moot.

This Court should exercise its discretion to find this case prudentially moot. "The cousin of the mootness doctrine, in its strict Article III sense, is a mélange of doctrines relating to the court's discretion in matters of remedy and judicial administration." *Chamber of Comm. v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980). Here, where CSOSA and the Commission have already implemented sweeping measures to improve their identification and treatment of individuals with disabilities as they navigate the supervised release system, the Court should decline to rule on remedy.

"Under the prudential mootness doctrine, 'a controversy, not actually moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the government to stay its hand, and to withhold relief it has the power to grant.'" *United Spinal v. O'Malley*, Civ. Act. No. 20-cv-2236 (TSC), 2024 U.S. Dist. LEXIS121504 (D.D.C July 11, 2024) (citing to *Chamber of Comm.*, 627 F.2d at 291). Further, "[a] court may abstain under this doctrine in suits for declaratory or injunctive relief where the defendant 'clearly . . . modified their behavior significantly since the suit was brought,' such that 'the likelihood of recurrent confrontations . . . is much too small to warrant" a decision.' *Id.* (quoting *Cmty. for Creative Nonviolence v. Hess*, 745 F.2d 697, 701 (D.C. Cir. 1984)). As described in the declarations of CSOSA and Commission employees, the Agencies have improved their existing system  by re-creating intake forms and hearing examiner worksheets, implementing training on disabilities and reasonable accommodations, and CSOSA has even gone as far as to revamp its entire case notes system to better account for identification of individuals who identify disabilities. Forsha Decl. ¶ 5-6. Defendants plan to continue to improve these systems as this litigation progresses. *Id.* Where many of the proposed modifications contained in Plaintiffs' motion have already been undertaken, there is little else that remains for the Court to rule on, lest it step directly into the shoes of the Agencies themselves in administering its supervised release system.

### C.  The Court should abstain from ruling on Plaintiffs' claims.

As evidenced by the attached declarations and above discussion of the agency's functions, it is clear that CSOSA and the Commission implement complex regulatory programs in accordance with state law which bear on policy problems of public import. The administration of supervised release is precisely the type of program in which federal involvement would be disruptive and should be abstained from under *Burford*. The Supreme Court has summarized the *Burford* abstention doctrine as follows:

- 28 -

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) where there are 'difficult questions of state law bearing on policy problems of substantial public import who importance transcends the results in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 350, 361 (1989).

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7 (1979). This absence of constitutional right means that a state has no duty to establish a system of parole, "and if it chooses to do so, federal courts should allow a state's parole authorities 'a wide range for experimentation and the exercise of discretion.'" *Vann v. Angelone*, 73 F.3d 519, 521 (4th Cir. 1996). "Moreover, to insure that the state-created parole system serves the public interest purposes of rehabilitation and deterrence, the state may be specific or general in defining the conditions for release and the factors that should be considered by the parole authority." *Greenholtz*, 4421 U.S. at 7-8. Courts have held that state authorities are the experts in evaluating whether offenders should be released or not, and that parole decisions involve "more than the exercise of state expertise . . .[T]hey are an integral part of the larger interest of states in administering their own system of corrections. Given such compelling reasons, it is no surprise that federal courts have generally refrained from meddling in state parole proceedings." *Id.* In *Vann v. Angelone*, the Fourth Circuit determined that "detailed standards" for parole eligibility would deprive the Parole Board of its essential discretion.

Plaintiffs' class consists entirely of individuals sentenced under the D.C. Code. D.C. Superior Court is responsible for ordering supervised release once a Defendant is sentenced. The

Commission and CSOSA then maintain jurisdiction over the offender while they are serving their term of supervised release. *Taylor v. Norton*, 2006 U.S. Dist. LEXIS 22070, *6 (D.D.C. Apr. 20, 2006). Although D.C. is not a state, CSOSA and the Commission derive their authority from state law and the scope of their authority relating to supervisees is determined by the D.C. Court of Appeals. *See* D.C. Code § 24-133(b)(2)(F); D.C. Code § 24-133(c)(2)&(d); *see Davis v. United States*, 307 A.3d 1066 (D.C. 2023). The federal district court should abstain from fashioning relief in this case where it would be dependent on interpretation of authority and obligations pursuant to state law. As described at length above, the Agencies are the experts in administering parole and supervised release in accordance with D.C. Code and should be afforded great deference in their administration of the supervised release programs for the district. A ruling in this case would be disruptive to the ongoing efforts of the Agencies, as described in their declarations, to update their already existing mechanisms to identify disabilities and afford reasonable accommodations where they are requested and appropriate. Plaintiffs should agree that this is a matter of substantial public concern, and that a coherent policy is paramount. The Agencies are in the best position to promulgate such a policy and endeavor to continue to do so without Court intervention.

Because the Court lacks the expertise to fashion a remedy here—and in particular a remedy of the type requested by Plaintiffs—the Court should grant summary judgment to the Agencies on the remedy issue. It is Plaintiff's burden to identify the remedy they are seeking. When that remedy, as framed by Plaintiffs, cannot be afforded, Defendants are entitled to summary judgment on that issue.

## CONCLUSION

Because Plaintiffs have failed to establish that any violations of the Rehabilitation Act occurred or that their requested relief could remedy such violations even if they had occurred,

Defendant's cross-motion for summary judgment should be granted and Plaintiff's Partial Motion

for Summary Judgment should be denied.

Dated: May 4, 2026

                                     Respectfully submitted,


                                     JEANINE FERRIS PIRRO
                                     United States Attorney


                                     By: */s/ Tara Derbisz*
                                     TARA DERBISZ
                                     Assistant United States Attorney
                                     601 D Street, NW
                                     Washington, DC 20530
                                     Phone:  (202) 809-0784
                                     tara.derbisz@usdoj.gov

                                   *Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILLIAM MATHIS and KENNEDY DAVIS,
individually and on behalf of all other
similarly situated,

      *Plaintiffs*,

      v.

UNITED STATES PAROLE COMMISSION,
*et al.*,

      Defendants.

Case No. 24-1312 (TNM)

**[PROPOSED] ORDER**

Upon consideration of Defendants' Cross-Motion for Summary Judgment, and the entire record herein, it is hereby ORDERED that

1. Defendants' Cross-Motion for Summary Judgment is GRANTED;

2. Plaintiffs' Motion for Partial Summary Judgment is DENIED;

3. Judgment is entered in favor of Defendants; and

4. This action is DISMSSED.

Dated: _____

_____
TREVOR N. MCFADDEN
United States District Judge

- 32 -