**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KENNEDY DAVIS**, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>**U.S. PAROLE COMMISSION** *et al.*,<br><br>Defendants. | Case No. 1:24-cv-1312 (TNM) |

## MEMORANDUM OPINION

A lifetime parolee with serious physical and mental impairments claims he faces disability discrimination at the hands of the federal agencies that supervise him. So he brings this case, on behalf of himself and other similarly situated parolees in the District of Columbia, against the U.S. Parole Commission and the Court Services and Offender Supervision Agency (collectively, "the Government").

The parolees claim that the Government has violated § 504 of the Rehabilitation Act through its wholesale failure to consider and accommodate disabilities during supervision. They seek injunctive relief, but for now, they move for partial summary judgment only on the Government's liability. The Government, meanwhile, cross moves for summary judgment on both liability and remedy.

Because the parolees have shown that the Government does not meaningfully consider and accommodate disabilities during supervision or parole, the Court will grant their motion. It

reserves the question of the appropriate remedy for another day.

**I.**

Some background on the supervision system for D.C. Code offenders living in Washington, D.C., sets the table for this case. Supervision occurs either through parole or supervised release. The difference is a matter of timing. Parole applied to offenses committed before August 5, 2000. But after that date, parole was abolished and replaced with supervised release. *See* Sentencing Reform Amendment Act of 2000, D.C. Law 13-302.[1]

Two federal agencies run supervision for D.C. Code offenders. Defs.' Resp. Pls.' SMF ¶¶ 1–3, ECF No. 95-2. The U.S. Parole Commission possesses major decision-making authority and takes the lead in administering the programs. *See* National Capital Revitalization and Self-Government Improvement Act of 1997 ("Revitalization Act"), Pub. Law 105-33, § 11231, 111 Stat. 745; 28 C.F.R. § 2.70(a) (describing authority over parole decisions for D.C. Code offenders); *id.* § 2.200(a) (similar for supervised release). It sets general supervision conditions and decides whether to continue, revoke, or terminate an offender's term of parole or supervised release. *See* 28 C.F.R. § 2.70(a)–(b); *id.* § 2.200(a)–(b).

The Court Services and Offender Supervision Agency ("CSOSA") implements the Commission's decisions. It provides the actual "supervision, through qualified supervision officers, for offenders on probation, parole, and supervised release pursuant to the District of Columbia Code." Revitalization Act § 11233(c)(1) (codified at D.C. Code § 24-133(c)(1)). Practically speaking, CSOSA's officers (known as "CSOs") handle the day-to-day supervision. They ensure that offenders comply with their conditions, set the location and frequency of check-

[1] For simplicity's sake, the Court refers to all offenders in the record and in the class collectively as "the parolees" even though some are technically "supervisees."

ins, and initially assess supervision violations. Defs.' Resp. Pls.' SMF ¶¶ 6, 11. CSOs respond to non-compliance with "graduated sanctions." *Id.* ¶ 17. Those sanctions start with increased supervision requirements. *Id.* But they can escalate to an Alleged Violation Report ("AVR"), which is a recommendation that the Commission issue an arrest warrant and begin revocation proceedings. *Id.* ¶¶ 18–19.

If the Commission issues an arrest warrant, the parolee is detained in the D.C. Jail until his probable cause hearing. *Id.* ¶ 20. During this hearing, a Commission hearing examiner determines whether probable cause supports the alleged violation, and if so, whether the parolee should proceed to a final revocation hearing. *Id.* ¶¶ 22–23. The final revocation hearing may occur weeks or months later, during which time parolees remain incarcerated. *Id.* ¶ 24. At final revocation hearings, the Commission hears evidence and decides whether to reinstate supervision, modify supervision conditions, or revoke supervision. *Id.* ¶¶ 25, 27. The Commission may override the CSO's recommendation. *Id.* ¶ 26.

Sometimes, a new criminal offense prompts revocation and reincarceration. But "technical violations" can trigger this kind of discipline, too. *Id.* ¶¶ 14, 17. Technical violations happen when a supervisee violates a condition of release—like missing an appointment with a CSO, failing to get a job, or skipping a drug test. *Id.* ¶ 15. These violations are "technical" because they stem from supervision conditions, not criminal law. Still, offenders who commit purely technical violations can face jailtime. *Id.* ¶ 16.

* * *

This case arises from that landscape. As certified by this Court, Plaintiffs are a class of "all people with a disability who are on or will be on parole or supervised release in the District of Columbia under the Commission's and CSOSA's supervision, and who need accommodations

in order to have an equal opportunity to succeed on parole or supervised release." *Davis v. U.S. Parole Comm'n*, No. 1:24-cv-01312, 2025 WL 457779, at *9 (D.D.C. Feb. 11, 2025). Each has a physical or mental condition that has complicated his success on supervised release.

Take the named Plaintiff, Kennedy Davis, who is on lifetime parole. Davis Decl., Pls.' Ex. 11 ¶¶ 3–4, ECF No. 61-12. Davis has chronic pain stemming from third degree burns on his bones and ribs. *Id.* ¶¶ 5–6. He also suffers from depression, anxiety, and posttraumatic stress disorder. *Id.* ¶ 7. His frequent medical appointments for his burns and his various mental impairments make it difficult to track and attend his supervision appointments. *Id.* ¶¶ 7, 11–15. When first hospitalized for his burns, for instance, Davis left the hospital against doctor's orders to meet with his CSO. *Id.* ¶ 5.

More recently, though, Davis collided with his supervision terms when he missed a required phone call with his CSO because he had no phone. *Id.* ¶¶ 34–39. Davis's anxiety and PTSD gave him "tunnel vision," and stopped him from thinking of solutions other than calling his mental health advocate. Seltzer Decl., Pls.' Ex. 12 ¶ 15, ECF No. 61-13. After eleven days without contacting his CSO, the CSO pursued revocation. Defs.' Resp. Pls.' SMF ¶ 144. Davis was arrested, spent two months in jail before his revocation hearing (missing previously scheduled burn surgery as a result), and then received a 12-month sentence for his violation. *Id.* ¶¶ 146–48.

Davis's story is not unique. The record details other parolees having similar experiences. Take William Mathis, who served a lifetime parole sentence until his recent death. *Id.* ¶ 152. His congestive heart failure frequently landed him in the hospital. Mathis Decl., Pls.' Ex. 40

¶¶ 4–5, ECF No. 61-22.[2] And his condition also left him dizzy and short of breath, which complicated walking, so Mathis used a cane. *Id.* ¶ 6. Mathis's medical appointments and supervision check-ins often were double booked, too, so he had to choose between them. *Id.* ¶¶ 10–11. He flagged this problem to his CSO several times and gave her a "list of his medical appointments," but she would not change the appointment dates. *Id.* ¶ 12. Trouble arose when Mathis missed three check-ins for medical appointments, prompting the Government to require him to wear a GPS ankle monitor. *Id.* ¶¶ 13, 27. His doctor advised against the device, noting it would dangerously restrict blood flow in Mathis's leg. *Id.* ¶ 17. Even though he told his CSO about the doctor's concerns, she attached it anyway and pain and swelling ensued. *Id.* ¶¶ 15–16.

Soon, Mathis was arrested and held in custody for missing a check-in and testing positive for marijuana. *Id.* ¶¶ 26–27, 30. He told a hearing examiner that he had heart surgery scheduled that week, and though the examiner recommended his release for this "serious medical procedure," the Commission rejected the recommendation and ordered him held in the D.C. Jail. *Id.* ¶¶ 34–35. He stayed there for about a week, missed his heart surgery, and was reinstated to

[2] The Government asserts that because Mathis is deceased, his declaration is inadmissible. *See, e.g.*, Defs.' Resp. Pls.' SMF ¶ 153. Not so. Mathis's declaration is admissible under Federal Rule of Evidence 807, which permits hearsay (1) supported by "sufficient guarantees of trustworthiness" (2) that is "more probative on the point for which it is offered" than any other reasonably obtainable evidence. Fed. R. Evid. 807(a). Mathis's declaration meets the mark. He swore his statements under penalty of perjury. *See Ali v. Rubio*, No. 1:22-cv-02786, 2025 WL 901287, at *3 (D.D.C. Jan. 24, 2025) (admitting deceased declarant's sworn statements under Rule 807 because "willfully lying . . . would have exposed [the declarant] to criminal prosecution"). And both Defendants' supervision records, as well as Davis's declaration and other parolee experiences, corroborate Mathis's account. *Accord Disabled in Action v. City of New York*, 437 F. Supp. 3d 298, 308 n.11 (S.D.N.Y. 2020) (admitting deceased declarant's declarations in ADA class action where corroborated by other class members' declarations). And because Mathis is deceased, his declaration is the most probative evidence available of his experience. The Government's only cited authority deemed a far less reliable out-of-court statement from a deceased declarant inadmissible hearsay. *See United States v. Mason*, 951 F.3d 567, 574 (D.C. Cir. 2020) (declining to admit deceased declarant's statement to a co-conspirator that a different co-conspirator wrote an inculpatory letter). It does not govern here.

supervision under the same terms. *Id.* ¶¶ 34–37.

Other parolees with physical and mental ailments likewise struggled on supervised release. Supervisee 1 has diagnoses for PTSD, Bipolar Disorder, Schizophrenia, Attention-Deficit/Hyperactivity Disorder ("ADHD"), and memory loss from a gunshot wound. *See id.* ¶ 51.[3] Though Supervisee 1 was hospitalized for a gunshot wound, his CSO initially instructed him to appear for an in-person check-in anyway before eventually agreeing to reschedule a few days later. *See id.* ¶ 54. At the rescheduled check-in, Supervisee 1's CSO saw him limping, *id.* ¶ 55, and he acknowledged that Supervisee 1's "mental health issues present a barrier" to his communication abilities, *id.* ¶ 56, but no CSO offered Supervisee 1 accommodations for his physical or mental impairments. *Id.* ¶ 57.

Supervisee 2 suffered two strokes, which left him in a coma for four months, hospitalized for six, and with memory deficiencies afterwards. *Id.* ¶¶ 58–59. He lost contact with his CSO around the time of the strokes, *id.* ¶¶ 58, 61, and did not regain contact for a "four-year" period, Pls.' Resp. Defs.' SMF ¶ 22, ECF No. 94-1. At a 2023 hearing, Supervisee 2 displayed mobility issues when he entered with a cane, and he detailed his memory problems. Defs.' Resp. Pls.' SMF ¶¶ 59, 64–65. While the hearing officer recommended Supervisee 2's release and the reinstatement of his supervision, noting that his medical issues "resulted in [his] inability to report," *id.* ¶ 66, the Commission overrode the recommendation, revoked Supervisee 2's supervision, and imposed a six-month imprisonment sentence, *id.* ¶ 67.

Next is Supervisee 10, who faced an AVR for failing to report while dealing with liver

---

[3] Other than Davis and Mathis, who filed unredacted, public declarations, the Court refers to individuals in the record by the pseudonyms the parties use. This course follows the Court's prior orders allowing the parties to file sensitive information under seal, *see, e.g.*, Minute Order, Feb. 20, 2026, and the discussion about sealed materials at the motion hearing, *see* Hr'g Tr. at 4:24–5:10.

cancer. *Id.* ¶¶ 112–114. His first hearing examiner determined that his cancer treatment affected Supervisee 10's compliance, so he recommended release. *Id.* ¶ 116. The Commission, however, rejected the recommendation despite the cancer, detained Supervisee 10 until his final hearing two months later, and then reinstated him to supervision under the same terms. *Id.* ¶¶ 117–19.

Many other parolees detail various mental health struggles they endured while on supervised release. Supervisee 3, for instance, has anxiety so serious that he spent time in a psychiatric hospital. *Id.* ¶ 70. Five days after his release, he called his CSO, who filed an AVR for failing to report while hospitalized. *Id.* ¶¶ 71–72. While a hearing examiner recommended release, the Commission disagreed and required Supervisee 3's detention until his final hearing. *Id.* ¶¶ 73–74. After a month in jail, the Commission released Supervisee 3 under the same supervision terms with which his hospitalization conflicted. *Id.* ¶ 75.

Supervisee 4 told her CSO that she has mood disorders, depression, and PTSD. *Id.* ¶ 77. Her AVR records suggest that her mental health conditions affect her time management, attendance, and follow through. *Id.* For instance, she knows that her frequent tardiness "is unacceptable but feels as though she does not know how to address it." Sealed Supervisee 4 AVR, Pls.' Ex. 31 at 11, ECF No. 62-15. Her CSO added that Supervisee 4 believes she "suffers from depression" and observed that she lacks "good coping skills" and thus needs extra help to "move forward." *Id.* at 7. When her CSO could not reach her, the CSO learned from Supervisee 4's mother that Supervisee 4 had recently called and "was threatening to commit suicide." *Id.* at 3. Hours later and despite "her mental health issues," *id.*, the CSO filed an AVR against her for all supervision infractions over the prior two years. *Id.* at 2. The Commission executed a warrant for Supervisee 4 in September 2022 but released her from custody early that same month. Pls.' Resp. Defs.' SMF ¶ 40.

The list goes on. Supervisee 6 reported to CSOSA that he had ADHD, and his CSO noted that he "constantly forgets his appointments." Defs.' Resp. Pls.' SMF ¶¶ 87–88 (cleaned up). His CSO filed an AVR for failure to appear and failure to report for drug testing without mentioning Supervisee 6's reported mental health issues. *Id.* ¶ 90.

Supervisee 7 also told his CSO about his depression and suicidal ideations. *Id.* ¶ 91; Sealed Supervisee 7 AVR, Pls.' Ex. 34 at 10–11, ECF No. 62-18. On one occasion, Supervisee 7 arrived at the Supervision Office to report too early, while his CSO "was at lunch." *Id.* at 11. He had to leave because "he had a ride waiting," and he "had to pick up his medication before he ha[d] another mental breakdown." *Id.* at 10. His dealings with his CSO include several references to mental health issues. *Id.* During a meeting when Supervisee 7 requested a "new mental health place" because his current one "isn't helping," his CSO recognized that "mental health issues are barriers" for Supervisee 7 yet told him that "he needs to get himself together" without further assistance. *Id.* at 5. Soon after, his CSO filed an AVR for failure to report and failure to comply with mental health aftercare. *Id.* at 3–4.

Supervisee 8's CSO noted Supervisee 8's reports of various mental impairments, ranging from schizophrenia to ADHD to depression to psychotic disorder to personality disorder. Defs.' Resp. Pls.' SMF ¶ 100. His CSO recognized his "history of chronic long standing mental health concerns that have led to criminality" in filing an AVR against him for various violations. Sealed Supervisee 8 AVR, Pls.' Ex. 35 at 3–4, ECF No. 62-19.

Both the CSOSA and the Commission knew that Supervisee 9 medicates for depression and mood swings. Defs.' Resp. Pls.' SMF ¶ 104. Supervisee 9's CSO filed an AVR, and a hearing officer opined that she takes treatment seriously, and her failure to follow supervision conditions could stem from her mental health conditions. *Id.* ¶¶ 106–07. The hearing officer

recommended an 8-month sentence, but the Commission overrode the recommendation and imposed a 14-month sentence. *Id.* ¶¶ 109–10.

These parolees are not alone. The Government's own estimates show that 90% of those under supervision had some indication of disability. *Id.* ¶¶ 40, 42.

The Government lacks formal means of addressing parolee disabilities. The Commission, for instance, has no standard procedure for requesting, processing, or providing reasonable accommodations to disabled supervisees. *Id.* ¶¶ 181, 258–60. CSOSA likewise has no policy requiring CSOs to consider disabilities when deciding supervision requirements. *Id.* ¶ 193. Indeed, an "exhaustive" search that CSOSA ran revealed no guidance or instructions about how to handle disabilities. *Id.* ¶¶ 182, 214; *see also id.* ¶ 227 (noting that CSOSA has no policy about how CSOs should "decide whether to grant or deny an accommodations request" (cleaned up)). Neither agency has an official who coordinates disability issues or accommodations requests. *Id.* ¶ 236. Neither has a formal grievance process to challenge a failure to provide accommodations. Forsha Dep., Pls.' Ex. 3 at 200:11–14, ECF No. 61-4; Vela Dep., Pls.' Ex. 4 at 153:18–21, ECF No. 61-5. All told, both agencies acknowledge that they have no policies "regarding disabilities" for either when "initially setting supervision requirements" or whenever the need for an accommodation "become[s] known." Defs.' Resp. Pls.' SMF ¶ 190 (cleaned up).

The parolees' difficulty navigating supervision drove them to this Court. Initially, two parolees sued the CSOSA and Commission, claiming disability discrimination in violation of the Rehabilitation Act. Compl. ¶¶ 139–55, ECF No. 1. They also sought a preliminary injunction to stop the Government from continuing the discrimination, Pls.' Mot. Prelim. Inj., ECF No. 3, which this Court granted, *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 26 (D.D.C.

2024). After one passed away, the remaining parolee, Kennedy Davis, moved for class certification, Mot. Class Cert., ECF No. 40, which the Court also granted, *Davis*, 2025 WL 457779, at *9. Discovery ensued, and the parolees then moved for partial summary judgment only on the Government's liability. Pls.' Mot. Summ. J. at 13, ECF No. 61. The Government opposed and crossed moved for summary judgment. Defs.' Opp'n & Cross Mot., ECF No. 71. These motions are now ripe.

**II.**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evidence conflicts, courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The movant bears the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once completed, the other party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up). Unsupported allegations or mere denials in the pleadings are not enough. *See* Fed. R. Civ. P. 56(c). Similarly, because the nonmovant must supply evidence that, if true, would allow a reasonable jury to find in his favor, a "mere . . . scintilla of evidence in support of" the nonmovant's position cannot defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

**III.**

Section 504 of the Rehabilitation Act states: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

To prove disability discrimination under this provision, the parolees "must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under any program or activity" solely by reason of their disability, "and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).

**A.**

The named Plaintiff and class satisfy these elements. The Court considers each in turn.

*Element One.* Section 504 defines the phrase "individual with a disability" as "any person who has a disability" under the Americans with Disabilities Act ("ADA"). 29 U.S.C. § 705(20)(B); *see also id.* § 794(a). The ADA, in turn, says "[t]he term 'disability' means . . . a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

This Court previously concluded that the named Plaintiff, Kennedy Davis, "undisputedly" satisfied this element, *Mathis*, 749 F. Supp. 3d at 15–16, and the full record compels the same conclusion as to him and the class now. Davis still has trouble walking because of his third-degree burns, and his anxiety makes problem solving difficult. Davis Decl.,

Pls.' Ex. 11 ¶¶ 5–6, 18, 21. For the rest of the class, the Government admits that "the class, by definition, includes 'all people with a disability . . . .'" Defs.' Resp. Pls.' SMF ¶ 35.

Numerous parolees in the summary judgment record bear that out. Mathis has congestive heart failure, which substantially limits his ability to walk. Mathis Decl., Pls.' Ex. 40 ¶¶ 4, 6. Supervisee 1 has a limp, diagnoses for several mental health issues including PTSD, bipolar disorder, and schizophrenia, and he suffers from memory loss. *See* Defs.' Resp. Pls.' SMF ¶¶ 53–56. Supervisee 2 walks with a cane and has memory problems after enduring two strokes and a four-month coma. *Id.* ¶¶ 58–64. Supervisee 10's liver cancer treatment made finding stable housing harder. *Id.* ¶¶ 112–115; Supervisee 10 Commission Report, Pls.' Sealed Ex. 37 at 2, ECF No. 62-21. Supervisee 3's anxiety landed him in a psychiatric hospital. Defs.' Resp. Pls.' SMF ¶ 70. Supervisee 8's spinal injury and broken bones restrict his mobility on top of his schizophrenia, depression, and psychotic disorder that put him at "risk." *Id.* ¶¶ 100–01 (cleaned up). Walking, thinking, concentrating, and interacting with others are major life activities, which the Government does not dispute. *See* 28 C.F.R. § 35.108(c)(1). Between these parolees' limitations, then, there is no question that the record is replete with qualifying disabilities.

*Element Two*. The parolees are "otherwise qualified" for supervision. *See Am. Council of the Blind*, 525 F.3d at 1266. An individual with a disability is "qualified" for a program if he meets "the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity." 28 C.F.R. § 39.103. Here, the relevant government programs are parole and supervised release. Kennedy Davis is on parole. Defs.' Resp. Pls.' SMF ¶ 30. The rest of the class, by definition, also is "on or will be on parole or supervised release in the District of

Columbia," *id.* ¶ 34, so they are also "otherwise qualified" for supervision. That satisfies the second element.

*Element Three.* By providing no consistent means of accommodating disabilities, the Government subjected parolees to discrimination. *See* 29 U.S.C. § 794(a).[4]

As the Supreme Court has explained, discrimination "against the handicapped" is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). That is why § 504 does not require proof of discriminatory intent for a plaintiff to prevail. *See id.* at 294–95. That is also why, at times, § 504 may require some degree of affirmative effort by the accommodations provider to adequately address a disability. *Cf. Chenari v. George Washington Univ.*, 847 F.3d 740, 748 (D.C. Cir. 2017) (contemplating cases "where the plaintiff's need for an accommodation is so apparent that the defendant must offer one regardless of whether the plaintiff requested it"). The crux of the § 504 inquiry boils down to whether a government agency has denied the disabled "meaningful access" to the relevant government program or benefit. *Am. Council of the Blind*, 525 F.3d at 1267.

The D.C. Circuit elaborated on this standard in *American Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008). There, an organization representing the blind and two visually impaired individuals challenged the Treasury Secretary's failure to accommodate their condition in issuing U.S. paper currency. *Id.* at 1261, 1267. Because "paper money springs from the world of the sighted," *id.* at 1269, the blind could not determine the denominations of paper

[4] Parolees' "failure-to-accommodate" theory suffices for a discrimination claim under § 504 of the Rehabilitation Act. *See Chenari v. George Washington Univ.*, 847 F.3d 746–47 (D.C. Cir. 2017) (addressing plaintiff's discrimination claim based on a failure-to-accommodate theory); *Davis v. Shah*, 821 F.3d 231, 259–60 (2d Cir. 2016) ("A plaintiff may base her [section 504] discrimination claim on . . . failure to make a reasonable accommodation.").

currency "without either the assistance of others or the use of expensive electronics," *id.* at 1267. The Circuit found this "dependence . . . anathema to the stated purpose of the Rehabilitation Act." *Id.* at 1269. While these "coping mechanisms" might have made it possible to "participat[e] in economic activity" somehow, they placed the blind at a "distinct disadvantage." *Id.* That disparity, not whether the blind had *any* means of using paper currency, meant they lacked "meaningful access" to U.S. currency. *Id.*

Sometimes, the disabled seek individual accommodations, not one specific accommodation for an entire group. *Chenari v. George Washington University*, 847 F.3d 740 (D.C. Cir. 2017), provides guidance for this kind of claim. There, a student sued George Washington University ("GW") after the school expelled him for cheating on an exam by continuing to bubble in answers for two minutes longer than testing rules allowed. *Id.* at 743–44. He argued that GW violated the Rehabilitation Act by expelling him rather than accommodating his ADHD with extra exam time. *Id.* at 746. His theory fell short for a few reasons.

First, GW never denied him any requested accommodation. *Id.* at 748. To the contrary, the record made it "abundantly clear" that GW offered the student accommodations like counseling, during his time at the school. *Id.* Second, and in "addition to these express offers of assistance," GW offered several paths for students to request accommodations. *Id.* GW had "an Office of Disability Support Services" ("the Office") that received and evaluated accommodation requests. *Id.* Indeed, the Dean of Students "tells all first-year students that if they have a disability and need to request an accommodation, it is the student's responsibility to go to [the Office] to pursue that matter." *Id.* (cleaned up). Aside from the Dean, GW's "First Year Survival Guide" likewise instructs "[s]tudents who suspect that they may have a disability[] which may require an accommodation" to contact the Office." *Id.* (cleaned up). Lastly, the

Office "maintains a website that walks students through the process for obtaining a reasonable accommodation." *Id.* Summing up, because GW "not only twice offered" the student accommodations through counseling, "but also" offered "all students a procedure for obtaining any reasonable accommodation they might need," the Rehabilitation Act demanded nothing more. *Id.* at 749.

On the other end of the spectrum, courts often find disability discrimination where government agencies lack procedures for handling disabilities like those in *Chenari. See, e.g.*, *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1032 (S.D.N.Y. 1995) ("In [the prison's] failure to provide notice of rights to accommodations and available assistance, to consult with disabled inmates as to the most effective form of accommodation . . ., and to formulate and effectuate grievance procedures regarding accommodations, Defendants have violated the ADA."); *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 556 (D. Md. 2019) ("[T]he undisputed failure of Defendants to implement policies and procedures designed to inform inmates of their legal rights may be used as evidence that Defendants violated the ADA or the Rehabilitation Act . . . by failing to provide reasonable modifications."); *Armstrong v. Brown*, 857 F. Supp. 2d 919, 933 (N.D. Cal. 2012) (finding an ADA violation where prisoners lacked "access to functional and timely grievance procedures at county jails to request and obtain disability accommodations"). That makes sense. If one requires disability accommodations to obtain "meaningful" access to a government benefit but cannot, in reality, seek out that accommodation, § 504's guarantees mean little. *See Am. Council of the Blind*, 525 F.3d at 1267.

Considering these guideposts, the Government falls short of its obligation in this case. The parolees do not seek one specific accommodation for all of them. Rather, they want a meaningful chance at requesting and obtaining disability accommodations in the first place. But

the Government supplies no procedures beyond those courts often reject—much less anything comparable to those that *Chenari* details.

As the parolees repeatedly emphasize, and the Government repeatedly admits, neither CSOSA nor the Commission has any standard procedure for requesting, processing, or providing reasonable accommodations to disabled supervisees. Defs.' Resp. Pls.' SMF ¶ 181 ("The Commission has no formal, official, or standardized system or process for providing reasonable accommodations to individuals with Disabilities on Supervision." (cleaned up)); *id.* ¶ 190 ("Defendants admit that they have not put in place any guidance, instructions, or policies regarding disabilities—including guidance/instructions/policies requiring assessing people's disability-related accommodation needs when initially setting supervision requirements, requiring provision of reasonable accommodations for people's disabilities as they become known, or providing a means by which people with disabilities can request reasonable accommodations" (cleaned up)). Unsurprisingly, then, the Government lacks any records showing which parolees have requested accommodations and whether they require them. *Id.* ¶ 258 ("The Commission does not maintain a list of supervisees with disabilities or track disability accommodations provided by CSOSA." (cleaned up)); Forsha Dep., Pls.' Ex. 3 at 165:01–18 (explaining that CSOSA lacks a list of accommodations requests and has not tried to create one).

Also unsurprisingly, parolees with severe physical and mental impairments rarely requested, were never meaningfully considered for, and never received disability accommodations. Instead, they endured supervised release with conditions that made compliance harder. Davis, recall, once left the hospital early and against doctor's orders to meet his CSO for a check-in because he had no alternative arrangement. Davis Decl., Pls.' Ex. 11 ¶ 5.

His anxiety and PTSD made tracking appointments harder and resulted in a missed check-in. *Id.* ¶ 35; Seltzer Decl., Pls.' Ex. 12 ¶ 15. That violation prompted Davis's arrest, Defs.' Resp. Pls.' SMF ¶ 144, and two months in jail, during which he missed a previously scheduled surgery, *id.* ¶¶ 145–46. Mathis, meanwhile, asked his CSO for check-in times that did not conflict with his medical appointments but was denied. Mathis Decl., Pls.' Ex. 40 ¶ 12. Supervisee 1's gunshot wound, hospitalization, subsequent limp, and mental health posed obvious conflicts with his check-ins. *See* Defs.' Resp. Pls.' SMF ¶¶ 54–56. Supervisee 2's two strokes and resulting memory problems hindered him from timely reporting to his CSO, *id.* ¶ 58, 66, but he ended up in jail for this failure anyway, *id.* ¶ 67. Ditto for Supervisee 10, whose liver cancer treatment contributed to his non-compliance according to his initial hearing officer, *id.* ¶ 115, yet whose final hearing officer reinstated him to the same supervision terms that conflicted with his cancer treatment, *id.* ¶¶ 117–19. So too for Supervisee 3, whose anxiety landed him in a psychiatric hospital. *Id.* ¶ 70. He earned a technical violation for failing to report while there. *Id.* ¶ 72. This misstep led to a month in jail before his reinstatement to the same supervision terms. *Id.* ¶ 75.

None of these accounts (nor those of remaining parolees) mentions or otherwise reflects any path, let alone a clear and consistent one, to request disability accommodations, much less a procedure for granting them. *Cf. Chenari*, 847 F.3d at 749 (listing options GW had for students to request accommodations). None suggests that the Government regularly addresses disabilities through other, informal means. *Cf. Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014) (describing informal accommodations processes in the employment discrimination setting). And all portray parolees who, because of their disabilities, face "obstacle[s] that impede[] their access" to various features of supervised release (in-person check-ins, phone calls, and

scheduling, to name a few). *Am. Council of the Blind*, 525 F.3d at 1267. Because the parolees lack "meaningful" ways to request accommodations to address the discrepancy, the Government denies them the equal access the Rehabilitation Act promises. *See id.*

*Element Four.* The parolees satisfy the final element because parole and supervised release count as "program[s] or activitie[s] . . . carried out by . . . federal executive agenc[ies] or with federal funds." *Id.* at 1266. The phrase "program or activity" carries an "expansive meaning" that encompasses "anything a Federal agency does." *Id.* at 1266 n.13 (cleaned up). And CSOSA and the Commission both count as federal agencies. *See* Parole Commission and Reorganization Act, Pub. L. No. 94-233, § 4202, 90 Stat. 219, 219 (1976) (establishing the Commission "as an independent agency in the Department of Justice"); Revitalization Act § 11233(a) (establishing CSOSA "within the executive branch of the Federal Government"). Indeed, the Government recognizes that both entities are "federal[ly] funded," Defs.' Reply at 10, ECF No. 89, further confirming that Davis and the class satisfy the fourth element.

**B.**

The Government's battery of rebuttals—challenging the first three elements of the Rehabilitation Act—proves unpersuasive. Starting from the top, the Government questions whether the sample parolees have disabilities at all. Because they did not supply medical documentation or third-party opinions proving their disabilities, the Government says, they do not satisfy this requirement. Defs.' Opp'n & Cross Mot. at 17. But there is "certainly no general rule that medical testimony is always necessary to establish disability." *See Katz v. City Metal Co.*, 87 F.3d 26, 32 (1st Cir. 1996). And the Government identifies no persuasive authority to the contrary. In its briefing, it points to *Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486 (S.D.N.Y. 2013), but there, the parties "agree[d] plaintiff is disabled" and disputed only whether

he needed a specific accommodation to complete his job, *id.* at 492. *Reyes* says nothing about needing a medical diagnosis to prove a disability. *Carten v. Kent State University*, 78 F. App'x 499 (6th Cir. 2003), fares no better. This unpublished, out-of-circuit case mentioned the plaintiff's need for a "proper diagnosis" of his learning disability where the record included medical opinions indicating that he lacked such disability. *Id.* at 501.

Here, by contrast, the Government "has not rebutted" the declarations, depositions, and AVR records' numerous references to the parolees' disabilities with other evidence. *See Brown v. Fogle*, 867 F. Supp. 2d 61, 64 (D.D.C. 2012). It supplies nothing, for instance, suggesting that a parolee faked a limp, bluffed about his cancer, lied about hospitalization when he was elsewhere, or pretended to have schizophrenia. *Cf. Brownfield v. Bair*, 541 F. Supp. 2d 35, 45–46 (D.D.C. 2008) (finding a fact dispute where non-movant's "deposition testimony and affidavits" contradicted movant's affidavits' portrayal of equal workload across employees). To the contrary, Government records show CSOs and Commission hearing officers routinely acknowledging parolees' impairments without questioning them. *See, e.g.*, Defs.' Resp. Pls.' SMF ¶ 43 (noting that CSOSA has observed a proliferation of mental health issues in recent years); *id.* ¶¶ 122–26 (describing CSOSA records showing that Davis was on crutches, had surgeries for his burns, was "receiving mental health . . . services" in 2017 and 2019, that he had "dual diagnoses," including a mental health issue, and that his mental health was a "barrier to change" (cleaned up)); *id.* ¶¶ 53–56 (recounting CSOSA records noting Supervisee 1's conflict between supervision and hospitalization); *id.* ¶¶ 58–59, 64 (describing Commission records noting that Supervisee 2 walked with a cane and displayed verbal and memory problems at his hearing). In any event, the Government (emphatically) distanced itself from this point at oral argument. *See* Hr'g Tr. at 36:23–37:01 ("I'm not saying they need medical records. That's

absolutely not what I'm saying. I'm saying that the disability . . . needed to be made known . . . .). Medical documentation thus bears little on the parolees' claims.

On the second element, the Government questions whether the parolees are "otherwise qualified" for supervision or parole. Gov't. Opp'n & Cross. Mot. at 18; Hr'g Tr. at 25:24–26:10. The Government "agree[s] that these supervisees . . . are eligible for supervision." Hr'g Tr. at 27:22–28:04. But it contends that the parolees must always "remain[] eligible" for the program to *ever* qualify under the Rehabilitation Act. *Id.* at 28:02–04. And parolees here have not shown this much, the Government continues, because one could theoretically "violate one of [his supervision] conditions," which could theoretically result in revocation and reincarceration and thus ineligibility for supervision. *Id.* at 26:23–27:05.

This view strains credulity. The possibility that a parolee may one day "no longer be eligible to participate in supervised release" does not render him permanently unqualified for supervision under the Act. *Id.* at 26:24–25. When pressed on the point at oral argument, the Government pointed to *Southeastern Community College v. Davis*, 442 U.S. 397 (1979), as support. *See* Hr'g Tr. at 28:06–07. The relevant portion states that an "otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Se. Cmty. Coll.*, 442 U.S. at 406. But nothing about this instruction means the Rehabilitation Act covers only parolees who never violate a release condition. The contrast between this case's context and *Southeastern Community College*'s shows why. In *Southeastern Community College*, the program at issue was a nursing program that required admission. *Id.* at 397. Here, the programs are parole and supervised release, neither of which requires admission (to the contrary, they are mandated as part of a criminal sentence). Of course, Plaintiffs do not seek to be under supervision, courts require it. So while *Southeastern Community College* questioned

whether a hearing-impaired, aspiring nurse could overcome her disability to meet essential, physical requirements of clinical training, *id.* at 414, no part of the case requires asking whether any parolee would make the cut for supervised release. Nor has the Government ever suggested one of these disabled parolees should be discharged from supervision because of his disability. Indeed, there is no dispute that Davis and the class are under supervision. There is thus no dispute that they are otherwise qualified for supervision. Hypothetical future changes to that supervision status will not sink the parolees' claim.

Turning to the third element—whether the Government discriminated against the parolees through its general failure to accommodate disabilities—the Government tries a few angles. To start, it claims that it adequately accommodates disabilities through its current "ad hoc" approach to parolees' disabilities. Defs.' Opp'n & Cross Mot. at 19. This argument does not withstand scrutiny. There may be cases where an unwritten, ad hoc approach to disabilities could provide the meaningful relief the Rehabilitation Act requires. But an inconsistent and unreliable ad hoc approach does not. *See, e.g.*, *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 642, 643–44 (S.D.N.Y. 2013) (finding ad hoc disability accommodations insufficient to provide meaningful access to the City's emergency preparedness program). The Government supplies little more than that. Without record citations, the Government asserts that on "numerous" occasions, it accommodated disabilities without an accommodations request by allowing telephonic check-ins, or making referrals to mental health services. Defs.' Opp'n & Cross Mot. at 19. Bald assertions untethered from record evidence do not carry the day. *Payne v. District of Columbia*, 741 F. Supp. 2d 196, 216 n.9 (D.D.C. 2010) ("The Court does not accept factual assertions by counsel that are not supported with citations to the record, nor does it scour the record for evidence that will support a party's claims.").

And what citations the Government supplies elsewhere do not fill the gaps. The Government points to one CSO's reminders to one parolee to charge his GPS as evidence of accommodating disabilities. Defs.' Opp'n & Cross Mot. at 19 (citing Defs.' Mitchell Dep. at 88:18–23, ECF No. 78-7). But a single CSO's treatment of a single parolee does not reflect cogent, consistent means of handling disabilities across the CSOSA or the Commission. Indeed, the record also shows one-off examples where the Government declined a request for a telephonic check-in or at-home check-in despite known physical or mental impairments. *See* Defs.' Resp. Pls.' SMF ¶¶ 54–55, 95; Davis Decl., Pls.' Ex. 11 ¶ 26 (noting that of the five to seven different CSOs parolee Davis had, only one "helped" his mobility limitations by, for example, coming to meet Davis "instead of making [him] go to her all the time"); Mathis Decl., Pls.' Ex. 40 ¶ 12 (noting that parolee Mathis asked to schedule supervision check-ins around his many medical appointments for heart failure but was denied). A stray example will not shield the supervision system from liability.

Next, the Government cites a Commission decision to release Mathis from detention and reinstate him to supervision despite its finding that Mathis violated his supervision conditions. Defs.' Opp'n & Cross Mot. at 19. But that decision (also a one-off) ultimately subjected Mathis to the same supervision conditions that made compliance harder in the first place. *See* Defs.' Resp. Pls.' SMF ¶¶ 153–66 (detailing how Mathis's medical appointments and mobility limitations conflicted with his supervised release conditions). And by that point, he had endured jailtime during the lead up to the Commission's hearing, missing congestive heart failure surgery as a result. *Id.* ¶¶ 162–65. Mathis thus needed an accommodation that accounted for his medical demands long before his final hearing. *Cf. Lejuez v. Turner*, No. 17-cv-1767, 2020 WL 6270747, at *4 (D.D.C. Oct. 23, 2020) (rejecting a "no-harm-no-foul" rationale by an employer who

eventually placed a disabled employee on paid leave because a "*de facto*" grant "cannot make up for a failure to formally grant reasonable accommodation under the Rehabilitation Act."). Eventually helping Mathis by letting him out of jail does not make up for the initial injury. *See Am. Council of the Blind*, 525 F.3d at 1270 (rejecting the "astounding proposition" that "the visually impaired have not been denied meaningful access to U.S. paper currency in view of the absence of evidence of their being frequently defrauded").

Declarations from CSOSA official Kaitlin Forsha and Parole Commission official Oscar Vela describing the Government's "flexible" approach to disabilities do not help either. Forsha Decl. ¶ 5, ECF No. 74-3. Parties cannot "create[] an issue of material fact by contradicting prior sworn testimony . . . ." *See Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007). But that is what the Government tries to do through Forsha and Vela's late-breaking declarations. In Forsha's declaration from April 2026, for instance, she paints a picture of some process, noting that CSOSA's intake forms provide a box for disabled parolees to check if they are disabled. Forsha Decl. ¶ 5. She claims that an "Offender Processing Specialist" then asks follow-up questions about the disability based on that form and his own observations and then documents the information in an electronic case management system. *Id.* Forsha continues that CSOs also consider disabilities and accommodate them as necessary. *Id.*

The trouble is, months before this declaration, Forsha testified differently. At her deposition in December 2025, Forsha stated that "during the intake process," there is no "informal system of assessing whether an individual who does have disabilities needs accommodations." Forsha Dep., Pls.' Ex. 3 at 179:18–180:01. She added that aside from a few distinct disabilities (say, if someone is "hearing voices" or having a "manic episode") neither CSOs nor Offending Processing Specialists are "trained to generally identify and observe

disabilities." *Id.* at 179:06–17. She never mentions back-and-forth with Offender Processing Specialists, but she claims that the only way to seek an accommodation is through a CSO. *Id.* at 167:03–06; 169:01–10.

Vela's declaration focusing on the Commission entails similar inconsistencies. *Compare* Vela Dep., Pls.' Ex. 4 at 100:19-101:13, ECF No. 61-5 (testifying, in December 2025, that the Commission does not provide training to hearing examiners about (1) the Rehabilitation Act; (2) determining whether someone has disabilities; or (3) determining appropriate accommodations) *with* Vela Decl. ¶ 28 (claiming in spring 2026 that, for several months before her December 2025 deposition, the Commission had included training on reasonably accommodating disabilities). Forsha and Vela's depositions, in short, confirm the Government's lacking disability procedures, but their later declarations claim that some degree of procedures exist. The contrast means that the later declarations count for little. *See Galvin*, 488 F.3d at 1030.

More, and even if the Government cites the Vela and Forsha declarations as evidence of newly implemented procedures, that angle likewise fails. Given the broad, system-wide failures the parolees repeatedly allege and the Government repeatedly admits, a few high-level descriptions of (mostly non-final) efforts to update CSOSA and Commission procedures do not reroute the case. *Cf. Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1144 (D.C. Cir.) (describing the "formidable burden" to establish mootness "due to voluntary cessation" (cleaned up)); *see also infra* Part III.C (rejecting the Government's prudential mootness argument).

Recycling an old argument, the Government also claims that the parolees have not shown that their failure to succeed on supervised release stemmed "solely" from their disabilities. Defs.' Opp'n & Cross Mot. at 21. As support, it lists several non-disability related reasons why

various parolees violated their supervised release conditions. *See id.* at 20. It did the same at oral argument. *See* Hr'g Tr. at 39:25–40:18.

There are a few problems with this. First, the Government inadequately supports these points. Its record citations in its briefs do not point to specific exhibits or portions of its statement of undisputed material facts. *See* Defs.' Opp'n & Cross Mot. at 21. In its responses to Plaintiffs' statement of undisputed material facts, the Government routinely "refer[s] to" a supervisee's "AVR for a complete and accurate statement of its contents" rather than pointing out specific portions that undermine Plaintiffs' case. *See, e.g.*, Defs.' Resp. Pls.' SMF ¶ 90. Even when the Government supplies page numbers to a specific AVR, some do not appear to correspond to any pages in the Government's compiled exhibits. *Compare* Defs.' Opp'n & Cross Mot. at 20 (citing "MATHIS-LW-CSOSA-026236-37") *with* Gov't Sealed Combined Exhibits, ECF No. 75 (not listing this page). The Government was no more specific at oral argument. Hr'g Tr. at 40:23–41:01 (noting without specific exhibits at-the-ready that parolees' details come from "the large Exhibit 1 through 33" filed at "Docket 75"). Because "judges are not like pigs, hunting for truffles buried in briefs or the record," *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) (cleaned up), such haphazard citations are insufficient.

This deficiency aside, the Court has twice rejected this very argument in prior litigation stages, and it does so again now. What matters for the parolees' claim is simply that their disabilities made it harder for them, compared to their non-disabled counterparts, to participate in the Government's supervision programs without accommodations. *See Mathis*, 749 F. Supp. 3d at 1 ("[T]he Government injured [the parolees] by requiring them to navigate supervision without offering reasonable accommodations."). The law requires no further downstream harms like revocation or reincarceration. *See Am. Council of the Blind*, 525 F.3d at 1270. So even if

some parolees *eventually* faced AVRs for failed drug tests or criminal violations unrelated to their disabilities, their Rehabilitation Act injuries ripened long before then and remain even after those additional violations occur.

The Government next argues that because parolees failed to request disability accommodations, the Government had no duty to provide them. *See* Defs.' Opp'n & Cross Mot. at 18–19. True, government entities typically accommodate disabilities upon request, unless a "plaintiff's need for an accommodation is so apparent that the defendant must offer one regardless of whether the plaintiff requested it." *See Chenari*, 847 F.3d at 748. Also true, those entitled to accommodations without requesting them typically have more obvious disabilities that call for a more obvious accommodation than the parolees, whose disabilities include some comparatively latent mental impairments. *See Windham v. Harris Cty.*, 875 F.3d 229, 236 n.8 (5th Cir. 2017) (explaining that notice refers to knowledge of both a disability *and* "its consequential limitations"); *cf. Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269–70 (D.D.C. 2015) (requiring communications accommodations for deaf prisoner who did not request them); *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 869 (9th Cir. 2022) (noting that deaf patients had an obvious need for communications accommodation).

Still, this argument falls short twice over. *First*, some parolees *did* request adjustments to their supervision terms for their disabilities. *See, e.g.*, Mathis Decl., Pls.' Ex. 40 ¶ 12 (noting Mathis requested that his CSO "account for" "appointments at the VA hospital"); Defs.' Resp. Pls.' SMF Resp. ¶ 95 (noting Supervisee 7 "requested a home visit" from his CSO); *see also Murphy v. District of Columbia*, 590 F. Supp. 3d 175, 183 (D.D.C. 2022) ("[A]ccommodation requests do not have to be in writing . . . or formally invoke the magic words 'reasonable

accommodation.'" (cleaned up)). Those inquiries did not prompt the requested accommodations or further discussions on the subject.

*Second*, the core of the parolees' argument is that the Government failed to supply meaningful ways to request accommodations in the first place. Pls.' Mot. Summ. J. at 31. And the Court agrees that this shortcoming poses a problem. *See supra* Part III.A. Claiming to lack notice does not get the Government off the hook. If anything, remaining unaware of the parolees' need for accommodations despite knowing that large portions of their ranks have disabilities, *see* Defs.' Resp. Pls.' SMF ¶ 40 (noting that CSOSA estimates that about 90% under its supervision had some indication of disability), and despite implementing no systems to address those disabilities, reflects "a failure of the [Government] to discharge is statutory responsibility," not the reverse. *See Chisolm v. McManimon*, 275 F.3d 315, 331 (3d Cir. 2001).

Indeed, supervision's criminal justice setting, compared to opt-in programs the government typically operates, reinforces this conclusion. As then-Judge Ketanji Jackson explained, the government's accommodation obligations are at an "apex" in prison given the "uneven power dynamic between prison officials and inmates" and because the "departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all." *Pierce*, 128 F. Supp. 3d at 269 (emphasis omitted). While these parolees are not typically incarcerated, they still labor under a similar governmentally-mandated regime in which there is a significant power and informational imbalance between them and the officers supervising them. In such a situation, and where stark punishments face parolees who upset their supervisors, it may be unrealistic to expect them to assert their rights or seek special accommodations.

In contrast, when disabled individuals *choose* to participate in a government program, say, by applying for or attending graduate school, *see, e.g.*, *Se. Cmty. Coll.*, 442 U.S. at 406; *Chenari*, 847 F.3d at 743, and they need accommodations to do so, power and coercion considerations are not at play. For these more run-of-the-mill government programs, accommodations help individuals do something they *want* to do—but something they do not *have* to do. The mandatory nature of supervised release, as well as CSOSA and the Commission's substantial control over the parolees, thus underscores the Government's weighty obligation here.

Finally, the Government claims that, even if the parolees have disabilities, various parts of their accommodation proposals would unduly burden the Government and fundamentally alter the nature of supervised release. Defs.' Opp'n & Cross Mot. at 24–25. The Court appreciates the Government's strong interest in effective administration of its parole and supervised release programs, but this concern does not carry the day. Because "a range of accommodations" would satisfy the Government's obligation under the Rehabilitation Act, it can defeat summary judgment on liability only by showing that "all" possible accommodations "would pose an undue burden." *Am. Council of the Blind*, 525 F.3d at 1271; *id.* ("[L]iability under section 504 requires only that the least burdensome accommodation not be unduly burdensome.").

The Government has not done so. It cherry-picks a few possible accommodations that it claims the parolees propose (without citations to these proposals), *see, e.g.*, Defs.' Opp'n & Cross Mot. at 24 (claiming that parolees "seek to eliminate in-person check-ins altogether for supervisees whose disabilities make in-person check-ins more difficult"), and dismisses them as overly burdensome, *see id.* at 24–25. In its reply, the Government clarifies that its objection is "more narrow" and questions only a requirement that the Government must "undertake

assessments of whether any unreported condition exists that might constitute a disability." Defs.' Reply at 26. Even this "narrow" objection has no place. At oral argument, the parolees specifically conceded that the obligation to accommodate stems from "notice of the disability," not from some earlier requirement that the Government investigate possible disabilities. Hr'g Tr. at 13:02–04. Claiming that one or two hypothetical accommodations—that the parolees have not proposed—would impose an undue burden will not defeat summary judgment on liability. The Court will address remaining questions about the scope of the appropriate remedy at a later stage. *See Franklin v. District of Columbia*, 163 F.3d 625, 629 (D.C. Cir. 1998) ("[C]ourts often resolve questions of liability first and questions of relief later.").

**C.**

The Government's final smattering of arguments concerns alleged deficiencies beyond the core Rehabilitation Act elements. It contends the Court should not consider testimony from the parolees' expert witness. Defs.' Opp'n & Cross Mot. at 25. But none of the Court's conclusions hinge on her findings or otherwise require expert testimony. *See Dinkel v. MedStar Health Inc.*, 99 F. Supp. 3d 37, 38 (D.D.C. 2015) ("Because the Court concludes that Plaintiffs' FLSA claim does not succeed even if the expert witness testimony they submitted were admissible, the Court need not resolve Defendants' . . . Motion to Exclude Testimony at this time."). So even if the parolees' expert testimony includes impermissible legal conclusions or otherwise inadmissible testimony, it makes no difference to the Court's ruling on summary judgment.

Next, the Government notes that since the parolees' case began, it has implemented several measures to improve accommodations procedures. Defs.' Opp'n & Cross Mot. at 32–33. Those efforts, the argument goes, undermine the parolees' claims for relief, so the Court should

deem the case "prudentially moot" and decline to rule. *Id.* at 32. This tack fails a few times over. *First*, given the Supreme Court's admonitions that a "federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (cleaned up), the Court cannot simply decide against ruling on a matter for convenience. *Second*, and to repeat, the Court need not decide the appropriate remedy at this stage. *Third*, even if the Court embraced the so-called "prudential mootness doctrine," that would not prevent a decision. Many changes the Government mentions are pending. *See* Forsha Decl. ¶ 6 (describing "pending policy" updates to intake forms); Vela Decl. ¶ 29 (noting that the Commission "is currently in the process" of adding notices to inform parolees' of their right to request accommodations). It is thus less than "clear[]" that the Government has so "significantly" changed its behavior that the risk of continued "confrontations" between the parolees and the Government is "too small" to warrant a decision from this Court. *See Cmty. for Creative Non-Violence v. Hess*, 745 F.2d 697, 701 (D.C. Cir. 1984). The Court will not tie its own hands so the Government can evade liability.

Last and least, the Government invokes the so-called *Burford* doctrine. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Under *Burford*, "[w]here timely and adequate state-court review is available," federal courts "must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (cleaned up).

Nothing about this case calls for this "extraordinary and narrow exception" to the Court's "duty" to "adjudicate [the] controversy properly before it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (cleaned up). For starters, a federal court ruling would not interfere with a "state administrative agenc[y]" (even assuming D.C. agencies qualify as "state" entities). *New Orleans Pub. Serv., Inc.*, 491 U.S. at 361. Individual supervised release hearings—arguably, the only local agency proceedings relevant to this case—serve as evidence for the discrimination claim at hand but would remain intact after this Court's decision. *Cf. Alabama Pub. Serv. Comm'n v. Southern R. Co.*, 341 U.S. 341, 348 (1951) (directing a case to proceed in state court under *Burford* after concluding that "an integral part" of the state's "regulatory process" entailed "concentrat[ing]" appeals of state commission decisions "in one" state "circuit court" (cleaned up)). More, no "difficult question of state law" is at issue. *See New Orleans Pub. Serv., Inc.*, 491 U.S. at 361 (cleaned up); *id.* at 362–63 (rejecting *Burford* abstention in a dispute about whether FERC regulations preempted a state's ratemaking order). The only question is whether two federal agencies, represented here by the U.S. Attorney's Office, complied with *federal* law (the Rehabilitation Act). It thus makes little difference, contrary to the Government's view, that the CSOSA and Commission were set up under and must comply with D.C. law. *See* D.C. Code § 24-133(b)(2)(B), (c)(2), (d). *Burford* abstention does not apply.

**IV.**

In sum, between the Government's lack of processes for accommodations requests, accommodations decision-making, and general handling of parolees disabilities, and considering multiple representative parolees who, because of the Government's wholesale deficiencies, have no meaningful chance at requesting or obtaining accommodations, Plaintiffs have shown that the

Government has not complied with the Rehabilitation Act. Summary judgment for them on liability is thus appropriate.

A separate Order will issue today.

2026.09.25
10:53:28
-04'00'

Dated: September 25, 2026

TREVOR N. McFADDEN, U.S.D.J.